# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

| | |
|---|---|
| STATE BOARD OF ADMINISTRATION OF FLORIDA, | |
|     *Plaintiff,* | |
| *v.* | No. 2:25-cv-_____ |
| TARGET CORPORATION, BRIAN C. CORNELL, DAVID P. ABNEY, DOUGLAS M. BAKER, JR., GEORGE S. BARRETT, GAIL K. BOUDREAUX, ROBERT L. EDWARDS, MELANIE L. HEALEY, DONALD R. KNAUSS, CHRISTINE A. LEAHY, MONICA C. LOZANO, GRACE PUMA, DERICA W. RICE, AND DMITRI L. STOCKTON, | JURY TRIAL DEMANDED |
|     *Defendants.* | |

**CLASS ACTION  COMPLAINT FOR VIOLATION OF SECTIONS 10(b), 14(a) & 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULES 10b-5 & 14a-9 PROMULGATED THEREUNDER**

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT .................................................................. 4

II.    PARTIES ............................................................................................... 15

III.   JURISDICTION AND VENUE ............................................................. 18

IV.    CONFIDENTIAL WITNESS ................................................................. 19

V.     CONTROL PERSON ALLEGATIONS ................................................... 20

VI.    SUBSTANTIVE FACTUAL ALLEGATIONS ......................................... 20

       A.    Under Defendant Cornell as Board Chairman and CEO,
             Target Undertook ESG/DEI Motivated LGBT Activism
             to Benefit "Stakeholders" ................................................... 21

       B.    Target's LGBT Activism Repeatedly Provoked Consumer
             Backlash and Subjected Target to Social and Political Risks ............. 50

       C.    Despite Increasing Risks, Target Drastically Expanded Its LGBT
             Activism with the 2023 LGBT-Pride Campaign............................. 58

       D.    Target's Disastrous 2023 LGBT-Pride Campaign Triggered
             Consumer Boycotts that Cost Investors Billions............................ 66

VII.   DEFENDANTS' MATERIAL FALSE AND MISLEADING
       STATEMENTS AND OMISSIONS......................................................... 87

       A.    Target Failed to Disclose Risk of Consumer Boycotts
             Because of Its ESG/DEI Initiatives in the 2021 & 2022
             Annual Reports.................................................................... 87

       B.    Target and Defendant Cornell Misleadingly Downplayed the
             Severity of Consumer Backlash to the 2023 LGBT-Pride Campaign... 97

       C.    Target's Board Assured Investors of its Oversight of
             "Social and Political Issues and Risks" to Target's ESG/DEI
             Initiatives in the 2022 & 2023 Proxy Statements ............................ 98

       D.    Target's Board Assured Investors that Target's ESG/DEI
             Initiatives Aimed to Increase Shareholder Value............................ 114

E.    Target's Board Claimed Executive Compensation Plans Were Designed to Align with Shareholder Value ............................ 119

VIII.  CLASS ACTION ALLEGATION…………………………………………..124

IX. RULE 10b-5 SCIENTER AND RULE 14a-9 NEGLIGENCE ALLEGATIONS…………………………………………………………126

X.    RULE 10b-5 LOSS CAUSATION .......................................................... 136

XI.    RULE 14a-9 TRANSACTION AND LOSS CAUSATION ..................... 141

XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE ....................... 154

XIII.    INAPPLICABILITY OF PSLRA SAFE HARBOR................................. 156

XIV.    CLAIMS FOR RELIEF ......................................................... 156

COUNT I CLAIM FOR VIOLATION OF RULE 10b-5 AGAINST DEFENDANTS CORNELL & TARGET WITH RESPECT TO THE 2021 & 2022 ANNUAL REPORT AND 2022 & 2023 PROXY STATEMENTS ..................................................................... 157

COUNT II CLAIM FOR VIOLATION OF RULE 14a-9 AGAINST THE DIRECTOR DEFENDANTS & TARGET WITH RESPECT TO THE 2022 AND 2023 PROXY STATEMENTS ...................................... 158

COUNT III CLAIM FOR VIOLATION OF SECTION 20(a) AGAINST THE DIRECTOR DEFENDANTS ......................................................... 159

XV.    REQUEST FOR RELIEF ...................................................... 161

XVI.    JURY DEMAND ................................................................ 162

## I.    PRELIMINARY STATEMENT

1.    This case is related to an action currently pending in this Court captioned *Craig v. Target Corp.*, No. 2:23-cv-599-JLB-KCD (M.D. Fl.). This action arises out of the same operative facts as *Craig v. Target Corp.* Aside from changes in the identity of Plaintiffs (and corresponding changes throughout) and the addition of class allegations, the substance of this complaint matches the substance of the first amended complaint in *Craig*. This case is also related to another class action currently pending in this Court captioned *City of Riviera Beach Police Pension Fund v. Target Corp.*, No. 2:25-cv-00085 (M.D. Fla.). That action asserts "substantially the same claim or claims" as this case for purposes of 15 U.S.C. § 78u-4(a)(3)(A)(ii).

2.    Target Corporation—the self-proclaimed store of the "boomer mom who drives a minivan and lives in the suburbs," Susan Berfield*, Target's Future Will Be Decided by Kids*, BLOOMBERG (July 7, 2016), https://tinyurl.com/ycypw6w5—and its Board of Directors betrayed both Target's core customer base of working families and its investors by making false and misleading statements about Target's Environmental, Social and Governance (ESG) and Diversity, Equity, and Inclusion (DEI) mandates that led to its disastrous 2023 children-and-family themed LGBT-Pride campaign (the "2023 LGBT-Pride Campaign").

3.    Target's 2023 LGBT-Pride Campaign was exceptionally offensive to Target customers for obvious and apparent reasons. Target marketed the Campaign at families and children and sold highly inappropriate merchandise such as transgender "tuck-friendly" women's swimsuits with "extra crotch coverage," sold in XXS sizes.

The Campaign provoked immense consumer backlash and boycotts that caused Target's sales to fall for the first time in six years and wiped out over $25 billion in Target's market capitalization—leading Target's stock to experience its longest losing streak in 23 years.

4.     Target's CEO Brian Cornell and its Board of Directors did not oversee or disclose the obvious risks of Target's 2023 LGBT-Pride Campaign and the ESG/DEI initiatives which it advanced, but they told investors that they did. In doing so, they deceived Target investors as to the true nature of the risks of their investments and caused them to unknowingly support Target's Board and management in their misuse of investor funds to serve its divisive political and social goals—and ultimately cost investors billions.

5.     Cornell and current and former members of Target's Board of Directors (the "Board") have violated Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9 promulgated thereunder by making or causing Target to issue misleading statements to investors:

- Target's 2021 and 2022 Annual Reports misleadingly omitted that Target was subject to the risk of consumer boycotts because of its ESG/DEI initiatives like the 2023 LGBT-Pride Campaign.

- Target's 2022 and 2023 Proxy Statements falsely and misleadingly stated that Target's Board and its committees (i) oversaw social and political issues and risks arising from Target's pursuit of ESG/DEI mandates, (ii)

5

adopted Target's ESG/DEI mandates in order to advance shareholder value, and (iii) proposed executive compensation plans that were aligned with shareholder value.

- Target and its CEO & Board Chairman Brian C. Cornell misleadingly downplayed the scope of consumer boycotts after they began.

Plaintiff respectfully seeks damages and declaratory relief for these violations, individually and on behalf of all others similarly situated.

*          *          *

6.    Target portrays itself as the store of working families. Berfield, *supra*. But as Target's formerly loyal customer base now recognizes, Target's Board and management for years spent Target's valuable financial and reputational capital on the pursuit of ESG/DEI initiatives of personal interest to the Board, Target's management, and a coterie of left-wing "stakeholders" behind the facade of Target's classic, all-American middle-class brand. They did so while falsely and misleadingly portraying the risks of this strategy to Target's shareholders in order to artificially inflate Target's stock price and secure the Board's re-election and insulate itself from accountability.

7.    The bill came due in May 2023, when Target faced immense customer backlash to a campaign Target undertook as a result of one of its hallmark ESG and DEI initiatives—Target's now infamous children-and-family-themed LGBT-"Pride Month" marketing and sales campaign. The 2023 LGBT-Pride Campaign was the

most ambitious and extreme "Pride Month" campaign in Target's history and was certain—if not intended—to prompt a strong adverse reaction from Target's customers. It featured extensive marketing and products directed to children as young as newborns and highlighted products by a "Satanist-inspired" designer. It embroiled Target in the culture war and caused Target to experience record stock declines and foregone sales, costing investors billions.

8.    The Defendants' misconduct began when, after Defendant Brian C. Cornell took over as Chairman of Target's Board ("Chairman") and Chief Executive Officer ("CEO") in 2014, Target adopted several ESG and DEI mandates that materially affected Target's corporate strategy and business performance under the guise of working with "stakeholders."

9.    The Board and Target's management consistently invoked "stakeholders" to justify ESG/DEI mandates that the Board and Target's management were also personally interested in. For one component of those ESG/DEI mandates, LGBT activism, Target was at the beck and call of pro-LGBT stakeholder organizations like the Human Rights Campaign and GLAAD. Even Target's focus on its "guests" (customers) was skewed by management to serve "stakeholder" interests in ESG/DEI initiatives rather than legitimate guest preferences.

10.    After extended lobbying and other activism by pro-LGBT stakeholder organizations, Target adopted an early version of its Pride Month campaigns,

publishing a "Pride Manifesto" in 2015, *#TakePride With Target,* TARGET (June 8, 2015), https://tinyurl.com/4y772d85; *Target's Pride Manifesto Video Transcript*, TARGET (June 8, 2015), https://tinyurl.com/mu4837bw.

11.    In 2016, Target became "the central battleground of a vitriolic national debate over transgender rights" after Target published an antagonistic response to North Carolina's transgender bathroom law. Hayley Peterson, *The Target Boycott is Spiraling Out of Control*, BUS. INSIDER (Apr. 26, 2016), https://tinyurl.com/2s4xhz7v; *see also* Rachel Abrams, *Target Steps Out in Front of Bathroom Choice Debate*, N.Y. TIMES (Apr. 27, 2016), https://tinyurl.com/2vhfnc39.

12.    Under Target's ESG/DEI motivated LGBT activism, Target also adopted "supplier diversity" targets, including for a majority of certain collections to be made by "LGBTQIA+ creators and brands." *2022 Target Environmental, Social and Governance Report*, TARGET, at 45, 51 (2022), https://tinyurl.com/mkh5dekj (the "2022 ESG Report").

13.    Target made other substantial ESG/DEI commitments in response to "stakeholder" demands. In 2020, Target committed to an expressly race-based hiring plan by pledging to "increase representation of Black team members across the Company by 20 percent" over three years through changes to its advancement, retention, and hiring plans. Press Release, TARGET, Target Releases Workforce Diversity Report; Plans to Increase Representation of Black Team Members Across the Company by 20 Percent, (Sept. 10, 2020), https://tinyurl.com/42p6uxxf.

14.    Target also launched an ESG/DEI initiative called "Target Forward" that, among other mandates, committed Target to work toward ensuring that "100% of suppliers [] have policies and programs to advance gender equity." *Target Forward: Our Sustainability Strategy*, TARGET, https://tinyurl.com/td7rd42k (last accessed Aug. 3, 2023).

15.    Target experienced customer and investor backlash to these initiatives. After Target's outspoken opposition to the North Carolina transgender bathroom law, several boycotts of Target were organized, *see* Phil Wahba, *Nearly 1 Million Sign Pledge to Boycott Target Over Bathroom Policy*, FORTUNE (Apr. 28, 2016), https://tinyurl.com/msfjn85s, which "cost the company millions in lost sales and added expenses" after "[s]hopper traffic and same-store sales started sliding for the first time in years . . . and the company was forced to spend $20 million installing single-occupancy bathrooms in all its stores to give critics of the policy more privacy." Hayley Peterson, *The Target Boycott Cost More Than Anyone Expected — and the CEO Was Blindsided*, BUS. INS. (Apr. 6, 2017), https://tinyurl.com/bdh99pj5.

16.    Shareholders, consumer groups, and conservative commentators repeatedly warned Target that its ESG/DEI initiatives and LGBT activism would cause it to lose customers.

17.    In Target's 2022 and 2023 Annual Proxy Statements, the Board assured Plaintiff and other investors that it was monitoring for social and political risks created by the ESG/DEI mandates that the Board and Target management had imposed on

the company. In reality, the Board, both itself and through the applicable Board committees, only monitored risks it perceived from *failing to achieve its self-imposed ESG/DEI mandates*. These "risks" were definably *not* "social or political" risks of ESG/DEI mandates—neither according to Target's definition nor by how a reasonable investor would understand the phrase's meaning—but instead were "risks" driven by Target and a select group of nonprofit-organization "stakeholders" that Target worked with to adopt those very ESG/DEI mandates. These "stakeholder"-driven "risks" were a pretext for Target to adopt ESG/DEI mandates, not a good-faith oversight of the social and political risks of adopting ESG and DEI motivated corporate policies.

18.     Even if these "stakeholder"-driven risks could be defined as "social and political" risks to ESG/DEI mandates, the Board still misrepresented its oversight because the Board monitored only one side—i.e., whether it would face backlash from having *too little* ESG and DEI, and not whether its divisive ESG/DEI mandates would create social and political risk such as customer backlash.

19.     Defendants knew their ESG/DEI mandates were a double-edged sword that risked backlash. After all, Target itself experienced significant backlash from its customers after Target became the face of corporate opposition to North Carolina's transgender bathroom law in 2016, and the risk environment for Target's and other companies' LGBT marketing campaigns was becoming more volatile. Defendants knew companies like Walt Disney and Anheuser-Busch were experiencing immense

backlash to similar LGBT marketing initiatives. Given this risk environment, peer companies included the risk of backlash in their oversight of the social and political risks to their ESG/DEI mandates. Not so with Defendants.

20.     Despite the evident risks to Target's ESG/DEI mandates, and despite the obvious and well-known risks of Target's planned exceptional and aggressive LGBT "Pride Month" campaign upcoming in May and June 2023, Target failed to disclose that Target was subject to backlash from consumers because of its ESG/DEI mandates and the upcoming LGBT campaign.

21.     This misrepresentation of the Target Board's risk-oversight strategy, and its catastrophic revelation in the 2023 LGBT-Pride Campaign, rendered other essential aspects of Target's 2022 and 2023 Annual Proxy Statements misleading as well. The 2022 and 2023 Annual Proxy Statements similarly misrepresented that Target adopted ESG/DEI mandates to advance shareholder value when, in reality, Target adopted and pursued ESG/DEI mandates for the collateral interests of Defendants and Target officers who had disabling conflicts of interest that prevented them from seeking the best interests of Target shareholders.

22.     The 2022 and 2023 Annual Proxy Statements also misled investors by stating that Target's proposed executive compensation plans were aligned with shareholder value when, in reality, they included substantial incentive payments to executives for meeting ambiguous and subjective "DEI progress" mandates.

11

23.     Relying on these proxy statements, at Target's 2022 and 2023 annual meetings Target shareholders re-elected Target's Board, turned down multiple proposals via shareholder vote to reform the Board's risk oversight functions, and approved executive compensation plans that incentivized Target's officers to implement DEI programs like the 2023 LGBT-Pride Campaign.

24.     Unbeknownst to investors, the Board's and management's years of failing to oversee the risks of their adoption of ESG and DEI mandates (and misleading investors both as to that failure and to the risks of those mandates) had made Target a house built on sand—liable to catastrophe. As a result of its aggressive ESG and DEI programs unchecked by Board oversight, Target developed an LGBT-"Pride" marketing and sales campaign that spared no one, not even toddlers.

25.     No rational board of directors or management of a retailer with a core customer base of working families would have approved such a nationwide campaign; nonetheless, Target's officials pursued it.

26.     Target's teams planning for and preparing the 2023 LGBT Pride Campaign recklessly disregarded the risk of consumer backlash. One team member stated: "I will make sales tank." *See*, WASH. EXAM., *infra*.

27.     The rain and the floods came in May 2023, when loyal Target shoppers discovered in the aisles products like:

- "LGBT Pride: Kids' Clothing," modeled by very young children with rainbow Mickey Mouse symbols, *see LGBT Pride: Kids Clothing*, TARGET, https://tinyurl.com/2rpxw8ec (last accessed Aug. 3, 2023);

- "T-shirts that say 'Pride Adult Drag Queen "Katya,"' 'Trans people will always exist!' and 'Girls Gays Theys,'" Shannon Thaler, *Target's Reputation Takes Hit over Children's LGBTQ Clothing, Survey Shows*, N.Y. POST (May 24, 2023), https://tinyurl.com/mry5eknm;

- "[S]wimsuits with clothing tags that describe the items as having a 'light binding effect' on breasts and 'tuck-friendly construction' for male genitalia" with "extra crotch coverage," Abigail Anthony, *Target Reportedly Moving 'Pride' Items to Back of Store to Avoid the Bud Light Treatment,* NAT'L REV. (May 23, 2023), https://tinyurl.com/2s3m5vva, with even pro-Target "fact-checkers" admitting the suits were available in "quite small" sizes, down to "extra, extra small," Hannah Hudnall, *Target's 'Tuck-Friendly' Swimsuit Is Made for Adults, Not Kids*, USA TODAY (May 26, 2023), https://tinyurl.com/4eesw4f2; and

- Designs like "Cure Transphobia, Not Trans People" produced by the "Satanist-Inspired" brand Abprallen, which is known for other designs that "glorif[y] violence" against so-called "transphobes," such as "designs showing the phrases 'We Bash Back' with a heart-shaped mace in the trans-flag colors, 'Transphobe Collector' with a skull, and

'Homophobe Headrest' with skulls beside a pastel guillotine," Abigail Anthony, *Target Knew of Satanist-Inspired Merchandise When It Partnered with LGBT Brand, Designer Claims*, NAT'L REV. (May 24, 2023), https://tinyurl.com/2dvffpfz.

28.    Pro-Target "fact-checkers" further acknowledged that "[t]he Pride apparel for kids, adults and pets was located together." *Target's Pride Collection Features 'Tuck-Friendly' Swimsuits for Adults, Not Kids*, AP (May 23, 2023), https://tinyurl.com/bdz42h9h.

29.    After immense customer backlash to Target's LGBT-Pride campaign resulted in customer boycotts of Target, Target lost $10 billion in market valuation over May 18–28, 2023 due to parents' backlash over the company's LGBT-themed clothing line for children, its "longest losing streak in 23 years." Ronny Reyes, *Target Loses $10B in 10 Days as Stocks Fall Following Boycott over LGBTQ-Friendly Kids Clothing*, N.Y. POST (May 28, 2023), https://tinyurl.com/yc8r99rt; James Rogers, *Target's stock, on its longest losing streak in 23 years, downgraded at JPMorgan*, MARKET WATCH (June 1, 2023), https://tinyurl.com/2vexy7z8. Between May 17 and October 6, Target erased more than $25 billion in market capitalization. Target's stock value remains depressed.

30.    Plaintiff is a state agency responsible for managing public pension funds that is a  Target shareholder. Plaintiff owns Target stock and has suffered damages from the record decline in Target's stock. Plaintiff stands to face further harm if

Defendants continue to make misleading statements about Target's ESG/DEI mandates and LGBT activism.

31.     Plaintiff makes these allegations based upon personal knowledge as to Plaintiff and Plaintiff's own acts and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, interviews with a former Target employee, a review of Target's public documents and statements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Target Corporation, analysts' reports and advisories about the company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations herein after a reasonable opportunity for discovery.

## II.   PARTIES

32.     Plaintiff State Board of Administration of Florida (SBA) is primarily responsible for investing the proceeds of the Florida Retirement System Pension Plan, administering the Florida Retirement System Investment Plan, managing the Florida Hurricane Catastrophe Fund, and running Florida PRIME, as well as investing the proceeds of more than 25 other funds directed to the SBA by the Florida Legislature. The SBA maintains its principal offices at 1801 Hermitage Boulevard, Tallahassee, Florida 32308.

33.     Florida Attorney General James Uthmeier represents the SBA in this matter along with undersigned co-counsel. Attorney General Uthmeier is a member of the Board of Trustees of the SBA. Attorney General Uthmeier's representation in this matter will assist in seeking critical corporate governance reforms and in the recovery of losses suffered by the Florida Retirement System Pension Plan caused by Target's actions.

34.     Plaintiff SBA is a Target shareholder. SBA held 787,694 shares of Target stock on March 8, 2022. SBA purchased Target stock multiple times between March 9, 2022, and August 16, 2023. *See* Exhibit A (detailing SBA's transaction history during the class period). SBA continues to hold Target stock.

35.     Defendant Target is a Minnesota corporation with principal executive offices at 1000 Nicollet Mall, Minneapolis, MN, 55403-2542. Target's common stock trades in an efficient market on the New York Stock Exchange (NYSE) under the trading symbol "TGT." Target issued the 2021 Annual Report, 2022 Annual Report, the 2022 Annual Proxy Statement (the "2022 Proxy"), and the 2023 Annual Proxy Statement (the "2023 Proxy").

36.     Defendant Brian C. Cornell has served as Target's Chairman and Chief Executive Officer at all relevant times, including when Target issued the 2021 and 2022 Annual Reports and 2022 and 2023 Proxy Statements. Defendant Cornell resides in Minnesota.

37.    Defendant David P. Abney is a Target director and was a Target director when Target issued the 2022 and 2023 Proxy Statements. Defendant Abney resides in Georgia.

38.    Defendant Douglas M. Baker, Jr. is a Target director and was a Target director when Target issued the 2022 and 2023 Proxy Statements. Defendant Baker resides in Minnesota.

39.    Defendant George S. Barrett is a Target director and was a Target director when Target issued the 2022 and 2023 Proxy Statements. Defendant Barrett resides in Ohio.

40.    Defendant Gail K. Boudreaux is a Target director and was a Target director when Target issued 2022 and 2023 Proxy Statements. Defendant Boudreaux resides in Indiana.

41.    Defendant Robert L. Edwards is a Target director and was a Target director when Target issued the 2022 and 2023 Proxy Statements. Defendant Edwards resides in Idaho.

42.    Defendant Melanie L. Healey is a former Target director and was a Target director when Target issued 2022 and 2023 Proxy Statements. Defendant Healey resides in Ohio.

43.    Defendant Donald R. Knauss is a Target director and was a Target director when Target issued the 2022 and 2023 Proxy Statements. Defendant Knauss resides in Texas.

44.    Defendant Christine A. Leahy is a Target director and was a Target director when Target issued 2022 and 2023 Proxy Statements. Defendant Leahy resides in Illinois.

45.    Defendant Monica C. Lozano is a Target director and was a Target director when Target issued the 2022 and 2023 Proxy Statements. Defendant Lozano resides in California.

46.    Defendant Grace Puma is a Target director and was a Target director when Target issued the 2023 Proxy Statement. Defendant Puma resides in Florida.

47.    Defendant Derica W. Rice is a Target director and was a Target director when Target issued the 2022 and 2023 Proxy Statements. Defendant Rice resides in Rhode Island.

48.    Defendant Dmitri L. Stockton is a Target director and was a Target director when Target issued the 2022 and 2023 Proxy Statements. Defendant Stockton resides in North Carolina.

49.    The foregoing defendants who are or were Target directors are hereinafter referred to as the "Director Defendants."

## III.  JURISDICTION AND VENUE

50.    The claims asserted herein arise under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), Section 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(a)) and Rule

14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9), and Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78t-1).

51.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

52.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Defendant Target conducts business in this Judicial District. Defendant Target sent the violative proxy statements to shareholders in this district. Defendants have minimum contacts with the United States. Defendants Target, Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Puma, Rice, and Stockton each reside in the United States. Defendant Target, of which each Director Defendant was or is a director, conducts its internal affairs and business in the United States.

53.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities markets.

## IV.    CONFIDENTIAL WITNESS

54.    The Confidential Witness[1] previously held a senior marketing position at Target. The Confidential Witness oversaw marketing efforts for a large region of Target stores. The Confidential Witness did not leave Target's employment until after the 2023 LGBT-Pride Campaign. The Confidential Witness provided information regarding Target's planning and implementation process for the 2023 LGBT-Pride Campaign and Target's response to consumer backlash after the Campaign began.

## V.    CONTROL PERSON ALLEGATIONS

55.    By reason of the Director Defendants' positions with Target as directors and, with respect to Defendant Cornell, his insider position with Target as CEO, the Director Defendants and Defendant Cornell possessed the power and authority to control the contents of Target's proxy statements and annual reports. The Director Defendants and Defendant Cornell were provided with copies of Target's proxy statements and had the ability and opportunity to prevent their issuance or cause them to be corrected.

56.    Because of their positions with Target, and their access to material, non-public information available to them, but not to the public, the Director Defendants

---

[1] In an effort to protect the identities of the knowledge witness who has come forward on a confidential basis, Plaintiff has not pleaded all available information concerning job titles, locations, and starting and ending dates of employment when providing such information would be tantamount to revealing the witness's identity. Plaintiff will provide such information to the Court *in camera* if the Court so requests.

knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

## VI.  SUBSTANTIVE FACTUAL ALLEGATIONS

57.    Target's 2022 Annual Report recognized that the company's core customer base is "families." Target Corp., 2022 Annual Report (Form 10-K) at 1 (Mar. 8, 2023), https://tinyurl.com/3jtfxc4v (the "2022 Annual Report"). Management recognized in bold letters the serious risk to the company's financial prospects if that core customer base were to have a negative perception of the corporation: "**Our continued success is dependent on positive perceptions of Target which, if eroded, could adversely affect our business and our relationships with our guests and team members.**" *Id.* at 8 (emphasis in original); *see also* Nathaniel Meyersohn, *How Target Is Trying to Woo Moms and Dads*, CNN BUS. (Feb. 21, 2019), https://tinyurl.com/yetr4hzn ("Parents are crucial to Target's success because they spend more every year than shoppers without children, the company says.").

58.    But at the same time, Target was undercutting its resiliency to that core risk by adopting divisive and extreme ESG and DEI motivated mandates, failing to oversee the risks of doing so, such as the risk of triggering a customer backlash, and misleading investors about both the mandates and these risks.

