**Declaration of Rajeev R. Bhattacharya, Ph.D.**

Rajeev R. Bhattacharya, Ph.D. hereby declares and says as follows:

## A. Qualifications

1. I have three decades' research, consulting, management, and teaching experience in finance, economics, and Big Data. I am the president of Washington Finance and Economics and have worked in senior roles at leading consulting firms including the Berkeley Research Group. I have served on the full-time faculty of the University of Maryland, Georgetown University, Washington University in St. Louis, and the University of New South Wales, and on the part-time faculty of Johns Hopkins University, George Mason University, and George Washington University.

2. I received my Ph.D. in economics from the University of Rochester in 1995. I was nominated for the *Donald M. Ephraim Prize in Law and Economics*, University of Chicago Law School, 2024, and have been declared an *Outstanding Researcher* by the U.S. Federal Government. My C.V. is attached in Exhibit A.

3. My primary expertise is in the application of the frontiers of quantitative methods to stocks, bonds, and derivatives, especially with event studies. I have recently presented my original research at twelve academic seminars at leading institutions and the U.S. Securities and Exchange Commission, using high-frequency intraday equity, fixed income securities, and derivatives data that consists of hundreds of trillions of observations and comprise over 25 TB of data. In my book, *Advanced Analytics for Finance: Theory and Empirics Using Big Data*, 2025 (forthcoming), Cambridge University Press (one of the world's leading producers of university textbooks), Chapter 1 details the scientific method and the

supremacy of truth; the other chapters are on the applications of purely objective, scientific methods to questions in finance that are particularly pertinent to securities litigation. I also have many highly-regarded publications in top finance journals, including a number of articles profiled on the website of the Stanford Securities Class Action Clearinghouse.

4. I have been a testifying expert on a number of matters, including the level of efficiency of the market for a stock and its implications for the use of market price as an approximation for value; harm to investors under allegations of securities manipulation; measuring harm as a result of delays in delivery of options, warrants and other derivatives; class certification and damages in a class action; tying and price fixing; the impact of alleged vertical foreclosure on price, quantity and quality; violation of intellectual property; and profits lost by a retailer due to directory error.

5. My firm is being compensated at the rate of $1,000 per hour for my time on this matter plus expenses. Our compensation does not depend on the outcome of this matter or on my opinions.

## B.    Losses under the assumptions used by State Teachers Retirement System of Ohio

C. I have reviewed the loss calculations provided by the State Teachers Retirement System of Ohio ("Ohio"). I have serious reservations about two assumptions those calculations make: (1) that it is proper to include nearly $3.3 million of losses that Ohio has not, in fact, realized and (2) that it is proper, given the relevant disclosures in this case, to extend the class period to November 19, 2024, which is roughly 17 months after Target's 2023 Pride Campaign.

## C.    Unrealized losses are a fundamentally unreliable measure of Ohio's financial interest in the case

6.  Ohio's calculations include nearly \$3.3 million of unrealized losses — *i.e.*, losses from Target shares it purchased during the Class Period but has not yet sold. Those unrealized losses are an unreliable measure of Ohio's financial interest in the case. If an investor bought a security at price \$p and sold at \$q, then it is the **truth** that if $q < p$, the investor lost \$p – \$q (ignoring the discount rate for now). However, if the investor never sold, but the sale price would have been \$x in the absence of inflation caused by the alleged fraud, we do not know this \$x as a truth. In statistical terms, the loss \$p – \$x is a random variable, and $E(\$p\text{-}\$x) = L^*$ refers to the expected value of this random variable. An unbiased and properly controlled estimate of $L^*$ would have the property that the expectation of the estimate would equal $L^*$. Further, in statistical terms σ refers to the standard deviation; it represents the inaccuracy of the estimate, which depends on the volatility of the asset and comparables and the quality of the information and models, and is strictly increasing in the size of the Class Period. Using these statistical terms, the estimates of the investor's losses for shares that were never sold have the following ranges (under normal distributions), for which, therefore, the accuracy of any loss estimate, however unbiased and properly controlled, will have to be adjusted for.