A.    **Under Defendant Cornell as Board Chairman and CEO, Target Undertook ESG/DEI Motivated LGBT Activism to Benefit "Stakeholders"**

59.    After Defendant Cornell began his tenure as Chairman and CEO as the "first outsider ever tapped to lead the company in its more than 100-year history," Allison Kaplan & Burl Gilyard, *2019 Person of the Year: Brian Cornell*, TWIN CITIES BUS. (Dec. 1, 2019), https://tinyurl.com/2bp68nea, Target began adopting increasingly aggressive and costly ESG/DEI commitments that purported to benefit various company "stakeholders." These commitments included Target's activism on behalf of LGBT issues, which Target marketed as among its ESG/DEI initiatives.

1.    Target Adopted "Stakeholder"-Oriented Corporate Governance and Undertook ESG/DEI Initiatives

60.    After Defendant Cornell began his tenure, Target adopted ESG/DEI mandates under the guise of concern for "stakeholders" and stakeholder-aligned corporate governance.

a.    *Usage of "stakeholders" in the corporate context*

61.    Though the term "stakeholder" has a broad definition in general, "[i]n the corporate context . . . [i]t is used to refocus corporate decision-makers on constituencies other than their shareholders." SEC Comm'r Hester M. Peirce, My Beef with Stakeholders: Remarks at the 17th Annual SEC Conference, Center for Corporate Reporting and Governance, Sept. 21, 2018, https://tinyurl.com/2p8cf788.

62.    When companies invoke non-shareholder stakeholder constituencies like "employees" or "suppliers," *id.*, they often are referring to social-policy issues often

raised by social-policy activists. *See* Jennifer Laidlaw & Esther Whieldon, *'Stakeholder capitalism,' the buzzword at Davos*, S&P GLOB. (Feb. 8, 2021), https://tinyurl.com/ybd76n2v (defining "stakeholder capitalism" as "the idea that companies are responsible for their role in society"). As a recent example, after The Walt Disney Company received "pressure" from activists like "Equality Florida" and the "AIDS Healthcare Foundation – a rabble-rousing nonprofit group," Gene Maddaus, *After 'Don't Say Gay,' a Weakened Disney Hopes to Limit the Damage*, VARIETY (Oct. 5, 2022), https://tinyurl.com/yc86usxy, Disney announced its opposition to Florida's so-called "Don't Say Gay" bill by invoking stakeholders like "LGBTQ+ members of the Disney family[] as well as the LGBTQ+ community in Florida and across the country." Press Release, THE WALT DISNEY CO., Statement on Disney's Support for the LGBTQ+ Community (Mar. 11, 2022), https://tinyurl.com/5cr8wj5j.

63.    Social-policy activists regularly characterize their issue-oriented campaigns with companies as being of "stakeholder" concern. *See, e.g.*, Lauren Costello & Marie Froehlicher, *Creating Visibility and Positive Recognition – LGBTQ+ Inclusion in the Workplace*, S&P GLOB. (June 29, 2022), https://tinyurl.com/3zxnujsf (surveying "stakeholder" interest in "companies . . . foster[ing] an inclusive culture for the LGBTQ+ community").

64.    Social-policy activists also seize on companies' disclosures of their commitments to stakeholder interests. "By committing to goals of responsible citizenship, companies allow stakeholders . . . to hold them accountable to their

inclusive ideals." Leo E. Strine Jr. & Joey Zwillinger, *What Milton Friedman Missed About Social Inequality*, N.Y. TIMES (Sept. 10, 2020), https://tinyurl.com/yc8kjam9. As SEC Commissioner Hester Peirce has described, such commitments by companies "introduce new pressure points that activists—or *stakeholders* as some prefer to call them—can use to strong-arm uncooperative companies into instituting policies more conducive to the activists' agendas or punish companies that fail to fall in line." SEC Comm'r Hester M. Peirce, Statement on Environmental, Social, and Governance Disclosures for Investment Advisers and Investment Companies, May 25, 2022, https://tinyurl.com/5abtk5ec (emphasis added).

65.    In the corporate context, "stakeholder" interests overwhelmingly correspond to ESG/DEI issues. "Stakeholder capitalism" is a "buzzword among major players in the ESG world." S&P GLOB., *supra*, ¶ 62; *see also* Peirce, My Beef With Stakeholders, *supra* ("[T]he 'S' in ESG could just as well stand for 'stakeholder.'"). Companies' invocation of "stakeholders" often serves as a reference point for "political and other nonrational forces operating on directors." Robert T. Miller, *How Would Directors Make Business Decisions Under Stakeholder Model?*, 77 BUS. LAW. 773, 797–98 (2023). Though the term "stakeholder" alone is "perfectly vacuous," its usage in corporate governance often refers to the "broad and deep agreement" on "a largely progressive political agenda that emphasizes issues such as climate change, environmental concerns, racial and gender diversity, economic equality, systematic racism, and so on." *Id.*

24

b.    *Target's embrace of stakeholder interests*

66.    Defendant Cornell signed, in his capacity as Target "Chairman & CEO," the Business Roundtable's controversial 2019 "Statement on the Purpose of a Corporation" (the "BRT Statement"), in which he pledged to make "a fundamental commitment to all of our stakeholders," that "[e]ach of our stakeholders is essential," and to "commit to deliver value to all of them." *Statement on the Purpose of a Corporation*, BUS. ROUNDTABLE (Aug. 19, 2019), https://tinyurl.com/2z24skvy; *see generally* Stephen M. Bainbridge, *Making Sense of the Business Roundtable's Reversal on Corporate Purpose*, 46 J. CORP. L. 285, 285–89 (2021).

67.    As Professor Bainbridge explains, the BRT Statement was controversial because state corporate law traditionally requires that directors "put shareholder interests ahead of those of other stakeholders," and "the vast majority of stakeholders have interests that collide with shareholders." Bainbridge, *supra*, at 287, 309 n.147 (internal quotation marks omitted). For this reason, corporate-law scholars have commented that the BRT Statement "infer[s] that the [signatories] plan to protect stakeholders beyond what would be called for by shareholder value maximization." Lucian A. Bebchuk & Roberto Tallarita, *The Illusory Promise of Stakeholder Governance*, 106 CORNELL L. REV. 91, 127 (2020). The BRT Statement's declaration of "all constituencies as 'essential[]' suggest[s] that the statement does not accord shareholders any priority over other constituencies." *Id*. Moreover, the Business Roundtable described the statement as "a call to action to ensure the benefits of

capitalism are shared more broadly," which "suggest[s] that implementing the commitments expressed in the statement will lead to a redistribution among constituencies relative to the current allocation of value." *Id.*

68.     Backing up Defendant Cornell's commitments to manage Target in alignment with "stakeholder" value, Target has stated that the Board's "governance and management systems" also "fully implement the [BRT] Statement of Purpose."

69.     After Defendant Cornell signed the BRT Statement, a Target shareholder submitted a proposal under the SEC's Rule 14a-8 requesting that the Board provide its "perspective regarding whether and how our Company's governance and management systems can or must be altered to fully implement the [BRT] Statement of Purpose." *Target Corp.*, 2021 WL 429126, at *1 (SEC No-Action Letter Feb. 5, 2021); *see generally* 17 C.F.R § 240.14a-8 (describing shareholder proposals under the SEC's Rule 14a-8).

70.     In briefings filed with the SEC opposing the shareholder proposal, Target argued that it could exclude the proposal from its proxy statement because Target had already "substantially implemented" the proposal. *Id.* at *2. Target explained that the Board's Governance Committee "reviewed the [BRT] Statement of Purpose and the Company's governance and management systems" in January 2021. *Id.* at *4, *7. "Based on this review, the Committee determined that the Company's governance and management systems already fully implement the Statement of Purpose and therefore

do not need to be altered in order to fully implement the Statement of Purpose." *Id*. at *7.

71.    Target further stated that the Board's "ongoing consideration of various stakeholders in its governance decisions and oversight of the Company's business and strategy" was "core to the Company's governance." *Id*. at *5. Target also described "the view that a company should be committed to delivering value to all stakeholders, not just its shareholders" as being at the "core of the Company's values." *Id.*

72.    To demonstrate its "full[] implement[ation]" of the BRT Statement, Target listed examples of its initiatives aimed at each stakeholder group mentioned in the BRT Statement. *Id* at *6. Target has also since updated several of these examples via its annual social-responsibility reports (variously titled the "Corporate Responsibility Report" (2020 & 2021), "Environmental, Social and Governance Report" (2022), and "Sustainability and Governance Report" (2023)), which "report on environmental, social and governance performance issues most important to our business stakeholders." Target Corp., 2020 Proxy Statement (Schedule 14A) at 16, https://tinyurl.com/yy9n3tsh.

73.    The initiatives that Target identifies as responsive to each of the BRT Statement's "stakeholder" interests, and which Target describes as being at the "core of the Company's values" and governance, include initiatives that correspond directly to progressive positions on ESG/DEI matters.

74. <u>Environment.</u> The BRT Statement included "protecting the environment by embracing sustainable practices." Among other commitments, Target has responded by making commitments on climate change. Defendant Cornell has announced that Target would achieve "net zero" carbon emissions by both the company and its supply chain by 2040—a commitment in line or better than the most progressive of "net zero" commitments recommended by the United Nations. Target 2021 Corporate Responsibility Report, at 5, 13 (2021), https://tinyurl.com/26vvwymw.

75. <u>Supporting communities.</u> The BRT Statement included "the communities in which we work" as a relevant stakeholder group. In response, Target noted its investments in groups "that expand economic opportunity equitably, enabling communities to determine their own future." *Target Corp.*, *supra*, at *6. Target "focus[es] on championing an inclusive society to help communities thrive, including directing philanthropic spending to communities of color to advance racial equity." *Diversity, Equity & Inclusion*, TARGET, https://tinyurl.com/yuewh9tv (last accessed July 13, 2023). Target's largest published such investment is in "racial equity," which includes "investing $2 billion in Black-owned businesses by 2025." 2022 ESG Report at 3. Target also noted that it has provided "pro bono consulting services for BIPOC-owned small business [sic] in the Minneapolis-St. Paul cities." *Target Corp., supra*, at *6.

76.   <u>Suppliers.</u> The BRT Statement included "[d]ealing fairly and equitably with our suppliers" as a relevant stakeholder interest. Among other things, Target responded by noting its "Supplier Diversity" policy. *Target Corp.*, *supra*, at \*6. Target annually touts its growing spend with "diverse-owned suppliers," which it defines as "suppliers that are at least 51% owned, controlled, and operated by women, BIPOC, LGBTQIA+, veterans or people with disabilities." 2022 ESG Report at 51; *see also* 2021 Target Corporate Responsibility Report at 33–34, TARGET, https://tinyurl.com/26vvwymw (the "2021 CR Report").

77.   <u>Employees.</u> The BRT Statement included "[i]nvesting in our employees" as a relevant stakeholder interest. Among other things, Target touted its "diversity & inclusion" or DEI programming. *Target Corp.*, *supra*, at \*6. Target's DEI initiatives include highly racially divisive concepts and other divisive social issues.

78.   Defendant Cornell has declared Target "an anti-racist organization." 2022 ESG Report at 3. In 2020, Target committed to an expressly race-based hiring plan by pledging to "increase representation of Black team members across the Company by 20 percent" over three years through changes to its advancement, retention, and hiring plans. Press Release, *Target Releases Workforce Diversity Report; Plans to Increase Representation of Black Team Members Across the Company by 20 Percent*, TARGET (Sept. 10, 2020), https://tinyurl.com/42p6uxxf.

79.   Responding to the BRT Statement, Target also noted its employee benefit plans. After the Supreme Court's 2022 decision in *Dobbs v. Jackson Women's Health*

*Organization*, Target expanded its employee-benefit plans to compensate employees' out-of-state travel to obtain abortions. Sarah Nassauer & Anna Wilde Mathews, *Walmart, Target Show Divergence on Companies' Abortion Coverage*, WALL ST. J. (July 1, 2022), https://tinyurl.com/3km47b5j.

80.    Target has received a 100/100 score from the LGBT activist group Human Rights Campaign for its "Three LGBTQ Internal Training and Education Best Practices," and "LGBTQ Corporate Social Responsibility," among other metrics. *Target Corp.*, HUM. RTS. CAMPAIGN, https://tinyurl.com/4ktavtbb (last visited November 22, 2023).

81.    Target includes pro-transgender policies as part of its "company value" of "inclusivity," welcoming its employees to "use the restroom or fitting room facility that corresponds with their gender identity." Press Release, TARGET, Continuing to Stand for Inclusivity (Apr. 19, 2016), https://tinyurl.com/2rccr9du.

82.    According to Target's DEI objectives, Target's Chief Diversity & Inclusion Officer and Vice President of Human Resources, Kiera Fernandez, has stated that even if an employee "do[esn't] believe in" Target's DEI initiatives, he or she "still ha[s] to do it to be part of this company." Sarah Weaver, *Resurfaced Video Shows Target Diversity Chief Suggesting Employees May 'Leave' If They Think Differently*, DAILY CALLER (May 30, 2023), https://tinyurl.com/ypw5zs4h. "[Each employee] will be responsible for these behaviors, values, and expectations." *Id.*

83.     Fernandez also stated during a panel appearance, in her capacity as a Target officer, that companies and diversity officers should "feel more called to push and . . . resolve to be provocative" on DEI issues in the workplace. Twin Cities Business Talks, *Diversity, Equity, and Inclusion: BIPOC Women Rise to Leadership*, YOUTUBE, at 23:18–35 (June 28, 2021), https://tinyurl.com/24zzn5xp. Fernandez then stated that "[t]he number one thing that I would encourage white women to do is take the [DEI] learnings that you've invested to better understand and use your voice so the woman of color in the room doesn't always have to be the woman that calls out transgression." *Id.* at 57:26–49.

84.     Fernandez also lauded "such a strong commitment from our CEO," Defendant Cornell, to these DEI issues. *Id.* at 13:10–23.

85.     In a blog post for Target, Fernandez characterized Target's DEI mandates as an "infrastructure . . . that allow[s] you to integrate DE&I into your ecosystem in a way that truly drives your business." *Target's Kiera Fernandez Shares How We're Championing Diversity, Equity, and Inclusion Outside Our Walls*, TARGET (Aug. 3, 2021), https://tinyurl.com/2e9nkyz6.

86.     Defendant Cornell also stated that Target's DEI commitments were "the right thing for society." Fortune Editors, *Target CEO: DEI has 'fueled much of our growth over the last 9 years'*, YAHOO FIN. (May 17, 2023), https://tinyurl.com/2shnh5yu.

87.     <u>Customers.</u> The BRT Statement included "delivering value to our customers" as a relevant stakeholder interest. Among other things, Target touted how

its partnerships with "diverse suppliers and underrepresented businesses in an effort to create broader, more inclusive assortments at Target to give our guests the products and brands they want and deserve." *Target Corp.*, *supra*, at *6.

88.    Target characterizes many of its ESG/DEI initiatives as customer or "guest"-oriented and uses the "guest" stakeholder category to launch additional ESG/DEI initiatives.

89.    Target's social-responsibility reports describe how Target views the "guest" stakeholder category as an "opportunity for us to show *our* authenticity" and to "lead the design and retail industry in inclusion and create waves of change." 2021 CR Report at 35 (emphasis added); *see also* 2022 ESG Report at 44.

90.    Target characterized its "community" stakeholder investment of $2 billion with black-owned businesses as also aimed to "create more equitable experiences for our Black guests." Target Statement, *supra*.

91.    Target has implemented product selection processes aimed at "addressing racialized design approaches by reimagining products, systems and experiences that help avoid micro-aggressions, implicit bias and systemic forms of racism." 2022 ESG Report at 45.

c.    *Role of "stakeholders" in Target's governance*

92.    Target has established an elaborate "stakeholder" input governance structure overseen by the Board's Governance & Sustainability Committee.

93.    The 2022 Proxy and 2023 Proxy described the allocation of "ESG matters"-oversight to Target's management, which included its responsibility to "instill ESG-related priorities into our business operations" and "regularly engage[]" with the Governance & Sustainability Committee and the full Board" on "the topics of most significance to our stakeholders":

> At the management level, our ESG matters are led and coordinated by our Senior Vice President, Corporate Responsibility, who reports to a member of our Leadership Team and regularly engages with the Governance & Sustainability Committee and the full Board. The Senior Vice President, Corporate Responsibility is responsible for:
>
> - conducting regular priority assessments to determine the topics of most significance to our stakeholders;
> - collaborating with our Leadership Team to instill ESG-related priorities into our business operations, including product design and development, sourcing and supply chain operations, human capital management, and our new store development; and
> - developing ESG-related goals and managing our ESG data, measurement, and reporting.

2023 Proxy at 16, https://tinyurl.com/36jffa5c. The 2022 Proxy Statement was substantially similar. 2022 Proxy at 16, https://tinyurl.com/y5sf6ajy.

94.    Target's management describes this structure in its 2022 ESG Report and 2021 CR Report, which were produced under the Board's and the Governance & Sustainability Committee's oversight. *See* 2022 Target ESG Report at 56; 2021 2021 CR Report at 63.

95.    In these reports and on a designated section of Target's website, Target describes how it "regularly . . . engag[es] key stakeholders and seek[s] their insights to identify, understand and validate key issues affecting our business." *Sustainability &*

*Governance Priorities*, TARGET, https://tinyurl.com/2xnt7ny9 (last visited Nov. 23, 2023).

96.    The 2022 ESG report laid out Target's approach, which grounded Target's ESG/DEI mandates in a series of benefits to its "business and our stakeholders":

> **ESG Priorities**
>
> We aim to center our business strategy, investments, engagement and reporting on the environmental, social and governance (ESG) topics that are most important to our business *and our stakeholders* across our value chain.
>
> As we seek to accelerate our progress – and leverage our size and scale to benefit people, the planet, and our business – our ESG priorities guide our actions in a cohesive, compelling, and risk-minded manner.

2022 Target ESG Report at 8 (emphasis added).

97.    Under the heading "Stakeholder Engagement," Target discussed how it uses "stakeholders['] . . . valued perspectives to inform our approach to systemic change." *Id.* at 9.

98.    In its 2022 ESG Report, Target summarized its "stakeholder engagement" for "Guests" as including "[e]levating equity in supply chains and communities," "[n]on-discrimination," and "[r]esponsible marketing." 2022 ESG Report at 9.

99.    The 2022 ESG Report also described that Target maintains a position titled "Director of Inclusive Products," which is responsible for advancing "social sustainability within our owned brands." 2022 ESG Report at 44. The Director's job

includes working with stakeholders to select Target merchandise based on Target's ESG/DEI initiatives. The Director is tasked with "working with internal teams" (like Target's internal Pride+ Business Council discussed *infra*, which has helped produce Target's Pride campaign merchandise) "as well as brands, trade groups, certification bodies, diversity organizations, and medical and academic institutions, to map social strategies to business priorities." *Id.*

100.    Target's 2021 CR Report similarly described that Target "seek[s] to center our strategy, investments, internal and external engagement, and reporting on the ESG topics that are most material to our business *and our stakeholders* across our value chain." 2021 Target CR Report at 15.

101.    The 2021 CR Report also notably included in the "Topics Raised" with "Guests" section "Diverse and inclusive marketing" and "Sustainable and inclusive products." *Id.*

102.    Under this ESG governance framework, overseen by the Board and the Governance & Sustainability Committee, Target has dutifully adopted the ESG and DEI mandates sought by social-policy activists.

103.    These "stakeholders" include the nonprofit social and environmental activist entity As You Sow, *see e.g., Target Agrees to Plastic Elimination Goal,* As You Sow (May 5, 2021), https://tinyurl.com/bddarcuc; the climate activist nonprofit charity the Carbon Disclosure Project, *Target Corporation CDP Climate Change Questionnaire*, Carbon Disclosure Project (Aug. 2022),

https://tinyurl.com/tv88ewmj (last visited Aug. 3, 2023); and the climate activist nonprofit Ceres, *see Target, U.S. Bank Join Ceres Company Network,* CERES (Aug. 31, 2017), https://tinyurl.com/bddcy4np; among others.

104.    Target's website lists a variety of "partners helping drive [their] climate and energy goals," including Anthesis, Apparel Impact Institute (AII), Arbor Day Foundation, Aspen Institute's Cargo Owners for Zero Emissions Vessels (coZEV), Business Ambition for 1.5°C, Business for Social Responsibility (BSR), CDP, Ceres, Clean Energy Buyers Association (CEBA), Gold Standard, Race to Zero, Science Based Targets Initiative, Sustainable Apparel Coalition (SAC), The Nature Conservancy, UNFCCC Fashion Industry Charter on Climate Action, World Resources Institute (WRI), and World Wildlife Fund (WWF). *Climate and Energy,* TARGET, https://tinyurl.com/33rux5ps (last visited Aug. 3, 2023).

105.    Target has also worked with stakeholders who use *de minimis* stockholdings, often having acquired shares for the primary purpose of advancing their social or political goals, who utilize the SEC's Rule 14a-8 to exert pressure on companies by placing shareholder proposals before all company shareholders at stockholder meetings.

106.    Target agreed with As You Sow to implement a proposal that would expand Target's disclosure of its DEI programs. *Target Corp: Greater Disclosure of Material Corporate Diversity, Equity, and Inclusion*, AS YOU SOW (Dec. 21, 2022), https://tinyurl.com/nhz9kbv6.

36

107.   Target partnered with social activist group Article One to "identify [Target's] most salient human rights risks." 2021 CR Report at 19. Based on this assessment, Target's "Salient Human Rights Risk Areas" in 2019 for Target included "DE&I," "Diverse and inclusive merchandise assortment and marketing promotions," and "Diverse workforce and equitable hiring and development practices." *Human Rights*, TARGET, https://tinyurl.com/3szb9tf4 (last accessed Aug. 3, 2023).

108.   Target partners with many other left-wing stakeholders, including organizations that advocate for LGBT issues and campaigns.

### 2.   Target Engages in LGBT Activism as One of Its ESG/DEI Initiatives Aimed at Pro-LGBT "Stakeholders"

109.   Companies increasingly treat "[t]he LGBT community as a stakeholder in communicating corporate social responsibility." Marta Szyndlar & Emilia Wąsikiewicz-Firlej, *The LGBT Community as a Stakeholder in Communicating Corporate Social Responsibility: An Analysis of Selected Case Studies*, 19 SCRIPTA NEO. POS. 191 (2019); *see also* Disney Statement, *supra*.

110.   Target has directly partnered with pro-LGBT stakeholder organizations on ESG/DEI mandates.

111.   In response to the BRT Statement's stakeholder group of "employees," Target touted its "PRIDE+ Business Council," a group of Target employees who work to "represent[] . . . the LGBTQIA+ community at Target." *Target Corp.*, *supra*, at 9.

112.   Between 2016 and the present, Target donated millions to an organization called "GLSEN" (pronounced "glisten"), which "Promotes LGBT

Activism in Schools." Bill Pan, *Target Donated Millions of Dollars to Group That Promotes LGBT Activism in Schools,* THE EPOCH TIMES (May 26, 2023), https://tinyurl.com/2mxc4tub.

113.    Among other things, GLSEN's mission includes undermining parents' federal and state constitutional and statutory rights by directing public schools to withhold "any information that may reveal a student's gender identity to others, including [to] parents or guardian[s]." Hannah Grossman, *Target Partners with Org Pushing for Kids' Genders to be Secretly Changed in Schools Without Parental Consent, 'We . . . Continue to Support Their Mission,' Target Corporation Said About GLSEN,* FOX NEWS (May 26, 2023), https://tinyurl.com/28kckdjp.

114.    A 2020 GLSEN guide states:

> Students may not be ready for their parents or guardians to know about their gender identity or expression, or that they are expressing their affirmed gender at school. Before contacting the parent or guardian of a transgender or nonbinary student, school staff should clarify with the student whether to use their gender affirming name and the pronouns that correspond to their gender identity, or whether to use their legal name when corresponding with a parent/guardian.

*Model Local Education Agency Policy on Transgender and Nonbinary Students*, GLSEN & NAT'L CTR. FOR TRANSGENDER EQUAL. at 5 (Oct. 2020), https://tinyurl.com/7nsw3zkn.

115.    Target management apparently supports this mission. By funding GLSEN, Target is subsidizing GLSEN's policy of promoting "secret gender transitions for kids." Laurel Duggan, *Major Children's Clothing Retailers Poured Money*

*into LGBT Group That Promotes Secret Gender Transitions For Children,* DAILY CALLER (May 30, 2023), https://tinyurl.com/2p8wf5nc.

116.    Target has stated: "We're proud to partner with GLSEN for more than a decade . . . Target annually supports GLSEN and its mission to create affirming, accessible and antiracist spaces for LGBTQIA+ students." *LGBTQIA+ Team Members & Guests,* TARGET, https://tinyurl.com/4pct4z37 (last visited Nov. 22, 2023).

117.    Target included GLSEN promotions on displays next to merchandise during the 2023-LGBT Pride Campaign.

118.    Target's marketing senior executive Carlos Saavedra serves as treasurer at GLSEN. Hannah Grossman, *Target Marketing VP Holds Senior Position at Org Pushing Secretive Transgender Policies in K-12 Schools,* FOX NEWS (May 29, 2023), https://tinyurl.com/38yjn67v.

119.    Target's current Executive Vice President and Chief Food and Beverage Officer, Rick Gomez, serves on the Board of GLSEN, *GLSEN Welcomes New Leaders to National Board of Directors,* GLSEN (June 13, 2022), https://tinyurl.com/4kz9ze9u, and has accepted an award from GLSEN on behalf of Target, @GLSEN, X (f.k.a. TWITTER) (October 21, 2016, 10:49 PM), https://tinyurl.com/yc36hwbj. Prior to being named to his current role in February 2021, Gomez served in senior marketing roles relevant to executing Target's LGBT activism. As senior vice president of brand and category marketing, Gomez was reportedly responsible for "leading marketing efforts across all merchandise categories . . . and seasonal marketing for campaigns."