   a.  $(L^* - \sigma, L^* + \sigma)$ with probability 68.3%

   b.  $(L^* - 2\sigma, L^* + 2\sigma)$ with probability 95.5%

   c.  $(L^* - 3\sigma, L^* + 3\sigma)$ with probability 99.1%

7.  For these reasons, a realized loss is substantially more reliable than a paper loss; I detail the nature of truth and a scientist's estimate of it in Chapter 1 of my book *Advanced*

*Analytics for Finance: Theory and Empirics Using Big Data*, forthcoming later this year with Cambridge University Press. It is to be emphasized that the above description of the inaccuracies and ranges of an estimate holds even when an unbiased and properly controlled inflation estimate is used.

8. In addition to the above discussion, I present here an alternative perspective on equity prices to investigate the price of TGT equity. The option theoretic perspective on equity pioneered by the Nobel Prize-winning work of Robert Merton expresses equity as a call option on the firm's assets with the strike (or exercise) price equal to the firm's debt liability and maturity equal to that of its debt. In other words, the shareholders have the right but not the obligation to buy (or not sell) the firm's assets by paying the matured debt liabilities, and if the shareholder exercises his option to buy (or not sell), the firm continues as a going concern, and if the shareholder declines to exercise his option, the firm goes bankrupt and the assets of the firm go to the debtholders. In other words, if an investor believes that a firm's asset value exceeds its debt at maturity, the investor will exercise his option to buy (or not sell) his shares. It is this optionality embedded in equity that, for instance, allows for an insolvent firm to have positive share prices even when the firm is bankrupt. In the case of shares purchased by the investor during the Class Period and still held, the investor was under no compulsion to hold the security, but instead he **chose** to not sell because he thought there was an optionality, i.e., the possible upside that the security would be worth a higher price in the future, even if the investor had the "true" information. In other words, modern finance theory finds the notion of unrealized losses fundamentally problematic.

## D.　　The Class Period proposed by Ohio is not supported by financial theory and practice.

9. The academic accounting and finance literature on the impact of potentially material events is unambiguous that in a sufficiently efficient market (which the market for TGT equity was, based on its high market capitalization, see, for instance, Bhattacharya, R., 2025 (forthcoming), *Advanced Analytics for Finance: Theory and Empirics Using Big Data*, Cambridge University Press: Cambridge, UK) the equity price reacts not to good news or bad news (such as a decline in earnings from the same quarter in the previous year or disappointing guidance, as mentioned in Paragraphs 129-130 of the complaint filed by the City of Riviera Beach Police Fund) but whether the news was better than expected by the market at the time of the announcement, worse than expected, or no surprise at all. Given that the market already knew about Target's 2023 Pride Campaign and its effects at the time of the earnings announcement, the description in Paragraphs 129-130 of the complaint filed by the City of Riviera Beach Police Fund does not indicate that it was a potentially material event, i.e., whether it was better than, worse than, or consistent with what the market expected. There are also no events in Paragraphs 161-162 that a financial economist would consider fraudulent information events after the 2023 proxy statement mentioned in Paragraph 160 of the complaint filed by the City of Riviera Beach Police Fund. See, for instance, Bhattacharya, R. and Gupta, M., 2023, "Diligence, Objectivity, Quality, and Accuracy," *Journal of Accounting Literature*, 47(1), 1-30, on analyst reports, earnings announcements, and management guidance. Finally, as mentioned above, the standard deviation σ, which represents the inaccuracy of the estimate, increases substantially with the size of the Class Period. Therefore, it is my opinion as a financial expert that the Class

Period should be substantially shorter and in particular, should not extend beyond August 16, 2023.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

April 15, 2025

_RRBhattacharya_

Rajeev R. Bhattacharya, Ph.D.