*Rick Gomez*, THE ORG, https://tinyurl.com/fd49ah9k (last visited Nov. 22, 2023). As executive vice president, chief marketing and digital officer for Target and a member of its executive leadership team, he was reportedly responsible for "overseeing marketing and media strategy, creative, guest research, e-commerce, digital strategy, and corporate responsibility." *Id.*

120.    Target has partnered with the LGBT stakeholder organization Gay & Lesbian Alliance Against Defamation (GLAAD). Among other actions, Target has partnered with GLAAD to "show their allyship with the LGBTQIA+ community and support of [GLAAD's] Spirit Day," which aims to highlight "LGBT youth." *Target Encourages LGBTQIA+ youth to #TakePride for Spirit Day*, GLAAD (Oct. 22, 2021), https://tinyurl.com/3dpa8tnu.

121.    Target has partnered with the LGBT stakeholder organizations the Human Rights Campaign, discussed below, and the National Gay & Lesbian Chamber of Commerce.

122.    Target has partnered with the Family Equality Council, which was founded in 1979 as the "Gay Fathers Coalition" and is an activist on LGBT issues. *Who We Are*, FAM. EQUAL. COUN., https://tinyurl.com/34rr9wjm (last visited Nov. 11, 2023). Target has donated proceeds from the sale of its LGBT-Pride merchandise to the organization and partnered with the Council "for more than a decade." STAR TRIB., *supra*.

123.    Target has partnered with Out & Equal, an activist organization that works on LGBT issues in the workplace. *Who We Are*, OUT & EQUAL, https://tinyurl.com/55647vu7 (last visited Nov. 12, 2023).

124.    Target also partners with other LGBT stakeholder organizations: "We also continue to support local, regional and national LGBTQIA+ organizations throughout the year." *LGBTQIA+ Team Members & Guests*, *supra*, ¶ 116.

125.    To date, Target has never stated it partnered with any organizations opposed to the sale of LGBT-themed or Pride merchandise.

126.    For years, Target has undertaken LGBT activism as part of its "stakeholder" governance and ESG/DEI initiatives. Target's LGBT activism has been motivated by and responsive to pro-LGBT "stakeholders" who claim to hold the company accountable to its pro-LGBT public stances.

127.    In 2010, after news media reported that Target made a political contribution to a political action committee supporting a Republican candidate's campaign for Minnesota governor, several left-of-center groups condemned Target for supporting a candidate who purportedly opposed LGBT rights.

128.    The Human Rights Campaign proclaimed that despite Target's "model employment policies for LGBT people," Target's donation "was a slap in the face" to the LGBT community, and placed a full-page ad in the Minnesota Star-Tribune calling on Target to "make it right." Press Release, HUM. RTS. CAMPAIGN, Target Corporation Message to LGBT Community: We Won't Make it Right (Aug. 16,

41

2010), https://tinyurl.com/rumkt2ha; *You Can't Have it Both Ways: Target and Best Buy Fund Anti-LGBT Rights Candidate in Minnesota*, NAT'L ORG. FOR WOM. (Aug. 2, 2010), https://tinyurl.com/8fw8ma5m. The Human Rights Campaign also dropped Target from its "Buying for Equality" consumer guide. *HRC Drops Target*, THE ADVOC. (Aug. 20, 2010), https://tinyurl.com/5md23xac.

129.    The liberal activist group MoveOn.org released a TV advertisement calling on customers to "Boycott Target" and directed viewers to a website titled "targetboycott.org." Jeanne Cummings, *MoveOn Calls for Boycott of Target*, POLITICO (Aug. 18, 2010), https://tinyurl.com/2h9mkren.

130.    A group of pro-ESG/DEI investment activists and nonprofits—consisting of the Pride Foundation, the Tides Foundation, Walden Asset Management, Calvert Asset Management, and Trillium Asset Management, among others—sponsored a shareholder proposal labeling Target's political contribution to the PAC as "ironic[]" given Target's reputation for "forward-looking policies and benefits for gay and lesbian employees" and calling for the independent members of the Board to "review" Target's political contributions. *Target Corp.* at 35–36 (Feb. 28, 2011) *available at* https://tinyurl.com/y3zm2zjt.

131.    After stakeholder pressure began, Target's then-CEO issued an apology stating he was "genuinely sorry" for how the company's actions were received by stakeholders and committed to setting up a review process for future contributions. Jack Crosby, *Target Apologizes for Giving to Group Backing Emmer*, STAR TRIB. (Aug. 6,

2010), https://tinyurl.com/u6rh62td. The CEO also pledged to consult stakeholders including "a group of companies and partner organizations for a dialogue focused on diversity and inclusion in the workplace, including GLBT issues." Scott Stiffler, *Target hits the LGBT market, with much-improved aim*, WASH. BLADE (Nov. 29, 2019), https://tinyurl.com/yvbxfx33.

132.  Target also responded by making changes to its political giving policy "to evolve" after the controversy. Speaking with the LGBT media outlet the *Washington Blade*, a Target spokesperson stated that, after considering the perspectives of "our team members, our guess, or other stakeholders," Target had "evolve[d]" and made "changes [that] are really reflective of that perspective that we gained over the 2010 election cycle." Chris Johnson, *Target enacts new political giving policies*, WASH. BLADE (Feb. 17, 2011), https://tinyurl.com/yeymrfuu. In its briefings before the SEC, Target also argued that its changes to its political giving policy "satisfied the essential objective" of the ESG/DEI stakeholders' shareholder proposal. *Target Corp.*, *supra* ¶ 130, at 26.

133.  Just over a year later, Target launched its first reported gay-themed merchandise and announced it would donate the proceeds of the merchandise sales to one of its stakeholders, the pro-LGBT activist group Family Equality Council.  Janet Moore, *Line of Target T-shirts to Support Gay Pride*, STAR TRIB. (May 22, 2012), https://tinyurl.com/2h6fue4a. The campaign bore the slogan, "Wear It With Pride" shirts included rainbow-hued designs such as "Love is love," and "Harmony." *Id.*

134.    A Target spokeswoman explained that, over the course of the previous year, Target "heard from our team members and guests that they'd like to see an assortment of Pride merchandise available at Target," and was led by Target's "LGBTA Business Council." *Id.*

135.    Stakeholders remained frustrated that Target had not taken a formal position on gay marriage. Asked about the issue during one of Target's annual meetings, Target's CEO stated that the company would "remain neutral." *Target Corp. Says It's Neutral on Minnesota's Gay Marriage Amendment*, GRAND FORKS HER. (June 9, 2011), https://tinyurl.com/49emcr3p.

136.    In August 2014, Target announced it had signed an amicus brief "in support of marriage equality." Press Release, TARGET, *Target Signs Amicus Brief on Marriage Equality* (Aug. 5, 2014), https://tinyurl.com/3dm3x5ba. Target's then-Executive Vice President and Chief Human Resources Officer stated that while "the issues [the brief] addresses have significant impact on businesses," "*it is more than that and we agreed that now is the right time to more directly share our views on this issue.*" *Id.* (emphasis added).

137.    Stakeholders praised Target's announcement of its pro-LGBT position. *See, e.g.*, Press Release, HUM. RTS. CAMPAIGN, *Target Signs on to Brief Supporting Marriage Equality Cases* (Aug. 5, 2014), https://tinyurl.com/2dhvcd6v.

138.    After the Supreme Court's decision in *Obergefell v. Hodges* in June 2015, Target LGBT stakeholders like the Human Rights Campaign called on companies to

take action in support of LGBT interests to take press their advantage. *See*, *e.g.*, Jake Miller, *After Supreme Court win, LGBT Activists Look Beyond Same-Sex Marriage*, CBS NEWS (July 1, 2015), https://tinyurl.com/5c4ae3tc.

139.   Target continued its shift in favor of LGBT public policy in 2015 by publicly endorsing the federal Equality Act, declaring that "Target proudly stands with the LGBT community through all that we do." *Stronger Together: Target Signs on in Support of the Equality Act,* TARGET (Sept. 10, 2015), https://tinyurl.com/34wmwhyj. Target's endorsement was in support of a Human Rights Campaign initiative to build support for the legislation. Press Release, HUM. RTS. CAMPAIGN, *With Endorsement from Target, Corporate Support for Equality Act Continues to Grow* (Sept. 15, 2015), https://tinyurl.com/25myfzpy.

140.   Target also announced in 2015 that it would be "deepening its long-standing support" of the Human Rights Campaign by becoming a national platinum partner of the organization. *Id.* As of November 2023, Target remains one of only 19 corporate national platinum partners of the organization. *Corporate Partners*, HUM. RTS. CAMPAIGN, https://tinyurl.com/yck2cfc3 (last visited Nov. 24, 2023).

141.   Also in 2015, Target introduced its "Pride Manifesto," which it described as "a year-round commitment to creating an inclusive culture." *Stronger Together*, *supra*. Target also asked its employees to espouse this belief. *#TakePride With Target,* TARGET (June 8, 2015), https://tinyurl.com/4y772d85; *Target's Pride Manifesto Video Transcript*, TARGET (June 8, 2015), https://tinyurl.com/mu4837bw. Target's Executive Vice

President and Chief Corporate Social Responsibility Officer Laysha Ward declared: "We're making our message loud and clear: Target proudly stands with the LGBT community, both as a team member and team player through all that we do." Curtis M. Wong, *Target's New Pride Commercial*, HUFFINGTON POST (June 9, 2015), https://tinyurl.com/yc8dcuec.

142.    Beginning in 2015, Target also introduced rainbow-themed merchandise under its #TakePride campaign. *Id*. The campaign received widespread praise from pro-LGBT stakeholders. *See, e.g.*, GLSEN, FACEBOOK (June 9, 2015), https://tinyurl.com/mupu42pe ("Target's new #TakePride campaign . . . create[s] a message about awareness and equality"); Perez Hilton (@ThePerezHilton), X (f.k.a. TWITTER) (June 22, 2016), https://tinyurl.com/mpn46b2t ("Thank you, @Target, for putting this in your stores! The homophobes can't handle our shine!").

143.    Also in 2015, Target announced it would eliminate gender labels on children's toys and other merchandise, i.e., labels for "boys" and "girls" or blue and pink coloring. Target stated it was doing so because "guests have raised important questions about a handful of signs in our stores based on gender," and that Target would be "phas[ing] out gender-based signage." Kathryn Robinson, *Target Ditches Gender Labels on Toys, Home and Entertainment*, NBC NEWS (Aug. 9, 2015), https://tinyurl.com/5ae89es4. Commenters noted stakeholder organizations had been calling for the move. *See* Christia S. Brown, *Target Is Right on Target About the Use of Gender Labels*, PSYCH. TODAY (Aug. 14, 2015), https://tinyurl.com/y269av33.

144.    After North Carolina enacted legislation in 2016 limiting multi-occupancy bathrooms and locker rooms to occupants of the same sex, as defined on occupants' birth certificate, LGBT stakeholders called on companies to respond. *See, e.g.*, Press Release, HUM. RTS. CAMPAIGN, *More Than 100 Major CEOs & Business Leaders Urge North Carolina to Repeal Anti-LGBT Law* (Mar. 31, 2016), https://tinyurl.com/4rtmzt9p.

145.    Target responded to LGBT stakeholders' calls for action. In April 2016, Target published a blog post responding to "proposed laws in several states" and stating: "[W]e welcome transgender team members and guests to use the restroom or fitting room facility that corresponds with their gender identity." Continuing to Stand for Inclusivity, *supra*.

146.    LGBT stakeholders rallied around Target's announcement. The Human Rights Campaign published a post stating "Target's announcement, however, takes a decisive step beyond on-paper policies, serving to publicly affirm transgender people at a time when our dignity and safety are under daily attack." Beck Bailey, *Target Affirms Trans-Inclusive Policies, Makes Powerful Statement During Surge of Anti-LGBT Bills*, HUM. RTS. CAMPAIGN (Apr. 20, 2016), https://tinyurl.com/4k3fpzte.

147.    Despite consumer backlash to Target's response to the North Carolina transgender law, *see*, *infra*, Part VI.B, Target doubled down on its LGBT activism, continuing to hold LGBT-"Pride Month" and other campaigns.

148.   For Target's 2020 Pride Month campaign, Target's Pride+ Business Council worked with Target designers to offer Pride-themed merchandise including "more than 90 products online and in nearly 500 stores across the country, with apparel in extended sizes, accessories, swimwear and more." Press Release, TARGET, *Here's How Target's Helping Guests and Team Members Honor Pride Month* (June 11, 2020), https://tinyurl.com/2p9svfev.

149.   For Target's 2021 Pride Month campaign, Target donated a portion of the proceeds from the sale of Pride merchandise to GLSEN. Lex Gabrielle, *Target Launches Pride Clothing Line For The Entire Family*, DIPLY (Aug. 16, 2021), https://tinyurl.com/27ts23hz.

150.   Target's 2021 Pride Month campaign was "developed by Target designers alongside the company's Pride+ Business Council." Palmer Haasch, *TikTok Users Are Roasting Pride Month Merchandise from Giant Corporations, Targeting 'Rainbow Capitalism'*, BUS. INS. (May 4, 2021), https://tinyurl.com/2uwv3es7.

151.   Target's 2021 Pride collection "received considerable backlash" from certain LGBT stakeholders for being insufficiently aggressive. "Users on social media called the collection homophobic because they felt the merchandise was out of touch. . . . TikTok user Julia Handra (53,000 followers) called the collection performative, saying "[Target] slapped some rainbows on a T-shirt and called themselves an ally." Gabriela Farcia-Astolfi, *Why Target Revamped Its 2022 Pride Collection After Criticism*, GLOSSY (June 24, 2022), https://tinyurl.com/3c48ww92.

48

152.    For Target's 2022 Pride Month campaign, Target recognized and responded to LGBT stakeholders' criticisms of the 2021 campaign. A Target spokesperson announced that for the 2022 campaign, "[f]or the first time, Target partnered with brands and designers outside of the company for exclusive Pride Month collection collaborations." *Id.* LGBT stakeholders responded positively. "Refinery 29 reported the collection was 'Queer-TikTok approved'" as favorable reviews posted as TikTok videos reached two million views. *Id.*

153.    Target also adopted pro-LGBT "supplier diversity" targets. In the 2022 ESG Report, Target stated that "59% of our Pride assortment was designed with and by LGBTQIA+ creators and brands" as part of Target's overall strategy that sources from "suppliers that are at least 51% owned, controlled and operated by women, BIPOC, LGBTQIA+, veterans or people with disabilities." 2022 ESG Report at 45, 51.

154.    In 2022, Target signed a business statement coordinated by the Human Rights Campaign opposing the State of Florida's "Parental Rights Act," which it characterized as "anti-LGBTQ legislation." Henry Berg-Brousseau, *Marriott, Hilton, American Airlines and AirBnb Join 150+ Major U.S. Companies to Oppose Anti-LGBTQ+ Legislation in Florida*, HUM. RTS. CAMPAIGN (Feb. 28, 2022), https://tinyurl.com/46njx8zh.

155.    Target also launched a campaign to censor books writing on LGBT issues from a conservative perspective.

156. This campaign began in 2020, when Target removed a book from its stores in response to a Twitter user accusing Target of platforming "transphobia." *See* Madeline Osburn, *Target Swiftly Bans Book on Behalf of Anonymous Twitter User Crying 'Transphobia'*, THE FEDERALIST (Nov. 13, 2020), https://tinyurl.com/5xdhvdff.

157. After predictable "political backlash" to this move, Target reversed its decision to remove the book. Charles Bowyer & Jerry Bowyer, *Target Hits Books*, NAT'L REV. (July 30, 2021), https://tinyurl.com/mrxhsbwu.

158. However, Target then quietly introduced official content-based bookselling "guidelines" that systematically banned the sale of numerous conservative and right-of-center books, including those they had just put back on the shelves in response to political backlash. *Id.*

159. Banned books included Mark Levin's THE DEMOCRAT PARTY HATES AMERICA (2023), *see* Paul Bedard, *Target Bans Mark Levin Book, Scared of Offending Democrats,* WASH. EXAMINER (July 5, 2023), https://tinyurl.com/yhahvhda; Abigail Shrier's IRREVERSIBLE DAMAGE (2020), *see* Charles Bowyer & Jerry Bowyer, *supra*; Dr. Deborah Soh's THE END OF GENDER (2020), *see id.*; and Matt Walsh's JOHNNY THE WALRUS (2022), *see* Dave Urbanski, *Matt Walsh Says His Best-Selling 'Johnny the Walrus' Book Was Removed from Amazon's LGBTQ Section As Well As Target's Website: 'The Canceling Begins',* BLAZE MEDIA (Dec. 10, 2021), https://tinyurl.com/bdz9hrne.

160.   The foregoing examples of LGBT activism by Target continued in substantial form when Target issued the 2022 Annual Report, 2022 Proxy, and 2023 Proxy.

### B.   Target's LGBT Activism Repeatedly Provoked Consumer Backlash and Subjected Target to Social and Political Risks

161.   Consumers have repeatedly responded negatively to Target's LGBT activism, harming the company's reputation, marketing, and ultimately earnings, and leading to investor losses. Target's LGBT activism has also subjected Target to mounting social and political risks.

162.   As early as 2011, Target was aware that the perception that Target was engaged in LGBT activism could harm the company by causing a negative reaction by Target consumers. In litigation surrounding a pro-LGBT group's canvassing support for gay marriage in California in front of Target stores, one of Target's briefs included testimony by one of its employees at a California store. The employee stated:

> Some guests have told us they are offended by the controversial pro-gay marriage messaging of the solicitors, and that they assume Target promotes the same view. . . . One guest informed us that they were going to return everything they have bought because they were offended by the group. Many mothers with children have complained about the sensitive nature of the solicitors' messaging.

Zack Ford, *Court Documents: Target Fears Customers Will Think It Promotes Same-Sex Marriage*, THINK PROGRESS (Mar. 26, 2011), https://tinyurl.com/yku8fw58.

163.   Target's first LGBT-themed merchandise campaign in 2012 provoked backlash from social and political leaders, who in turn notified consumers of Target's controversial actions.

164.    Family Research Council President Tony Perkins stated that Target's campaign wasn't "'very smart,' especially in conservative states, where [Target] does the biggest business" and called on listeners to "Let Target know that its agenda isn't your style. Log on to target.com, scroll down, and click 'Contact Us.'" Brian Tashman, *American Family Association, Family Research Council Attack Target for Selling 'Pride' T-Shirts*, RIGHT WING WATCH (May 23, 2012), https://tinyurl.com/vdtamvpz.

165.    The American Family Association released an "action alert" stating "Target is joining President Obama in ramming same-sex marriage down the throats of the American people" and calling on readers to "[s]end an email to Target['s] Chairman" to "[l]et him know that a majority of Americans oppose same-sex marriage and are able to use their pocketbooks to voice their opposition to companies that support it." *Id.*

166.    After Target joined amicus briefs supporting gay marriage in 2014, several groups, including the National Organization for Marriage, the Liberty Counsel, and American Decency Association organized a consumer protest in response. National Organization for Marriage President Brian Brown stated:

> Target and other companies need to be forced to realize that it is their alignment with the radical cause of redefining marriage that is "bad for business" . . . So I'm announcing a new boycott today, against Target, for insulting consumers like you and me. The brief they signed in court this week insinuates that people like you and me, who would vote to uphold traditional marriage, as akin to segregationists and racial bigots. Would you want to shop at a place that viewed you in that way?

*Who's Targeting Whom?*, NAT'L ASSOC. FOR MARRIAGE (Aug. 7, 2014), https://tinyurl.com/457wdsue. The petition associated with the protest reportedly received double its targeted number of signatures. *See* Alfred Verhoeven, *Boycotts As a Marketing Instrument*, MARKETING THE RAINBOW, https://tinyurl.com/49twwna7 (last visited November 21, 2023); Lucas Grindley, *NOM Aims Low on Boycott of Target Over Support for Marriage Equality*, THE ADVOC. (Aug. 8, 2014), https://tinyurl.com/44afvc67.

167.   Target's initiative to eliminate "boys" and "girls" labeling on toys and other merchandise also sparked backlash from social and political commentators, who called on consumers to respond.

168.   The Reverend Franklin Graham, president of the Billy Graham Evangelistic Association, published a Facebook post that was liked by over 102,000 users that stated: "I think Target may be forgetting who has made their stores strong. It's not gender-neutral people out there—it's working American families, fathers and mothers with boys and girls they love" and "let Target know what you think. Let them know that you are perfectly willing to shop where the genders God created are appreciated." Franklin Graham, FACEBOOK (June 9, 2015), https://tinyurl.com/4zsemtk4.

169.   The popular conservative commentator Matt Walsh explained how Target's preference of stakeholders over its consumers led to the decision. Citing news media accounts of Target stakeholders, Walsh explained that "[a] few hypersensitive,

hyperliberal parents complained that gender segregation in the toy department makes kids feel 'deflated' and 'chastised,' and Target made the change to accommodate them. The sensitivities of the 0.0001 percent outweighed the concerns of the 99.999 percent, as usual." Matt Walsh, *Yes, Target, I Do Want My Daughter To Conform To Her Gender*, THE BLAZE (Aug. 13, 2015), https://tinyurl.com/4v2n6xh8.

170.    The risks and harms to Target's reputation from its LGBT activism boiled over into massive consumer backlash when Target published its transgender bathroom post responding to North Carolina's 2016 bill. Target provoked outrage and experienced significant losses because of its response to a law passed by the North Carolina legislature that limited bathroom access to the sex listed on one's birth certificate.

171.    Target "botched" its response to the North Carolina law by publishing a blog post, which was reportedly not reviewed by senior management, "welcoming transgender employees and shoppers to use restrooms and fitting rooms corresponding with their gender identities" and changing Target's signature "red bullseye logo into a gay-pride rainbow." Khadeeja Safdar, *How Target Botched Its Response to the North Carolina Bathroom Law*, WALL ST. J. (Apr. 5, 2017), https://tinyurl.com/ycyddz93.

172.    In response, more than 1.5 million people pledged to boycott Target over its transgender bathroom policy after a campaign from the American Family Association and other groups. *Id*. The group LifeSiteNews "put up billboards in Oklahoma urging customers to #FlushTarget and drove a truck with that message to

stores near Target's headquarters in May," and "[p]rotesters attended Target's June shareholder meeting to speak out against the policy." *Id.*

173.    Target's same-store sales growth fell in each of the next three quarters after publishing the blog post in April 2019:



*Id.*

174.    After the massive backlash to Target's blog post, "[a]t Target's Minneapolis headquarters, executives scrambled to control the damage," which, "[a]fter an internal review, executives determined . . . was the tipping point for some stores" in several markets, leading to Target closing those stores. *Id.*

175.    After the incident, Defendant Cornell reportedly admitted to Target staff that "Target didn't adequately assess the risk, and the ensuing backlash was self-inflicted," but "it was too late to reverse course." *Id.*

176.    Nonetheless, Defendant Cornell publicly defended the decision, stating: "We took a stance, and we're going to continue to embrace our belief of diversity and inclusion, just how important that is to our company." Travis M. Andrews, *Target CEO Responds to Nationwide Boycott of the Store Over Transgender Bathroom Policy*, WASH. POST (May 13, 2016), https://tinyurl.com/36xtbjec.

177.    The cost of Target's "botched" response to the North Carolina law was steep. Target's sales fell in each quarter following the blog post and, in response, Target was forced to "spend $20 million to add private bathrooms to the stores that didn't have them" and "embark[] on a multibillion-dollar revamp" of the stores that were falling behind as a result. Safdar, *supra*.

178.    Consumer backlash resulting from Target's transgender bathroom policy lasted into 2017 and 2018. At the same time, Target continued to face consumer backlash and social and political blowback from its Pride Month campaigns and LGBT merchandise.

179.    Conservative commentators responded negatively to Target's 2018 Pride Month Campaign. A Family Research Council representative stated: "I would think Target would have learned their lesson about participating in aggressive LGBT activism from the backlash they received from their open bathroom policy last year, yet they seem not to have learned that lesson," and Target didn't "understand that those people who signed up to boycott Target are not going to be any happier with the

Take Pride merchandise that they're offering." *Target at It Again, Pushing Pro-LGBT Agenda*, CBN (May 12, 2017), https://tinyurl.com/2tw2aa37.

180.    According to several online accounts, Target employees at many stores regularly received complaints from customers about LGBT-Pride merchandise during the 2021 and 2022 Pride Month campaigns and afterward.

181.    In a viral video from 2021, a Target guest confronted a Target employee about its Pride merchandise, asking "Do you guys support the satanic pride propaganda?" The Target employee replied, "Yeah both. Satan and Pride." Taylor Henderson, *A Target Employee Shut Down This Pride Month Heckler in the Best Way*, YAHOO NEWS (Nov. 10, 2021), https://tinyurl.com/2mbjzz53 (video embedded). The guest responded by asking the Target employee, "[w]hat's God gonna think of that?" The employee answered, "I don't believe in God." *Id.* The guest later stated, "God will judge you guys." The Target employee responded: "[H]e can't if I don't believe in him." *Id.*

182.    During Target's 2022 Pride campaign, Target sold transgender-related merchandise in sizes small enough for children to wear such as "chest binders" and "packing underwear," produced by the designer "TomboyX." Nicole Russell, *Target Normalizes Transgender Lifestyle*, THE DAILY SIGNAL (May 13, 2022), https://tinyurl.com/2mce5x66. Among many others, conservative commentator Allie Beth Stuckey announced she boycotted Target over its offering this merchandise.

Allie Beth Stuckey, YouTube, *One Year of My Target Boycott (& They're Queerer Than Ever)*, May 15, 2023, https://tinyurl.com/2vp5weru.

183.    Target experienced customer complaints because of these items. For example, one Target employee stated in an online forum for Target employees that there was "a lady at our store who had a fit over the compression tops" and "[s]tarted screaming at me, another tm [team member, i.e. Target employee], and a manager that we were selling items that were 'binding our children's genitals.'" Another commented that another guest "complain[ed] about our[] [Pride assortment]" and ask "how could anyone shop there with it being shoved in their faces[?]"

184.    Target's stock price has declined during "Pride Month," which is ordinarily the month of June, in three of the last four years.

**C.    Despite Increasing Risks, Target Drastically Expanded Its LGBT Activism with the 2023 LGBT-Pride Campaign.**

185.    In 2023, Target LGBT stakeholder the Human Rights Campaign declared a "state of emergency" over alleged "anti-LGBTQ" laws and sentiment mounting across the country. Claire Thornton, *'State of emergency': LGBTQ Americans Given Dire Warning from Human Rights Campaign*, USA Today (June 6, 2023), https://tinyurl.com/zb24r758. Despite escalating backlash to Target and other companies' similar LGBT activism, Target doubled down on its LGBT activism by planning its most aggressive LGBT-Pride Month campaign yet by far with the 2023 LGBT-Pride Campaign.

1. <u>There Was Abundant Risk of Consumer Backlash to LGBT Activism among Similarly Situated Companies.</u>

186. In April 2023, a month before Target began the LGBT-Pride Campaign, a consumer boycott of the brand Bud Light over its LGBT marketing campaign cost the brand over 25 percent in sales. Daniel Newman, *Bud Light Sales Continue to Plummet After Transgender Marketing Controversy*, ST. LOUIS POST-DISPATCH (May 1, 2023), https://tinyurl.com/59skyrsm.

187. Similar boycotts and backlash over LGBT and other ESG/DEI marketing and product campaigns also hit other companies before Target's 2023 Pride Campaign, including:

- Nike, *see* Lauren Thomas, *Nike Shares Fall as Backlash Erupts Over New Ad Campaign Featuring Colin Kaepernick*, CNBC (Sept. 4, 2018), https://tinyurl.com/ypwazzpu;

- Gillette, *see* Katie Pavlich, *Woke to Broke: Gillette Loses Billions After Anti-Men, Transgender Shaving Ads*, TOWNHALL (Aug. 1, 2019), https://tinyurl.com/2dt6c7fb;

- National Football League, *see* Daniel Roberts, *Poll: 33% of NFL Fans 'Purportedly Stopped Watching' This Season*, YAHOO NEWS (Jan. 8, 2018), https://tinyurl.com/3vcc7nah;

- Netflix, *see* Staff and Agencies, *Cuties Controversy Sparks #CancelNetflix Campaign*, THE GUARDIAN (Sept. 11, 2020), https://tinyurl.com/4x3ssn9x;

- Major League Baseball, *see* Andrew Solender, *Republicans Vow Boycott, Retaliation Against MLB Over Pulled All-Star Game*, FORBES (Apr. 2, 2021), https://tinyurl.com/452weztf;

- The Walt Disney Company, *see* Andrew Stiles, *Disney Stock Down 33 Percent Since CEO Instigated Feud with DeSantis*, WASH. FREE BEACON (May 24, 2023), https://tinyurl.com/ycwztnea;

- Jack Daniel's, *see* Aleks Phillips, *Jack Daniels Faces Boycott Calls Over LGBT Campaign: 'Lost a Loyal Drinker,'* NEWSWEEK (Apr. 6, 2023), https://tinyurl.com/2c43bxe4; and

- National Basketball Association, *see* Clay Travis, *NBA is America's First Bud Light-Style Fiasco But You're Not Supposed to Know That*, FOX NEWS (July 8, 2023), https://tinyurl.com/522a45pc;

188.    Numerous companies, including Target competitors and similarly positioned companies and brands, faced concurrent backlash with Target for this year's LGBT-themed campaigns, such as:

- Walmart, *see* Giulia Carbonaro, *Walmart Under Fire for LGBTQ+ Merchandise After Target Retreats*, NEWSWEEK (May 24, 2023), https://tinyurl.com/4d9ywpvk;

- Kohl's, *see* Lee Brown, *Kohl's Latest Retailer Facing Boycott Calls for Selling Pride Onesie for Babies: 'Time for a Bud-Lighting,'* N.Y. POST (May 29, 2023), https://tinyurl.com/3ta2c3cj;

- PetSmart, *see* Aubrie Spady, *PetSmart Faces Boycott Calls for 'Pride Dog Bikini,' Donations to Group Pushing Gender Ideology on Students*, FOX NEWS (June 1, 2023), https://tinyurl.com/2nsp3dve;

- Starbucks, *see* Amelia Lucas, *Starbucks Union Claims Dozens of Stores Aren't Allowed to Decorate for Pride*, CNBC (June 13, 2023), https://tinyurl.com/4w27hksw;

- Cracker Barrel, *see* Kristopher J. Brooks, *Cracker Barrel Faces Boycott Call for Celebrating Pride Month*, CBS NEWS (June 9, 2023), https://tinyurl.com/nst84fxf;

- The North Face, *see* Danni Button, *North Face is Latest Target of Backlash After Pride Celebration Ad*, THE STREET (May 25, 2023), https://tinyurl.com/4ffft7x5;

- LEGO, *see* Shannon Thaler, *LEGO Becomes Latest Company Facing Boycotts Over Its 'Transgender Building Sets'*, N.Y. POST (June 1, 2023), https://tinyurl.com/2p85wpyn; and

- Adidas, *see* Jessica Guynn, *Is Adidas Having a Bud Light Moment? Transgender Pride Swimsuit Touches Off Controversy*, USA TODAY (May 19, 2023), https://tinyurl.com/5ee6ftcj.

189.    Political risk to ESG/DEI initiatives was also increasingly evident. To date, at least 99 so-called "ESG backlash" bills have been filed in state legislatures, and anti-ESG bills have become law in at least 16 states. Ross Kerber, *Business Fights Back*

*as Republican State Lawmakers Push Anti-ESG Agenda*, REUTERS (Apr. 24, 2023), https://tinyurl.com/yfea62s5; Adam Aton & Avery Ellfeldt, *States Shrug Off Warnings, Plow Ahead with Anti-ESG Laws*, E&E NEWS (June 22, 2023), https://tinyurl.com/5yhpwvxy.

190.    Numerous companies have recognized anti-ESG backlash as a material social and political risk arising from their pursuit of ESG goals. *See, infra*, ¶¶ 269–272. And it is an emerging consensus among board-focused advisers and publications that directors should oversee anti-ESG risks. *See, e.g.*, Isabel Gottlieb, *Anti-ESG Backlash is Phenomenon Boards Must Tackle, Lipton Says*, BLOOMBERG LAW (July 27, 2023), https://tinyurl.com/yb4p45wn; Brooke Goodlett et al., *The "Anti-ESG" Movement: Balancing Conflicting Stakeholder Concerns and Inconsistent Regulatory Regimes*, DLA PIPER (Feb. 21, 2023), https://tinyurl.com/2rp9j44d.

2.    Defendant Cornell and Target Commit to LGBT Activism, Ignore Risks & Develop Target's Most Aggressive and Offensive LGBT-Pride Campaign Yet.

191.    Target and executives were aware of these mounting risks but displayed no sign of accounting for these risks or changing course.

192.    The President of the American Family Association twice visited Target's headquarters and requested that Target rescind its transgender bathroom policy but was "rebuffed" each time. *Methodist Bishops, Meet Brian Cornell*, AM. FAMILY ASSOC. (June 28, 2017), https://tinyurl.com/bdhz2kt9.

193. Defendant Cornell wrote off the consumer backlash to Target's transgender policy as "a lot of tough feedback." *Safdar*, *supra*. Nonetheless, he doubled down by committing to "continue to embrace our belief of diversity and inclusion" via Pride campaigns and other forms of LGBT activism. *Id*.

194. Target was especially aware of the risks of its LGBT activism because of the backlash Bud Light had recently received and continued to receive. A Target insider stated that "given the current situation with Bud Light, the company is terrified of a Bud Light situation." Brian Flood, *Target Holds 'Emergency' Meeting over LGBTQ Merchandise in Some Stores to Avoid 'Bud Light Situation*,' FOX NEWS (May 23, 2023), https://tinyurl.com/3wuz7rdj.

195. Target representatives admitted to Plaintiff Inspire that "the environment seems to have changed" with respect to Target's LGBT-Pride Month campaigns.

196. Target and Defendant Cornell's reckless approach to the risk of consumer backlash because of Target's LGBT activism continued in the leadup to the 2023 LGBT-Pride Campaign, which was Target's most aggressive and offensive yet.

197. Unlike prior years' campaigns, Defendant Cornell publicly lauded Target's "teams who have been working so hard on our plans for Pride." *See*, *infra*, ¶ 409.

198. One member of Target's "teams" was Target's current "Senior LGBTGQIA+ Segmentation Strategist & Pride Lead," Erik Thompson, who announced that he was "[h]onored to . . . lead Target's LGBTQIA+ multicultural

merchandising strategy and Pride businesses for the company and the LGBTQIA+ & Allied communities across the the [sic] nation" and that it was "[t]ime to whip out the Glitter & Hellfire flamethrowers and rip that old world to shreds darlings." Luke Gentile, *Target's Newest Pride Strategist Bringing a Whole New LGBT Spirit to Christmas*, WASH. EXAM. (Nov. 16, 2023), https://tinyurl.com/4xeeu2js.

199. When Thompson was asked if he would hurt Target's sales, he responded "Yes. Yes I will make sales tank." Amanda Harding, *Target Promotes 'GayCruella' To 'LGBTQIA+ Segmentation Strategist' Amid Abysmal Sales From Pride Backlash*, THE DAILY WIRE (Nov. 15, 2023), https://tinyurl.com/3b2u7w3j. Thompson has been employed by Target in several corporate roles and has worked for the company since June 2014. *Id.*

200. The Confidential Witness recounted that decisions about the content of the 2023 LGBT-Pride Campaign were made at the senior-executive level and that the Campaign was a "big priority for Minneapolis." He explained that decisions about which merchandise would be included in the 2023 LGBT-Pride Campaign "came from HQ." He stated that decisions to sell LGBT-themed children's apparel and "tuck-friendly" women's swimsuits "came down from the top."

201. Target's 2023 LGBT-Pride Campaign was different than previous years' "Pride Month" displays. The Confidential Witness explained that the 2023 LGBT-Pride Campaign was more expansive and aggressive than previous years' "Pride Month" displays. In previous years, "Pride Month" related merchandise was relegated

to a small display in the "men's" section of stores. For the 2023 LGBT-Pride Campaign, senior executives directed stores to make the display "an entire department" and "move the Pride stuff forward" to the "front and center when you walk into the store."

202.   Compounding the more prominent displays, for the 2023-LGBT Pride Campaign Target contracted with new suppliers for its LGBT-Pride merchandise that were exotic and bizarre. This was reportedly done to meet Target's supplier diversity targets, which Target elsewhere lauded for the fact that its Pride assortment was "designed with and by LGBTQIA+ creators and brands." Target also promoted the 2023 Pride Month more extensively than in previous years. Finally, as discussed below, Target included for the first time certain pro-LGBT children's material and marketing materials directed at children.

203.   The Confidential Witness described how senior executives' decisions to undertake the 2023 LGBT-Pride Campaign and make it more prominent were deliberate, explaining that nothing was spontaneously decided on, and everything was thought through." Target's corporate "mantra now" was to "stick [its] nose so far out . . . even at the risk of alienating certain customers" and "without thinking [if] this is going too far." It was not enough to offer LGBT-themed merchandise, Target executives viewed it as their role to "push the envelope."

204.   The 2023 LGBT-Pride Campaign was one of Target's ESG/DEI initiatives. As Defendant Cornell later recounted, the Campaign was "part of our

commitment to support a diverse team, which helps us serve a diverse set of guests."
Q2 2023 Target Corp Earnings Call Transcript, *infra*.

### D. Target's Disastrous 2023 LGBT-"Pride" Campaign Triggered Consumer Boycotts that Cost Investors Billions

205.   In May 2023, Target undertook its now infamous 2023 LGBT-Pride Campaign, in which it marketed rainbow themed LGBT-Pride merchandise and GLSEN signs to families and children and offered shockingly offensive merchandise that provoked immense consumer backlash. The Campaign was the most ambitious and extreme in Target's history and was certain to prompt intensely negative reactions from the working-class-family customers upon whose "positive perceptions" Target's sales—and stock price—depended.

### 1.   Target Rolls Out the 2023 LGBT-Pride Campaign

206.   In May 2023, Target began stocking its stores with LGBT-themed clothing targeted at children and families and others.

207.   For the 2023 LGBT-Pride Campaign, "Target followed a protocol that many advocates see as essential to corporate declarations of support, especially in the aftermath of Black Lives Matter protests. The retailer partnered with independent LGBTQ+ designers and advocacy organizations on apparel, swimwear, footwear, accessories, toys and messaging, with uplifting, supportive and sometimes defiant slogans. Signage was vivid and large, and displays were placed at the front of the store." Daphne Howland, *How Target went from loud and proud – to silent*, RETAIL DIVE (June 5, 2023), https://tinyurl.com/vhuf8duy.

208.    Target's website listed over 100 products under the category "LGBT Pride: Kids' Clothing," which are often modeled by very young children and almost always feature themes designed to attract and interest them, like rainbow Mickey Mouse symbols. *LGBT Pride: Kids Clothing*, TARGET, https://tinyurl.com/2rpxw8ec (last visited Aug. 3, 2023).

209.    The 2023 LGBT-Pride Campaign also extended to brick-and-mortar stores. News reports state that "[t]here was plenty of LGBTQ merch in Target's children's section," and Target also stocked "T-shirts that say 'Pride Adult Drag Queen "Katya,"' 'Trans people will always exist!' and 'Girls Gays Theys.'" Shannon Thaler, *Target's Reputation Takes Hit Over Children's LGBTQ Clothing*, *supra*.

210.    No child was too young for Target, which advertised and sold LGBT-themed products like onesies, bibs, and overalls aimed at newborns and toddlers.

211.    Target displayed signage and promotions for GLSEN next to children's Pride merchandise:



RETAIL DIVE, *supra*.

212.    Target also stocked other controversial merchandise in the LGBT-Pride
Campaign, including extra-extra-small "swimsuits with clothing tags that describe the
items as having a 'light binding effect' on breasts and 'tuck-friendly construction' for
male genitalia" with "extra crotch coverage." Abigail Anthony, *Target Reportedly
Moving 'Pride' Items, supra*. See below:



Will Potter, *Target Takes 'Emergency' Action to 'Avoid a Bud Light Situation' and Removes 'Tuck-Friendly' Women's Swimwear and LGBTQ Products from Display in Southern Stores— as CEO Defends the Line*, DAILY MAIL UK (May 23, 2023), https://tinyurl.com/ms74wm48.

213.   Former Target Vice Chairman Gerald Storch stated "that tuck swimsuit" was "where the big mistake was made." Agustin Hays, *Former Target exec reveals the 'one item' that sparked consumer firestorm*, FOX NEWS (June 3, 2023), https://tinyurl.com/5ftxtbhs (internal brackets omitted). While other companies might "show the rainbow," Target's "tuck swimsuit . . . really made the difference versus the competitors." *Id*.

214.   Target's Pride merchandise offerings also included "pride toddler legging." Will Hild, X (f.k.a. TWITTER), (Nov. 2, 2023) https://twitter.com/WillHild/status/1720084164035449156.

215.   Other Pride merchandise marketed at children reportedly included rainbow sports bras modeled by young boys:



*Woke Alert: Target*, CONSUMERS RES., https://consumersresearch.org/woke-alert/target/ (last visited Nov. 6, 2023).

216.   Target also sold pro-LGBT children's books, including titles such as "I'm Not A Girl," "Are You a Boy or Are You a Girl?" and "The Hips on the Drag Queen Go Swish, Swish, Swish":



*Id.*

217.    Videos filmed by consumers showed that some of the Pride merchandise depicted the outlines of naked men and women. Oli London (@OliLondonTV), X (f.k.a. TWITTER), May 10, 2023, https://tinyurl.com/9cm25ub2.

218.    Target also knowingly stocked merchandise by "Satanist-Inspired" brand Abprallen for its pride collection, according to its designer Erik Carnell. Abigail Anthony, *Target Knew of Satanist-Inspired Merchandise*, *supra*.

219.    Abprallen is known for designs that "glorif[y] violence" against so-called transphobes, such as "designs showing the phrases 'We Bash Back' with a heart-shaped mace in the trans-flag colors, 'Transphobe Collector' with a skull, and 'Homophobe Headrest' with skulls beside a pastel guillotine." Abigail Anthony, *Target Partners with Satanist Brand to Create Items for 'PRIDE' Collection,* NAT'L REV. (May 22, 2023), https://tinyurl.com/bdsbf9c9. See below:



*Homophobe Headrest,* ABPRALLEN, https://tinyurl.com/bddmh3yy (last accessed Aug. 3, 2023).

220.    Abprallen's other designs also include divisive imagery, including "pentagrams, horned skulls and other Satanic products," Siddharth Cavale, *Target Removing Some LGBTQ Merchandise Following Customer Backlash*, REUTERS (May 24, 2023), https://tinyurl.com/y7j8hvcw, and one design "featuring the slogan 'Satan Respects Pronouns' and a horned ram representing Baphomet—a half-human, half-animal deity that is both male and female." Helen Reid, *Target Pride Backlash Exposes 'Rainbow Capitalism' Problem, Designer Says*, REUTERS (May 31, 2023), https://tinyurl.com/35b9wxw2. See below:



Abprallen    (@abprallenuk),    INSTAGRAM    (May    29,    2023), https://tinyurl.com/5ef2c9p7.

221.    According to an Instagram post by Carnell, Target "was fully aware of the brand's Satanist-inspired merchandise." Abigail Anthony, *Target Knew of Satanist-Inspired Merchandise, supra*. In the post, Carnell wrote:

> When I was approached to create products for Target they told me that my work such as 'Satan Respects Pronouns' wouldn't be a good fit, they were observant enough and had the necessary critical thinking skills to realise [sic] that my use of occult imagery is as harmless as any horror movie targeted towards adults but wanted my collection for adults to be a bit less gothic.

222.    According to Carnell, the Abprallen designs Target sold included a fanny pack with the statement "We Belong Everywhere," a tote that says "Too Queer For Here," and a sweatshirt with a serpent that says "Cure Transphobia, Not Trans People." BrieAnna J. Frank, *British Brand, not Target, sells 'Satan Respects Pronouns' Shirt: Fact Check*, USA TODAY (May 25, 2023), https://tinyurl.com/bdhwcnee.

223.    Consumers stated that they were enraged by the foregoing merchandise and the revelation of the "LGBTQIA+ designers and brands" like Abprallen that Target partnered with.

224.    Many consumers uploaded videos of offensive merchandise they saw at Target online on social media websites, and several videos were viewed millions of times.

225.    As news of the 2023 LGBT-Pride Campaign began circulating, consumers began calling for boycotts, with messages like "Target deserves the Bud Light treatment," Ariel Zilber, *Target's 'tuck-friendly' swimwear for kids sparks outcry: 'Bud Light 2.0'*, N.Y. POST (May 19, 2023), https://tinyurl.com/kpdaakze. "Graham Allen, host of the conservative *Dear America* podcast, posted several viral tweets urging his nearly 300,000 followers to boycott Target" including: "Target does NOT deserve our business" alongside a TikTok video of an angered customer displaying how extensive Target's Pride line was. Conor Murray, *Target Removes Pride Items After Conservative Firestorm—Sparking Criticism From LGBTQ Groups*, FORBES (May 24, 2023), https://tinyurl.com/yv66r442. "As of Thursday afternoon, videos on TikTok with the hashtag #boycotttarget had attracted nearly 25 million views." Sarah Nassauer, *Target to Pull Some LGBT-Themed Merchandise After Customer Backlash*, WALL ST. J. (May 24, 2023), https://tinyurl.com/mkyykyz4.

226.    A rap song titled "Boycott Target" reached #1 on iTunes sales in the United States. Shannon Thaler, *'Boycott Target' Song over Retailer's LGBTQ 'Agenda'*

*Tops iTunes — But Rapper Still Claims He's 'Shadow-Banned,'* N.Y. POST (May 30, 2023), https://tinyurl.com/52kevs6f. The song's video features a rapper showing sexualized merchandise aimed at children in an actual Target store while encouraging customers not to shop at Target. *See* Forgiato Blow, *Boycott Target "Official Music Video",* YOUTUBE (May 25, 2023), https://tinyurl.com/48t2kp42.

227.    The foregoing consumer backlash prompted the largest boycott and reduced consumer demand for Target in recent history, perhaps ever, leading to billions in investor losses.

2.    The 2023 LGBT-Pride Campaign & Consumer Boycotts Caused Target Massive Financial and Reputational Harm

228.    Prior to the complete revelation of the 2023 LGBT-Pride Campaign and consumer backlash to it, Target's stock was priced at around $160.96 on May 17, 2023. Between May 17 and October 6, investors would wipe out more than $25 billion in Target's market capitalization.

229.    News reports stated that Target lost $10 billion in market valuation over May 18–28, 2023 due to parents' backlash over the company's LGBT-themed clothing line for children. Ronny Reyes, *Target Loses $10B in 10 Days as Stocks Fall Following Boycott over LGBTQ-Friendly Kids Clothing,* N.Y. POST (May 28, 2023), https://tinyurl.com/yc8r99rt. Target's stock value remains depressed.

230.    Market observers similarly noted that Target stock endured "its longest losing streak in 23 years." Sabrina Escobar, *Target Isn't the Only Retailer Facing Anti-Pride Backlash,* BARRON'S (June 1, 2023), https://tinyurl.com/yc6zn8bc.

231.    In May, "Target's market value [fell] over $12 billion to $61.77 billion. . . . Mid-month the market value was over $74 billion." David Rutz, *Target May Have 'Lost Control of the Narrative' As Financial Losses, LGBT Anger Mount: Consumer Researchers*, FOX NEWS (May 31, 2023), https://tinyurl.com/3bn2t5cz.

232.    JPMorgan downgraded Target's stock, citing "recent company controversies" as part of the explanation that "could turn "Target's traffic negative after an impressive run of 12 consecutive positive quarters." Caroline Downey, JPMorgan Downgrades Target Stock amid Backlash over LGBT Merchandise, NAT'L REV. (June 2, 2023), https://tinyurl.com/4jp8mrdf. Wells Fargo analysts said the 2023 LGBT-Pride Campaign "'generated a meaningful amount of negative in-store and social media attention' that adds uncertainty to its already challenged near-term prospects and may be hurting store traffic." RETAIL DIVE, *supra*.

233.    This dramatic and sudden loss in company market capitalization is a direct and predictable result of management's calculated decisions to promote sexualized material to children, and the Board's lack of oversight thereof, as a means of virtue signaling to culturally extreme "stakeholders" at the expense of the corporation's core customer group of families and parents, whose reputational views are paramount, as Target itself has recognized. "We call our customers 'guests,' [and] there is outrage on their part," stated one Target insider who has worked there for nearly two decades. *Target Holds 'Emergency' Meeting*, *infra*.

234.  As one investment fund described, Target's stock price drop was "primarily driven by customers and public reaction to in-store promotions for the month of June." Soumya Eswaran, *Here's Why Target Corporation (TGT) Declined in Q2*, YAHOO FIN. (Aug. 2, 2023), https://tinyurl.com/mpu6vj65.

235.  Management's program to alienate the corporation's core customer base by promoting sexualized products for young children has caused catastrophic reputational harm. Target "took 53rd place on the 2023 Axios Harris Poll 100 corporate reputation rankings released Tuesday — the same day the chain yanked some of its Pride merch off store shelves after the pro-LGBTQ messages caused violent outbursts among customers." Shannon Thaler, *Target's Reputation Takes Hit over Children's LGBTQ Clothing, Survey Shows*, N.Y. POST (May 24, 2023), https://tinyurl.com/mry5eknm. "Target's 21-spot drop was the third-largest on the list." *Id.*

236.  On August 16, 2023, Target reported its earnings for the second quarter of 2023, which included the months of May, June, and July during which the LGBT-Pride Campaign occurred. Target reported that its comparable sales fell for the first time in six years, declining 5.4 percent in the quarter. Press Release, TARGET CORP., *Target Corporation Reports Second Quarter Earnings* (Aug. 16, 2023), https://tinyurl.com/3jxezp2j. Digital comparable sales fell 10.5 percent. *Id.*

237.  On Target's second quarter earnings call, Target Chief Growth Officer Christina Hennington called consumer backlash to the 2023 LGBT-Pride Campaign—

"the strong reaction to this year's Pride assortment"—a "headwind" that negatively affected earnings. Edited Transcript, Q2 2023 Target Corp Earnings Call, TARGET (Aug. 16, 2023), https://tinyurl.com/3mbmwn8t.

238.    Target's stock continued to decline throughout the summer and fall. By October 6, 2023, Target's stock price hit a low of $105.01 per share.

239.    On November 15, 2023, Target reported its earnings for the third quarter of 2023. Target's comparable sales continued to fall, declining 4.9 percent, and digital comparable sales fell 6 percent. Press Release, TARGET, *A Closer Look at Target's Q3 2023* (Nov. 15, 2023), https://tinyurl.com/377nfhdp.

240.    Target's LGBT-Pride Campaign put it at the center of the culture-war spotlight, unsurprisingly bringing it under regulatory scrutiny from both ends of the political spectrum.

241.    After Target announced the changes to the LGBT-Pride Campaign as a result of customer backlash discussed *infra*, a group of fifteen state attorneys general wrote a letter to Defendant Cornell expressing their concern that Target's decision to reduce its commitment to the LGBT-themed marketing strategy might "set back the march for social progress and LGBTQIA+ equality." Letter from Andrea Joy Campbell, Attorney General of Massachusetts, and fourteen other state attorneys general to Brian C. Cornell, Chairman and CEO, Target Corp. 2 (June 16, 2023), https://tinyurl.com/29r5emzc.

242. Instead, the attorneys general "urge[d] Target to double down on inclusivity[] [and] reject hate in all its forms," and insinuated that Target's reported changes to the marketing strategy might run afoul of public accommodation laws that "demand that customers be treated equally." *Id.* at 3.

243. On July 6, 2023, a different group of seven state attorneys general sent a letter to Mr. Cornell expressing their concern for Target's "promotion and sale of potentially harmful products to minors, related potential interference with parental authority in matters of sex and gender identity, and possible violation of fiduciary duties by the company's directors and officers." Letter from Todd Rokita, Attorney General of Indiana, and six other state attorneys general to Brian C. Cornell, Chairman and CEO, Target Corp. 1 (July 6, 2023), https://tinyurl.com/4h5yyxac.

244. The attorneys general suggested that "Target's 'Pride' campaign and financial support to organizations such as GLSEN . . . raise concerns under our States' child-protection and parental-rights laws," including laws penalizing the "sale or distribution … of obscene matter" and "material harmful to minors." *Id.* at 1, 3. In addition to expressing concerns about the campaign's lawfulness under child-protection and parental-rights laws, the attorneys general noted their states' beneficial interests as Target shareholders and indicated that "Target's directors and officers may be negligent in undertaking the 'Pride' campaign." *Id.* at 3.

3.  Target Management's Irrational & Inconsistent Responses to Consumer Boycotts

245.  Initially, Target and its officers repeatedly emphasized "safety"—not legitimate consumer backlash, boycotts, or declining sales—as the reason for any response or changes to the 2023 LGBT-Pride Campaign.

246.  On May 24, 2023, Target management issued a press release, "Target Statement on 2023 Pride Collection," in which it both announced changes to the LGBT-Pride Campaign due to consumer backlash and further doubled down on Target's commitment to it:

> For more than a decade, Target has offered an assortment of products aimed at celebrating Pride Month. Since introducing this year's collection, we've experienced threats impacting our team members' sense of safety and well-being while at work. Given these volatile circumstances, we are making adjustments to our plans, including removing items that have been at the center of the most significant confrontational behavior. Our focus now is on moving forward with our continuing commitment to the LGBTQIA+ community and standing with them as we celebrate Pride Month and throughout the year.

Press Release, *Target Statement on 2023 Pride Collection,* TARGET (May 24, 2023), https://tinyurl.com/yns9wz9.

247.  In its press release, Target announced it would be "removing [certain Pride-related] items," citing "threats impacting our team members' sense of safety and well-being while at work." *Id.*

248.  A Target spokeswoman elsewhere elaborated that "people have confronted workers in stores, knocked down Pride merchandise displays, and put threatening posts on social media with video from inside stores." Nassauer, *supra.*

249. Defendant Cornell also sent a companywide email addressing Target employees and "the LGBTQIA+ community" with a similar "safety"-related explanation for the changes:

> This has been a very hard day for Target, and it follows many difficult days of deliberation and decision-making.
>
> To our team in Stores: thank you for steadfastly representing our values. No one is better at working through uncomfortable situations in service to an inclusive guest experience.
>
> What you've seen in recent days went well beyond discomfort, and it has been gut-wrenching to see what you've confronted in our aisles.
>
> To our team in the service centers, thank you for your patience and professionalism through high volumes of angry, abusive and threatening calls. I recognize how difficult and even frightening those interactions can be, and thank you for the composure with which you've fielded those comments.
>
> To the teams who have been working so hard on our plans for Pride - and now are showing incredible agility as we adjust - thank you. Your efforts will ensure we can still show up and celebrate Pride in meaningful ways.
>
> To the LGBTQIA+ community, one of the hardest parts in all of this was trying to contemplate how the adjustments we're making to alleviate these threats to our team's physical and psychological safety would impact you and your wellbeing and psychological safety. We stand with you now and will continue to do so - not just during Pride Month, but each and every day.
>
> Those were the two guiding principles when it came time for us to act: do all we can to keep our team safe, and do all we can to honor our commitment and connection to the LGBTQIA+ community.
>
> From a host of difficult alternatives, we have sincerely sought the best path forward, finding ways to recognize Pride Month, while making adjustments to prioritize safety. As always, we're stronger together, and I want you to know that I'm committed to doing all I can, and all we can as a company, to support a culture across the country of care, empathy,

> equity and simple civility, in hopes that we'll not have to face these kinds of agonizing decisions in the future.
>
> Thank you for the care you've shown each other, our frontline teams and the LGBTQIA+ community.

Dominick Reuter, *Target CEO defends the decision to remove Pride displays and pledges to support the LGBTQ community. Read his letter to employees.*, Bus. Ins. (May 25, 2023), https://tinyurl.com/yehdhduv.

250. Defendant Cornell later elaborated on this purported "safety" rationale by stating the improbable view that the threats to Target employees' safety were greater during the consumer backlash to the 2023 LGBT-Pride Campaign than during the George Floyd-inspired riots Target faced during the summer of 2020. In an interview with CNBC's Becky Quick, Cornell stated:

> I've seen natural disasters, we've seen the impact of Covid leading into the pandemic, some of the violence that took place after George Floyd's murder. But I would tell you, Becky, what I saw back in May is the first time since I've been in this job where I had store team members saying it's not safe to come to work.

*CNBC Transcript: Target CEO Brian Cornell Speaks with Becky Quick from the CNBC Evolve Global Summit*, CNBC (Nov. 2, 2023), https://tinyurl.com/4zkspb2z.

251. This view was improbable because Target faced such violent criminal conduct during the Floyd riots that it was forced to "temporarily close 175 of its locations across the U.S." Lisette Voytko, *Target Closes 175 Stores Nationwide In Wake Of George Floyd Protests, Looting*, Forbes (May 31, 2020), https://tinyurl.com/sk3b48ej. By contrast, Target did not close any of its locations in response to the backlash to the 2023 LGBT-Pride Campaign.

252.   Belying Target and Defendant Cornell's stated rationale, on the same day as Target's statement, a Target insider stated that Target's internal reporting systems lacked evidence of threats. "[A]n LGBTQ employee" that spoke with Business Insider "said there was no mention of safety in the display-removal instructions they received via an internal messaging system." Dominick Reuter, *Target Workers Say the Abrupt Removal of Pride Month Displays Has Alienated Some LGBTQ Employees*, Bus. Ins. (May 24, 2023), https://tinyurl.com/2f8f4t7e. Instead, the employee stated that "[t]he communication provided to us explicitly said the decision to move these items was to replace them with swimwear to better meet our sales goals. Not once was safety mentioned." *Id.*

253.   Instead of threats, Target employees reported receiving calls and emails from guests "accusing the company of 'grooming' and 'indoctrinating' kids with the selection of Pride-themed apparel." *Id.*

254.   Further belying Target and Defendant Cornell's stated rationale for moving the products, a Target insider stated that Target directed stores in politically conservative areas to "relocate[] Pride sections to avoid the kind of backlash Bud Light has received" as early as May 19—five days before Target's May 24 statement. *Target Holds 'Emergency' Meeting*, *supra*.

255.   A TikTok video of a Target employee moving Pride merchandise on May 22 further appears to confirm that Target began relocating Pride merchandise prior to Target's May 24 statement. The video was captioned: "A guest complained about the

Pride section so they had to move it." MaryJane (@siswiththattiktok), TikTok (May 22, 2023), https://tinyurl.com/2v5mz4jz.

256.    Target employees posting on online employee forums provided their suspicions that Cornell's statement was pretextual. "The 'threats' were all social media posts and not actual 'threats' being made on a serious basis," said one commenter in an online Target employee forum. "Sure, there were unruly guests, but not any moreso than other years, and certainly no actual credible physical threats to stores in any capacity," the commenter continued. Another said that Cornell was "lying through his teeth!"

257.    Target provided no documentary evidence of violent threats to employees' safety caused by *opposition* to the 2023 LGBT-Pride Campaign. Target stores were, however, reportedly subject to violent threats, including bomb threats, from *pro-LGBT* extremists at stores in Ohio, Utah, Pennsylvania, Oklahoma, New York, New Hampshire, Vermont, and Louisiana. Brian Flood, *Target Stores Received Bomb Threats Accusing Retailer of Betraying LGBTQ Community Amid Woke Backlash,* Fox News (June 13, 2023), https://tinyurl.com/565t3cdc. One bomb threat letter written to a Vermont store proclaimed that Target "betray[ed] the LGBTQ+ community." *Id.* Another letter to a Louisiana Target indicated the author intended to bomb Target locations because of Target's "intolerance":

> You are pathetic cowards who bowed to the wishes of far right extremists . … We will not tolerate intolerance or indifference. If you are not with us then you are against us. That is why we placed a bomb in each of your locations.

84

*Id.*

258.    Just days after the May 24 statement, Target expanded the number of stores pulling back its Pride merchandise beyond just the stores purportedly receiving "threats" and also pulled back specific items of offensive merchandise across the entire United States. "Employee sources in six states tell Insider that the order came down on Thursday to stores across the US, less than a week after a similar directive to Target locations in Southern states where front-end Pride displays were taken down and moved to low-traffic areas of the store." Dominick Reuter, *Target Is Expanding Removal of Pride Merchandise Across the Country, Workers Say, in a Potential Win for Anti-LGBTQ Protestors*, BUS. INS. (May 27, 2023). The employees also stated that Target specifically stopped providing its line of "transgender-friendly swimsuits." *Id.*

259.    One employee who was a member of Target's Pride+ Business Council explained that "the expanded order applies to locations that the company previously told the council would not be affected" and that the order "got far more overreaching than originally portrayed." *Id.*

260.    Target and Defendant Cornell later revealed their true reasons for re-locating Pride merchandise to less prominent areas in the store: it was never because of supposed violent "threats" by conservative opponents of the Campaign, but instead was done to mitigate the consumer backlash and lost sales resulting from the ill-advised 2023 LGBT-Pride Campaign.

261.    Target executives admitted the negative effects of the consumer backlash on the Q2 2023 earnings call. *See*, *supra*, ¶ 239.

262.    Defendant Cornell also admitted the consumer backlash and blamed it on the timing and prominent location of the Pride merchandise in the store. In the CNBC interview, he explained that Target exposed itself to consumer backlash because "we set the presentation much earlier than everyone else" by beginning in May, and because the display "was very prominent." *CNBC Transcript*, *supra*.

263.    Target executives also admitted that, in the future, they planned to mitigate the risk of consumer backlash by re-locating Pride merchandise to less prominent areas of the store, just as they did after customer backlash to the 2023 LGBT-Pride Campaign.

264.    In the CNBC interview, Cornell stated:

> So as we go forward, we'll time [the Pride campaign] differently. Next year, you'll see Pride on June 1. It's not gonna be the first thing you see in our store, but we'll present it appropriately. We'll curate our assortment much more carefully and we'll probably design most of it ourselves. So we'll take that learning and bring it forward.

*CNBC Transcript, supra*.

265.    Target executives also committed to making changes to future Pride campaigns beyond relevant merchandise's prominence in stores. Hennington stated that "the reaction is a signal for us to pause, adapt, and learn so that our future approach to these moments balances celebration, inclusivity, and broad-based appeal." Q2 2023 Earnings Call Transcript, *supra*. Defendant Cornell stated that, in

the future, Target would be "leveraging our digital experience"—a reference to offering fewer in-store Pride merchandise—and "reconsidering the mix of own brands, national brands, and external partners within these assortments," a reference to the offensive merchandise produced by Target's "external partners" like Abprallen. *Id*.

266.    Defendant Cornell stated in his CNBC interview that Target would "manage these moments [like the Pride Campaign] very differently." *CNBC Transcript, supra*.

## VII.  DEFENDANTS' MATERIAL FALSE AND MISLEADING STATEMENTS AND OMISSIONS.

### A.    Defendants Cornell and Target Failed to Disclose Risk of Consumer Boycotts Caused by Its ESG/DEI Initiatives in the 2021 & 2022 Annual Reports

#### 1.    Target Was Subject to Risks From Consumer Backlash to Its ESG/DEI initiatives like the 2023 LGBT-Pride Campaign.

267.    An increasingly relevant and material risk that companies face is the risk that consumers will react strongly and negatively to companies' pursuit of ESG/DEI mandates, and that those negative reactions will impair the companies' stock prices.

268.    As companies have increasingly adopted ESG/DEI mandates to serve various stakeholders and undertaken business strategies to achieve them, they have also often experienced backlash from their customers, many of whom oppose ESG/DEI mandates.

269.    To comply with the federal securities laws, companies that have committed to ESG and DEI-related mandates often disclose that their material risks

include backlash from their customers. *See* Andrew Ramonas, *Citi, Valero, ADT Flag New Investment Risk: the Anti-ESG Effect*, BLOOMBERG L. (Mar. 15, 2023), https://tinyurl.com/mhnfw9ca; Emma Williams, *What Are the Risks of Social Washing?*, MORNINGSTAR (Aug. 19, 2022) https://tinyurl.com/bdh75kbm (stating that adopting ESG goals "[i]nevitably [] means alienating certain groups while appeasing others" and "lead[s] to backlash from both sides of a debate" that can "result in social risks being poorly managed or even elevated").

270. For example, ADT Inc.'s 2022 Form 10-K described risks related to its ESG initiatives even-handedly. First, the company described the risks it faced from failing to "achieve" its ESG goals, i.e., risks it faced from stakeholders who support ESG mandates, and thus would react negatively to ADT "fail[ing]" to "achieve" ESG mandates:

> If we are unable to provide sufficient disclosure about our ESG practices, or if we fail to establish and achieve the objectives of our ESG program, which could include targets or commitments, consistent with investor, customer, employee, or other stakeholder expectations, we may not be viewed as an attractive investment, service provider, workplace, or business, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

ADT Inc., Annual Report (Form 10-K) at 47 (Feb. 28, 2023), https://tinyurl.com/4h36vhmz. The company immediately followed this language with a description of risks to their pursuit of ESG mandates from the other side, that is, risks arising from the company's pursuit of ESG goals in the first place:

> In addition, there exists certain "anti-ESG" sentiment among some individuals and government institutions. As we continue to establish our

> ESG related initiatives, we could face a negative reaction or legislation
> that impedes our activities or reflects poorly upon the Company, any of
> which could have a material adverse effect on our business, financial
> condition, results of operations, and cash flows.

*Id.*

271.    In its 2022 Form 10-K, State Street Corp., which has adopted a variety

of ESG and DEI mandates, similarly described risks arising from a backlash to its ESG

practices:

> [P]ublic criticism levelled at ESG investing practices could result in
> reduced investor demand for ESG-related products, which could in turn
> negatively effect [sic] our assets under management and resulting fee
> revenues.

State    Street    Corp.,    2022    Annual    Report    (Form    10-K)    at    42–43,

https://tinyurl.com/bdhf9hpb (emphasis added).

272.    Other companies that have adopted ESG and DEI goals have described

the risk of backlash similarly. *See, e.g.*, Citigroup, Inc., 2022 Annual Report (Form

10-K) at 44 https://tinyurl.com/57ump2hm ("Citi also faces potentially conflicting

anti-ESG initiatives"); Valero Energy Corp., 2022 Annual Report (Form 10-K) at 20,

https://tinyurl.com/3tksmrmy ("'anti-ESG' focused activism and investment funds[]

may result in additional strains on company resources."); The Carlyle Grp., Inc., 2022

Annual Report (Form 10-K) at 68, https://tinyurl.com/3ehnk6jw ("Conversely, anti-

ESG sentiment has also gained momentum").

273.    Other companies have also disclosed when they engage in "Pride

Month" campaigns. *See, e.g.*, Southwest Airlines Co., Current Report (Form 8-K), Ex.

99.1 (July 27, 2023), *available at* https://tinyurl.com/2sw8bjjy; Nasdaq, Inc., 2023

Proxy Statement (Schedule 14A) at 67 (June 15, 2023), *available at* https://tinyurl.com/v9hxf5e4; Anheuser-Busch InBev SA/NV, Current Report (Form 6-K) at 47 (Feb. 26, 2021), *available at* https://tinyurl.com/34nsv83c.

274.    One of the ESG/DEI mandates that subjected Target to the risk of consumer boycotts was Target's 2023 LGBT-Pride Campaign. Customers previously boycotted Target in response to Target's pro-LGBT activism in 2016. *See*, *supra*, ¶¶ 178–183. Customers threatened to boycott Target during other years' "Pride Month" campaigns and after other instances of Target's LGBT activism. *See*, *supra*, Part VI.B.

275.    In its annual and quarterly filings with the SEC, Target was required to provide investors with direct and honest disclosure of the actual risk—known to Target's Board and management—that customers would react increasingly negatively to its increasingly assertive ESG/DEI initiatives. Under Item 105 of Regulation S-K promulgated by the Securities and Exchange Commission, Target was required to disclose in a section titled "Risk Factors" those "material factors that make an investment . . . speculative or risky" and to "[c]oncisely explain how each risk affects the [company] or [its] securities." 17 C.F.R. § 229.105(a), (b). Here, Target and its stock were subject to a specific and material risk of consumer backlash to its ESG and DEI initiatives—including, in particular, to its Pride Month campaigns. This risk was increasing in probability and severity because Target, under Cornell's leadership, was doubling down on those initiatives in the face of known and adverse customer sentiment toward them.

<ins>2.</ins>    <ins>In the 2021 Annual Report, Target Misrepresented and Failed to Disclose that It Was Subject to Increasing Risks of Consumer Backlash to Its ESG/DEI Initiatives.</ins>

276.    The Class Period Begins on March 9, 2022. On that day, Target issued its 2021 Annual Report. In the Risk Factors section of its 2021 Annual Report on Form 10-K, Target said the following regarding the risks stemming from its ESG/DEI mandates:

> We believe that one of the reasons our shareholders, guests, team members, and vendors choose Target is the reputation we have built over many years for serving those constituencies and the communities in which we operate. ***To be successful in the future, we must continue to preserve Target's reputation.*** Our reputation is based in large part on perceptions, both about us and others with whom we do business, and broad access to social media makes it easy for anyone to provide public feedback that can influence perceptions of Target. It may be difficult to ***control negative publicity***, regardless of whether it is accurate. Target's responses to crises and ***our position or perceived lack of position*** on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation. While reputations may take decades to build, negative incidents involving us or others with whom we do business can quickly erode trust and confidence and can result in consumer boycotts, workforce unrest or walkouts, government investigations, or litigation. For example, we have a limited ability to end our relationship with CVS, which leases space to operate their clinics and pharmacies within our stores. If our guests have negative experiences with or unfavorably view CVS or other companies with whom we have relationships, it could cause them to reduce or stop their business with us. Negative reputational incidents could adversely affect our business and results of operations, including through lost sales, loss of new store and development opportunities, or team member retention and recruiting difficulties.

Target Corp., Annual Report (Form 10-K) at 7 (Mar. 9, 2022), https://tinyurl.com/4np2bzry (hereinafter the "2021 Annual Report").

277.    This statement was incorporated by reference into Target's quarterly reports on Form 10-Q filed with the SEC on May 27, 2022, August 6, 2022, and November 23, 2022, with each report stating that "[t]here have been no material changes to the risk factors described" in the 2021 Annual Report.

278.    Target's disclosure of the risks stemming from its ESG/DEI mandates in the 2021 Annual Report and subsequent 2021 quarterly reports was materially false and misleading.

279.    Target neglected to mention the known risk of adverse customer and stockholder reactions to its ESG/DEI mandates in general, and its "Pride Month" campaigns in particular, which rendered its generic statement about its "position or perceived lack of position" concerning those matters materially misleading.

280.    Target neglected to mention that the known risk of those reactions was not being monitored or addressed by the Board, and that Target was thus not attempting to "preserve Target's reputation" or "control negative publicity" with respect to adverse customer reactions to its ESG/DEI initiatives.

281.    Target failed to disclose, as required by Item 105, the known risk of adverse customer reaction to its ESG/DEI mandates and to the Pride Month campaigns it intended to continue with increasing intensity. Target concealed the known risk of adverse customer sentiment toward its ESG and DEI initiatives in a blunderbuss description statement that failed to identify it.

    **3.**    <u>In the 2022 Annual Report, Target Misrepresented and Failed to Disclose that It Was Subject to Risks from Customer Backlash to Its ESG/DEI initiatives.</u>

282.    Although it was misleading, at least the 2021 Annual Report mentioned some risk associated with Target's ESG/DEI mandates. Target's 2022 Annual Report was even worse. With the disastrous 2023 LGBT-Pride Campaign just two months away, the 2022 Annual Report broke with Target's earlier statements and inexplicably failed to make any mention of these risks at all.

283.    Target released its 2022 Annual Report on Form 10-K March 8, 2023. 2022 Annual Report at 68. Under the heading "Item 1A. Risk Factors," the Report purported to disclose "the material risks we face." *Id.* at 7.

284.    Unlike the 2021 Annual Report, the 2022 Annual Report made no mention of "ESG" or "DEI" in its discussion of reputational risks that could lead to "consumer boycotts." 2022 Annual Report at 8. A comparison is provided below, with the relevant removed language from the 2021 Report highlighted in red and underlined:

**2021 Annual Report "Consumer Boycott" Language**

To be successful in the future, we must continue to preserve Target's reputation. Our reputation is based in large part on perceptions . . . It may be difficult to control negative publicity, regardless of whether it is accurate. Target's responses to crises and <u>our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation.</u> While reputations may take decades to build, negative incidents involving us or others with whom we do business can quickly erode trust and confidence and can result in

93

consumer boycotts, workforce unrest or walkouts, government investigations, or litigation.

**2022 Annual Report "Consumer Boycott" Language**

To be successful in the future, we must continue to preserve Target's reputation. Our reputation is largely based on perceptions. It may be difficult to address negative publicity across media channels, regardless of whether it is accurate. Negative incidents involving us, our workforce, or others with whom we do business could quickly erode trust and confidence and result in consumer boycotts, workforce unrest or walkouts, government investigations, and litigation.

2021 Annual Report at 7; 2022 Annual Report at 8. The 2022 Report provides no disclosure of ESG/DEI backlash as a "negative incident" that could result in consumer boycotts.

285.    Also unlike the 2021 Annual Report, the 2022 Annual Report made no mention of any risks whatsoever caused by Target's ESG/DEI mandates. *Id*. Instead, the 2022 Annual Report stated the opposite: that the only risks stemming from Target's ESG/DEI mandates came from Target failing to adequately "achieve" such mandates. The 2022 Annual Report provided:

[S]takeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform. We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. Any failure, or perceived failure, by us to achieve these goals and initiatives or to otherwise meet evolving and varied stakeholder expectations could adversely affect our reputation and result in legal and regulatory proceedings against us.

2022 Annual Report at 8.

286.    These statements were incorporated by reference into Target's quarterly reports on Form 10-Q filed with the SEC on May 26, 2023 and August 25, 2023, with each report stating that "[t]here have been no material changes to the risk factors" described in the 2022 Annual Report.

287.    Target's failure to mention the risk of adverse customer and shareholder reactions to its ESG/DEI mandates in the 2022 Annual Report is exceptional considering the fact that the 2023 LGBT-Pride Campaign was just two months away. The 2023 LGBT-Pride Campaign was also an ESG/DEI mandate, *see, supra*, ¶ 205, that subjected Target to the risk of customer boycotts. Target was subject to even greater risk of customer boycotts with the 2023 LGBT-Pride Campaign because it was more extreme than prior "Pride Month" campaigns, featuring Satanist-inspired designs and, for the first time, certain LGBT materials directed specifically toward children. It was all but calculated to offend Target's customer base.

288.    At the time Target issued the 2022 Annual Report, Target employees were planning and beginning to implement the 2023 LGBT-Pride Campaign. Target management knew of the planned LGBT-Pride Campaign.

289.    It was likely that the 2023 LGBT-Pride Campaign would make Target subject to material risk, *see*, *supra*, Part VI.C and Target management was aware of these risks. Target management experienced the risks of Target's LGBT activism after the boycotts Target's response to the North Carolina transgender law and incidents of consumer backlash to previous Pride Month displays. *See*, *supra*, ¶¶ 172-185.

290. Target management also indicated its awareness of risks of consumer backlash to the 2023-LGBT Pride Campaign when it reportedly told Target's partner Abprallen that the design "'Satan Respects Pronouns' wouldn't be a good fit." *See*, *supra*, ¶ 221.

291. Nonetheless, Target failed to disclose the risk that its ESG/DEI initiatives could harm its reputation, let alone disclose any information about the upcoming LGBT-Pride Campaign in its 2022 Annual Report.

292. The risk of consumer boycotts because of Target's ESG/DEI mandates was also material because it risked Target's reputation with its customers, which Target declared "[o]ur continued success is dependent on." 2021 Annual Report at 7.

293. The risk disclosure in the 2022 Annual Report and subsequent quarterly reports was materially false and misleading.

294. Target made no mention of the known risk of adverse customer reactions to its DEI/ESG mandates, which was necessary to make what it did say about "stakeholder expectations" not misleading.

295. Target made no mention of the known risk of the 2023 LGBT-Pride campaign, which was assured to cause adverse customer reactions, which was necessary to make what it did say about "stakeholder expectations" not misleading.

296. Target neglected to mention that that known risk was not being monitored or addressed by the Board, and that Target was thus not attempting to manage "stakeholder expectations" in that respect.

297.    Target failed to disclose, as required by Item 105, the known risks posed by its DEI/ESG mandates and the 2023 LGBT-Pride campaign.

**B.    Defendants Cornell and Target Misleadingly Downplayed the Severity of Consumer Backlash to the 2023 LGBT-Pride Campaign**

298.    Shortly after calls for consumer boycotts began Target took certain remedial measures to remove offensive merchandise to less prominent locations in displaying stores. Target and Defendant Cornell each issued statements explaining that Target did this because of "threats" to employee safety. But in reality, Target did so because the consumer backlash to these items was immense and was already harming Target metrics like store traffic. By offering a false and misleading reason for Target's relocation of offensive LGBT-Pride merchandise, Defendant Cornell and Target downplayed the material risk and harms Target was facing because of calls for consumer boycotts.

299.    The allegations of Defendant Cornell and Target's statements in paragraphs 246 and 249 are repeated and realleged as if fully set forth herein.

300.    As later revealed by Defendant Cornell and other Target executives' admissions that Target's 2023 LGBT-Pride Campaign was too prominent and that future campaigns would be less prominent in the store (*see*, *supra*, ¶¶ 260–266) Target in fact removed LGBT-Pride related merchandise because it caused consumer backlash and boycotts that harmed Target's sales and other financial metrics.

301.    However, Target released a press statement and Defendant Cornell sent an email to staff and circulated to the public that stated Target removed the certain

Pride-themed merchandise because of "threats" to Target employees by consumers who were offended by the merchandise. *See*, *supra*, ¶¶ 251–259.

302.   Target and Defendant Cornell's statements were pretextual and misleading. The violent threats Target reportedly received were threats from pro-LGBT activists angry that Target was removing or demoting the merchandise at all.

303.   Target and Defendant Cornell's statements that Target removed the offending merchandise for "threat"-related reasons were false and pretextual reasons that downplayed the extent of the consumer backlash to the merchandise.

304.   Instead of truthfully revealing to investors the existence of consumer backlash and boycotts in response to the 2023-LGBT Pride Campaign, Defendants Cornell and Target offered a statement that lacked rational basis for justifying Target's decision to remove the merchandise and misled investors about the harm Target was experiencing.

### C.   Target's Board Assured Investors of its Oversight of "Social and Political Issues and Risks" to Target's ESG/DEI Initiatives in the 2022 and 2023 Proxy Statements

305.   In Target's 2022 and 2023 annual proxy statements, Target assured investors that the Board monitored "social and political issues and risks" arising from the company's ESG mandates. In reality, the Board—both itself and through the applicable Board committees—oversaw only the risks Target perceived from *failing to achieve Target's ESG and DEI mandates*.

306. These latter risks are definably *not* social or political risks—under both Target's definition and how a reasonable investor would understand the meaning of the phrase "social and political issues and risks."

307. Even if they were social and political risks, the Board misrepresented its oversight because it monitored only one side—i.e., whether it would face backlash from *too little* ESG and DEI, and not whether it would incur backlash from its customers because of its aggressive, divisive, and extreme ESG and DEI mandates.

> 1.    Relevant Statements in Target's 2022 Proxy and 2023 Proxy.

308. Target issued the 2022 Proxy on April 25, 2022 and 2023 Proxy on May 1, 2023. *See* 2022 Proxy at 6, https://tinyurl.com/y5sf6ajy; 2023 Proxy at 6, https://tinyurl.com/36jffa5c.

309. In nearly identical language, the 2022 Proxy and the 2023 Proxy each described the Board's key role in risk oversight:

**Risk oversight**

Oversight of the various risks we face in implementing our strategy is an integral and continuous part of the Board's oversight of our business. The Board, each Committee, and management have specific roles and responsibilities with respect to those risks.

**The Board and its Committees**

The Board provides oversight of overall risks and seeks to ensure that our Leadership Team has processes in place to appropriately manage risk. Strategic risks are emphasized within that overall risk oversight responsibility because they are an integral and ongoing part of the Board's oversight of our business. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of our strategy, including the development and monitoring of specific initiatives and their overall alignment with our strategy. Similarly, at

> every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our Leadership Team the major events, activities, and challenges affecting Target.

2023 Proxy at 14. The 2022 Proxy was substantially similar. 2022 Proxy at 14.

310.    The 2022 Proxy and 2023 Proxy also each emphasized the significance of "ESG matters" to the Board's risk oversight and described the Board's allocation of oversight of those matters throughout the Board and its committees:

> **Sustainability & ESG**
>
> We engage with a diverse group of stakeholders around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible. Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy. . . . Given the breadth of ESG matters for a company of our size and scale, oversight of those issues is allocated throughout the Board and its Committees:
>
> **Board**
>
> - Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)
> - Sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)
> - Reputation management
> - Crisis management and response
>
> ***
>
> **Audit & Risk Committee**
>
> - Supply chain ESG matters, including vendor human capital and responsible sourcing practices
>
> ***

**Governance & Sustainability Committee**

- Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)

\*\*\*

- Social and political issues and risks not allocated to other Committees
- Philanthropy and community engagement
- Policies and practices regarding public policy advocacy and political activities

2023 Proxy at 15–16. The 2022 Proxy was substantially similar. *See* 2022 Proxy at 15–16.

311.    While the 2022 Proxy and 2023 Proxy were clear that each of Target's Board, the Audit & Risk Committee, and the Governance & Sustainability Committee were responsible for oversight of various "ESG matters," only the Governance & Sustainability Committee was described as overseeing "social" and "political" issues and risks.

312.    In discussing the Board Committees' roles in "fulfilling the oversight and other responsibilities delegated by the Board," the 2022 Proxy and 2023 Proxy each also referenced Target's "Board Committee Charters" and directed shareholders to "current cop[ies]" of such charters "available on Target's website." 2022 Proxy at 12, 75; 2023 Proxy at 12, 78.

313.    The Board's Governance & Sustainability Committee Charter further described the Committee's ESG and political and social risk oversight responsibilities:

**ESG & Corporate Responsibility Matters.** Oversee the Corporation's overall approach to environmental, social & governance and corporate responsibility matters, including:

\*\*\*

- identification of the ESG-related topics that are most relevant and important to the Corporation and any goals or aspirations related thereto;

\*\*\*

- *social and political issues and risks impacting the Corporation* (other than the human capital matters overseen by the Compensation & Human Capital Management Committee and the supply chain matters overseen by the Audit & Risk Committee);
- the Corporation's philanthropy and community engagement activities;
- external reporting on ESG and corporate responsibility matters

**Public Advocacy and Political Activities.** Oversee the Corporation's policies and practices regarding public policy advocacy and political activities, including the process for selecting issues for engagement, lobbying activities, political contributions with corporate funds (including support of other organizations that may engage in political activity), and the activities of any political action committee organized by the Corporation.

Target Governance & Sustainability Committee Charter at 2–3 (emphasis added), *available at* https://tinyurl.com/mwrdkuzs.

314. As its charter describes, the Governance & Sustainability Committee's oversight responsibility for "social and political issues and risks impacting the Corporation" is distinct from the Committee's other responsibilities, including the Committee's oversight of the "identification of ESG-related topics," "philanthropy and community engagement," and even "public advocacy and political activities." *Id.*

102

315. As its charter also describes, the Governance & Sustainability Committee's oversight responsibility for "social and political issues and risks impacting the Corporation" is also distinct from "human capital matters overseen by the Compensation & Human Capital Management Committee" and "supply chain matters overseen by the Audit & Risk Committee." *Id*.

2. <u>Target's 2022 Proxy and 2023 Proxy Represented to Investors that the Board Oversaw Social and Political Risks Arising from Backlash to its ESG & DEI Initiatives.</u>

316. The 2022 and 2023 Proxy Statements' assurances that the Governance & Sustainability Committee oversaw the "social and political issues and risks" of Target's ESG matters was false and misleading. The Governance & Sustainability Committee did not oversee social and political issues and risks arising from Target's ESG matters. Instead, the Committee oversaw Target's engagement with "stakeholders" to advance ESG/DEI-aligned goals—regardless of social or political issues or risks created or enhanced by Target's pursuit of them.

317. The Governance & Sustainability Committee was established in September 2021 as part of the Board's overhaul of its committee structure. 2022 Target ESG Report at 56.

318. In its 2022 ESG Report, Target explained that the Board's "revised structure and charters for the committees were guided by . . . external trends in corporate governance." Target also asserted that its committee oversight allocation aligned with other companies, stating: "we believe the changes appropriately reflect

how companies are adjusting to current expectations of Board oversight of ESG matters." *Id.*

319. The Governance & Sustainability Committee was preceded by the Governance Committee. *See* 2022 Proxy at 63 (describing the position of Governance & Sustainability Committee as "formerly Governance Committee Chair"); *id.* at 75 (erroneously still referring to the nomination of director candidates to the Governance & Sustainability Committee as the "Governance Committee").

320. The predecessor Governance Committee lacked express oversight responsibility for social and political issues and risks created by ESG matters.

321. With respect to oversight of Target's ESG matters, the old Governance Committee "[a]ddresse[d] ESG topics on a consolidated basis by allocating responsibilities for ESG topics among the Board and its Committees . . . and [by] overseeing our overall approach to corporate responsibility." Target Corp., 2021 Proxy Statement and Notice of Annual Meeting of Shareholders at 18 (June 9, 2021), https://tinyurl.com/yukm87zw (the "2021 Proxy").

322. The old Governance Committee also oversaw management's responsibility to "instill ESG-related priorities into our business operations, including product design and development" and other business tasks. 2021 Proxy at 18.

323. According to the old Governance Committee's charter, the Governance Committee's oversight responsibilities did not include any oversight of "risk." Target Corp., Governance Committee Charter, https://tinyurl.com/4c394dk4.

324.   Target's previous proxy statements did not mention "risk" in the old Governance Committee's ESG-oversight responsibilities. *See, e.g.*, 2021 Proxy at 18.

325.   The Board's 2021 overhaul of its committee structure eliminated the Governance Committee and established the "Governance & Sustainability" Committee and added ESG risk-oversight to its portfolio.

326.   The Governance & Sustainability Committee retained many of the previous Governance Committee's responsibilities, including to "[o]versee the Corporation's overall approach to environmental, social & governance and corporate responsibility matters." Governance & Sustainability Committee Charter at 2.

327.   With the Board's 2021 committee-structure overhaul, the Governance & Sustainability was allocated the new responsibility to "oversee . . . *social and political issues and risks*" of Target's "ESG & Corporate Responsibility Matters." Governance & Sustainability Charter, *supra*, at 2–3 (emphasis added).

328.   Both the 2022 Proxy and the 2023 Proxy highlighted the Governance & Sustainability Committee's new ESG oversight responsibility for social and political issues and risks.

329.   Target touted the Board's new committee structure as a way for the Board to "enhance its approach to oversight of risk and ESG matters by reallocating to its committees oversight responsibility" for ESG and DEI matters. 2022 Target ESG Report at 56.

330.   The foregoing background to the Governance & Sustainability's ESG-risk oversight responsibilities and context of Target's intended alignment with corporate best practices supports the meaning of overseeing "social and political issues and risks" that includes the social and political risks of both adopting ESG/DEI mandates and failing to adopt them, as other companies have done.

331.   To a reasonable investor, the phrase "social and political issues and risks" means issues and risks that could negatively affect their investment returns that relate to current social and political issues, usually arising from popular cultural movements, political campaigns, or governments. *See, e.g.*, James Chen, *Political Risk*, INVESTOPEDIA (Mar. 24, 2020), https://tinyurl.com/cp4zyc5s ("Political risk is the risk an investment's returns could suffer as a result of political changes"); Robert Ludke, *Understanding and Mitigating Social Risk*, RISK MGMT. (Apr. 1, 2021), https://tinyurl.com/c5esaz3a ("[S]ocial risk . . . can be defined as the exposure to adverse consequences stemming from population-based activities and negative public perception."); David F. Larcker & Brian Tayan, *Blindsided By Social Risk: How Do Companies Survive a Storm of Their Own Making?*, ROCK CTR. FOR CORP. GOVERNANCE AT STAN. U. at 1 & n.1 (July 21, 2020), *available at* https://tinyurl.com/5cxr8wwj ("Social risk . . . describes events that impair a company's social capital," which includes "the goodwill or positive perception of a company among its stakeholders that contributes economic value through dimensions such as purchase intent by customers.").

106

332.    In proxy statements, companies regularly define their boards' oversight of social and political issues and risks to include a broad set of material risks, including "social, political, reputational, and security risk," Kosmos Energy Ltd., 2016 Definitive Proxy Statement (Apr. 29, 2016), https://tinyurl.com/mvvt5ffm, "public perception," *see* The Williams Companies, Inc., 2022 Definitive Proxy Statement (Mar. 17, 2022), https://tinyurl.com/382x66zv, and specific public policies that affect the company, *see* Equity Residential, 2022 Definitive Proxy Statement (Apr. 18, 2022), https://tinyurl.com/36d563b5 (discussing "key political issues for the Company, such as Section 1031 exchange rules, rental relief payments, eviction moratoriums and rent control measures"); *see also* Brody Mullins, *Government Posing Greater Risk to Corporate Profits, Chamber Study Finds*, WALL ST. J. (Apr. 11, 2023), https://tinyurl.com/2s3nyprn (citing 327,357 instances in which companies in the S&P 500 "mention[ed] political risks in annual reports" in 2021).

333.    An increasingly relevant social and political risk that companies manage is the risk of social and political backlash to their pursuit of ESG/DEI mandates, and companies that have committed to ESG/DEI mandates often disclose such risks in their securities filings. *See*, *supra*, ¶¶ 268–272.

334.    In its 2022 Form 10-K, State Street Corp.—in addition to disclosing ESG backlash risks discussed *supra*—similarly described ESG-backlash risk as "political issues":

> Views on ESG practices . . . have *also become political issues*, which can amplify the reputational risks associated with such allegations. . . . We

107

> are, therefore, subject to related risks of non-compliance with relevant
> legal requirements, including fines, penalties, lawsuits, regulatory
> sanctions, difficulties in obtaining governmental approvals, limitations
> on our business activities or reputational harm, any of which may be
> significant. . . . Moreover, aside from any governmental enforcement or
> litigation activity, public criticism levelled at ESG investing practices
> could result in reduced investor demand for ESG-related products, which
> could in turn negatively effect [sic] our assets under management and
> resulting fee revenues.

State Street Corp., *supra*, at 42–43, https://tinyurl.com/bdhf9hpb (emphasis added).

335.    A reasonable investor would understand the phrase "social and political issues and risks" to mean any material risks to Target arising from social or political responses to Target's business activities.

336.    In the 2022 Proxy and 2023 Proxy, Target touted its extensive commitment to ESG mandates—and even broadcast the Governance & Sustainability Committee's oversight of "social and political issues and risks" under the heading "Oversight areas for ESG matters."  A reasonable investor would conclude that the Committee was overseeing material risks relating to Target's adoption and implementation of ESG goals, including the risk of public backlash to Target's pursuit of ESG mandates.

337.    The 2022 Proxy and 2023 Proxy clearly distinguished the Committee's oversight of "social and political issues and risks" arising from ESG matters from the Committee's other responsibilities of identifying ESG priorities and overseeing Target's "public policy activities" and "political activities." The statements' precise distinction that the Governance & Sustainability Committee oversaw the "social and

political issues and risks" under "*ESG matters*" at least communicated that the Committee oversaw *any* material risk that arose from Target's pursuit of ESG mandates—regardless of which side of the political spectrum it came from.

### 3. Target's Board Did Not Oversee Social or Political Risks to ESG Matters.

338.    Contrary to what a reasonable investor would understand "social and political issues and risks" to mean, and unlike the boards of the companies discussed *supra* and other public companies, Target's Board—both directly and through its Governance & Sustainability Committee—instead oversaw only the issues and risks arising from the corporation's perceived failure to achieve its ESG and DEI mandates.

339.    Rather than overseeing social and political issues and risks to protect shareholder interests by serving Target's customers, as the 2022 Proxy and 2023 Proxy represented, the *actual* oversight responsibility Target's Board and the Governance & Sustainability Committee exercised focused on potential negative responses by "stakeholders" to Target's perceived failure to achieve ESG and DEI mandates. *See*, *supra*, Part VI.A.

340.    Target elaborated on the meaning of this "stakeholder expectations"-driven ESG and DEI risk in its 2022 Annual Report (which Target and Director Defendants caused Target to issue):

> *[S]takeholder expectations* regarding environmental, social, and governance matters continue to evolve and are not uniform. We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. *Any*

109

*failure, or perceived failure, by us to achieve these goals and initiatives* or to otherwise meet evolving and varied stakeholder expectations could adversely affect our reputation and result in legal and regulatory proceedings against us.

Target Corp., 2022 Annual Report (Form 10-K) at 8 (emphasis added).

341.   In the foregoing annual reports, Target identified as its principal ESG-matter risk as the failure to meet "stakeholder expectations" concerning its ESG and DEI commitments could adversely affect the company—including via a social risk, e.g., "harm our reputation," and political risks, e.g., "legal and regulatory proceedings." Target Corp., 2022 Annual Report, *supra*, at 8.

342.   While Target's definition of these "stakeholder expectation"-based risks share similar impacts with social and political risks (such as reputational harm and legal and regulatory proceedings), risks arising from failure to meet "stakeholder expectations" are definably not "social or political issues and risks."

343.   Instead, such "stakeholder expectation" risk is a separate category of risk that arises from negative responses by "stakeholders," such as those described *supra* Part VI.A, to Target's failure (whether actual or perceived) to achieve the ESG and DEI mandates it has adopted.

344.   The "stakeholders" to which Target ascribes these risks are not social or political classes or entities whose responses would create social or political risk, such as regulators or Target customers reacting to Target as participants in social or political movements, but a discrete and ascertainable group of nonprofit stakeholder activists

and organizations which Target consults—and even delegates responsibility to—in making its ESG and DEI commitments.

345.  Target's engagement with these activists and organizations is not oversight of "social or political issues or risks" arising from Target's adoption of ESG and DEI commitments because the purpose of Target's engagements with them is to adopt and implement those very ESG and DEI mandates regardless of the social or political issues or risks they create for Target.

346.  As evidenced by the Board's, the Governance & Sustainability Committee's, and Target's focus on "stakeholders" under its ESG risk framework, the Governance & Sustainability Committee did not oversee social and political issues and risks as the 2022 Proxy and 2023 Proxy represented.

347.  The sole example of oversight by the Governance & Sustainability Committee Target has provided involved "reports" on "ESG matters" by "our Senior Vice President, Corporate Responsibility, who reports to a member of our Leadership Team and regularly engages with the Governance & Sustainability Committee and the full Board." 2023 Proxy at 16. None of the Senior Vice President for Corporate Responsibility's functions involve the oversight or consideration of backlash to ESG/DEI risks. Instead, they involve partnering with "stakeholders" and "instill[ing] ESG-related priorities into our business." *See*, *supra*, ¶ 93.

348.   Moreover, the 2023 LGBT-Pride Campaign was so egregiously offensive to Target's core customer base that no reasonable Board oversight of social and political issues and risks of ESG matters would have permitted it to go forward.

349.   The fact that Target engaged in the uniquely controversial 2023 LGBT-Pride Campaign is prima facie evidence of the Board's lack of oversight of social and political issues and risks.

### 4.    Alternatively, Target's Board Only Oversaw Perceived Social or Political Risks to *Not* Adopting ESG Matters.

350.   Even if a reasonable investor would consider the Target Board's focus on its "stakeholder expectations" version of ESG/DEI risk oversight to include oversight of social and political issues or risks to it pursuit of ESG and DEI goals, the Board's selective focus on the social and political issues and risks of only issues associated with the political left rendered misleading the 2022 and 2023 proxy statements' representations that the Board oversaw "social and political issues and risks."

351.   Instead of overseeing social and political issues and risks relating to ESG mandates in good faith regardless of the ideological valence of those risks, the Board and the Governance & Sustainability Committee only oversaw risks arising from one end of the political spectrum.

352.   The 2022 Proxy's and 2023 Proxy's statements that the Governance & Sustainability Committee oversaw "social and political issues and risks" of ESG matters were a pretext for the Board's and management's one-track focus on social and political issues associated with liberal views.

353. A reasonable investor would conclude that the Governance & Sustainability Committee's oversight of "social and political issues and risks" related to ESG matters would include *any* material risk related to Target's ESG mandates, whether from Target's "failure to achieve" its ESG mandates or from Target's pursuit of ESG mandates in the first place.

354. Contrary to what a reasonable investor would understand "social and political issues and risks" to mean, and unlike the boards of the companies discussed *supra* and other public companies, Target's Board—both directly and through its Governance & Sustainability Committee—instead oversaw only the issues and risks arising from Target's perceived *failure to achieve* its ESG and DEI mandates.

355. Target's ESG/DEI mandates align with one end of the political spectrum: the left. The Governance & Sustainability Committee's exclusive focus on the perceived risks of Target's "failure to achieve" its ESG and DEI mandates therefore focused on risks arising from one end of the political spectrum. But to a reasonable investor, "social and political issues and risks" can arise from *any* part of the political spectrum—just as the backlash to Target's LGBT Pride campaign evidenced.

356. Target further demonstrated its oversight of only left-wing ESG risks, rather than material social or political issues or risks generally, by engaging in an ideologically motivated campaign to restrict books on LGBT issues from a conservative perspective from its stores and other sales platforms. *See*, *supra*, ¶¶ 155–

113

159. Target engaged in and continues to engage in this campaign for no rational purpose despite ongoing political backlash, which suggests the Board has not overseen social and political risks.

357.   Target management's self-identified "stakeholders," *see*, *supra*, Part VI.A, skew heavily in a distinct and left-wing ideological direction and do not appear to include any culturally or socially conservative groups that would be closer to representative of the average Target shopper and the potential source of social or political risks.

358.   The 2022 Proxy's and 2023 Proxy's assurance of the Board's oversight of "social and political issues and risks" arising from Target's ESG mandates conveyed to investors that the Board oversaw material social and political issues and risks of all kinds related to their ESG mandates. However, the Board only oversaw perceived issues and risks from one side of the spectrum.

359.   Alternatively, even if the phrase "social and political issues and risks" meant only left-wing, pro-ESG "issues and risks," the 2022 Proxy and 2023 Proxy were still misleading because they omitted to state the material fact that those were the issues that the Board viewed as material social and political issues and risks arising from Target's ESG mandates.

### D.    Target's Board Assured Investors that Target's ESG/DEI Initiatives Aimed to Increase Shareholder Value

360.   In the 2022 Proxy and the 2023 Proxy, the Board represented that Target adopted ESG and DEI mandates in order to advance shareholder value.

361.    But in public comments and other documents, Target's officers admitted the presence of collateral, non-shareholder interests in Target's adoption and pursuit of ESG and DEI commitments.

362.    In the 2022 Proxy and 2023 Proxy, Target repeatedly asserted that the Board acted to advance shareholder interests across all Company transactions, including with respect to its ESG/DEI mandates.

363.    The 2022 Proxy and 2023 Proxy both communicated that "the Board prefers to maintain the flexibility to determine which leadership structure best serves *the interests of Target and our shareholders*." 2022 Proxy at 10; 2023 Proxy at 10 (emphasis added).

364.    The 2022 Proxy and 2023 Proxy also stated that the Board, through its Audit & Risk Committee, would, with respect to conflicted transactions between Target and its directors or executive officers, act to "prohibit any transaction it determines to be inconsistent with the interests of Target and its shareholders." 2022 Proxy at 17; 2023 Proxy at 18.

365.    The 2022 Proxy and 2023 Proxy stated that the Board's capital allocation strategy "[f]ully invest[s] in opportunities to profitably grow our business, create sustainable long-term value, and maintain our current operations and assets." 2022 Proxy at 17; 2023 Proxy at 17.

366.    These representations were material because a reasonable investor would have understood these statements to clarify that, despite Target's commitment of

significant business resources to ESG/DEI mandates and the Board's and management's preferred political and social agendas, the Board and management remained focused on shareholder value.

367.   But Defendant Cornell and numerous Target officers admitted that Target's ESG and DEI mandates were formulated and enforced to serve collateral "stakeholder" interests.

368.   In an interview on May 17, 2023, Defendant Cornell stated that Target's DEI commitments were "the right thing for society." *See*, *supra*, ¶86.

369.   In Target's 2022 ESG Report and 2021 CR Report among other filings, Target repeatedly asserted that its management, as overseen by the Board, managed the company for collateral stakeholder benefits. *See*, *supra*, ¶¶ Part VI.A.

370.   Target's chief diversity officer's comments on Target's DEI goals as an "infrastructure . . . that allows you to integrate DE&I into your ecosystem in a way that truly drives your business" revealed that Target's DEI goals *drove Target's business* rather than serving the subordinate role of advancing shareholder value. *See*, *supra*, ¶83.

371.   According to Target's own financial disclosures and credible media and financial reports, Target's DEI mandates demonstrably did not contribute to Target's growth. Target's 2023 Proxy definitively declared: "growth was driven primarily by traffic growth as guests increasingly chose Target as a convenient, reliable one-stop shop." 2023 Proxy at 43. In the 2022 Annual Report, Defendant Cornell attributed

Target's strength in store traffic to its merchandising program, which involved "being able to flex into the merchandise categories and channels that are most relevant to guests." 2022 Annual Report at 5. Target's merchandising program was focused on consumer purchasing patterns, switching when needed into "frequency categories like food & beverage, essentials and beauty grew quickly as guests on tighter budgets prioritized basics," and then switching back to "discretionary choices, [with customers] purchasing nearly $55 billion in apparel, home and hardlines in 2022." *Id.* Defendant Cornell stated that "[t]his flexibility and focus on guests consistently delivers growth." *Id.* Nothing in these descriptions of Target's growth mentioned DEI.

372.    Independent financial analysts attribute Target's growth before the 2023 LGBT-Pride Campaign to its e-commerce strategy and investments. "According to [Target's] earnings release, in Q3 ending Oct. 30, its digital comparable sales grew 29% after leaping 155% in Q3 of 2020. In comparison, Amazon's Q3 net sales grew 15% and Walmart's Q3 U.S. e-commerce sales grew 8%." Kunal Chopra, *What Target is Doing Right In the Pandemic Era E-Commerce Race?*, FORBES (Feb. 3, 2022), https://tinyurl.com/m7m9fs93. *See also* Tricia McKinnon, *Target's eCommerce Strategy, Why it's Outperforming*, INDIGO9DIGITAL (Mar. 9, 2023), https://tinyurl.com/2f72f7bv ("For several years Target has made investments in its digital business. Those investments are now paying dividends. . . . Its business model which is centered around one stop shopping as well as its omni-channel offerings are

just a few of the areas Target has excelled in."). These reports also did not mention DEI.

373.    Target's focus on collateral social-value stakeholder interests is also revealed by the fact the Board and management delegated the implementation of Target's ESG and DEI mandates to Target officials who could not do implement those mandates in good faith consistent with shareholder interests because the officials suffered from disabling personal conflicts of interest, including with some of the very activists that Target partnered with in adopting and pursuing the ESG and DEI mandates.

374.    For example, Target senior executive Carlos Saavedra served as treasurer at GLSEN, and Target's Executive Vice President and Chief Food and Beverage Officer, Rick Gomez, served on the Board of GLSEN. *See*, *supra*, ¶118–119. These positions would have imposed conflicting duties on those officers and precluded them from implementing Target's ESG and DEI mandates related to GLSEN and the 2023 LGBT-Pride Campaign in good faith to advance shareholder interests.

375.    Target's chief diversity officer also indicated her personal commitment to advancing "racial equity" for its own sake, even if it was "provocative," and singled out "white women" for special obligations to this cause. *See*, *supra*, ¶ 83.

376.    This conduct indicates and reveals that the 2022 Proxy's and 2023 Proxy's statements that Board oversaw Target's ESG and DEI mandates to advance shareholder interests were misleading because, in reality, the Board delegated the

execution of these mandates to executives who could not advance shareholder value in good faith.

### E.    Target's Board Claimed Executive Compensation Plans Were Designed to Align with Shareholder Value

377.    In seeking shareholders' approval of Target's executive compensation plans, the 2022 Proxy and 2023 Proxy represented that the plans aligned executives' incentives with maximizing shareholder value. In reality, Target's executive compensation was designed to substantially incentivize executives to pursue Target's DEI mandates.

378.    The 2023 Proxy outlined Target's "Executive compensation guiding principles," which provided, in full:

> We believe executive compensation should be *directly linked to performance and long-term value creation for our shareholders*. With that in mind, three principles guide our compensation program:
>
> - Deliver on our pay for performance philosophy in support of our strategy.
> - Provide a framework that encourages *outstanding financial results* and shareholder returns over the long-term.
> - Attract, retain, and motivate a premier management team to sustain our distinctive brand and its competitive advantage in the marketplace.

2023 Proxy at 39 (emphasis added). The 2023 Proxy further elaborated on Target's "long-standing belief that our executive compensation should directly reflect our organization's performance *with substantial emphasis on creating long-term value for our shareholders*. *Id.* (emphasis added). Target also attested that "[t]he pay programs described throughout [the 2023 Proxy] align with our pay for performance philosophy

and are structured based on financial and operational performance and shareholder outcomes." *Id.* at 38.

379.    A reasonable investor would understand these representations to mean that Target's executive compensation was substantially aligned with advancing Target shareholders' pecuniary interests in Target's stock performance, as measured by quantifiable financial performance metrics.

380.    In reality, however, Target awarded substantial amounts of executive compensation based on its executives' "performance" of satisfying ambiguous and subjective DEI goals.

381.    Buried within multiple layers of the 2023 Proxy and scattered from its discussion of executive-compensation principles, a close reading of the 2023 Proxy reveals that substantial sums of executives' compensation were not connected to shareholder value at all, but instead were based on Target's own internal and subjective assessment of executives' performance along DEI metrics.

382.    Under the heading "Pay for performance," a footnote described that Target's executive compensation included a component ambiguously (and innocuously) labeled "STIP" (an acronym the 2023 Proxy never defined, but which stands for "Short Term Incentive Plan"). 2023 Proxy at 39. The 2023 Proxy elaborated on the STIP component of executive compensation in a text box that followed immediately below this footnote, labeled with the subheading "How annual CEO pay is tied to performance":

The following pay elements are performance-based and represent a significant percentage of Annual TDC:

- STIP — Payouts range from 0% to 200% of goal depending on Sales, Incentive Operating Income, and the assessment of the team scorecard

*Id.* at 40.

383.    In a following section under the heading "Incentive measures and actual performance," the 2023 Proxy further provided: "Our STIP is based on a combination of absolute *financial goals* and progress made toward key strategic priorities." *Id.* at 41 (emphasis added).

384.    Tables accompanying this section and others provided further that the "Team scorecard" component of "STIP" receives a 33% "Weight." *Id.* at 41, 43.

385.    The investor-reader following along in the 2023 Proxy would, so far, understand that Target aligned its executive compensation with shareholder value, defined under quantifiable performance-based financial metrics; that executive compensation includes a component called STIP; and that STIP is a performance-based measure based on "financial goals and progress made toward key strategic priorities."

386.    These statements were misleading in light of a final section that was buried below and scattered from the 2023 Proxy's initial declaration that executive compensation was aligned with shareholder value.

387.    In a different section, under a heading titled "Fiscal 2022 team scorecard assessment," the 2023 Proxy described that the "team scorecard component of the

STIP . . . emphasized the business outcomes we expect from the execution of strategic priorities." *Id*. at 44. Those priorities, or "specific team scorecard progress indicators," included that executives "advance[d] progress on our new three-year enterprise DE&I goals." *Id*. at 44. Target's DEI goals—or any other nonfinancial goals or subjective measurements—were not mentioned in Target's guidelines for executive compensation.

388.   Moreover, the section provided that this "team scorecard assessment" affected not only the STIP component of Target's executive compensation plan, but also "provides a general structure for discussing and measuring performance" of executives for compensation purposes. *Id*. at 44. This is in direct conflict with Target's "guiding principle[]" of alignment with Target shareholders' pecuniary interests in Target's stock performance, as measured by quantifiable financial performance metrics.

389.   The 2022 Proxy made substantially the same representations as the 2023 Proxy regarding the alignment of Target's executive compensation with shareholder value, and the allegations *supra* paragraphs 378–388 are repeated and re-alleged here with respect to the 2022 Proxy.

390.   The 2022 Proxy stated the same "guiding principles" for executive compensation, including to "encourage[] outstanding financial results and shareholder returns over the long-term." 2022 Proxy at 40.

391.   The 2022 Proxy expressed Target's "long-standing belief that our executive compensation should directly reflect our organization's performance with substantial emphasis on the creation of long-term value for our shareholders." *Id.* at 37.

392.   The 2022 Proxy also stated that "[t]he pay programs described throughout our CD&A align with our pay for performance philosophy and are structured based on financial and operational performance and shareholder outcomes." *Id.* at 35.

393.   Like the 2023 Proxy, the 2022 Proxy also failed to describe the STIP component of executive compensation with specificity or connection to its executive compensation principles, describing it under the heading "How annual CEO pay is tied to performance" as "STIP — Payouts range from 0% to 200% of goal depending on Sales, Incentive Operating Income, and the assessment of the Team Scorecard." *Id.* at 37.

394.   When the 2022 Proxy described the Team Scorecard, it stated that the STIP component was based, in part, on "[p]ositive progress on three-year enterprise DE&I goals," including because "[w]e met or exceeded our ambitious goals for representation, advancement, and experience" and "[w]e increased promotion and reduced turnover rates for people of color." *Id.* at 43.

395.    This buried, scattered, and conflicting information in the 2023 Proxy and 2022 Proxy rendered Target's representation that its executive compensation was aligned with shareholder value misleading.

## VIII. CLASS ACTION ALLEGATIONS

396.    Plaintiff SBA brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Target common stock between March 9, 2022 and August 16, 2023 (the "Class Period") and who were damaged thereby (the "Class").

397.    Excluded from the Class are Defendants, the officers and directors of Target, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

398.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Target's shares actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Target shares were traded publicly during the Class Period on the New York Stock Exchange. Record owners and other members of the Class may be identified from records maintained by Target or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

399.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

400.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

401.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.  whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Target; and

    c.  to what extent the members of the Class have sustained damages and the proper measure of damages.

402.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    RULE 10b-5 SCIENTER AND RULE 14a-9 NEGLIGENCE ALLEGATIONS.

403.    The facts pleaded herein establish the relevant Defendants' required states of mind for pleading violations of Rule 10b-5 and Rule 14a-9. Plaintiff's claims under Rule 14a-9 do not require proof of scienter.

### 1.    Defendant Cornell

404.    Defendant Cornell had a motive to mislead Target's investors as to the risks associated with Target's ESG/DEI mandates because his compensation was based in part on Target's advancement of subjective ESG/DEI goals like that which the 2023 LGBT-Pride Campaign intended to accomplish.

405.    Defendant Cornell's signing of the 2019 BRT Statement demonstrated his awareness that he and Target were committed to "stakeholder" benefits that excluded oversight of social and political risks of backlash to such stakeholder benefits. Knowing that both he and Target would manage Target to benefit "stakeholders," Defendant Cornell knew that he, Target, and the Board would fail to oversee risks from groups excluded from Target's definition of "stakeholders."

406.    Defendant Cornell was aware that he and Target's Board did not oversee risks of backlash to Target's ESG/DEI mandates because he viewed those mandates as part of his role and implemented them for their social value regardless of risk.

Cornell stated that CEOs "have to be the role models that drive change … [and] use [their] voice on a national level, as [they] impact civic discussions and policy." Melissa Repko, *Target CEO Brian Cornell Says George Floyd's Murder Pushed Him to Do More About Racial Equity, Diversity*, CNBC (Apr. 28, 2021), https://tinyurl.com/yd3ud3m9.

407.    Defendant Cornell knew Target was subject to customer backlash from its activism on LGBT political issues because he served on the Board and as CEO during Target's response to the North Carolina transgender bathroom law, during which he admitted Target "didn't adequately assess risk," causing consumer backlash that caused Target significant losses.

408.    Defendant Cornell knew of the risk of customer backlash to Target's ESG and DEI activism. As CEO, Defendant Cornell was privy to Target positions on ESG and DEI matters and their effect on the company. After Target's "botched" response to the 2016 North Carolina transgender law, company policy reportedly required that all "public pronouncements on hot-button issues may not be made without Mr. Cornell's consent." Safdar, *supra*.

409.    Defendant Cornell admitted his awareness of "backlash" to corporate "social justice" efforts. An interview with Defendant Cornell published May 17, 2023 provided the following:

> [Interviewer 1]: What's your take on some of the pushback now on you know, so called "woke" capitalism … We saw so many CEOs like yourself stand up during this really challenging time in our society, when a lot kind of bubbled to the surface. … We saw a lot of statements, a lot of partnerships sparked different programs and initiatives. **And now we're seeing a lot of backlash, not just on the social justice side, but**

**kind of woke capitalism in general**. What is your take on it? How do you approach it? How do you answer those criticisms?

[Defendant Cornell]: You know, I start every day thinking about our company purpose and our company culture. So when we think about purpose at Target, it's really about helping all the families, and that "all" word is really important. How to discover that little bit of joy in everyday life. Our brand is all about delighting and taking care of the families we serve, and all those families, most of America shops at Target. So we want to do the right thing to support families across the country. **And when it's true to our purpose and true to our culture, we lean in. And I'm really proud of the work we've done in the DE&I space**. Now, the fact that we talked about almost 2,000 stores, well, half of those stores are run by female store directors. Over 40% of our store directors are diverse. That component is so important, but it also reflects the consumer we serve. And when your team, your leadership represents the consumer you serve, I think good things happen. So I can see the benefits for our shareholders. **I know that focus on diversity and inclusion and equity has fueled much of our growth over the last nine years.** But when you walk into a store and you feel at home, and it represents the community, it makes a huge difference. . . . **I think those are just good business decisions, and it's the right thing for society, and it's the great thing for our brand.**

[Interviewer 2]: Okay, but Brian, that was very compelling. You gave a very compelling answer to Michal's question without saying anything about politics or politicians. But what we're talking about is a political movement here that's trying to take what you just described, and turn it into a wedge issue. **You exist in the political world. How do you deal with that?** Do you just do what you just did there and stay out of it? How do you deal with what's happening in politics?

[Interviewer 1]: I should point out you're in Florida right now. Good thing you're not with Disney. But still?

. . .

[Defendant Cornell]: I go back to, we start with what's right for the company purpose and that focus on families. We think about what's right for our team, and what's consistent with our culture. And Alan, when we do that, I think we make really good decisions. And we add value for our shareholders. And that's part of why we've seen explosive top-line growth. So, I think the facts are in, the results for us, and the

things we've done from a DE&I standpoint, it's adding value, it's helping us drive sales, it's building greater engagement with both our teams and our guests. And those are just the right things for our business today.

Fortune Editors, *Target CEO: DEI Has 'Fueled Much of Our Growth Over the Last 9 Years,'* Fortune (May 17, 2023), https://tinyurl.com/2e5whjsp.

410.    Defendant Cornell was aware of the "teams working on Pride" prior to the campaign's launch. Given the 2023 LGBT-Pride Campaign's patently offensive content, Defendant Cornell would have been aware of the risks of consumer backlash to the campaign.

411.    Defendant Cornell knew about the Board's lack of oversight of ESG/DEI risk because he managed a senior executive team that pushed the 2023 LGBT-Pride Campaign without regard for those risks. The Confidential Witness recounted that decisions about the content of the 2023 LGBT-Pride Campaign were made at the senior-executive level and that the Campaign was a "big priority for Minneapolis" and executives saw it as their role to "push the envelope" on social issues. *See, supra*, ¶¶ 200-203.

412.    Defendant Cornell also acknowledged his awareness of the heightened risk of consumer backlash to the 2023 LGBT-Pride Campaign because of the increasingly hostile consumer environment for LGBT marketing strategies. Cornell stated he was aware that Target made the 2023 LGBT-Pride Campaign "prominent in an environment where people had points of view" against LGBT marketing strategies like the campaign. *CNBC Transcript*, *supra*.

129

413.    Defendant Cornell had or was severely reckless in not knowing about Target's contracting with the "Satanist-inspired" brand Abprallen. Defendant Cornell indicated he was aware of problems with Target's "external partners within [the 2023 LGBT-Pride Campaign's] assortments," *see*, *supra*, ¶ 265, a reference to the offensive merchandise produced by Target's "external partners" like Abprallen.

### 2.    Defendant Target

414.    Defendant Target knew by and through Defendant Cornell, who was responsible for the 2021 and 2022 Annual Reports and 2022 and 2023 Proxy Statements, that Target was subject to the material risk of consumer boycotts in response to Target's ESG/DEI mandates and the 2023 LGBT-Pride Campaign; that Target's Board did not oversee those risks; that Target was not being managed to advanced shareholder value; and that Target's executive compensation was not aligned with shareholder value.

415.    Defendant Target knew of the risks of the 2023 LGBT-Pride Campaign because its agents knew of Target's contracting with a Satanist-inspired brand Abprallen and the offensive nature of his designs, *see*, *supra*, ¶¶ 218, 221, and witnessed and reported customer complaints to prior years' "Pride Month" campaigns, *see*, *supra*, Part VI.B, among other conduct described in the foregoing.

### 3.    All Director Defendants.

416.    By virtue of their positions with Target, the Director Defendants were provided with copies of Target's 2022 and 2023 Proxy Statements and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of

their positions with Target, and their access to material, non-public information available to them, but not to the public, the Director Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

417.    The Director Defendants were also aware or should have been aware of red flags pertaining to Target being subject to the risks caused by consumer backlash to its ESG/DEI mandates.

418.    The Director Defendants were also aware or should have been aware of red flags pertaining to the Board's oversight of social and political risks of Target's ESG and DEI goals, including risks relating to pursuing "stakeholder" value over shareholder value, and incentivizing its executives to pursue these goals via executive compensation plans.

419.    The Director Defendants would specifically have been on notice that Target was subject to the risk due to its activism on LGBT political issues because Target was recently the subject of a large customer boycott organized after Target entered the political fray on *another* LGBT political issue, namely, Target's response to the North Carolina transgender bathroom law. *See*, *supra*, ¶¶ 170–177.

420.    The Director Defendants would have also been on notice to the risk of customer boycotts against consumer-facing companies like Target that undertook

LGBT-issue oriented campaigns, like the boycott Target experienced for its stance on transgender issues in 2016. *See*, *supra*, ¶¶ 186-200.

421.    The Director Defendants would have been on notice that Target faced risk of backlash because of Target's customer base of working and middle-class families and Target's revenue share from stores located in culturally conservative areas. *See*, *supra*, ¶ 258 (discussing "Southern" stores)

422.    The Director Defendants had or should have had notice of growing "anti-ESG" backlash by consumers and governments. *See*, *supra*, ¶ 189.

423.    Director Defendants had or should have had notice of the risk of customer backlash to the LGBT-Pride Campaign because Target delegated the execution of Target's business strategy to officers who had known and publicly disclosed disabling conflicts of interest that prevented them from being able to execute Target's ESG and DEI-related business strategies in good faith. *See*, *supra*, ¶¶ 118–119.

### 4.    Individual Director Defendants

424.    Defendants Barrett, Healey, Leahy, Lozano, and Stockton knew the Board failed to oversee social and political risks to Target's ESG and DEI activism because they served on the Governance & Sustainability Committee at all relevant times.

425.    Defendants Edwards, Healey, Knauss, and Rice knew Target was subject to significant social and political risk from its activism on LGBT political issues

because they served on the Board during Target's response to the North Carolina transgender bathroom law and the ensuing consumer backlash.

426.    Defendant Abney knew or should have known that he and Target were committed to "stakeholder" benefits that excluded oversight of social and political risks of backlash to such stakeholder benefits because he also signed the BRT Statement.

427.    Defendant Abney knew or should have known that he failed to oversee the risks of backlash to Target's ESG/DEI mandates because he had pre-committed himself in favor of those mandates. In 2022, Defendant Abney stated that ESG "will be a requirement" and "a standard practice for all companies." "[T]hose that don't [prioritize ESG in their operations] will be left behind." *The Future of ESG: Predictions from Fortune 500 Leaders*, TEAM DEED (June 10, 2022), https://tinyurl.com/ce93nxm9.

428.    Defendant Baker had a motive to downplay anti-ESG risks like consumer backlash against ESG/DEI mandates because he had financial interests in highlighting pro-ESG risks. Baker is a co-founder of an ESG-centered private equity partnership, E2SG. E2SG, https://e2sgpartners.com/ (last visited Nov. 17, 2023). In a 2020 interview on GreenBiz, Baker discussed ESG and at one point was asked how he addresses ESG issues on quarterly earnings calls. Baker failed to mention negative risks to ESG initiatives. GreenBiz, *Ecolab CEO Doug Baker on How Business Can Drive Positive Change at Scale*, YOUTUBE (Feb. 20, 2020), https://tinyurl.com/y2fa4fra.

429.   Defendant Knauss knew or should have known that the Board failed to oversee the risk of backlash to ESG/DEI mandates and the 2023 LGBT-Pride Campaign because his public record demonstrated his commitment to advancing those causes. As CEO of Clorox, Defendant Knauss "was the first Fortune 500 CEO to address more than 2,000 LGBT workers and their allies at the annual Out & Equal Workplace Summit." Simone Strydom, *Celebrating Clorox LGBT Allies With Tom Johnson,* THE CLOROX CO. (June 30, 2014), https://tinyurl.com/3j97z7xd. Defendant Knauss was also celebrated "as an advocate for [DEI] for more than three decades . . . [and] the Jackie Robinson Foundation awarded [him] the annual national ROBIE award for leadership in promoting workforce diversity. Julene Snyder, *$50 Million Gift Creates The Knauss School of Business*, USD NEWS LETTER (Dec. 4, 2021), https://tinyurl.com/2ceraspy.

430.   Defendant Lozano knew that the Board failed to oversee social and political risks to Target's DEI activism because she touted that very activism and made no allowance for risk of backlash in her opening letter to the 2023 Proxy. She lauded Target's "leader[ship] in DE&I" and declared the company's "progress on equitable business decisions aimed at increasing relevance with diverse guests" (a reference to Target's LGBT Pride campaigns). 2023 Proxy at 3. She further announced that "The Board fully supports these efforts" and that the Board was "committ[ed] to . . . meeting or exceeding" (and therefore in no circumstance failing to meet) "Target's 2022-2024 DE&I goals." *Id*.

431. Defendant Lozano knew or should have known that the Board failed to oversee the risks of backlash to Target's ESG/DEI mandates because all of Lozano's public record indicates her alignment with pro-ESG/DEI "stakeholders." Lozano has highlighted her efforts to ethnically "diversify" corporate boards. Regents of the University of California, Minutes of the Investments Committee at 8 (Jan. 21, 2020), https://tinyurl.com/5x7wznfr. Defendant Lozano also serves on the board of the Weingart Foundation, a private grantmaking foundation that "provides grants and loans to left-progressive and left-of-center organizations that focus on immigration, race relations, economic matters, and youth organizing" and has funded pro-LGBT stakeholder organizations like the ACLU and Planned Parenthood. *Weingart Foundation*, INFLUENCEWATCH, https://tinyurl.com/myhnbxck (last visited Nov. 21, 2023). She also previously served on the boards of other left-leaning organizations including the Rockefeller Foundation, the University of California Board of Regents, UnidosUS (formerly the National Council of La Raza), and Governor Gavin Newson's Jobs and Economic Recovery Task Force.

432. Defendant Rice was aware of the risks of backlash to Target's LGBT activism because he was on the board of The Walt Disney Company, which has itself recently faced multiple instances of anti-ESG backlash before Target's in May/June 2023. *See e.g.,* Allison Prang, *An Anti-ESG Activist Investor Presses for Changes at Apple and Disney*, WALL ST. J. (Sept. 20, 2022), https://tinyurl.com/3dau4jsb; *Florida Moves to*

*Curtail Disney World's Powers as "Don't Say Gay" Feud Advances*, CBS NEWS (Jan. 6, 2023), https://tinyurl.com/4bh9en3y.

## X.   RULE 10B-5 LOSS CAUSATION

433.   Plaintiff was damaged as a result of Defendants' misleading statements. Defendants knowingly and recklessly engaged in a scheme to deceive the market by issuing a series of materially false and misleading statements (and omitting material facts).

434.   The declines in Target's stock price beginning May 17, 2023, including, but not limited to, the declines summarized below, are directly attributable to the market absorbing information correcting Defendants' misrepresentations and omissions and/or the materialization of risks concealed by Defendants from Target's investors and shareholders.

435.   Plaintiff suffered substantial economic losses as the price of Target's stock fell in response to the issuance of partial corrective disclosures and/or the materialization of risks concealed by the Defendants from Target's investors and shareholders. The following corrective disclosures caused Target's stock to drop, thereby damaging investors, are representative, not exclusive, of the partial corrective disclosures and/or the materialization of concealed risks that led to Plaintiff's and damages for which relief is sought in this matter.

436.   When Plaintiff SBA purchased Target stock at multiple times during the class period, as detailed in SBA's class representative certification attached as Exhibit

A, the price of Target's common stock was artificially inflated as a direct result of the Defendants' material misrepresentations and omissions regarding the 2023 LGBT-Pride Campaign the Board's oversight social and political issues and risks arising from Target's ESG and DEI mandates and the consistency of those mandates with Target's representations that it and its executive compensation plans were aligned shareholder value. When these misstatements and omissions were revealed and risks materialized when Target's customers responded by boycotting the store in response to the LGBT-Pride Campaign, Target's stock price fell immensely.

437.    Target's stock prices at the time of some of Plaintiff's relevant purchases before the consumer boycotts of Target for the 2023 LGBT-Pride Campaign materialized risks are as follows:

| Purchase Date | Closing Price |
|---|---|
| April 28, 2022 | $235.03 |
| September 19, 2022 | $163.54 |
| November 1, 2022 | $163.52 |

438.    The true value of Target's stock on each of these dates—as evidenced by its sharp drop to $124.12 on June 12, 2023 in the midst of the immense consumer backlash described above and enduring low value in the months after consumer boycotts began—was significantly less than Plaintiff's purchase values.

    1.    Losses After the Partial Corrective Disclosures and/or Risk Materialization Events of the Consumer Boycotts Provoked by the 2023 LGBT-Pride Campaign

439.    The long-lasting and growing consumer boycotts launched in response to Target's 2023-LGBT Pride Campaign were gradually accumulating partial corrective

disclosures and/or risk materialization events that revealed (i) Target was subject to risks from its ESG/DEI initiatives, (ii) Target was subject to risks from the Campaign itself, (iii) that the Board did not oversee risks arising from its ESG/DEI initiatives, (iv) the Board did not adopt its ESG/DEI initiatives to enhance shareholder value, and (v) that Target was subject to immense and financially material consumer backlash, not merely isolated threats.

440.   After Target's 2023 LGBT-Pride Campaign began, risks gradually materialized and it was gradually disclosed that consumers were outraged and responding by boycotting Target and encouraging others to do the same via social media and other media diffusion.

441.   On May 18, the American Family Association, one of the leading organizations supporting the boycott, published a blog post encouraging consumers to "officially join with the 1.57 million others who have pledged to boycott Target." Monica Cole, *Target Indoctrinates Youth*, AM. FAM. ASSOC. (May 18, 2023), https://tinyurl.com/mtnd7tt4. Target's stock began its record decline that same day.

442.   Defendants Cornell and Target contributed to the gradually emerging disclosure of the consumer backlash and the fact of Target's failure to oversee ESG/DEI risks by implementing the 2023 LGBT-Pride Campaign by issuing statements on May 24 that admitted controversy surrounding the Campaign.

443.   Defendants Cornell and Target's additional misrepresentations in their May 24 statements downplaying the scope and intensity of the consumer backlash to

the 2023 LGBT-Pride Campaign negatively affected the market's ability to process information about the backlash and prolonged the period of the corrective disclosure.

444. Over time, as the market progressively realized the scope and intensity of the consumer backlash, from May 17 to June 14, Target's stock declined from closing prices of $160.96 to $124.12. Target's stock remained low, closing at $125.05 on the eve of Target's Q2 2023 earnings call discussed below.

445. Target's peers did not see similar stock declines during the same period. From May 17, 2023, to June 14, 2023, Walmart Inc. common stock (NYSE: WMT) increased from a price of $149.53 to $156.87. Costco Wholesale Corporation (NASDAQ: COST) saw its common stock increase from $495 to $527.20 over the same period. Kroger (NYSE: KR) stock fell from $49.25 to $47.21 during the same period, which was a 4% drop (compared to Target's nearly 19% decline during the same period).

446. Widespread consumer boycotts and news related to their growth continued periodically from June through November 2023 and continue today.

447. Defendants concealed the true financial condition of the company, its true risk management and oversight procedures, and material risks to Target's value.

448. These misstatements and omissions caused financial loss to Plaintiff and other shareholders.

### 2.   Losses After the Partial Corrective Disclosure of Target's Q2 2023 Earnings Report Release and Investor Call

449.   Defendant Cornell and other executives revealed additional information as to the scope and effect of the consumer backlash to the 2023 LGBT-Pride Campaign on Target's Q2 2023 Earnings Report call on August 16, 2023. *See*, *supra*, ¶¶ 236–237, 260–265. On the earnings call, Defendants and other Target executives revealed that the 2023 LGBT-Pride Campaign harmed the company's earnings and other financial metrics. This disclosure establishes the end of the Class Period.

450.   On the call, Defendants also revealed that Target's removal and relocation of LGBT Pride-themed merchandise aimed to mitigate the strategic errors Target made with the 2023 LGBT-Pride Campaign rather than just respond to isolated threats. *Id*.

451.   From the day before the Q2 2023 earnings report release, August 15, 2023, to October 6, 2023, Target stock fell from closing prices of $125.05 to $105.01 per share.

452.   Defendants concealed the true financial condition of the Company, its true risk management and oversight procedures, and material risks to Target's value.

453.   These misstatements and omissions caused financial loss to Plaintiff and other shareholders.

## XI.  RULE 14A-9 TRANSACTION AND LOSS CAUSATION

### A.  Transaction Causation: Shareholders' Re-election of Directors on the Basis of Their Proclaimed ESG-Risk Management Competencies was an Essential Link to the LGBT-Pride Campaign

454.  As a result of Target's issuing the misleading 2022 Proxy, Target shareholders voted to reelect Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Rice, and Stockton to the Board.

455.  As a result of Target's issuing the misleading 2023 Proxy, Target shareholders voted to reelect Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Knauss, Leahy, Lozano, Puma, Rice, and Stockton to the Board.

456.  The re-election of Target's directors in 2022 and 2023 were each essential links in causing the LGBT-Pride Campaign and the resulting losses to Plaintiff and other Target shareholders.

#### 1.  The 2022 Annual Meeting

457.  Given the likely time it would have taken for Target management to plan and execute the 2023 LGBT-Pride Campaign, Board-level oversight of the social and political risks of the LGBT-Pride Campaign occurred after the 2022 Annual Meeting, which was held on June 8, 2022.

458.  The 2022 Annual Meeting squarely presented the issue of the Board's oversight of ESG and DEI matters.

459.  The 2022 Annual Meeting was the first meeting after Target's Board overhauled its Board Committee structure to establish the Governance & Sustainability Committee and was therefore the first opportunity shareholders had to

consider director candidates in light of the Governance & Sustainability Committee's purported oversight of social and political issues and risks.

460.   In the 2022 Proxy, unlike in previous proxy statements, Target also employed a line item in its director "skills and diversity matrix" that highlighted the director-candidates' skill of "ESG Understanding," or "[k]nowledge or experience that contributes to the Board's understanding of one or more ESG matters affected by our business," and awarded the attribute to nine of the eleven non-company employee directors on the Board—each of whom shareholders re-elected at the 2022 Annual Meeting. 2022 Proxy at 22.

461.   Unlike in previous proxy statements, the 2022 Proxy's matrix also included the director skill of "Reputation Management," defined as "[e]xperience in community relations, public service, government affairs, corporate governance," and marked all eleven of the independent directors as having that skill. *Id.* at 22.

462.   The re-election of Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Rice, and Stockton to the Board enabled the 2023 LGBT-Pride Campaign by electing a Board that failed to oversee the Campaign's risks or mitigate those risks.

463.   Defendants' conduct in allowing the preparation of the 2023 LGBT-Pride Campaign and failing to oversee social and political issues and risks preceded and continued after their election to the Board at the 2022 Annual Meeting.

464.    Plaintiff would have voted against the election of Defendants to the Board if they had been told the truth of the Board's allowing of the 2023 LGBT-Pride Campaign and lack of oversight of social and political issues and risks.

2.    The 2023 Annual Meeting

465.    The 2023 Annual Meeting was held on June 14, 2023, amid the LGBT-Pride Campaign customer backlash and during Target's lingering stock-price decline.

466.    Given the intense focus on the LGBT-Pride Campaign at the time of the 2023 Annual Meeting, the Target Board's purported oversight of social and political issues and risks was a central issue of the directors' reelection.

467.    The 2023 Proxy called for directors' re-election by expanding on the 2022 Proxy's attribute of "ESG Understanding" with an attribute labeled "ESG," which denoted the directors' "[e]xperience in strategies supporting sustainable long-term value creation or any matters included in our ESG priorities; actively supervising someone performing similar functions; or on a board of directors overseeing any matters included in our ESG priorities." 2023 Proxy at 22.

468.    The 2023 Proxy marked ten of the eleven independent directors with this new "ESG" attribute in calling for their re-election. *Id.* at 23.

469.    The 2023 Proxy's director skills and diversity matrix also notably updated its definition of "Reputation Management" to include "[e]xperience in . . . *crisis response*" (and still marked ten of the eleven independent directors as having this now-revised skill). 2023 Proxy at 22 (emphasis added).

143

470.   The 2023 Proxy also added language to each of the Defendants' biographies not previously included in Target's proxy statements, noting Defendants' skills that "enhanc[e] the Board's collective oversight capability." 2023 Proxy at 23–29.

471.   The 2023 Proxy's biographies for Defendants Abney, Baker, Barrett, Boudreaux, Knauss, Leahy, Lozano, Rice, and Stockton also each included new language highlighting their "risk management, reputation management, and ESG skills." *Id.*

472.   The biographies for the other directors also included similar new language: Defendant Cornell's biography highlighted his "skills . . . including . . . risk management, reputation management, and ESG," Director Puma's bio mentioned her "risk management" and "ESG skills" (but omitted any "reputation management" skills), and Defendant Edwards's bio mentioned only "risk management" and "reputation management" skills. *Id.* at 25, 26, 28.

473.   These representations put into issue the Board's competence to manage social and political issues and risks arising from Target's pursuit of ESG and DEI mandates and contributed to shareholders re-electing directors on that basis.

474.   Instead of stopping the ongoing LGBT-Pride Campaign and attempting to reverse the damage caused by the LGBT-Pride Campaign, immediately after the directors were reelected, Target continued the LGBT-Pride Campaign and continues

to sell products associated with the Campaign, causing further damage to Target's stock price and enabling continuing consumer backlash.

475.    While each of the director nominees was elected at the 2023 Annual Meeting, shareholder voting support for the all director nominees in the aggregate declined compared to the 2022 Annual Meeting.

476.    The election of Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Puma, Rice, and Stockton to the Board enabled the 2023 LGBT-Pride Campaign by electing a Board that failed to oversee the Campaign's risks or mitigate those risks.

477.    Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edward, Healey, Knauss, Leahy, Lozano, Rice, and Stockton's conduct in allowing the preparation of the 2023 LGBT-Pride Campaign and failing to oversee social and political issues and risks preceded and continued after their election to the Board at the 2022 Annual Meeting.

478.    Plaintiff would have voted against the re-election of Defendants to the Board if they had been told the truth of the Board's allowing of the 2023 LGBT-Pride Campaign and lack of oversight of social and political issues and risks.

**B.    Transaction Causation: Shareholders' Rejection of Good-Governance Shareholder Proposals on the Basis of the Board's Proclaimed ESG-Risk Management Competencies Was an Essential Link to the 2023 LGBT-Pride Campaign.**

479.    As a result of Target's misleading 2022 and 2023 Proxy Statements, shareholders voted to reject good-governance proposals that would have increased

board accountability and enabled enhanced oversight of ESG/DEI initiatives like the 2023 LGBT-Pride Campaign. Specifically, the proposals considered would have allowed shareholders to more easily nominate candidates for election to the Board and separate the positions of CEO and Board Chairman currently combined and held by Defendant Cornell.

480.    Had Target been forthcoming about its Board's and Defendant Cornell's failures of risk oversight and these proposals been adopted, Target would not have failed to oversee ESG/DEI risks.

481.    Contrary to claims that shareholder proposals are non-binding, "[e]very proposal carries the implied threat to directors that their failure to respond to that proposal in the desired fashion will result in a coordinated effort to have those directors removed." Letter from Austin Knudsen, Attorney General of Montana and 20 other state attorneys general, to BlackRock, JPMorgan, Goldman Saches, and 50 other asset managers (Mar. 30, 2023), https://tinyurl.com/3usc3c22. The largest proxy advisors, ISS and Glass Lewis, whose recommendations control up to 16 percent of the vote at most public companies, *see* Stephen Choi, Jill E. Fisch & Marcel Kahan, *The Power of Proxy Advisors: Myth or Reality?*, 590 EMORY L.J. 870, 900 (2010), caution companies and directors in their voting guidelines that they will strongly consider voting against directors at companies that fail to respond to shareholder proposals that receive broad shareholder support. As a result, shareholder proposals that receive a majority vote are often successful in securing company commitments. Glass Lewis, *2023 Policy*

*Guidelines*, GLASS, LEWIS & CO. at 18 (2022), https://tinyurl.com/5etdnwmh; *see* Institutional S'holder Servs., *United States Proxy Voting Guidelines 2022*, ISS GOVERNANCE at 17 (Dec. 13, 2022), https://tinyurl.com/399bprwm ("Directors should respond to investor input, such as that expressed through . . . significant support for shareholder proposals (whether binding or non-binding)").

482.   As a result of Target issuing of the misleading 2022 Proxy, Target shareholders rejected a proposal to enable shareholders to more easily nominate candidates for election to the Board (the "Director Nomination Proposal").

483.   The Director Nomination Proposal explained that Target's bylaws required that, in order for a shareholder or group of shareholders to be eligible to nominate a candidate for election to the Board, the shareholder or group must own at least 3 percent of Target's outstanding stock and, in the case of a group, not exceed more than 20 shareholders. 2022 Proxy at 69.

484.   The Director Nomination Proposal requested that the Board instead "enable as many shareholders as may be needed [] combine their shares" in order to nominate director candidates. *Id*.

485.   Noting that the proposed change would "serve[] as a guardrail to make sure that management elects the best directors" by improving shareholders' remedies if Target's "management does not engage in good faith," the Proposal concluded that "[c]ompetition is good for our board of directors." *Id*.

147

486.   The Board opposed the Director Nomination Proposal and recommended that Target shareholders vote against it. *Id.* at 69–70.

487.   In advocating its opposition, the Board reiterated it was "committed to being accountable to shareholders and has shown that commitment through both its policies and practices." *Id.* at 70.

488.   In reliance on the 2022 Proxy and the Board's representation of its competence as to risk management, shareholders defeated this proposal.

489.   This was an essential link to the LGBT Pride Campaign because it further insulated the Board from accountability and enabled to Board to fail to oversee social and political issues and risks.

490.   As a result of Target's mailing of the 2023 Proxy, Target shareholders also rejected a proposal to separate the positions of CEO and Board Chairman (the "Independent Chairman Proposal").

491.   The Independent Chairman Proposal noted that Target had not yet adopted this corporate governance "best practice" and that Target's current arrangement allowed the Chairman/CEO to "ignore the advice and feedback" from independent directors, suggesting Target "does not take the role of lead director seriously." 2023 Proxy at 71.

492.   In recommending that shareholders vote against the proposal, the 2023 Proxy stated:

> The Board believes that its current leadership structure and governance practices provide effective, independent oversight without mandating a

148

> predetermined Board leadership structure . . . The Lead Independent
> Director role provides effective, independent leadership through its
> clearly defined and robust set of roles and responsibilities.

*Id.* at 71–72. In reliance on the 2023 Proxy and the Board's representation of its competence as to risk management, shareholders defeated this proposal.

493.    This was also an essential link to the LGBT Pride Campaign because it permitted Defendant Cornell to maintain immense influence over the Board, which would enable any attempt by Defendant Cornell to prevent the Board's oversight of social and political issues and risks arising from his management's engagement in the LGBT-Pride Campaign.

494.    Defendant Cornell was a driving force behind Target's ESG/DEI initiatives and LGBT activism and exercised immense influence over the Board. Cornell has been Chairman during *all but one* of the current directors' nominations to the board. Despite the backlash invited by Cornell's management to Target's previous LGBT activism, Target's Board has carved out exceptions to company rules to Mr. Cornell greater discretion in his capacity as CEO. In September 2022 Target's board of directors eliminated the company's mandatory retirement age for the CEO position in order to allow Mr. Cornell to continue serving as CEO years after he turns 65. Charity L. Scott, *Target CEO Brian Cornell to Stay Three More Years*, WALL ST. J. (Sept. 7, 2022), https://tinyurl.com/3u9zj7hn.

495.   The Independent Chairman Proposal would have removed Defendant Cornell from the Board and thereby removed a chief source of Target's pro-ESG/DEI initiatives, allowing for improved oversight.

**C.    Separate and Independent Transaction & Loss Causation: Shareholders' Approval of Unauthorized and Excess Executive Compensation Was An Essential Link to the LGBT-Pride Campaign & Independently Caused Loss.**

496.   At both the 2022 and 2023 annual meetings, shareholders approved "Say on Pay" items for Target's executive compensation plan proposals in reliance on misleading statements and disclosures in the 2022 and 2023 Proxy Statements. At each meeting, shareholders approved the following resolution:

> Resolved, that the shareholders approve the compensation awarded to the NEOs, as described in the [Proxy Statement], tabular disclosures, and other narrative executive compensation disclosures in the 2023 [or, in the case of the 2022 Proxy, 2022] Proxy Statement.

497.   Shareholders' approval of each executive compensation plan was an essential link in causing the LGBT-Pride Campaign and Plaintiff's losses resulting from it.

498.   Both the executive compensation plans approved by shareholders materially incentivized Target executives to advance Target's DEI goals, which the 2023 LGBT-Pride Campaign also advanced.

499.   For the executive compensation approved at the 2022 annual meeting, performance along the "three-year enterprise DE&I goals" on which Target's executive compensation was based included meeting spending targets with "diverse suppliers," such as the "LGBTQIA+-owned suppliers" Target mentioned in its 2022

ESG Report. Press Release, *Inside Target's 2019-2021 Diversity, Equity & Inclusion Journey – and Where We're Going Next* (Mar. 7, 2022), https://tinyurl.com/m5hbm64s.

500.   For the executive compensation approved at the 2023 meeting, performance along the "three-year enterprise DE&I goals" on which Target's executive compensation was based included Target's goal to "increase relevance with diverse guests" and "offer more products from diverse suppliers." *Id.*

501.   Named Executive Officers (NEOs), including Defendant Cornell, also would have reasonably expected that engaging in the 2023 LGBT-Pride Campaign would improve their outcomes under the Team Scorecard for DEI progress, and thereby materially increase their compensation.

502.   The shareholder approval of each of the executive compensation plans in the 2022 Proxy and 2023 Proxy, respectively, also authorized the execution of corporate spending that caused an independent harm to Target and Target shareholders by paying Target NEOs unauthorized compensation and excess compensation.

503.   In reliance on the misleading executive compensation disclosures, Target paid NEOs (including Defendant Cornell) executive compensation that was not validly approved by shareholders. At the 2022 annual meeting, Target shareholders approved over $42.8 million in compensation to Target NEOs. 2022 Proxy at 53. At the 2023 annual meeting, Target shareholders approved over $36.9 million. 2023 Proxy at 53.

504.    In the 2022 executive compensation plan, NEOs received over $2.5 million in STIP payouts for the "team scorecard component" that included progress on DEI goals. 2022 Proxy at 53. In 2023, they received nearly $1.5 million. 2023 Proxy at 53.

505.    Target secured shareholder approval of these sums via misleading proxy statements that tainted the shareholder approval process and renders these amounts unauthorized by shareholders.

506.    The payment by Target of such unauthorized and excess sums harmed Target shareholders, including Plaintiff, by interfering in Target's proper corporate governance, wasting corporate assets, and incentivizing value-destroying behavior by Target's executives.

**D.    Loss Causation**

507.    Plaintiff repeats and realleges the allegations in paragraphs 433 through 452 as if fully set forth herein.

508.    In the 2024 Proxy Statement, Target announced its plans to hold a 2025 Annual Meeting. Target Corporation, 2024 Proxy Statement, https://tinyurl.com/2p9pazru (last accessed Feb. 17, 2025).

509.    Evidence suggests that, despite Target's and Defendant Cornell's purported recognition of the losses caused by the 2023 LGBT-Pride Campaign, the Pride marketing and merchandise Target is planning to produce and offer will continue to be offensive to consumers and inspire backlash.

510.   Target reportedly promoted self-titled "gaycruella" Erik Thompson (who has said he "will make Target sales tank") to the title of "Senior LGBTQIA+ Segmentation Strategist & Pride Lead" in November 2023. *See*, *supra*, ¶ 198.

511.   Target has continued to market and sell LGBT-themed content, encouraging consumers to "show your love and support for the LGBTQIA+ community" by buying and displaying products such as "Pride Christmas Decorative Nutcracker" holding a "BIPOC transgender pride flag," which prompted another round of backlash from conservative commentators and consumers online. *See, e.g.*, Valerie Richardson, *'Pride Nutcracker': Target reignites boycott calls with Christmas Pride line*, WASH. TIMES (Nov. 21, 2023), https://tinyurl.com/3t4cu69z.

512.   Target's 2024 Proxy Statement continued to state that the Governance & Sustainability Committee would oversee "social and political issues and risks." Target Corporation, 2024 Proxy Statement, https://tinyurl.com/2p9pazru (last accessed Feb. 17, 2025). Board's oversight of the social and political risks of Target's ESG/DEI mandates. These misleading statements would affect the re-election of directors at the 2025 Annual Meeting.

513.   All Plaintiff continues to hold its stock and will be entitled to vote at the 2025 Annual Meeting.

514.   The re-election of the Board at the 2025 Annual Meeting would cause investors further losses as a signal that Target will continue to conduct "Pride Month" campaigns and cause investors losses.

## XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE

515.   As a shareholder eligible to vote at Target's annual meetings, Plaintiff relied on Defendants' misstatements and omissions in the 2022 and 2023 Proxy Statements.

516.   As a result of the misconduct alleged herein (Defendants' misstatements and omissions), the market for Target securities was artificially inflated. Under such circumstances, the presumptions of reliance available under the "fraud-on-the-market" theory and *Affiliated Ute* apply. *See Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972).

517.   Plaintiff justifiably expected the Defendants to disclose material information as required by law and SEC regulations in Target's periodic filings with the SEC and in the Company's other statements directed to its investors. The Defendants were under a fiduciary duty to make such disclosures. Thus, reliance by Plaintiff should be presumed with respect to the Defendants' omissions of material information as established under the *Affiliated Ute* presumption of reliance.

518.   The market for Target's securities was, at all times, an efficient market that promptly digested current information with respect to Target from all publicly available sources and reflected such information in the prices of Target's securities. When Plaintiff purchased Target stock and throughout the period of their ownership:

(a)    Target's stock met the requirements for listing and was listed on the New York Stock Exchange;

(b)     As a regulated issuer, Target filed periodic public reports with the SEC;

(c)     Target's securities volume was substantial;

(d)     Target was followed by various analysts employed by major Wall Street brokerage firms, who wrote reports which were distributed to the sales force and certain customers of the brokerage firms and which were available to various automated data retrieval services; and

(e)     The market price of Target securities reacted efficiently to new information entering the market.

519.    The foregoing facts demonstrate the existence of an efficient market for trading of Target securities and support the application of the fraud-on-the-market theory.

520.    Plaintiff relied on the integrity of the market price for the buying of their securities and are entitled to a presumption of reliance with respect to the Defendants' misstatements and omissions alleged in this Complaint.

521.    Had Plaintiff known of the material adverse information not disclosed by the Defendants or been aware of the truth behind the Defendants' material misstatements, Plaintiff would not have engaged in the buying of their securities detailed herein to buy their securities at artificially inflated prices.

## XIII. INAPPLICABILITY OF PSLRA SAFE HARBOR

522.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. The statements complained of were not forward-looking statements nor were they identified as forward-looking statements when made. Rather, the false or misleading statements complained of in this Complaint concerned historical and/or current facts and conditions existing at the time the statements were made.

523.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

524.    Alternatively, to the extent the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants Cornell and Target are liable for those false or misleading forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading.

## XIV. CLAIMS FOR RELIEF

### Count One
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

525.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 523 as if fully set forth herein.

526.    Plaintiff brings this claim as a direct claim against Defendants Cornell and Target for violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

527.    Rule 10b-5 (17 C.F.R. § 240.10b-5), promulgated under Section 10(b) of the Exchange Act, provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

528.    Defendant Cornell signed and Defendant Target issued the misleading 2021 and 2022 Annual Reports. Defendant Cornell caused to be issued and Defendant Target issued the misleading 2022 and 2023 Proxy Statements.

529.    Prior to the relevant Plaintiff's purchases of Target stock, Defendants Cornell and Target disseminated to investors the false and misleading 2021 Annual Report and subsequent quarterly reports, the 2022 Annual Report, the 2022 Proxy, and the 2023 Proxy, which Defendants Cornell and Target knew or were severely reckless in not knowing that each made false and misleading statements of material facts and which failed to state material facts necessary to make the statements that

were made not misleading in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

530.    As a result of the Defendants' preparation, review, and dissemination of the 2022 Proxy and 2023 Proxy, Plaintiff has suffered substantial harm. By reason of such misconduct, the Defendants are liable pursuant to Section 10(b) of the Exchange Act and Rule 10b-5.

### Count Two
### (Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)

531.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 523 as if fully set forth herein.

532.    Plaintiff brings this claim as a direct claim against Defendant Target and the Director Defendants for violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

533.    Rule 14a-9 (17 C.F.R § 240.14a-9), promulgated under § 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

534.    The Director Defendants caused to be issued and Defendant Target issued the misleading 2022 and 2023 Proxy Statements soliciting shareholder votes on their behalf.

535.    When Plaintiff purchased the stock and throughout the period of his ownership, the Director Defendants and Target disseminated the false and misleading 2022 Proxy and 2023 Proxy, which made false and misleading statements of material facts and which failed to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9.

536.    As a result of the Defendants' preparation, review, and dissemination of the 2022 Proxy and 2023 Proxy, Plaintiff has suffered substantial harm.

537.    Because of such misconduct, the Defendants are liable pursuant to Section 14(a) of the Exchange Act and Rule 14a-9.

## Count Three
### (Violations of Section 20(a) of the Exchange Act Against the Director Defendants)

538.    Plaintiff repeats and realleges the allegations in Paragraphs 1 through 523 as if fully set forth herein.

539.    During the period Plaintiff owned Target stock, the Director Defendants had and exercised the power to control the general affairs of Target, participated in the management and operation of Target, and conducted and participated, directly and indirectly, in the conduct of Target's business affairs.

540.    Because of their senior positions, the Director Defendants knew the adverse non-public information about the development of the 2023 LGBT-Pride Campaign and the Board's failure to oversee it and the social and political risks that Target's proxy statements proclaimed the Board oversaw.

541.    As directors and, with respect to Defendant Cornell, as CEO of a publicly owned company, the Director Defendants had a duty to disseminate accurate and truthful information with respect to Target's governance and operations, and to correct promptly any proxy statements issued by Target that were or had become materially false or misleading.

542.    Because of their positions of control and authority as directors and senior officer, the Director Defendants were able to, and did, control the contents of the proxy statement Target disseminated in the marketplace during the Plaintiff's period of ownership. Throughout that period, the Director Defendants exercised their power and authority to cause Target to engage in the loss-causing acts complained of herein.

543.    The Director Defendants, therefore, were "controlling persons" of Target within the meaning of Section 20(a) of the Exchange Act.

544.    In this capacity, they participated in the conduct alleged which artificially inflated the market price of Target securities.

545.    Each of the Director Defendants, therefore, acted as a controlling person of Target. Each of the Director Defendants had the power to direct the actions of, and

exercised the same to cause, Target to engage in the unlawful acts and conduct complained of herein.

546. Each of the Director Defendants exercised control over the general operations of Target and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff complains.

547. Because of the above conduct, the Director Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Target.

## XV. REQUEST FOR RELIEF

548. Plaintiff respectfully request that this Court provide the following relief:

**A.**    A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

**B.**    A declaration that Defendants Cornell and Target violated Section 10(b) and Section 14(a) of the Exchange Act; that Target and the Director Defendants violated Section 14(a) of the Exchange Act; and that Director Defendants violated Section 20(a) of the Exchange Act;

**C.**    An order awarding to Plaintiff and the other Class members the damages they have sustained as a result of the violations set forth above from each Defendant, jointly and severally;

**D.**    A declaration that Target's 2023 director election was void;

**E.**    Permanent injunctive relief requiring Target and Defendants who are current Target directors to comply with Section 14(a) of the Exchange Act, and the regulations thereunder, by fully disclosing their plans and purposes concerning their monitoring of ESG/DEI backlash risk in the upcoming 2025 annual proxy statement to ensure a lawful board election in 2025; and

**F.**    Such other and further relief as the Court deems just and proper, including reasonable attorney's fees and costs.

## XV.  JURY DEMAND

549.    Plaintiff demands a trial by jury.

Dated: February 20, 2025

Respectfully submitted,

/s/ Jonathan Berry

JAMES UTHMEIER (FBN: 113156)
Attorney General
State of Florida
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300

JONATHAN BERRY (*pro hac vice forthcoming*)
    *LEAD COUNSEL*
ANDREW W. SMITH (*pro hac vice forthcoming*)
Boyden Gray PLLC
800 Connecticut Ave NW, No. 900
Washington, DC 20006
(202) 955-0620
jberry@boydengray.com

PAUL C. HUCK, JR. (FBN: 968358)
SAMUEL J. SALARIO, JR. (FBN: 083460)
JASON B. GONZALEZ (FBN: 146854)
Lawson Huck Gonzalez, PLLC
215 S. Monroe Street, Suite 320
Tallahassee, Florida 32301
(850) 825-4334
jason@lawsonhuckgonzalez.com

REED D. RUBINSTEIN (*pro hac vice forthcoming*)
ANDREW J. BLOCK (*pro hac vice forthcoming*)
America First Legal Foundation
611 Pennsylvania Avenue S.E.
No. 231
Washington, DC 20003
(202) 964-3721
reed.rubinstein@aflegal.org

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2025, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties who have registered with CM/ECF and filed an appearance in this action.

/s/ Jonathan Berry
JONATHAN BERRY