# EXHIBIT A

~~harm~~evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### **NATURE OF THE ACTION**

1. This is a shareholder derivative action brought ~~by Plaintiff on behalf~~in the right, and for the benefit, of ~~nominal defendant Target~~the Company against certain of its officers and ~~members of~~directors seeking to remedy the ~~Board (the~~ "Individual ~~Defendants")[1] for,~~ *inter alia,* ~~intentional breaches of their fiduciary duties~~Defendants' (defined below) violations of state and federal law that have occurred from ~~at least~~ March 9, 2022~~,~~ through May 24, 2023~~, and violations of federal securities laws, as set forth below~~ (the "Relevant Period") and have caused substantial harm to the Company.

2. Target is a Minneapolis-based corporation that serves customers through its nearly 2,000 retail stores nationwide, as well as through its online platform, Target.com.~~-~~

~~3.~~ Target has a long history of launching various diversity, equity, and inclusion ("DEI") initiatives and campaigns—ranging from supporting nationwide initiatives and policies, creating in-store policies, and launching products in stores and

---

~~[1] The Individual Defendants are Brian C. Cornell ("Cornell"), David P. Abney ("Abney"), Douglas M. Baker, Jr. ("Baker"), George S. Barrett ("Barrett"), Gail K. Boudreaux ("Boudreaux"), Robert L. Edwards ("Edwards"), Melanie L. Healey ("Healy"), Donald R. Knauss ("Knauss"), Christine A. Leahy ("Leahy"), Monica C. Lozano ("Lozano"), Grace Puma ("Puma"), Derica W. Rice ("Rice"), Dimitri L. Stockton ("Stockton"), and Michael J. Fiddelke ("Fiddelke"). "Defendants" means Target and the Individual Defendants.~~

online.

4.3.    The Company has hosted a number of social activism initiatives to celebrate the LGBTQ community during Pride Month over the past decade, most of which proved to be financially unsuccessful.[2]

5.4.    For instance, in April 2016, Target received extreme backlash, including a boycott by more than one million customers, when the Company announced a new policy that allowed transgender customers to use any bathroom or fitting room.[3]

6.5.    Despite prior backlash and boycotts, Target launched an LGBTQ campaign in May 2023 to celebrate Pride Month (the "2023 Pride Campaign"). The Company's 2023 Pride Campaign included the sale of more than 2,000 LGBTQ- related products in Target stores and online.[4]

6.    Despite its efforts to serve the LGBTQ community, at bottom, Target is publicly traded corporation whose directors and officers are vested with fiduciary duties to maximize shareholder value—not effectuate social change to the detriment of the Company and its shareholders. That is what exactly happened here:  The 2023 Pride Campaign caused nationwide controversy and boycotts, which resulted in the Company scaling back the

---

[2] Nathaniel Meyersohn, *Target Removing Some Pride Merchandise After Anti-LGBTQ Threats Against Staff*, CNN (May 25, 2023), https://www.cnn.com/2023/05/23/business/target-lgbtq-merchandise/index.html.

[3] Hayley Peterson, *The Target Boycott is Spiraling Out of Control*, BUS. INSIDER (Apr. 26, 2016), https://www.businessinsider.com/the-target-boycott-is-spiraling-out-of-control-2016-4.

[4] Meyersohn, *supra* note 2.

2023 Target portrays itself as the store of working families. But as Target's formerly loyal customer base now recognizes, Target's Board and management for years spent Target's valuable financial and reputational capital on the pursuit of ESG and DEI mandates behind the facade of Target's classic middle-class brand—all the while falsely and misleadingly portraying the risks of its strategy to Target's shareholders in order to secure its re-election and insulate itself from accountability.

7. The bill came due in May 2023, when Target faced an unprecedented customer backlash to a campaign Target undertook as a result of its ESG and DEI initiatives—Target's now infamous children-and-family-themed LGBT-"Pride" marketing and sales campaign—which embroiled Target in the culture war and caused Target to experience the biggest stock decline in the Company's history, costing investors billions.

7. Pride Campaign by removing certain products and only limiting the 2023 Pride Campaign to select stores.[5] The 2023 Pride Campaign caused the Company's stock price and profits to plummet.[6]

---

[5] Jessica Guynn, *Battered by Boycott and Backlash, Target Will Not Sell Pride Collection in All Stores*, USA TODAY (May 10, 2024), https://www.usatoday.com/story/money/2024/05/09/target-pride-month-collection-backlash-fewer-stores/73636054007/; TARGET, *Target Statement on 2023 Pride Collection* (May 24, 2023), https://corporate.target.com/press/statement/2023/05/target-statement-on-2023-pride-collection.
[6] Nick Halter, *Target in the Crosshairs, is Taking a Beating on Wall Stret*, AXIOS (Jun. 2, 2023), https://www.axios.com/local/twin-cities/2023/06/02/target-stock-prices-tumble-pride-boycotts; Nathaniel Meyersohn, *Pride Month Backlash Hurt Target's Sales. They Fell for the First Time in Six Years*, CNN (Aug. 16, 2023), https://www.cnn.com/2023/08/16/investing/target-stock-earnings/index.html.

8.    As detailed herein, the Individual Defendants (defined below) assured investors that the Board and Company management were overseeing and disclosing known risks to the Company stemming from the DEI and environmental, social, and ~~governance ("ESG") initiatives the Company was advancing, including the 2023 Pride Campaign.~~ governance ("ESG") initiatives the Company was advancing, including the 2023 Pride Campaign.

~~8.~~9.    However, the Company repeatedly failed to disclose that ~~the~~ Target faced numerous risks, including a known substantial risk of consumer boycotts and a loss of profits, and that the Board and its committees were not conducting proper oversight over the Company's advancement of DEI and ESG initiatives.

~~9.~~10.    The truth about the risks and harm to the Company began to publicly emerge when the 2023 Pride Campaign was launched, and customers began to boycott Target. As a result of the boycotts, there was an influx of negative publicity about Target and the 2023 Pride Campaign. On May 24, 2023, publicly recognizing the extent of the backlash caused by the 2023 Pride Campaign, the Company issued the "Target Statement on 2023 Pride Collection," announcing that the Company was making "adjustments" to its plan and removing items from the collection due to backlash.[7]

~~10.~~11. On this news, the Company's stock price fell $20.21 per share, or approximately 14%, to close at $140.75 on May 25, 2023, the days after the

---

[7] ~~Target Statement on 2023 Pride Collection, supra note 5.~~

Company's May 24, 2023 announcement.

11.12. As Target continued to receive significant financial backlash for the 2023 Pride Campaign, the Company's stock price dropped further. Between May 17, 2023, and June 14, 2023, Target's stock price fell $27.73 per share, or approximately 20%, to close at $124.12 per share on June 14, 2023.

12. As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact concerning, *inter alia*, the risks the Company faced related to its DEI and ESG initiatives. Specifically, the Individual Defendants failed to disclose to investors that: (a) Target was subject to the risk of consumer boycotts and reduced profits because of its ESG and DEI initiatives, such as the 2023 Pride Campaign; (b) the Board and Company management were not conducting proper oversight and had not established sufficient controls or reporting systems over the risks associated with Target's DEI and ESG initiatives; (c) the Company's ESG and DEI initiatives were not implemented to maximize shareholder value; (d) the consumer boycotts following the 2023 Pride Campaign were more serious than the Company was letting on; and (e) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. In further breach of their fiduciary duties,

7

the Individual Defendants failed to establish or maintain adequate controls or reporting systems, and separately caused Target to repurchase over a billion dollars of its own common stock at prices they knew were artificially inflated due to the false and misleading statements they issued or allowed to be issued.

13. As a result of the foregoing, the Securities Action was filed against the Company and current and former members the Board on August 8, 2023, in the United States District Court for the Middle District of Florida.

14. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying damages in the Securities Action, as well as additional losses, including reduced profits, reputational harm, and loss of goodwill.

15. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Target's Board cannot consider a demand to commence litigation against themselves and the other Individual

8

Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of for violations ofas Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (, 15 U.S.C. § 78n(a)) and)(1), Rule 14a-9 (of the Exchange Act, 17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section, and Sections 10(b) of the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, and Rule 20(a) of the Exchange Act (15 U.S.C. § 78t(a)). Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

17. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Action based on violations of the Exchange Act.

18.13. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28

U.S.C. §1367(a). This action is not a collusive ~~action designed~~one to confer jurisdiction on a court of the United States ~~that~~which it would not otherwise have.

14. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through issuing false statements in this District and maintaining retail stores in this District.

~~19.~~16. In connection with the acts, transactions, and conduct ~~and other wrongs complained of~~alleged herein, the Individual Defendants~~,~~ directly ~~or~~and indirectly~~,~~ used the means and instrumentalities of interstate commerce, including

the United States mail, interstate telephone communications, and the facilities of a national securities marketexchange.

20. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391(b)(1), as a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, and the Securities Action is pending in this District.

## PARTIES

### Plaintiff

21.17. *Plaintiff Chamandeep Kaur* is, and has beenwas at all relevant times since 2019, a shareholder of Target.the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation. Plaintiff is a citizen of Virginia. New York.

### Nominal Defendant

22.18. *Nominal Defendant Target* is a Minnesota corporation with its principal executive offices located at 1000 Nicollet Mall, Minneapolis, Minnesota 55403. Target's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "TGT."

### *Individual*Director Defendants

23.19. *Defendant Brian C. Cornell* ("Cornell") has served as the Chair and Chief Executive Officer ("CEO") of the Company since August 2014. Upon

11

information and belief, Defendant Cornell is a citizen of Minnesota. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Cornell received the following in compensation from the Company between 2021 and 2023:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $19,758,766 |
| 2022 | $17,664,896 |
| 2023 | $19,203,353 |

24.20. **Defendant David P. Abney** ("Abney") has served as a director of the Company since 2021. Abney also serves as a member of the Company's Audit & Risk Committee and Infrastructure & Finance Committee. Upon information and belief, Defendant Abney is a citizen of Georgia. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Abney received the following in compensation from the Company between 2021 and 2023:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $197,689 |
| 2022 | $310,113 |
| 2023 | $310,058 |

25.21. **Defendant Douglas M. Baker, Jr.** ("Baker") has served as a director of the Company since 2013. Baker also serves as a member of the Company's Compensation & Human Capital Management Committee and Governance & Sustainability Committee. Upon information and belief, Defendant Baker is a

12

citizen of Minnesota. ~~As set forth in the Company's annual proxy statements filed with the SEC, Defendant Baker received the following in compensation from the Company between 2021 and 2023:~~

| ~~Year~~ | ~~Total Compensation~~ |
|---|---|
| ~~2021~~ | ~~$325,027~~ |
| ~~2022~~ | ~~$335,113~~ |
| ~~2023~~ | ~~$335,128~~ |

~~26.~~22. **Defendant *George S.* Barrett** ("Barrett") has served as a director of the Company since 2021. Barrett also serves as Chair of the Company's Governance & Sustainability Committee and as a member of the Company's Compensation & Human Capital Management Committee. Upon information and belief, Defendant Barrett is a citizen of Ohio. ~~As set forth in the Company's annual proxy statements filed with the SEC, Defendant Barrett received the following in compensation from the Company between 2021 and 2023:~~

| ~~Year~~ | ~~Total Compensation~~ |
|---|---|
| ~~2021~~ | ~~$295,144~~ |
| ~~2022~~ | ~~$310,071~~ |
| ~~2023~~ | ~~$326,693~~ |

~~27.~~23. **Defendant *Gail K.* Boudreaux** ("Boudreaux") has served as a director of the Company since 2021. Boudreaux also serves as a member of the Company's Audit & Risk Committee and Infrastructure & Finance Committee. Upon information and belief, Defendant Boudreaux is a citizen of Indiana. ~~As set forth~~

13

in the Company's annual proxy statements filed with the SEC, Defendant Boudreaux received the following in compensation from the Company between 2021 and 2023:

| Year | Total Compensation |
|---|---|
| 2021 | $172,992 |
| 2022 | $310,071 |
| 2023 | $310,026 |

28.24. *Defendant Robert L. Edwards ("Edwards")* has served as a director of the Company since 2015. Edwards also serves as a member of the Company's Audit & Risk Committee and Infrastructure & Finance Committee. Upon information and belief, Defendant Edwards is a citizen of Utah. Edwards previously served as Chair of the Company's Audit & Risk Committee until June 2024. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Edwards received the following in compensation from the Company between 2021 and 2023:

| Year | Total Compensation |
|---|---|
| 2021 | $325,027 |
| 2022 | $335,113 |
| 2023 | $335,058 |

29.25. *Defendant HealeyMelanie L. Healy ("Healy")* served as a director of the Company from 2015 until 2023. While on the Board, Healey served as a member of the Company's Compensation & Human Capital Management

Committee and Governance & Sustainability Committee. Upon information and belief, Defendant Healey is a citizen of Ohio. ~~As set forth in the Company's annual proxy statements filed with the SEC, Defendant Healey received the following in compensation from the Company between 2021 and 2023:~~

| ~~Year~~ | ~~Total Compensation~~ |
|---|---|
| ~~2021~~ | ~~$295,027~~ |
| ~~2022~~ | ~~$310,113~~ |
| ~~2023~~ | ~~$240,058~~ |

~~30.~~26. *Defendant* *Donald R.* *Knauss* ("Knauss") has served as a director of the Company since 2015. Knauss also serves as Chair of the Company's Infrastructure & Finance Committee and as a member of the Company's Compensation & Human Capital Management Committee. Upon information and belief, Defendant Knauss is a citizen of Texas. ~~As set forth in the Company's annual proxy statements filed with the SEC, Defendant Knauss received the following in compensation from the Company between 2021 and 2023:~~

| ~~Year~~ | ~~Total Compensation~~ |
|---|---|
| ~~2021~~ | ~~$295,027~~ |
| ~~2022~~ | ~~$326,780~~ |
| ~~2023~~ | ~~$335,058~~ |

~~31.~~27. *Defendant* *Christine A.* *Leahy* ("Leahy") has served as a director of the Company since 2021. Leahy also serves as a member of the Company's Compensation & Human Capital Management Committee and Governance &

15

Sustainability Committee. Upon information and belief, Defendant Leahy is a citizen of Illinois. ~~As set forth in the Company's annual proxy statements filed with the SEC, Defendant Leahy received the following in compensation from the Company between 2021 and 2023:~~

| ~~Year~~ | ~~Total Compensation~~ |
|---|---|
| ~~2021~~ | ~~$295,027~~ |
| ~~2022~~ | ~~$310,071~~ |
| ~~2023~~ | ~~$310,026~~ |

~~1.~~28.  *Defendant Monica C. Lozano* ("Lozano") has served as a director of the Company since 2016. Lozano also serves Chair of the Company's Compensation & Human Capital Management Committee and as a member of Company's Governance-

~~32.~~  & Sustainability Committee. Upon information and belief, Defendant Lozano is a citizen of California. ~~As set forth in the Company's annual proxy statements filed with the SEC, Defendant Lozano received the following in compensation from the Company between 2021 and 2023:~~

| ~~Year~~ | ~~Total Compensation~~ |
|---|---|
| ~~2021~~ | ~~$335,027~~ |
| ~~2022~~ | ~~$370,113~~ |
| ~~2023~~ | ~~$370,058~~ |

~~33.~~29. *Defendant Grace Puma* ("Puma") has served as a director of the Company since 2022. Puma also serves as a member of the Company's Audit &

Risk Committee and Infrastructure & Finance Committee. Upon information and belief, Defendant Puma is a citizen of Florida. ~~As set forth in the Company's annual proxy statements filed with the SEC, Defendant Puma received the following in compensation from the Company for the years 2022 and 2023:~~

| ~~Year~~ | ~~Total Compensation~~ |
|---|---|
| ~~2022~~ | ~~$205,162~~ |
| ~~2023~~ | ~~$310,026~~ |

~~34.~~30. *Defendant* ~~*Derica W.*~~ *Rice* ("Rice") has served as a director of the Company since 2020. Rice also serves as a member of the Company's Audit & Risk Committee and Infrastructure & Finance Committee. Upon information and belief, Defendant Rice is a citizen of Indiana. ~~As set forth in the Company's annual proxy statements filed with the SEC, Defendant Rice received the following in compensation from the Company for the years 2021 through 2023:~~

| ~~Year~~ | ~~Total Compensation~~ |
|---|---|
| ~~2021~~ | ~~$295,144~~ |
| ~~2022~~ | ~~$310,071~~ |
| ~~2023~~ | ~~$310,026~~ |

~~35.~~31. *Defendant* ~~*Dmitri L.*~~ *Stockton* ("Stockton") has served as a director of the Company since 2018. Stockton also serves as Chair of the Company's Audit & Risk Committee and as a member of the Company's Infrastructure & Finance Committee. Upon information and belief, Defendant Stockton is a citizen of North

17

Carolina. ~~As set forth in the Company's annual proxy statements filed with the SEC, Defendant Stockton received the following in compensation from the Company between 2021 and 2023:~~

| ~~Year~~ | ~~Total Compensation~~ |
|---|---|
| ~~2021~~ | ~~$295,144~~ |
| ~~2022~~ | ~~$310,071~~ |
| ~~2023~~ | ~~$310,026~~ |

32. The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

33. *Defendant Michael Fiddelke* ("Fiddelke") has served as Executive Vice President and Chief Operating Officer of the Company since February 2024. Fiddelke previously served as the Company's Chief Financial Officer from November 2019 until September 2024. Upon information and belief, Defendant Fiddelke is a citizen of Minnesota. ~~September 2024. Upon information and belief, Defendant Fiddelke is a citizen of Minnesota. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Fiddelke received the following in compensation from the Company between 2021 and 2023:~~

34. Defendants Fiddelke and Cornell are collectively referred to herein as the "Officer Defendants."

36. The Director Defendants~~, because of their positions of control and authority as directors and/or officers of Target, were able to and did, directly~~

18

and/or indirectly, exercise control over the wrongful acts complained of herein.

37. To discharge their duties, the officers and directors of Target were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38.35. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual along with the Officer Defendants complained of are collectively referred to herein involves a knowing and culpable violation of their obligations as directors and/or officers of Target, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the as the "Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.."

39. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful

19

information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

40. To discharge their duties, the officers and directors of Target were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Target were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Minnesota and the United States, and pursuant to Target's own Code of Ethics (the "Code of Ethics") and the Director Code of Ethics (the "Director Code of Ethics");

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality

20

performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how Target conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Target and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Target's operations would comply with all applicable laws and Target's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii) Refrain from unduly benefiting themselves and other

21

Company insiders at the expense of the Company; and

(viii) Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

41. Each of the Individual Defendants further owed to Target and the shareholders the duty of loyalty requiring that each favor Target's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

42. At all times relevant hereto, the Individual Defendants were the agents of each other and of Target and were at all times acting within the course and scope of such agency.

43. Because of their advisory, executive, managerial, and directorial positions with Target, each of the Individual Defendants had access to adverse, non-public information about the Company.

44. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Target.

## TARGET'S CODE OF ETHICS

22

45. The Company's Code of Ethics applies to "all team members," which includes the Company's leadership team.[8]

46. The Code of Ethics begins with a message from Target's CEO and a section titled "defining ethics at Target," which states, in relevant part, "Target's commitment to ethical standards is reflected in the way we conduct business and through our actions. As team members, at any level, we must always consider the impact on our guests, team members, stakeholders, community and the Target brand when making business decisions."

47.1. The Code of Ethics, in the section titled "avoid conflicts of interests" states, in relevant part, "we never allow our personal interests to impact the business decisions we make as Target team members. When our outside activities conflict or even appear to conflict with our responsibilities as a Target team member, we avoid and disclose any activity that could be considered a conflict of interest."

48. Under the section titled "be truthful in marketing and advertising," the Code of Ethics states, in relevant part, "in promoting our business, we communicate accurately and honestly." The section goes on to state, "our guests make decisions about where they'll shop and what they'll buy based on what they see in stores, online or what they learn about us. We have an obligation in our promotions,

---

[8] *See* TARGET, *Corporate Governance*, https://corporate.target.com/sustainability-governance/governance-and-reporting/corporate-governance (last visited Dec. 20, 2024).

advertising and guest communications to follow all laws and provide guests with accurate information."

49. The Code of Ethics contains a section titled "provide accurate financial information," which states in relevant part:

The U.S. Securities and Exchange Commission and other governing bodies have strict rules about the accuracy of our financial statements and disclosures and the strength of our internal controls over financial reporting. Our financial and operational records must remain accurate, so we can make sound business decisions, keep our operations running efficiently and meet our goals and obligations. . . .

As team members, we have an obligation to follow all internal control procedures to maintain our financial records – this includes submitting an expense report, reviewing or approving financials and handling any other business record. Accurate recordkeeping helps us provide complete, accurate, timely and understandable information in our public disclosures.

50. In a section titled "trade securities fairly and regularly," the Code of Ethics states, in relevant part:

Trading securities of a company based on inside information (information that is both material and non-public) is illegal and unfair. When we take steps to prevent it, we uphold our Company's reputation for dealing honestly wherever we do business. . . .

As part of your job, you may be exposed to inside information about our Company or another company, such as one of our business partners. It is unfair and illegal to use inside information to buy or sell securities for personal gain. We should trade only when information is lawfully and publicly available. We should also not tip others by sharing inside information with them to trade. . . .

If you have access to information that isn't publicly accessible, you're an insider. Although you're always obligated to maintain the

24

confidentiality of any non-public information you learn as part of your job you should be sensitive to information that could potentially be used for insider trading purposes. . . .

51.1. Under a section titled "communicate responsibly," the Code of Ethics states, in relevant part:

As team members, we love our Company and enjoy talking about it – to each other and everyone. We designate authorized individuals who are trained to speak on behalf of Target because we can damage our reputation in just a few words with an untrue statement. . . .

Our reputation is one of our greatest assets, and it's up to each team member to protect it. We refer all outside inquiries about Target's business to our Enterprise Communications team to ensure that all information conveyed to the public, regulatory authority and others is accurate, complete and consistent. . . .

If your work authorizes you to communicate with or respond to government or regulatory entities, it's important to be accurate. Anything you say or report to these entities should be accurate, complete and consistent. Never mislead, provide incorrect information or omit important details.

52.1. The Code of Ethics contains a section titled "engage responsibly in political activities," which states:

The Government Affairs team works to make sure that Target has a voice in decisions made by government officials. Target also encourages team members to participate in the civic process. . . .

When you engage in advocacy on behalf of Target, you must always follow the policies and laws that apply. You must also keep your personal political activities separate from your role at Target.

53. At all relevant times, Defendants Cornell and Fiddelke, as officers of the Company, were required to abide by the Code of Ethics.

**TARGET'S DIRECTOR CODE OF ETHICS**

25

54.1. In addition to Target's Code of Ethics, the Company's Corporate Governance Guidelines contains the Director Code of Ethics. The Director Code of Ethics states that it "is intended to focus the Board and each Director on areas of ethical risk, provide guidance to Directors to help them recognize ethical issues and understand how to report unethical conduct, and help foster a culture of honesty and accountability."

55. In a section titled "Conflicts of Interest," the Director Code of Ethics states, in relevant part:

> A Director must avoid conflicts of interest with the Corporation. A conflict of interest can occur when a Director's personal or business interests are adverse to the interest of the Corporation or when a Director (or a Director's family member) receives an improper personal benefit as a result of the Director's position as a member of the Board. A Director's personal or business interests include the interests of the Director's family members or organizations with which the Director or the Director's family members have a material relationship.

56.1. Under the section titled "Compliance with Law, Rules, and Regulations; Fair Dealing," the Director Code of Ethics states, "directors should comply with all applicable laws, rules, and regulations. Directors are subject to and must comply with the Corporation's Securities Trading Policy. Directors should deal fairly with Target's team members, guests, suppliers, and competitors."

57. At all relevant times, the Director Defendants (defined herein) were required to abide by the Director Code of Ethics.

**TARGET'S AUDIT & RISK COMMITTEE CHARTER**

58. Target's Audit & Risk Committee Charter states that the "function" of the Audit & Risk Committee is to:

Assist the Board of Directors in overseeing (i) the integrity of the Corporation's financial statements; (ii) the independence, qualifications and performance of the Corporation's independent auditor; (iii) the performance of the Corporation's internal audit function; (iv) the Corporation's compliance and ethics programs; and (vi) the Corporation's enterprise risk management program.

59.1. The "Responsibilities" section of the Audit & Risk Committee Charter outlines the following responsibilities of Target's Audit & Risk Committee, among others:

A. Accounting and Reporting

1.1. **Review of Earnings Releases and Other Information**. Review and discuss with management the Corporation's earnings press releases, including the use of non-GAAP financial measures and any earnings guidance provided, before issuance. Discuss generally the types of financial information provided and the types of presentations to be made to analysts and rating agencies (such discussion need not occur prior to each disclosure).

2. **Review of Annual and Quarterly Reports**. Review and discuss with management and the independent auditors the Corporation's interim unaudited and annual audited financial statements, including disclosures made in management's discussion and analysis, the results of the independent auditor's review (or audit in the case of annual financial statements) and any other matters required to be communicated to the Committee by the independent auditor, prior to filing each Form 10-Q or 10-K, respectively. Recommend to the Board whether the audited financial statements should be included with the Corporation's Form 10-K. The Committee shall also prepare the "Report of Audit Committee" contained in the annual Proxy Statement.

3. **Internal Controls**. Receive information from management about any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting. Review and discuss with management and the independent auditor, the report of management on internal control over financial reporting and the independent auditor's report on internal control over financial reporting prior to the filing of the Corporation's Form 10-K.

4. **General Oversight**. Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles and any critical accounting estimates made in the course of preparing the financial statements.

5. **Regulatory Changes and Off-Balance Sheet Items**. Discuss with management and the independent auditor the effect of pending regulatory changes to accounting practices, as well as off-balance sheet structures (if any) on the Corporation's financial statements.

1. 6. **Tax Matters**. Discuss with management the Corporation's positions with respect to income and other tax obligations, and review periodic reports from management with respect to tax compliance matters. . . .

C. C. Oversight of Internal Audit

1. **Audit Plan Risk Assessment**. Review and discuss with the head of internal audit the internal audit function's ongoing assessments of the Corporation's risk management processes and system of internal control, and the commitment of internal audit resources to audit the Corporation's guidelines, policies and procedures to mitigate identified risks. Such discussions should encompass the Corporation's principal financial, accounting, internal control and related risk exposures and, as appropriate, include the Corporation's principal risk officer.

2. **Internal Audit Function**. Discuss the internal audit department's responsibilities, audit plan, budget and staffing with the head of internal audit.

1. 3. **Internal Audit Results**. Review significant internal audit results and management's action plans.

28

**D. Additional Accounting, Audit, and Reporting Matters**

1. **Accounting and Auditing Complaints**. Establish procedures for the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or audit matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

2. **Legal Matters**. Review periodic reports of the General Counsel on litigation and other legal matters that may have a material impact on the financial statements or the Corporation's internal controls.

1. 3. Related Party Transactions. Review and approve related party transactions consistent with the Corporation's Related Party Transactions – Policies and Procedures (or any successor related party transaction policy) and report to the full Board on any approved transactions.

C. E. Oversight of Compliance and Ethics

1. **Compliance and Ethics Programs.** Oversee the Corporation's compliance and ethics programs, including those related ethics, legal, and regulatory matters, and receive periodic reports on such programs from appropriate members of management, including information on any significant compliance and ethics issues and the budget and staffing for the Corporation's compliance and ethics function.

2. **Compliance and Ethics Monitoring**. Oversee the effectiveness of the process used by management to identify, investigate and address allegations of potential misconduct and violations of compliance and ethics policies, including the Corporation's Code of Ethics (or any successor code of conduct) and possible legal or regulatory violations.

1. 3. **Investigations and Remediation Efforts**. Unless addressed by the Board or another Committee, oversee investigations and remediation efforts related to the Corporation's compliance and ethics program.

C. F. Oversight of Enterprise Risk Management

1. **Enterprise Risk Management Program**. Oversee the Corporation's enterprise risk management program to obtain an understanding of the primary enterprise risks facing the Corporation, including:

- management's process for identifying and assessing risks and, where appropriate, employing strategies for risk mitigation; and

- the budget and staffing for the Corporation's enterprise risk management function.

2. **Principal Business and Operational Risks**. Oversee the principal business and operational risks facing the Corporation, including:

- vendor risk management

- cybersecurity and information security

- privacy

- product safety, including food safety

- business continuity and disaster recovery.

1. 3. **Coordination of Risk Oversight**. Periodically review the Corporation's approach to risk identification, assessment and mitigation strategies with the Board to facilitate coordination with the activities of the Board and other Board Committees.

**G.** Oversight of Supply Chain Corporate Responsibility Matters

In addition to the Committee's oversight responsibilities for the Corporation's compliance and risk management functions, the Committee shall serve as the primary Committee for oversight of management's efforts to instill responsible and ethical practices within its supply chain. This includes the human capital practices expected of the Corporation's vendors and responsible sourcing practices with respect merchandise procurement.

**H.** Other

1. **Investigations.** Conduct any investigation that the Committee deems appropriate, with full access to all of the

Corporation's records, facilities, personnel and outside advisors, and retain outside counsel, auditors and other consultants to advise the Committee for that purpose. . . .

**5.** **Reporting to the Board**. Provide the Board with regular reports of the activities of the Committee.

**6.** **Consultants and Advisors**. Possess the sole authority to retain or terminate, as it deems necessary or appropriate, outside counsel, auditors and other consultants or outside advisors to assist in discharging its responsibilities. The Corporation will provide appropriate funding, as determined by the Committee, for payment of any resource engaged for this purpose, including the engagement of the independent auditor, and for all other administrative expenses necessary for the Committee to carry out its duties.

5. **7.** **Committee Evaluation**. Annually evaluate the performance of the Committee.

60. At all relevant times, the Audit & Risk Defendants (defined herein) were required to abide by the Audit & Risk Committee Charter.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

*Background*

61.36. Incorporated in 1902, Target is a Minneapolis-based corporation that serves customers through its nearly 2,000 retail stores nationwide, as well as through its online platform, Target.com.

62.37. The majority of the Company's stores are larger than 170,000 square feet and offer a wide assortment of general merchandise and a full line of food items. Target's digital channels include a wide range of merchandise and food assortment, including items found in the stores and other additional items sold by Target and third parties.

63.38. The CompaniesCompany's five core merchandise categories are: (i) Apparel & Accessories; (ii) Food & Beverage; (iii) Home Furnishings & Décor; (iv) Beauty & Household Essentials; and (v) Hardlines.

## The Company'sTHE DEI CAMPAIGN

### Target's *Initiative*DEI History

39. Target has a long and unsuccessful history of launching DEI initiatives and campaigns—ranging from supporting nationwide initiatives and policies, launching products in stores and online, and creating in-store policies.

64.40. During the last decade, the Company has hosted a number of initiatives to celebrate the LGBTQ community.[9] While the Company's first LGBTQ in-store campaign dates back to May 2012,[10] the number and scale of DEI initiatives began to increase in 2014, which coincided with the appointment of Defendant Cornell to Chairman and CEO of Target in 2014.

65.41. As detailed herein, through the past decade, Target's LGBTQ initiatives have received criticism and backlash from both sides of the political spectrum.

66.42. In August 2014, Target signed an amicus brief in support of marriage

---

[9] Meyersohn, *supra* note 2.

[10] Janet Moore, *Line of Target T-shirts to Support Gay Pride*, THE MINN. STAR TRIB. (May 22, 2012), https://www.startribune.com/line-of-target-t-shirts-to-support-gay-pride/152818315

equality.[11]

67.43. In June 2015, Target launched its Pride Month campaign, titled "#TakePride," which consisted of a line of apparel and accessories with the Company's logo in rainbow that could be purchased online or in stores.[12] Also in June 2015, the Company posted a "Pride Manifesto" to its website, which has since been removed.[13]

68.44. The Company also announced in June 2015 that it was partnering with an activist group called Gay, Lesbian and Straight Education Network ("GLSEN"), an organization that focuses on school initiatives concerning LGBTQ individuals, to produce "a mini-documentary highlighting the work of students, educators and volunteers who have improved school climate for lesbian, gay, bisexual and transgender (LGBT) youth across the country."[14]

69.45. In August 2015, Target announced that they were getting rid of gender based signage in its stores, including in the toys, home, and entertainment

---

[11] TARGET, *Target Signs Amicus Brief on Marriage Equality* (Aug. 5, 2014), https://corporate.target.com/news-features/article/2014/08/target-signs-amicus-brief-marriage-equality?clkid=8d5d3465N3a9f11eda8fea3d0e33f3305&cpng=PTID1&lnm=81938&afid=intent X%20Inc.&ref=tgt_adv_xasd0002.

[12] Cory Fernandez, *Daily Crush: #TakePride Campaign by Target*, OUT (Jun. 9, 2015), https://www.out.com/truman-says/2015/6/09/target-launches-takepride-campaign-pride-month?page=10#toggle-gdpr.

[13] Adele Chapin, *Target Aligns Itself More Strongly with the LGBT Community*, RACKED (Sep. 10, 205), https://www.racked.com/2015/9/10/9306249/target-equality-act.

[14] GLSEN, *GLSEN and Target Team Up for 25th Anniversary Documentary* (Jun. 2, 2015), https://www.glsen.org/news/glsen-and-target-team-25th-anniversary-documentary.

departments.[15] The Company alleged that these changes were being made after receiving concerns from customers regarding the gender-based signs. ~~*Id.*~~

~~70.~~46. In September 2015, Target announced that it signed on in support of the "Equality Act," which was federal legislation introduced to ban housing, employment, and other types of discrimination based on sexual orientation or gender identity.[16]

~~71.~~47. In 2015 and 2016, Target was named a "platinum" National Corporate Partner of the Human Rights Campaign ("HRC"), which is a designation offered to companies that demonstrate a high level of commitment to equality.[17] Additionally, Target received a 100 on HRC Foundation's Corporate Equality Index, the national benchmarking tool on corporate policies and practices pertinent to LGBT employees. ~~*Id.*~~

~~72.~~48. In April 2016, in response to North Carolina legislation that limited multi-occupancy bathrooms to occupants of the same sex, the Company announced a new policy that allowed "transgender team members and guests to

---

[15] ~~Kathryn Robinson, *Target Ditches Gender Labels on Toys, Home, and Entertainment*, NBC NEWS (Aug. 9, 2015), https://www.nbcnews.com/news/us-news/target-ditches-gendered-labels-toys-home-entertainment-n406741.~~
[16] ~~TARGET, *Stronger Together: Target Signs on in Support of the Equality Act* (Sep. 10, 2015), https://corporate.target.com/news-features/article/2015/09/equality-act.~~
[17] ~~Beck Bailey, *Target Affirms Trans-Inclusive Policies, Makes Powerful Statement During Surge of Anti-LGBT Bills*, HUM. RTS. CAMPAIGN (Apr. 20, 2016), https://web.archive.org/web/20160423090807/http://www.hrc.org/blog/target-affirms-trans-inclusive-policies-makes-powerful-statement-during-sur; HUM. RTS. CAMPAIGN, National Corporate Partners, https://web.archive.org/web/20160415030632/http://hrcnationaldinner.org/sponsors/partners (last visited Dec. 23, 2024).~~

use the restroom or fitting room facility that corresponds with their gender identity."[18]

73.49. Within weeks, more than 550,000 people signed a pledge to boycott Target.[19] The policy ultimately led to more than one million people pledging to boycott the Company and a decline in shopper traffic, resulting in the Company's sales falling 7.2% for the quarter.[20] Target also responded to the backlash by spending $20 million to install new single-occupancy bathrooms. *Id.* Furthermore, the boycotts resulted in Target's stock value falling more than 35%.[21]

50. However, the Company continued on with its LGBTQ initiatives even after the boycotts and backlash.

74.51. In 2017, the Company again launched a Pride Month campaign with similar products to the 2016 #TakePride campaign. *Id.* Coming on the heels of the bathroom policy, this 2017 campaign was not well-perceived by certain groups, with one critic stating the following:

"I would think Target would have learned their lesson about participating in

---

[18] Stephen Peters, *More Than 100 Major CEOs & Business Leaders Urge North Carolina to Repeal Anti-LGBT Law*, HUM. RTS. CAMPAIGN (Mar. 31, 2016), https://www.hrc.org/press-releases/more-than-100-major-ceos-business-leaders-demand-north-carolina-repeal-radi; TARGET, *Continuing to Stand for Inclusivity* (Apr. 19, 2016), https://corporate.target.com/news-features/article/2016/04/target-stands-inclusivity.

[19] Dana Farrington, *Petition Calls for Boycott of Targets 'Inclusive' Bathroom Policy*, NPR (Apr. 25, 2016), https://www.npr.org/sections/thetwo-way/2016/04/25/475624646/petition-calls-for-boycott-of-targets-inclusive-bathroom-policy.

[20] Hayley Peterson, *The Target Boycott is Costing More Than Anyone Expected*, BUS. INSIDER (Aug. 24, 2016), https://www.businessinsider.com/target-boycott-costs-20-million-2016-8.

[21] Elena Cherubini, *Target Doubles Down on Pride Celebrations Despite Anti-LGBT Boycott*, LGBTQ+ INST. (May 15, 2017), https://www.lgbtqinstitute.org/news/2017/5/15/target-doubles-down-on-pride-celebrations-despite-anti-lgbt-boycott.

aggressive LGBT activism from the backlash they received from their open bathroom policy last year, yet they seem not to have learned that lesson," said Peter Sprigg, of Family Research Council (FRC).

"They ~~don't~~don't understand that those people who signed up to boycott Target are not going to be any happier with the Take Pride merchandise that ~~they're~~they're offering.~~"[22]~~.

~~75.~~52. In 2018, the Company again launched merchandise to support the LGBTQ community and received backlash for one Pride-themed shirt in particular, as the artist accused the Company of stealing his design and putting it onto the shirt.[23]

~~76.~~53. Each year, the Company's Pride Month campaigns continued to grow in size. In 2020, the Company launched a robust pride campaign, which included a collection of more than 90 products that were sold online and in nearly 500 stores across the country.[24] The Company also disclosed that Target's Pride+ Business Council, which is an "HQ-based team member resource group" planned internal programming for employees, including online panels, team member testimonials, and more, to help the Company's team members come together to honor Pride Month. *Id.* Target also donated $100,000 to GLSEN. *Id.*

~~77.~~54. In November of 2020, in response to Twitter activists, Target banned

---

[22] ~~THE CHRISTIAN BROAD. NETWORK, *Target at it Again, Pushing Pro-LGBT Agenda* (May 12, 2017), https://cbn.com/news/us/target-it-again-pushing-pro-lgbt-agenda.~~
[23] ~~Kate Taylor, *Target Quietly Removes a T-Shirt from its Website After Being Accused of 'Stealing the Art of a Gay Mexican Artist,'* BUS. INSIDER (May 16, 2018), https://www.businessinsider.com/target-accused-of-stealing-design-stops-selling-shirt-2018-5.~~
[24] ~~TARGET, *Here's How Target's Helping Guests and Team Members Honor Pride Month* (Jun. 11, 2020), https://corporate.target.com/news-features/article/2020/06/pride?clkid=8d5d3465N3a9f11eda8fea3d0e33f3305&cpng=PTID1&lnm=81938&afid=intentX%20Inc.&ref=tgt_adv_xasd0002.~~

36

two books that contained viewpoints that were skeptical of prevailing LGBT beliefs.[25] This ban caused backlash from the public, which resulted in Target reversing the ban the very next day. ~~Id.~~ However, in June 2020, the books once again were taken off Target.com, seemingly due to Target's new "Book Content Guidelines," which were published on Target's corporate governance section of its website. ~~Id.~~ These guidelines state, in relevant part:

> As a bookseller, our assortment represents the varied and diverse perspectives of our guests. However, we can decide not to sell certain content, including pornography, erotica, sexually explicit content, obscenity, some forms of satire, other inappropriate content, and any content that is illegal, infringing, harmful or potentially harmful.

> Harmful or potentially harmful content is defined as:

> • Content that has the potential to cause harm to an individual or group of people based on race, ethnicity, national origin, sex, sexual orientation, gender, gender identity, religion, or disability, including content that could incite violence, harmful stereotypes or derogatory language, statements of inferiority, medical misinformation, or calls for exclusion or segregation without any historical context or significance. Target reserves the right to make a determination on the historical value of the item~~. . ..~~[26] …

~~78.~~ 55. This book ban and Target's new book content guidelines resulted in further backlash.[27]

---

[25] Charles Bowyer & Jerry Bowyer, *Target Hits Books*, NAT'L REV. (Jul. 30, 2021), https://www.nationalreview.com/2024/12/motivated-reasoning-has-no-home-here/?utm_source=onsite&utm_medium=nri&utm_campaign=december&utm_term=geraghty.

[26] TARGET, *Book Content Guidelines*, https://corporate.target.com/sustainability-governance/responsible-supply-chains/suppliers/book-content-guidelines (last visited Dec. 23, 2024).

[27] Bowyer, *supra* note 25; Madeline Osburn, *Target Swiftly Bans Books on Behalf of Anonymous Twitter User Crying 'Transphobia,'* THE FEDERALIST (Nov. 13, 2020),

79.56. However, Target continued on with its DEI initiatives. In 2021, Target again launched a Pride Month campaign in June, which consisted of "over 150 inclusive products available in all stores and on Target.com. (Hint: It offers-_even more-_ways to help you celebrate at home, with home décor like decorative lights and scented candles on top of our guest-favorite apparel assortment)."[28] Target also donated $100,000 to GSLEN and donated and volunteered hours to other organizations, including HRC. *Id.* Furthermore, the Pride+ Business Council facilitated opportunities and events for the Company's team members. *Id.*

80.57. Target's 2021 Pride Month collection received backlash from various groups, with some critiquing the aesthetics of the collection and others alleging that Target missed the mark entirely on the LGBTQ messaging.[29] Some customers called the collection homophobic and "out of touch."[30] Many customers critiqued one of the Company's T-shirts, listed on Target.com as a "Pride Gender Inclusive Adult 'Pronouns' Short Sleeve Graphic T-Shirt," with one critic calling it "an

---

https://thefederalist.com/2020/11/13/target-swiftly-bans-book-on-behalf-of-anonymous-twitter-user-crying-transphobia/.

[28] TARGET, *Take Pride! Here's How Target's Recognizing Pride Month* (Jun. 2, 2021), https://corporate.target.com/news-features/article/2021/06/pride.

[29] Palmer Haasch, *TikTok Users are Roasting Pride Month Merchandise from Giant Corporations*, Targeting 'Rainbow Capitalism,' BUS. INSIDER (May 4, 2021), https://www.businessinsider.com/target-pride-month-collection-tiktok-ratings-2021-5.

[30] Gabriela Garcia-Astolfi, *Why Target Revamped Its 2022 Pride Collection After Criticism*, GLOSSY (Jun. 24, 2022), https://www.glossy.co/fashion/why-target-revamped-its-2022-pride-collection-after-criticism/.

invitation for 'allies' to misgender you on [sic] accident."[31]

81.58. In 2022, Target attempted to revamp its Pride Month initiatives and announced that it teamed up with LGBTQIA+ designers, entrepreneurs, and Target team members to design the Pride Month collection.[32] The collection was launched online and in stores and included 250+ items that were marketed as "designed by and for the LGBTQIA+ community." Id. Furthermore, the Target Pride+ Business Council put together a full lineup of Pride Month events. Id.

82.59. The 2022 Pride Month campaign received a more positive response than the 2021 collection, with Refinery 29 reporting that the collection was "Queer Tik Tok approved."[33]

83.60. Additionally, in 2022, Target donated $250,000 to GLSEN, which marked the 11th year of partnership between the two entities and $2.1 million total donated since the beginning of the partnership.[34]

### Target'sThe 2023 Pride Campaign

84.61. Despite the backlash received from both sides of the political spectrum in previous years, the Company launched its 2023 Pride Campaign, its largest Pride Month campaign yet.

---

[31] Haasch, *supra* note 29.
[32] TARGET, *Here's How Target's Celebrating Pride Month This June — and All Year* (Jun. 1, 2022), https://corporate.target.com/news-features/article/2022/06/pride#:~:text=Target%20donated%20$250%2C000%20donation%20to%20GLSEN%20to,accessible%20and%20antiracist%20spaces%20for%20LGBTQIA+%20students.
[33] Garcia-Astolfi, *supra* note 30.
[34] Haasch, *supra* note 29.

85.62. The 2023 Pride Collection included more than 2,000 products, including "'gender fluid' mugs, 'queer all year' calendars, and books for children aged 2-8 titled 'Bye Bye, Binary,' 'Pride 1,2,3' and 'I'm not a girl.'"[35] Other controversial products included: (a) products from the brand "Abprallen" and its association with designer Erick Carnell due to Carnell's designs with images of pentagrams, horned skulls, and other Satanic products; (b) a slogan sweater with the words "cure transphobia not trans people;" (c) a tote bag that said "too queer for here;" and (d) transgender swimsuits marketed as "tuck friendly."[36]

86.63. Upon releasing the 2023 Pride Campaign into stores, the backlash started immediately, with many consumers calling for a boycott of Target.[37] Many consumers were outraged with the products in the 2023 Pride Campaign targeted at children.[38] One account responded to the campaign by saying "it is highly inappropriate and disturbing. We hope there are enough parents out there that understand how wrong this is and show them that this garbage will not sell," while another said "Target deserves the Bud Light treatment. We will work to put pressure on them." *Id.*

---

[35] Meyersohn, *supra* note 2.

[36] Siddharth Cavale, *Target Removing Some LGBTQ Merchandise Following Customer Backlash*, REUTERS (May 24, 2023), https://www.reuters.com/business/retail-consumer/target-remove-some-lbgtq-merchandise-after-facing-customer-backlash-2023-05-23/.

[37] Abigail Anthony, *Target Sheds $9 Billion in Market Cap Amid Backlash Over 'PRIDE' Collection*, NAT'L REV. (May 25, 2023), https://www.nationalreview.com/news/target-sheds-9-billion-in-market-cap-amid-backlash-over-pride-collection/.

[38] Ariel Zilber, *Target's 'Tuck-Friendly' Swimwear for Kids Sparks Outcry: 'Bud Light 2.0,'* N.Y. POST (May 19, 2023), https://nypost.com/2023/05/19/targets-tuck-friendly-swimwear-for-kids-sparks-controversy/.

2.64.  Target also claimed that employees were experiencing threats while at work due to outrage over the 2023 Pride Campaign.[39] As a result of the outrage and calls for boycotts, Target lost $9 billion in market value within one week of the online controversy. *Id.*

87.65. At first, the Company doubled down on its 2023 Pride Campaign. On May 17, 2023, in an interview, when asked about the backlash about various social justice campaigns, including the 2023 Pride Campaign, were receiving, Defendant Cornell defended the Company's initiatives and the 2023 Pride Campaign, stating, in relevant part, "I think those are just good business decisions, and it's the right thing for society, and it's the great thing for our brand."[40]

88.66. However, the Company began to back track on its 2023 Pride Campaign within weeks.

89.67. On May 23, 2023, Fox News published an article where a "Target insider" revealed that there were "emergency" calls held with managers and district senior directors where they were told by the Company to "tamp down" the Pride sections immediately.[41] The insider said that they "were given 36 hours to take all of our Pride stuff, the entire section, and move it into a section that's a third

---

[39] Anthony, *supra* note 37.

[40] Ariel Zilber, *Target CEO Defends LGBTQ-Friendly Kids Clothing Amid Boycott Calls: 'The Right Thing for Society,'* N.Y. POST (May 23, 2023), https://nypost.com/2023/05/23/target-ceo-defends-woke-capitalism-in-face-of-boycott-calls/.

[41] Brian Flood, *Target Holds 'Emergency' Meeting Over LGBTQ Merchandise in Some Stores to Avoid 'Bud Light Situation,'* FOX NEWS (May 23, 2023), https://www.foxnews.com/media/target-holds-emergency-meeting-lgbtq-pride-merchandise-stores-avoid-bud-light-situation.

the size. From the front of the store to the back of the store, you can't have anything on mannequins and no large signage." ~~Id.~~

90.68. The article went on, stating:

The insider, who has worked at the retailer for almost two decades, said Target rarely makes such hasty decisions. They said Friday's call began with roughly 10 minutes on ~~"~~"how to deal with team member safety~~"~~" because of the amount of backlash the Pride merchandise has generated, noting that Target Asset Protect & Corporate Security teams were present on the call.

~~Id.~~

3.69. Then, on May 24, 2023, the Company announced that it was scaling back its 2023 Pride Campaign due to the backlash, stating:

For more than a decade, Target has offered an assortment of products aimed at celebrating Pride Month. Since introducing this ~~year's~~year's collection, ~~we've~~we've experienced threats impacting our team ~~members'~~members' sense of safety and well-being while at work. Given these volatile circumstances, we are making adjustments to our plans, including removing items that have been at the center of the most significant confrontational behavior. Our focus now is on moving forward with our continuing commitment to the LGBTQIA+ community and standing with them as we celebrate Pride Month and throughout the year.[42]

91.70. Although much of the backlash received was from the conservative and religious right, the Company's decision to scale back the 2023 Pride Campaign also resulted in critiques from the left, with many saying the decision highlighted

---

[42] ~~Target Statement on 2023 Pride Collection, supra note 5.~~

the problem of "rainbow capitalism."[43] A transgender designer stated that "it's a very dangerous precedent to set, that if people just get riled up enough about the products you're selling, you can completely distance yourself from the LGBT community, when and if it's convenient." ~~Id.~~

92.71. Additionally, Bob Witeck, the president of an organization that specializes in LGBTQ+ related communications, stated that Target's decision to backtrack "~~mounts~~amounts to walking away from its own previously stated values, suggesting hypocrisy and risking rejection from all corners."[44]

**~~The~~ Individual Defendants Knew, or Should Have Known~~, the~~ The Risks of the 2023 Pride Campaign**

93.72. As detailed above, Target faced backlash due to numerous LGBTQ+ initiatives from 2014 up until 2023 when the 2023 Pride Campaign was launched. As such, the risk of a campaign of this magnitude was well known to the Company. The Individual Defendants, as members of the Board and officers of the Company, were, or should have been, informed of previous unsuccessful initiatives.

94.73. Furthermore, numerous other large companies experienced similar public backlash for a variety of DEI initiatives. For instance, just weeks before Target launched its 2023 Pride Campaign, Anheuser-Busch partnered with a transgender influencer, Dylan Mulvaney, for a promotion campaign, which

---

[43] Helen Reid, *Target Pride Backlash Exposes 'Rainbow Capitalism' Problem, Designer Says,* YAHOO! FIN. (May 31, 2023), https://finance.yahoo.com/news/target-pride-backlash-exposes-rainbow-080342807.html.

[44] Daphne Howland, *How Target Went From Loud and Proud – to Silent*, RETAIL DIVE (Jun. 5, 2023), https://www.retaildive.com/news/target-pride-month-boycott-backlash/651329/.

resulted in severe backlash on social media and a boycott by many customers.[45] Early reports indicated that sales of Bud Light dipped following the campaign and Anheuser-Busch's stock price dropped slightly.[46]

~~95.~~74. There were also several previous DEI and ESG initiatives over the past decade that should have been cautionary tales for Target, including Hershey's[47] and Jack Daniel's,[48] among many others.

~~96.~~75. As such, the Individual Defendants knew, or should have known, that the Company's DEI and ESG initiatives, and the 2023 Pride Campaign specifically, posed significant risks to the Company.

*~~Individual Defendants' Materially False and Misleading Statements~~*

## MATERIALLY FALSE AND/OR MISLEADING STATEMENTS

~~97.~~76. Throughout 2022 and 2023, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts regarding the Company's DEI and ESG initiatives, and the 2023

---

[45] ~~*Id.*; Emily Stewart, *The Bud Light Boycott, Explained as Much as is Possible*, VOX (last updated Jun. 30, 2023), https://www.vox.com/money/2023/4/12/23680135/bud-light-boycott-dylan-mulvaney-travis-tritt-trans.~~

[46] ~~Stewart, *supra* note 45.~~

[47] ~~*See* Michael Bartiromo, *Hershey Responds to Backlash Over Women's Day Campaign Featuring Trans Activist,* NEWS NATION (Mar. 3, 2023), https://www.newsnationnow.com/nmw/hershey-responds-to-backlash-over-womens-day-campaign-featuring-trans-activist/ (consumers called for a boycott of Hershey after Hershey Canada announced that it was releasing limited-edition chocolate bars featuring the likeness of five Canadian women, one of which was a trans women).~~

[48] ~~*See* Aleks Phillips, *Jack Daniels Faces Boycott Calls Over LGBT Campaign: 'Lost a Loyal Drinker,'* NEWSWEEK (Apr. 6, 2023), https://www.newsweek.com/jack-daniels-whiskey-boycott-calls-lgbt-campaign-1792890 (Jack Daniel's removed its "small town, big pride" campaign, which teamed up with drag queens to promote the liquor, from its website after many boycotted the products).~~

Pride Campaign specifically.

**Risk Statements**

98.77. The Company did not disclose to stockholders the known risk of adverse customer and stockholder reactions to its ESG and DEI initiatives, and the LGBTQ initiatives specifically. Rather, the Company posed any potential risks to the Company from the ESG and DEI initiatives as merely hypothetical.

99.78. For instance, the "Risk Factors" section of the Company's 2021 annual report filed on a Form 10-K with the SEC on March 9, 2022 (the "2021 10-K"), stated, in relevant part:

> Our continued success is dependent on positive perceptions of Target which, if eroded, could adversely affect our business and our relationships with our guests and team members.
>
> We believe that one of the reasons our shareholders, guests, team members, and vendors choose Target is the positive reputation we have built over many years for serving those constituencies and the communities in which we operate. To be successful in the future, we must continue to preserve Target'sTarget's reputation. Our reputation is based in large part on perceptions, both about us and others with whom we do business, and broad access to social media makes it easy for anyone to provide public feedback that can influence perceptions of Target. It may be difficult to control negative publicity, regardless of whether it is accurate. Target's responses to crises and our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation. While reputations may take decades to build, negative incidents involving us or others with whom we do business can quickly erode trust and confidence and can result in consumer boycotts, workforce unrest or walkouts, government investigations, or litigation. . . . .

45

2021 10-K at 7 (Emphasis added).

79. The 2021 10-K was signed by Defendants Cornell and Fiddelke in their capacity as CEO and CFO, respectively, and by Defendant Fiddelke, as power of attorney on behalf of Defendants Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Rice, and Stockton. The 2021 10-K was also accompanied by certifications made by Defendants Cornell and Fiddelke pursuant to Sections 13(a) and 15(d) of the Exchange Act and Section 302 of the Sarbanes-Oxley Act of 2002 (the "SOX Certifications"). In the SOX Certifications, Defendants Cornell and Fiddelke attested to the accuracy of the 2021 10-K.

80. Additionally, the risk factor statements from the 2021 10-K were incorporated by reference into the Company's quarterly reports, filed with the SEC on Form 10-Qs, on May 27, 2022 (the "1Q22 10-Q"), August 6, 2022 (the "2Q22 10-Q"), and November 23, 2022 (the "3Q22 10-Q"), with each Form 10-Q stating that "there have been no material changes to the risk factors described [in the 2021 10-K]."

81. The 1Q22 10-Q, 2Q22 10-Q, and 3Q22 10-Q were each signed by Defendant Fiddelke and were accompanied by SOX Certifications from Defendants Cornell and Fiddelke.

82. Furthermore, the Company's 2022 annual report, filed on a Form 10-K with the SEC on March 8, 2023 (the "2022 10-K"), did not disclose the risks faced by the Company in connection with its ESG and DEI initiatives. The 2022 10-K again sidestepped the issue and included vague statements of risks to the

Company. The "Risk Factors" section of the 2022 10-K stated, in relevant part:

> Our continued success is dependent on positive perceptions of Target which, if eroded, could adversely affect our business and our relationships with our guests and team members.
>
> We believe that one of the reasons our shareholders, guests, team members, and vendors choose Target is the positive reputation we have built over many years for serving those constituencies and the communities in which we operate. To be successful in the future, we must continue to preserve **Target's** reputation. Our reputation is largely based on perceptions. It may be difficult to address negative publicity across media channels, regardless of whether it is accurate. Negative incidents involving us, our workforce, or others with whom we do business could quickly erode trust and confidence and result in consumer boycotts, workforce unrest or walkouts, government investigations, and litigation. Negative reputational incidents or negative perceptions of us could adversely affect our business and results of operations, including through lower sales, the termination of business relationships, loss of new store and development opportunities, and team member retention and recruiting difficulties.
>
> In addition, stakeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform. We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. Any failure, or perceived failure, by us to achieve these goals and initiatives or to otherwise meet evolving and varied stakeholder expectations could adversely affect our reputation and result in legal and regulatory proceedings against us. Any of these outcomes could negatively impact our results of operations and financial condition.

2022 10-K at 8 (Emphasis added).

104.83.       The 2022 10-K was signed by Defendants Cornell and Fiddelke in their capacity as CEO and CFO, respectively, and by Defendant Fiddelke, as power of attorney on behalf of Defendants Abney, Baker, Barrett, Boudreaux,

47

Edwards, Healey, Knauss, Leahy, Lozano, Puma, Rice, and Stockton. The 2022 10-K was also accompanied by SOX Certifications made by Defendants Cornell and Fiddelke, wherein they attested to the accuracy of the 2022 10-K.

~~105.~~84.        The risk factor statements contained in the 2022 10-K were incorporated into the Company's quarterly reports filed with the SEC on Form 10-Qs on May 26, 2023 (the "2Q23 10-Q") and August 25, 2023 (the "3Q23 10-Q"), with each Form 10-Q stating that "there have been no material changes to the risk factors [in the 2022 10-K]."

85.     The 2Q23 10-Q and 3Q23 10-Q were each signed by Defendant Fiddelke and accompanied by SOX Certifications from Defendants Cornell and Fiddelke.

~~106.~~86.        The above-referenced statements ~~contained in ¶¶ 110, 112, 113, and 116~~ were materially false and misleading because Target failed to disclose the risk of potential adverse customer and shareholder reactions to the Company's ESG and DEI mandates. Specifically, the 2021 10-K, 2022 10-K, and the Form 10-Qs that incorporated each, failed to mention the risks associated with the Company's Pride Month campaigns, including the 2023 Pride Campaign. The 2022 10-K also failed to disclose the risk of consumer boycotts and loss of sale associated with the Company's ESG and DEI initiatives, including the 2023 Pride Campaign.

b.   Pride Campaign ~~Risk Oversight Statements~~

48

107.87.  In addition to the risk factor statements above, the Company also issued materially false and misleading statements related to the Board's oversight of risks to the Company. Specifically, the Company made statements that the Board was overseeing ESG risks to the Company. However, the launch of 2023 Pride Campaign shows that the Board was not overseeing risks to the Company related to ESG anand DEI, or, if they were, was doing so ineffectively.

108.88.  For instance, the Company's proxy statement for the year 2022, which was filed on a Schedule 14A with the SEC on April 25, 2022 (the "2022 Proxy Statement"), contained materially false and misleading statements regarding risk oversight. The 2022 Proxy Statement began with a letter to shareholders from Defendant Lozano, which stated, in relevant part, "with the growing focus among stakeholders on how companies are addressing the risks and opportunities related to environmental, social, and governance (ESG) issues, the Board revised its committee structure in 2021, clarifying and enhancing our oversight of these matters." 2022 Proxy Statement at 3 (Emphasis added).

109.89.  In a section titled "Risk oversight," the 2022 Proxy Statement also stated:

> Oversight of the various risks we face in implementing our strategy is an integral and continuous part of the Board's oversight of our business. The Board, each Committee, and management have specific roles and responsibilities with respect to those risks.
>
> **The Board and its Committees**
>
> The Board provides oversight of overall risks, with emphasis on

strategic risks, which occurs as an integral and continuous part of the Board's oversight of our business and seeks to ensure that management has processes in place to appropriately manage risk. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of our strategy, including the development and monitoring of specific initiatives and their overall alignment with our strategy. Similarly, at every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our senior executive officers the major events, activities, and challenges affecting Target.

*Id.* at 14.

110.90. Furthermore, the 2022 Proxy Statement contained a section on "Sustainability & ESG," which stated, in relevant part:

We engage with a diverse group of stakeholders around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible. Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy.

*Id.* at 15 (Emphasis added).

111.91. Additionally, the Sustainability & ESG section of the 2022 Proxy Statement contained a chart of what oversight areas of ESG matters the Board and its committees were responsible for. Notably, this chart stated that the Board is responsible for "top ESG risks" and "reputation management" and that the Governance & Sustainability Committee is responsible for "social and political issues and risks not allocated to other Committees." *Id.* at 15-16.

| Responsible | Oversight areas for ESG matters |

| Responsible party | Oversight areas for ESG matters |
|---|---|
| Board | • Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities) <br><br> • Top ESG risks <br><br> • Reputation management <br><br> • Crisis management and response <br><br> • Organizational team health |
| Audit & Risk Committee | • Compliance and ethics <br><br> • Supply chain ESG, including vendor human capital and responsible sourcing practices <br><br> • Cybersecurity and information security <br><br> • Privacy <br><br> • Product and food safety |

| Responsible party | Oversight areas for ESG matters |
|---|---|
| Governance & Sustainability Committee | • Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting) <br><br> • Environmental stewardship practices (including climate and energy, waste, natural resources, and chemicals) <br><br> • Social and political issues and risks not allocated to other Committees |

| Responsible party | Oversight areas for ESG matters |
|---|---|
| ~~Compensation & Human Capital Management Committee~~ | ~~• DE&I~~<br>~~• Culture and employee engagement~~<br>~~• Pay equity~~<br>~~• Broad-based compensation and benefits~~<br>~~• Growth and development~~<br>~~• Purpose and values~~ |

| Responsible party | Oversight areas for ESG matters |
|---|---|
| Board | • Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)<br>• Top ESG risks<br>• Reputation management<br>• Crisis management and response<br>• Organizational team health |
| Audit & Risk Committee | • Compliance and ethics<br>• Supply chain ESG, including vendor human capital and responsible sourcing practices<br>• Cybersecurity and information security<br>• Privacy<br>• Product and food safety |

**TARGET CORPORATION ⊙ 2022 Proxy Statement** 15

| Responsible party | Oversight areas for ESG matters |
|---|---|
| Governance & Sustainability Committee | • Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)<br>• Environmental stewardship practices (including climate and energy, waste, natural resources, and chemicals)<br>• Social and political issues and risks not allocated to other Committees<br>• Philanthropy and community engagement<br>• Policies and practices regarding public policy and political activities |
| Compensation & Human Capital Management Committee | • DE&I<br>• Culture and employee engagement<br>• Pay equity<br>• Broad-based compensation and benefits<br>• Growth and development<br>• Purpose and values |

112.92. The Sustainability & ESG section of the 2022 Proxy Statement also directed shareholders to the Company's annual ESG report, stating that "we report ESG matters in our annual Corporate Responsibility Report, which has extensive information on specific ESG topics." The Company's 2022 Environmental, Social and Governance Report (the "2022 ESG Report"), which was publicly posted on Target's website, stated that "the Governance & Sustainability Committee of our Board is charged with overseeing our policies and practices regarding public policy advocacy and political activities." *Id. at 16.*

113.93. The Company's proxy statement for 2023, filed on a Schedule 14A with the SEC on May 1, 2023 (the "2023 Proxy Statement"), contained substantially similar statements regarding the Board's and management's oversight over risks to the Company. The "Risk oversight" section stated, in relevant part:

> The Board provides oversight of overall risks and seeks to ensure that our Leadership Team has processes in place to appropriately manage risk. Strategic risks are emphasized within that overall risk oversight responsibility because they are an integral and ongoing part of the Board's oversight of our business. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of our strategy, including the development and monitoring of specific initiatives and their overall alignment with our strategy. Similarly, at every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our Leadership Team the major events, activities, and challenges affecting Target.

2023 Proxy Statement at 14.

114.94. The 2023 Proxy Statement contained an identical

"Sustainability & ESG" section, stating, in relevant part:

> We engage with a diverse group of stakeholders around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible. Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy.

*Id.* at 15.

115.95.  Furthermore, the Sustainability & ESG section of the 2023 Proxy Statement contained an ESG oversight chart, which stated that the Board  is responsible for "sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)" and "reputation management" and that the Governance & Sustainability Committee is responsible for "social and political issues and risks not allocated to other Committees." *Id.* at 15-16.

| Responsible party | Oversight areas for ESG matters |
| --- | --- |
| Board | • Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)<br>• Sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)<br>• Reputation management<br>• Crisis management and response<br>• Organizational team health |

54

| Audit & Risk Committee | • Compliance and ethics<br>• Supply chain ESG matters, including vendor human capital and responsible sourcing practices<br>• Cybersecurity and information security<br>• Privacy<br>• Product and food safety |
|---|---|

TARGET CORPORATION ● 2023 Proxy Statement     15

| Responsible party | Oversight areas for ESG matters |
|---|---|
| Governance & Sustainability Committee | • Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)<br>• Environmental stewardship practices (including climate and energy, waste, natural resources, and chemicals)<br>• Social and political issues and risks not allocated to other Committees<br>• Philanthropy and community engagement<br>• Policies and practices regarding public policy advocacy and political activities |

| Compensation & Human Capital Management Committee | • DE&I |
| --- | --- |
| | • Culture and Team Member engagement |
| | • Pay equity |
| | • Broad-based compensation and benefits |
| | • Growth and development |
| | • Purpose and values |

| Responsible party | Oversight areas for ESG matters |
| --- | --- |
| Board | •Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)<br>•Sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)<br>•Reputation management<br>•Crisis management and response<br>•Organizational team health |
| Audit & Risk Committee | •Compliance and ethics<br>•Supply chain ESG matters, including vendor human capital and responsible sourcing practices<br>•Cybersecurity and information security<br>•Privacy<br>•Product and food safety |

**TARGET CORPORATION** ⊙ 2023 Proxy Statement 15

| Responsible party | Oversight areas for ESG matters |
| --- | --- |

| Governance & Sustainability Committee | •Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)<br>•Environmental stewardship practices (including climate and energy, waste, natural resources, and chemicals)<br>•Social and political issues and risks not allocated to other Committees<br>•Philanthropy and community engagement<br>•Policies and practices regarding public policy advocacy and political activities |
| Compensation & Human Capital Management Committee | •DE&I<br>•Culture and Team Member engagement<br>•Pay equity<br>•Broad-based compensation and benefits<br>•Growth and development<br>•Purpose and values |

116.96.     The Sustainability & ESG section of the 2023 Proxy Statement also directed shareholders to the Company's annual ESG Report, which was publicly available on Target's website. The Company's 2023 Sustainability and Governance Report (the "2023 ESG Report") stated, in relevant part, that "our Board of Directors Governance & Sustainability Committee oversees our policies and practices regarding public policy advocacy and political activities." Id. at 16.

117.97.     The above-referenced statements in ¶¶ 120 through 128 were materially false and misleading because the Board and its committees were not properly overseeing ESG risks, and "political and social risks" specifically, as evinced by the Company launching the 2023 Pride Campaign, which resulted in severe backlash and harm to Target.

b.     **Shareholder Value Statements**

118.98. The 2022 Proxy Statement and the 2023 Proxy Statement also contained materially false and misleading statements regarding the Company's reasons for adopting its various ESG and DEI initiatives. Specifically, the proxy statements represented to shareholders that the Board was acting to advance shareholder interests in all of its decisions, including its decisions on DEI and ESG initiatives.

119.99. For instance, the 2022 Proxy Statement stated that the Board "maintain[s] flexibility to determine which leadership structure best serves the interests of Target and our shareholders." 2022 Proxy Statement at 10.

120.100. Furthermore, the 2022 Proxy Statement stated that the Board, through the Audit & Risk Committee, when considering any transaction that involved Target and one of its directors or executive officers where there is a direct or indirect material interest, must "prohibit any transaction it determines to be inconsistent with the interests of Target and its shareholders." Id. at 17.

121.101. The 2022 Proxy Statement also stated that the most important priority for the Company's capital allocation was to "fully invest in opportunities to profitability grow our business, create sustainable long-term value, and maintain our current operations and assets." Id.

122.102. The 2023 Proxy Statement contained nearly identical statements. The 2023 Proxy Statement stated:

> The Board has a fiduciary duty to act as it believes to be in the best interests of Target and its shareholders. To meet that duty, the Board

58

believes it is important to maintain the flexibility to determine which
Board leadership structure best serves those interests as Target's needs
and circumstances evolve.

2023 Proxy Statement at 71.

123.103.   The 2023 Proxy Statement also stated, with respect to any related party transaction, that "the Audit & Risk Committee must prohibit any transaction it determines to be inconsistent with the interests of Target and its shareholders." *Id. at 18.*

124.104.   The 2023 Proxy Statement again stated that the most important priority for the Company's capital allocation was to "fully invest in opportunities to profitability grow our business, create sustainable long-term value, and maintain our current operations and assets." *Id. at 17.*

125.105.   These statements in the 2022 Proxy Statement and the 2023 Proxy Statement, coupled with the statements regarding the Company's ESG and DEI initiatives and risk oversight, would lead a reasonable shareholder to believe that every action the Company was taking, including with respect to its ESG and DEI initiatives, would be in the best interests of shareholders and would increase shareholder value.

126.106.   However, the statements in ¶¶ 131 through 136above-referenced were materially false and misleading because, in reality, Target insiders were implementing the DEI and ESG initiatives, including the 2023 Pride Campaign, to benefit themselves and external stakeholders, such as GLSEN and

59

HRC, and were not in the best interests of shareholders. Furthermore, the Company's public filings, including proxy statements, annual reports, and earnings releases, are devoid of anything to show that the various ESG and DEI initiatives actually contributed to the Company's financial growth. Conversely, the reduced profits caused by the 2023 Pride Campaign show that certain DEI and ESG initiatives had the opposite effect on profits and shareholder value, which the Board and management knew, or should have known, based on prior ill- perceived initiatives.

e. **Executive Compensation Statements**

127.107.    The 2022 Proxy Statement and 2023 Proxy Statement each sought shareholder approval of the Company's executive compensation plans. In connection with this, the proxy statements alleged that the executive compensation plans aligned with maximizing shareholder value.

128.108.    The 2022 Proxy Statement stated, in relevant part:

> Our compensation programs are structured to align the interests of our executive officers with the interests of our shareholders. They are designed to attract, retain, and motivate a premier management team to sustain our distinctive brand and its competitive advantage in the marketplace, and to provide a framework that encourages outstanding financial results and shareholder returns over the long term. Shareholders are urged to read the CD&A, which discusses in-depth how our executive compensation programs are aligned with our performance and the creation of shareholder value.

2022 Proxy Statement at 67.

109.    The 2023 Proxy Statement stated, in relevant part:
129.

We believe executive compensation should be directly linked to performance and long-term value creation for our shareholders. With that in mind, three principles guide our compensation program:

> •  Deliver on our pay for performance philosophy in support of our strategy.

> •  Provide a framework that encourages outstanding financial results and shareholder returns over the long-term.

> •  Attract, retain, and motivate a premier management team to sustain our distinctive brand and its competitive advantage in the marketplace.

A significant portion of our executive compensation is at risk, so the actual compensation realized by our NEOs may vary from targeted compensation based upon the level of achievement of specified performance objectives and stock price performance.

2023 Proxy Statement at 39.

130.110.    These statements would lead a reasonable shareholder to believe that the Company's executive compensation plans were aligned with advancing shareholder value, as measure by financial performance. However, in reality, Target's executive compensation plans were based on its executives satisfying DEI goals, which, as detailed above, did not actually maximize shareholder value. For instance, the 2022 Proxy Statement states bonuses are tied to "team scorecards" (2022 Proxy Statement at 53, 55), and the 2021 team scorecard assessment notes "[p]ositive progress on three-year enterprise DE&I goals [and] [w]e met or exceeded our ambitious goals for representation, advancement, and experience." Id. at 43.

61

131.111. Per the 2022 Proxy Statement and 2023 Proxy Statement, executive compensation plans were tied to DEI goals, which the Individual Defendants knew were not in the best interest of the Company.

132.112. Under a section titled "Pay for performance," the 2022 Proxy Statement states "consistent with our guiding principles, 92% of CEO Annual TDC and 83% of other NEO [Named Executive Officer] Annual TDC [total direct compensation] is performance-based." *Id. at 37.* Furthermore, this section goes on to state:

> The following pay elements are performance-based and represent a significant percentage of Annual TDC. The payout ranges below are based on awards outstanding as of the end of Fiscal 2021.
>
> • STIP — Payouts range from 0% to 200% of goal depending on Sales, Incentive Operating Income, and the assessment of the Team Scorecard. . . .

*Id.* (Emphasis added).

133.113. However, STIP is not immediately defined. Six pages later, the 2022 Proxy Statement stated that:

> The team scorecard provides a general structure for discussing and measuring performance of the management team as a group. . . . For Fiscal 2021, the primary team scorecard progress indicators included: hold 2020 market share gains, advance progress on three-year enterprise DE&I goals, maintain strong team engagement, increase utilization of same-day fulfillment services, and increase guest engagement with Target Circle."

*Id.* at 43 (Emphasis added).

134.114. The 2023 Proxy Statement made substantially similar

statements regarding executive compensation. ~~See 2023 Proxy Statement at 39, 40, 44.~~

~~135.~~115.    This explanation of what was included in the "Team Scorecard" reveals that the executive compensation plans were, in part, tied to the Company meeting certain DEI goals. As established above, the DEI initiatives were not actually implemented by the Company in order to maximize shareholder value.~~-~~

~~136.~~116.    As such, the above-referenced statements ~~in ¶¶ 140 and 141~~ were materially false and misleading because, as Target's executive compensation plans were actually tied to meeting DEI goals, the executive compensation plans were not designed to maximize shareholder value.

**Statements ~~on~~Regarding Consumer Boycotts and Lost Profits ~~Following the 2023 Pride Campaign~~**

~~137.~~117.    After the 2023 Pride Campaign was launched and the Company started to receive backlash, Target, and Defendant Cornell ~~specifically,~~ downplayed the severity of the effects the 2023 Pride Campaign was having on the Company.~~-~~

118.    For instance, as detailed above and herein, Defendant Cornell first defended the 2023 Pride Campaign when asked about the backlash on May 17, 2023, stating, in relevant part that "it's the right thing for society, and it's the great thing for ~~our brand."⁴⁹~~ our brand."

---

⁴⁹ ~~Zilber, *supra* note 38.~~

138.119.    Then, the Company ultimately decided to scale back the 2023 Pride Campaign one week later. In Target's statement to the public on May 24, 2023, the Company stated that the reason it was scaling back the 2023 Pride Campaign was because of "threats impacting our team members' sense of safety and well-being while at work."[50]

139.120.    However, the above-referenced statements in ¶¶ 150 and 151 were materially false and misleading because they downplayed the existence of the consumer backlash and boycotts that the Company was experiencing in response to the 2023 Pride Campaign. Neither statement revealed that the Company was receiving extreme negative press, boycotts of Target were happening nationwide, and that the Company was losing profits.

121.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that:

140. (a) Target was subject to the risk of consumer boycotts because of its ESG and DEI initiatives, and the 2023 Pride Campaign specifically; (b) the Board and management were not conducting proper oversight over the risks associated with Target's DEI and ESG initiatives; (c) the Company's ESG and DEI initiatives were not implemented to maximize shareholder value; (d) the consumer boycotts

---

[50] *Target Statement on 2023 Pride Collection, supra* note 5.

following the 2023 Pride Campaign were more serious than the Company let on; and (e) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

*The Truth is Revealed*

## THE TRUTH EMERGES

141.122.    The truth about the risks to the Company began to emerge when customers began to boycott Target following the launch of the 2023 Pride Campaign. As a result of the boycotts, there was an influx of negative publicity about Target and the 2023 Pride Campaign.

142.123.    At first, Target doubled down on its 2023 Pride Campaign. When asked about the backlash to the 2023 Pride Campaign on May 17, 2023, Defendant Cornell stated, "I think those are just good business decisions, and it's the right thing for society, and it's the great thing for our brand."[51]

143.124.    However, after the Company realized the full extent of the backlash of the 2023 Pride Campaign, the Company issued the "Target Statement on 2023 Pride Collection" May 24, 2023, announcing that the Company was making "adjustments" to its plan and removing items from the collection due to

---

[51] Zilber, *supra* note 38; Fortune Editors, *Target CEO: DEI Has 'Fueled Much of Our Growth Over the Last 9 Years,'* FORTUNE (May 17, 2023), https://fortune.com/2023/05/17/target-ceo-brian-cornell-interview-diversity-equity-inclusion/.

backlash.[52]

144.125.    As a result, between May 17, 2023, and May 25, 2023, the day after the Company's announcement, the Company's stock price fell $20.21 per share, or approximately 14%, to close at $140.75 on May 25, 2023.

126.    As Target continued to receive backlash for the 2023 Pride Campaign, the Company's stock price continued to drop. Between May 17, 2023, and June 14, 2023, Target's stock price fell $27.73 per share, or approximately 20%, to close at $124.12 per share on June 14, 2023. It was reported that Target's market value dropped $15.7 billion during this time.[53] $124.12 per share on June 14, 2023. It was reported that Target's market value dropped $15.7 billion during this time.

145.127.    In addition to the stock price dropping, the Company also experienced a drop in sales for the first time in six years due to the 2023 Pride Campaign, with in-store sales dropping 5.4% and online sales dropping 10.5% during the second quarter of 2023.[54] However, the full extent of the Company's losses due to the 2023 Pride Campaign were not revealed until August.

146.128.    On August 16, 2023, the Company issued a press release announcing its second quarter earnings for 2023 (the "Q2 2023 Earnings Release"), wherein the Company finally revealed to the public that it experienced

---

[52] *Target Statement on 2023 Pride Collection, supra* note 5.

[53] Brian Flood et al., *Target Market Cap Losses Hit $15.7 Billion, Shares Approach 52-Week Low Amid Woke Backlash*, FOX BUS. (Jun. 12, 2023), https://www.foxbusiness.com/media/target-market-cap-losses-hit-15-7-billion-share-near-52-week-low-amid-woke-backlash.

[54] Meyersohn, *supra* note 6.

reduced earnings due to the 2023 Pride Campaign.

147.129.    The Q2 2023 Earnings Release stated, in relevant part:

Comparable sales declined 5.4 percent in the second quarter, reflecting comparable store sales declines of 4.3 percent and comparable digital sales declines of 10.5 percent. Total revenue of $24.8 billion was 4.9 percent lower than last year, reflecting a total sales decline of 4.9 percent partially offset by a 1.3 percent increase in other revenue.

130.   Also on August 16, 2023, the Company hosted its second quarter 2023 earnings call for investors (the "Q2 2023 Earnings Call"). In the Q2 2023 Earnings Call, A. Christina Hennington, Target's Executive Vice President and Chief Growth Officer, stated "[i]n the second quarter, comparable sales were down 5.4%, softer than our expectations coming into the quarter.  . . .  As you heard from Brian, we anticipated

148. some of the headwinds at play throughout the second quarter. including the continued pullback in discretionary spending. Other headwinds were incremental, including the strong reaction to this ~~year's~~year's Pride assortment." (Emphasis added).

149.131.    Furthermore, in the Q2 2023 Earnings Calls, Defendant Fiddelke stated, in relevant part:

Total revenue was down 4.9% in the second quarter. Total sales also decreased by that same amount while other revenue grew 1.3%. Within other revenue, we continue to see strong growth from our Roundel ad business, which offset declines in credit card profit sharing and other small income items compared with last year. Comparable sales were down 5.4% in Q2, reflecting a 4.8% decline in

67

traffic.

Among the factors affecting our top line performance, comps and discretionary categories continue to reflect challenging trends in the industry, which softened further in Q2. A second factor was lower inflation in food, beverages and essentials as we compare to over peak inflation a year ago. Furthermore, traffic and top line trends were affected by the reaction to our Pride assortment, which launched in the middle of May. And lastly, our results reflected the comparison over last year's clearance and promotional activity, which affected weekly comp trends in certain categories, particularly in the digital channel. While each of these factors played a role in the quarter, it's not possible to reliably quantify the separate impact of each one.

(Emphasis added).

150.132.   Following the news of the Company's decreased earnings, Target's stock closed at $128.75 on August 16, 2023, a drop of $32.21 per share, or approximately 20%, from May 17, 2023.

***The Securities Action***

151.   The Securities Action was filed against the Company and Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Puma, Rice, and Stockton.

152.   The plaintiff in the Securities Action filed an amended complaint on November 28, 2023 (the "Securities Action AC"). On January 26, 2024, the defendants in the Securities Action filed a motion to dismiss the Securities Action AC (the "Securities Action MTD").

153.   On December 4, 2024, this Court entered an order, denying the Securities Action MTD (the "Securities Action MTD Order").

154.   The Securities Action MTD Order stated, in relevant part that: (a) the plaintiffs properly alleged that "Target knew of the risks of their upcoming 2023 Pride Month Campaign and failed to craft a tailored disclosure"; (b) the facts in the Securities Action AC regarding past instances of backlash demonstrate that it is plausible that the board knew, or should have known, that a new and more aggressive Pride Month campaign posed a risk of backlash and financial repercussions, and that it was plausible that the risk disclosures were knowingly false; and (c) the plaintiffs "have pleaded that the 2022 and 2023 proxy statements contained at least one false, misleading, statement or omission [regarding risk oversight]." Securities Action MTD Order at 13, 20, 23-24.

155.   The Securities Action is still pending before this Court.

*Insider Sales*

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

133.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

134.   The purpose and effect of the conspiracy, common enterprise, and/or

common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

135. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

136. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Target, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

137. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

138. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Target and at all times

70

acted within the course and scope of such agency.

## INSIDER TRADING

~~156.~~139.    During 2022 and 2023, before the effects of the 2023 Pride Campaign came to light, Defendants Cornell and Fiddelke made sales of Company stock while in possession of material non-public information concerning the Company's financial condition and business prospects, specifically as related to the Company's DEI and ESG initiatives.~~-~~

~~157.~~140.    While the Company's stock price was artificially inflated, Defendant Cornell sold 65,000 shares of Company stock, totaling proceeds of $12,054,800. ~~Defendant Cornell made the following sales of Target stock:~~His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

| ~~Transaction Date~~ | ~~Buy/Sell~~ | ~~Number of Shares~~ | ~~Average Share Price~~ | ~~Total Transaction~~ |
|---|---|---|---|---|
| ~~3/16/2022~~ | ~~Sell~~ | ~~30,000~~ | ~~$216.35~~ | ~~$6,490,500.00~~ |
| ~~3/14/2023~~ | ~~Sell~~ | ~~35,000~~ | ~~$158.98~~ | ~~$5,564,300.00~~ |

~~158.~~141.    While the Company's stock price was artificially inflated, Defendant Fiddelke sold 5,000 shares of Company stock, totaling proceeds of $1,050,950. ~~Defendant Fiddelke made the following sale of Target stock:~~ His insider sales, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

| Transaction Date | Buy/Sell | Number of Shares | Average Share Price | Total Transaction |
|---|---|---|---|---|
| 4/4/2022 | Sell | 5,000 | $210.19 | $1,050,950.00 |

159. As a result of these insider sales, Defendants Cornell and Fiddelke were unjustly enriched.

*Stock Repurchases*

### SHARE REPURCHASES

160.142. According to the Company's public filings, while the price of Target stock was artificially inflated due to the false and misleading statements detailed herein, the Individual Defendants caused the Company to repurchase approximately 12.6 million shares of its own stock, for a total of roughly $2.6 billion, during the first and second quarters of 2022. According to the 1Q22 10-Q and 2Q22 10-Q, the Company made the following repurchases of its stock:

| Time Period | Number of Shares Purchased | Average Price Paid Per Share | Total Investment |
|---|---|---|---|
| Three Months Ended April 30, 2022 | 100,000 | $208.60 | $10,000,000 |
| Three Months Ended July 31, 2022 | 12,500,000 | $211.58 | $2,644,750,000 |

161.143. Given that the price of Target common stock was $128.75 after

the corrective disclosures on August 17, 2023, the true value of the 12.6 million repurchased shares was roughly $1.6 billion. Accordingly, the Individual Defendants caused the Company to overpay approximately $1 billion to repurchase these shares.

~~Harm to~~These harmful actions could not be the product of informed business judgment, nor could they be construed as being in the best interests of the Company

162. ~~.~~ As a ~~direct and proximate~~ result ~~of~~, the ~~Individual Defendants'~~ ~~misconduct, Target~~Company has ~~lost and expended, and will lose and expend,~~ ~~millions~~suffered substantial harm which was caused by, or otherwise permitted by, each of ~~dollars.~~

163. ~~Such expenditures include, but are not limited to, the legal fees~~ ~~associated with the Securities Action filed against the Company and the~~ ~~Company's Board and amounts paid to outside lawyers, accountants, and~~ ~~investigators in connection therewith.~~

~~164.~~144. ~~Such expenditures also include, but are not limited to,~~ ~~significant compensation and benefits paid to~~ the Individual Defendants ~~who~~ ~~breached~~, in direct violation of their fiduciary duties owed to the Company.

## DAMAGE TO THE COMPANY

### Securities Class Action

73

165.   On November 28, 2023, an amended securities class action complaint was filed in the United States District Court for the Middle District of Florida against the Company and Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Puma, Rice, and Stockton. The complaint alleges violations of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rules 10b-5 and 14a-9, in the case captioned: *Craig v. Target Corporation, et al.*, Case No. Such losses include, but are not limited to, the billions lost in market valuation and millions in lost profits experienced by the Company as a result of the 2023 Pride Campaign.

145.   Furthermore, the Securities Action has exposed2:23-cv-00599 (M.D. Fla.) (the "Securities Class Action").

166.146.   As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Actions and any liability. or settlement that results.

**Unjust Compensation**

147.   At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

148.  Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

149.  However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company. **Share Repurchases**

150.  As detailed above, during the Relevant Period, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, causing the Company to overpay for its own common stock by over $1 billion. **Insider Trading**

151.  As also detailed above, Defendants Cornell and Fiddelke, while in possession of material, non-public information, collectively sold 70,000 shares of their personally held stock for collective gross proceeds in excess of $14 million.

**Additional Damage to the Company**

152.  In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

153.  The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

154.  The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

155.  At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly,

each of the Individual Defendants were required to comply with the corporate

governance documents, as detailed below.

156.  Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company

and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Ethics**

157.   At all relevant times hereto, Target had in place its Code of Ethics, which applies to "all team members," which includes the Company's leadership team. The Code of Ethics begins with a message from Target's CEO and a section titled "defining ethics at Target," which states, in relevant part, "Target's commitment to ethical standards is reflected in the way we conduct business and through our actions. As team members, at any level, we must always consider the impact on our guests, team members, stakeholders, community and the Target brand when making business decisions."

158.   In a section titled "avoid conflicts of interests" the Code of Ethics states the following, in relevant part: "we never allow our personal interests to impact the business decisions we make as Target team members. When our outside activities conflict or even appear to conflict with our responsibilities as a Target team member, we avoid and disclose any activity that could be considered a conflict of interest."

159.   Under the section titled "be truthful in marketing and advertising," the Code of Ethics states, in relevant part, "in promoting our business, we communicate accurately and honestly." The section goes on to state, "our guests make decisions about where they'll shop and what they'll buy based on what they

77

see in stores, online or what they learn about us. We have an obligation in our promotions, advertising and guest communications to follow all laws and provide guests with accurate information."

160.   The Code of Ethics contains a section titled "provide accurate financial information," which states in relevant part:

> The U.S. Securities and Exchange Commission and other governing bodies have strict rules about the accuracy of our financial statements and disclosures and the strength of our internal controls over financial reporting. Our financial and operational records must remain accurate, so we can make sound business decisions, keep our operations running efficiently and meet our goals and obligations. . . .
>
> As team members, we have an obligation to follow all internal control procedures to maintain our financial records – this includes submitting an expense report, reviewing or approving financials and handling any other business record. Accurate recordkeeping helps us provide complete, accurate, timely and understandable information in our public disclosures.

161.   In a section titled "trade securities fairly and regularly," the Code of Ethics states, in relevant part:

> Trading securities of a company based on inside information (information that is both material and non-public) is illegal and unfair. When we take steps to prevent it, we uphold our Company's reputation for dealing honestly wherever we do business. . . .
>
> As part of your job, you may be exposed to inside information about our Company or another company, such as one of our business partners. It is unfair and illegal to use inside information to buy or sell securities for personal gain. We should trade only when information is lawfully and publicly available. We should also not tip others by sharing inside information with them to trade. . . .
>
> If you have access to information that isn't publicly accessible, you're an insider. Although you're always obligated to maintain the confidentiality of any non-public information you learn as part of

78

your job you should be sensitive to information that could potentially be used for insider trading purposes. . . .

162.  Under a section titled "communicate responsibly," the Code of Ethics states, in relevant part:

As team members, we love our Company and enjoy talking about it – to each other and everyone. We designate authorized individuals who are trained to speak on behalf of Target because we can damage our reputation in just a few words with an untrue statement. . . .

Our reputation is one of our greatest assets, and it's up to each team member to protect it. We refer all outside inquiries about Target's business to our Enterprise Communications team to ensure that all information conveyed to the public, regulatory authority and others is accurate, complete and consistent. . . .

If your work authorizes you to communicate with or respond to government or regulatory entities, it's important to be accurate. Anything you say or report to these entities should be accurate, complete and consistent. Never mislead, provide incorrect information or omit important details.

163.  The Code of Ethics contains a section titled "engage responsibly in political activities," which states:

The Government Affairs team works to make sure that Target has a voice in decisions made by government officials. Target also encourages team members to participate in the civic process. . . . When you engage in advocacy on behalf of Target, you must always follow the policies and laws that apply. You must also keep your personal political activities separate from your role at Target.

**Director Code of Ethics**

164.  In addition to Target's Code of Ethics, the Company's Corporate Governance Guidelines contains the Director Code of Ethics. The Director Code of Ethics states that it "is intended to focus the Board and each Director on areas

of ethical risk, provide guidance to Directors to help them recognize ethical issues and understand how to report unethical conduct, and help foster a culture of honesty and accountability."

165.   In a section titled "Conflicts of Interest," the Director Code of Ethics states, in relevant part:

> A Director must avoid conflicts of interest with the Corporation. A conflict of interest can occur when a Director's personal or business interests are adverse to the interest of the Corporation or when a Director (or a Director's family member) receives an improper personal benefit as a result of the Director's position as a member of the Board. A Director's personal or business interests include the interests of the Director's family members or organizations with which the Director or the Director's family members have a material relationship.

166.   Under the section titled "Compliance with Law, Rules, and Regulations; Fair Dealing," the Director Code of Ethics states, "directors should comply with all applicable laws, rules, and regulations. Directors are subject to and must comply with the Corporation's Securities Trading Policy. Directors should deal fairly with Target's team members, guests, suppliers, and competitors."

**Audit & Risk Committee Charter**

167.   Target also maintains an Audit & Risk Committee Charter which states that the "function" of the Audit & Risk Committee is to:

> Assist the Board of Directors in overseeing (i) the integrity of the Corporation's financial statements; (ii) the independence, qualifications
> and performance of the Corporation's independent auditor; (iii) the performance of the Corporation's internal audit function; (iv) the Corporation's compliance and ethics programs; and (vi) the

80

Corporation's enterprise risk management program.

168. The "Responsibilities" section of the Audit & Risk Committee Charter outlines the following responsibilities of Target's Audit & Risk Committee, among others:

**A. Accounting and Reporting**

**1. Review of Earnings Releases and Other Information**. Review and discuss with management the Corporation's earnings press releases, including the use of non-GAAP financial measures and any earnings guidance provided, before issuance. Discuss generally the types of financial information provided and the types of presentations to be made to analysts and rating agencies (such discussion need not occur prior to each disclosure).

**2. Review of Annual and Quarterly Reports**. Review and discuss with management and the independent auditors the Corporation's interim unaudited and annual audited financial statements, including disclosures made in management's discussion and analysis, the results of the independent auditor's review (or audit in the case of annual financial statements) and any other matters required to be communicated to the Committee by the independent auditor, prior to filing each Form 10-Q or 10- K, respectively. Recommend to the Board whether the audited financial statements should be included with the Corporation's Form 10-K. The Committee shall also prepare the "Report of Audit Committee" contained in the annual Proxy Statement.

**3. Internal Controls**. Receive information from management about any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting. Review and discuss with management and the independent auditor, the report of management on internal control over financial reporting and the independent auditor's report on internal control over financial reporting prior to the filing of the Corporation's Form 10-K.

**4. General Oversight**. Discuss with management and the independent auditor significant financial reporting issues and judgments made in

81

connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles and any critical accounting estimates made in the course of preparing the financial statements.

**5. Regulatory Changes and Off-Balance Sheet Items**. Discuss with management and the independent auditor the effect of pending regulatory changes to accounting practices, as well as off-balance sheet structures (if any) on the Corporation's financial statements.

**6. Tax Matters**. Discuss with management the Corporation's positions with respect to income and other tax obligations, and review periodic reports from management with respect to tax compliance matters. . . .

**C. Oversight of Internal Audit**

**1. Audit Plan Risk Assessment**. Review and discuss with the head of internal audit the internal audit function's ongoing assessments of the Corporation's risk management processes and system of internal control, and the commitment of internal audit resources to audit the Corporation's guidelines, policies and procedures to mitigate identified risks. Such discussions should encompass the Corporation's principal financial, accounting, internal control and related risk exposures and, as appropriate, include the Corporation's principal risk officer.

**2. Internal Audit Function**. Discuss the internal audit department's responsibilities, audit plan, budget and staffing with the head of internal audit.

**3. Internal Audit Results**. Review significant internal audit results and management's action plans.

**D. Additional Accounting, Audit, and Reporting Matters**

**1. Accounting and Auditing Complaints**. Establish procedures for the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or audit matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing

matters.

**2. Legal Matters**. Review periodic reports of the General Counsel on litigation and other legal matters that may have a material impact on the financial statements or the Corporation's internal controls.

**3.** Related Party Transactions. Review and approve related party transactions consistent with the Corporation's Related Party Transactions – Policies and Procedures (or any successor related party transaction policy) and report to the full Board on any approved transactions.

**E. Oversight of Compliance and Ethics**

**1. Compliance and Ethics Programs**. Oversee the Corporation's compliance and ethics programs, including those related ethics, legal, and regulatory matters, and receive periodic reports on such programs from appropriate members of management, including information on any significant compliance and ethics issues and the budget and staffing for the Corporation's compliance and ethics function.

**2. Compliance and Ethics Monitoring**. Oversee the effectiveness of the process used by management to identify, investigate and address allegations of potential misconduct and violations of compliance and ethics policies, including the Corporation's Code of Ethics (or any successor code of conduct) and possible legal or regulatory violations.

**3. Investigations and Remediation Efforts**. Unless addressed by the Board or another Committee, oversee investigations and remediation efforts related to the Corporation's compliance and ethics program.

**F. Oversight of Enterprise Risk Management**

**1. Enterprise Risk Management Program**. Oversee the Corporation's enterprise risk management program to obtain an understanding of the primary enterprise risks facing the Corporation, including:

> • management's process for identifying and assessing risks and, where appropriate, employing strategies for risk mitigation; and
> • the budget and staffing for the Corporation's enterprise risk management function.

**2. Principal Business and Operational Risks**. Oversee the principal business and operational risks facing the Corporation, including:

- vendor risk management
- cybersecurity and information security
- privacy
- product safety, including food safety
- business continuity and disaster recovery.

**3. Coordination of Risk Oversight**. Periodically review the Corporation's approach to risk identification, assessment and mitigation strategies with the Board to facilitate coordination with the activities of the Board and other Board Committees.

**G. Oversight of Supply Chain Corporate Responsibility Matters**

In addition to the Committee's oversight responsibilities for the Corporation's compliance and risk management functions, the Committee shall serve as the primary Committee for oversight of management's efforts to instill responsible and ethical practices within its supply chain. This includes the human capital practices expected of the Corporation's vendors and responsible sourcing practices with respect merchandise procurement.

**H. Other**

**1. Investigations**. Conduct any investigation that the Committee deems appropriate, with full access to all of the Corporation's records, facilities, personnel and outside advisors, and retain outside counsel, auditors and other consultants to advise the Committee for that purpose.

[. . .]

**5. Reporting to the Board**. Provide the Board with regular reports of the activities of the Committee.

**6. Consultants and Advisors**. Possess the sole authority to retain or terminate, as it deems necessary or appropriate, outside counsel, auditors and other consultants or outside advisors to assist in discharging its responsibilities. The Corporation will provide

84

appropriate funding, as determined by the Committee, for payment of any resource engaged for this purpose, including the engagement of the independent auditor, and for all other administrative expenses necessary for the Committee to carry out its duties.

7. **Committee Evaluation**. Annually evaluate the performance of the Committee.

## FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS

169. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

170. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

171. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

4.172. Each director of the Company owes to the Company and its investors

the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In

addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

173. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(a)(c)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial

controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

174.   Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties

of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

175. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

~~167.~~176. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties ~~by the Individual Defendants~~, gross mismanagement, and other wrongful conduct as alleged herein.

~~168.~~ Plaintiff will adequately and fairly represent the interests of ~~Target~~the Company and its shareholders in enforcing and prosecuting its rights.

169. Target is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

170.177. Plaintiff is a current shareholder of Target and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights andhas retained counsel competent and experienced in derivative litigation.

178. A pre-suit demand on the Board of Target is futile and, therefore, excused. At the time this action was commenced, the twelve-person Board consisted of Individual Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Knauss, Leahy, Lozano, Puma, Rice, and Stockton (the "Director Defendants"). As set forth below, all of the Director Defendants arePlaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

171.179. Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of

making an independent and disinterested decision to institute and vigorously prosecute this action ~~because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act~~.

180. The Company Board is currently comprised of twelve (12) members – Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Knauss, Leahy, Lozano, Puma, Rice, and Stockton (*i.e.*, the Director Defendants). Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, six (6), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

181. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

~~172.~~182. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

183. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

184. Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

185. As a trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

~~173.~~186. Each of the Director Defendants approved and/or permitted the

91

wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

~~174.~~187.    Each of the ~~Individual~~Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

~~175.    As members of the Board charged with overseeing the Company's affairs, each~~ Each of the Director Defendants ~~had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Target, the Director Defendants knew, or should have known, the material facts surrounding Target's financial condition and internal control mechanisms.~~

~~176. Defendant Cornell is not disinterested or independent. Defendant Cornell serves as the Company's CEO and as Chair of the Board. Additionally, Defendant Cornell made insider sales of Target stock in 2022~~

92

and 2023. Furthermore, in~~solicited~~ the proxy ~~statement filed by the Company on a Schedule 14A with the SEC on April 29, 2024, the Company conceded that Defendant Cornell is a non-independent director. Thus, the Company admits that Defendant Cornell is a non-independent director.~~

~~177.~~ statements containing the false and misleading statements, as discussed *supra*, which obtained their re-election to the Board, thus enabling them to continue breaching~~Furthermore, each of the Director Defendants are named as defendants in the Securities Action, and as such, face a substantial likelihood of liability for the misconduct alleged therein, as evinced by the Court's Securities Action MTD Order.~~

~~178.~~188. ~~Moreover, the 2021 10-K and the 2022 10-K were signed by Defendant Cornell and by Defendants Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Rice, and Stockton, through a power of attorney. The 2021 10-K, 2022 10-K, 1Q22 10-Q, 2Q22 10-Q, 3Q22 10-Q, 2Q23 10-Q, and 3Q23 10-Q were also each accompanied by a SOX Certification signed by Defendant Cornell. Accordingly, all of the Director Defendants breached~~ their fiduciary duties~~, face a substantial likelihood of liability, are not independent or disinterested, and thus~~ to the Company. As each Director Defendant benefitted, either directly or indirectly, from the false and misleading proxy statements, they are incapable of considering a demand ~~upon them is futile, and, therefore, excused~~to sue.

179.189. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

190. MoreoverFurther, the Director Defendants willfully ignored, or recklessly failed to inform themselves of,authorized the obvious problems with the Company's internal controls, practices,harmful share repurchase program and caused the Company to repurchase its own common stock at artificially inflated prices, thereby causing the Company to overpay for its own stock. As such, the Director Defendants face a substantial likelihood of liability therefor and are incapable of independently considering a demand in the best interests of the Company.

191. Furthermore, each of the Director Defendants are named as defendantsprocedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties in the Securities Action, and as such, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused. Additionally, the Director Defendants took no action to redress the harm suffered for the misconduct alleged therein, as supported by the Company resulting from Court's order denying defendants' motion to dismiss in the Securities Class Action.

180.192. Despite having knowledge of the history of their own

misconduct and mismanagement, the Director Defendants have failed to seek recovery for Target for any of the misconduct alleged herein.

181. Defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton (the "Audit & Risk Defendants") serve on the Company's Audit & Risk Committee, and pursuant to the Audit & Risk Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit & Risk Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit & Risk Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

182. The Director Defendants, as members of the Board, were and are subject to the Director Code of Ethics. The Director Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Director Code of Ethics because they knowingly or recklessly participated

in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Director Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

**Additionally, the Director Defendants are no independent or disinterested in light their longstanding business and personal relationships with each other. For instance,THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED**

**Defendant Cornell**

193. Defendant Cornell is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Cornell cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

194. As CEO, Defendant Cornell also fails the NYSE bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant Cornell could not objectively and disinterestedly consider a demand to sue the Individual

96

Defendants and any demand upon Defendant Cornell is therefore futile.

195. Defendant Cornell also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Cornell is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

196. In addition, Defendant Cornell receives lucrative compensation in connection with his employment with the Company. Defendant Cornell is not independent from the Director Defendants serving on the Compensation Committee who are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Cornell. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Cornell could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

197. Furthermore, Defendant Cornell, while in possession of material, non- public information, took advantage of the Company's artificially inflated stock price and sold approximately 65,000 shares of Company stock for personal proceeds in excess of $12 million. As such, Defendant Cornell received a material

personal benefit thereby and also faces a substantial likelihood of liability therefor.

5.198. Because of Defendant Cornell's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Cornell is unable to comply with his fiduciary duties and prosecute this action. Defendant Cornell is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendants Bouderaux, Leahy and Knauss**

199. Defendants Boudreaux, Leahy and Knauss are each irreconcilably conflicted and cannot consider a demand to sue the Individual Defendants for the reasons that follow:

(a) Defendant Boudreaux serves as President & CEO of Elevance Health, Inc., from which Target obtained the wellness services that previously comprised the Company's Team Member life resources program; and

(b) Leahy serves as President & CEO of CDW Corporation, from which weTarget purchased supplies, merchandise, equipment, software, servicing, repairs, and maintenance. Additionally, Donald; and

183.(c) Defendant Knauss' son represents a supplier in its relationship with Target during Fiscal 2023. Target purchased approximately $15.1 million of merchandise from the supplier in Fiscal 2023 and $12

98

million in 2024.

200. Accordingly, ~~a pre-suit~~ Defendants Boudreaux, Leahy and Knauss each have personal and professional relationships which preclude them from being able to exercise independent and objective judgment.

**Defendant Abney, Boudreaux, Edwards, Puma, Rice and Stockton**

201. Defendants Abney, Boudreaux, Edwards, Puma, Rice and Stockton either serve, or served during the Relevant Period, as members of the Audit & Risk Committee. Pursuant to the Audit & Risk Committee Charter, Defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements.

202. However, throughout the Relevant Period, Defendants Abney, Boudreaux, Edwards, Puma, Rice and Stockton breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, Defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

**Additional Reasons Demand is Futile**

99

203. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

204. The Company, at all material times, had its Code of Ethics and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Ethics and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

205. In violation of the Code of Ethics, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Ethics, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial

likelihood of liability and demand is futile as to them.

206. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board is futile and . They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

184.207. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused. as being futile.

### COUNT I

### Against The Director Defendants For Violations of Section 14(a) of The Securities Exchange Act of 1934

208. Publicly traded companies, such as Target, typically carry director and officer liability insurance from which the Company could potentially recover

some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

209. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duty)

185.210. Plaintiff incorporates by reference and realleges re-allege each and every allegation set forth above, as though fully set forth herein.

186. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use

102

of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

187.1. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

188. The 2022 Proxy Statement and 2023 Proxy Statement were materially false and misleading because the Board and its committees were not properly overseeing ESG risks, and "political and social risks" specifically, as evinced by the Company launching the 2023 Pride Campaign, which resulted in severe backlash and harm to Target.

189.1. Under the direction and watch of the Director Defendants, the 2024 Proxy failed to disclose, inter alia: (1) contrary to 2022 Proxy Statement and 2023 Proxy Statement's descriptions of the Board's risk oversight function and the Audit & Risk Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board breached their fiduciary duties; and (2) the Defendants on the Board at that time

103

who breached their fiduciary duties were improperly interested in increasing their unjust compensation.

190. The 2022 Proxy Statement and 2023 Proxy Statement were materially false and misleading because Target insiders were implementing the DEI and ESG initiatives, including the 2023 Pride Campaign, to benefit collateral stakeholder interests and themselves, and were not in the best interests of shareholders.

191. Per the 2022 Proxy Statement and 2023 Proxy Statement, executive compensation plans were indeed tied to DEI goals, which the Individual Defendants knew were not in the best interest of the Company.

192. The misrepresentations and omissions in the 2022 Proxy Statement and 2023 Proxy Statement were material to Company stockholders. The misrepresentations and omissions were material to Company stockholders in voting on the matters set forth for stockholder determination in those proxy statements, including but not limited to the reelection of certain Director Defendants. The 2022 Proxy Statement and 2023 Proxy Statement was an essential link in Defendants' insulation from stockholder challenge.

193. The false and misleading statements and material omissions in the 2022 Proxy Statement and 2023 Proxy Statement led to, *inter alia,* the approval of executive compensation and the reelection of Board members, including many of the Director Defendants.

194. The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2022 Proxy Statement and 2023 Proxy Statement.

195. As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

## COUNT II

### Against the Individual Defendants for Violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

196.1. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

197. The Individual Defendants participated in a scheme with the purpose and effect of defrauding Target. Not only is Target now defending claims in the Securities Action that it violated Section 10(b) of the Exchange act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Target by the Individual Defendants.

198. During the first and second quarters of 2022, while the price of the Company's common stock was artificially inflated as a result of the false and misleading statements issued, or caused to be issued by the Individual

Defendants, the Individual Defendants caused the Company to repurchase roughly 12.6 million shares of Company stock and overpay by approximately $1 billion. As a result, Target was damaged through its repurchases of Company common stock at prices artificially inflated by the materially false and misleading statements.

199. The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's public statements and periodic and current reports filed with the SEC.

200. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Target not misleading.

201. The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to, and did,

control the conduct complained of herein and the content of the public statements disseminated by Target.

202. The Individual Defendants acted with scienter, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

203. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over a billion dollars in the repurchase of Target stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

204. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

205. Plaintiff, on behalf of Target, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants
### For Violations of Section 20(a) of the Exchange Act

206. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

207. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase Target at prices artificially inflated by those materially false and misleading statements.

208. Plaintiff, on behalf of Target, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants
### For Breach of Fiduciary Duty

209. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

The Individual Defendants owed the Company fiduciary obligations.
210.211. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

108

211.212.   ~~Each of the~~The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith~~, loyalty, oversight, and supervision~~.

212.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by ~~permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.~~

213.   ~~Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that~~allowing the Company to improperly misrepresent that: ~~:~~ (i) Target was subject to the risk of consumer boycotts because of its ESG and DEI initiatives, and the 2023 Pride Campaign specifically; (ii) the Board and management were not conducting proper oversight over the risks associated with Target's DEI and

ESG initiatives; (iii) the Company's ESG and DEI initiatives were not implemented to maximize shareholder value; (iv) the consumer boycotts following the 2023 Pride Campaign were more serious than the Company let on; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

214. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

215. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

216. The Individual Defendants repeatedly failed to take red flags

110

seriously and delayed the implementation of appropriate internal controls to ensure the Company operated in compliance with the law. The Individual Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their recurrence. As detailed herein, the Individual Defendants were on notice and/or became aware of risks that Target was violating the law or was otherwise headed for a corporate trauma, but did nothing in response. The Individual Defendants had numerous opportunities to address the Company's noncompliance and lack of reporting protocols and information controls. By failing to make a good faith effort to implement and monitor an oversight system and by consciously disregarding their duty to learn of and investigate red flags, the Individual Defendants failed to exercise due care and failed to satisfy their duty of loyalty to the Company and its stockholders.

214. As a direct and proximate result of the Individual Defendants' failure to fulfillperform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

217.215. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only

111

monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs ~~incurred in~~ associated with defending ~~itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and~~ securities lawsuits, severe damage to the share price of the ~~Company's stock~~ Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

~~218.    Plaintiff, on behalf of Target, has no adequate remedy at law.~~

## ~~COUNT V~~

## SECOND CAUSE OF ACTION

## (Against the Individual Defendants for Gross Mismanagement)

216.    Plaintiff incorporates by reference~~Aiding~~ and re-allege each allegation contained above, as though fully set forth herein.

### ~~Abetting Breach of Fiduciary Duty~~

~~219.~~1. Plaintiff ~~incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.~~

~~220.~~217.    By ~~encouraging and accomplishing the illegal and improper transactions~~ their actions alleged herein ~~and concealing them from the public~~, the Individual Defendants ~~have each encouraged, facilitated, and advanced their breaches of their~~, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties. ~~In so doing,~~

the Individual Defendants have each aided and abetted, conspired, and schemed with one another~~regard~~ to ~~breach their fiduciary duties, waste the Company's corporate~~ prudently managing the assets~~,~~ and ~~engage~~business of the Company in ~~the ultra vires and illegal conduct complained of herein~~a manner consistent with the operations of a publicly held corporation.

221.   ~~Plaintiff on behalf~~As a direct and proximate result of ~~Target has no adequate remedy at law.~~

**~~COUNT VI~~**

**~~Against~~** the Individual **~~Defendants for Unjust Enrichment~~**

~~222.~~218.   ~~Plaintiff incorporates by reference and realleges each~~Defendants' gross mismanagement and ~~every allegation contained above, as though fully set forth~~breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

223.   ~~By their wrongful acts, violations of law,~~Because of the misconduct and ~~false and misleading statements and omissions of material fact that they made and/or caused to be made~~breaches of duty alleged herein, the Individual Defendants ~~were unjustly enriched at the expense of, and to the detriment of, Target.~~

~~224.~~219.   ~~The Individual Defendants either benefitted financially from~~are liable to the ~~improper conduct, or received bonuses, stock options, or similar compensation from Target that was tied to the performance or~~

113

~~artificially inflated valuation of Target, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct~~Company.

~~225. Plaintiff, as a shareholder and a representative of Target, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.~~

~~226. Plaintiff on behalf of Target has no adequate remedy at law.~~

**~~COUNT VII~~**

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

220. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

~~227. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.~~

~~228.~~221. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the ~~time period in issue.~~ Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

~~229.~~222. As a result of the misconduct described above, the Individual

114

Defendants wasted corporate assets by, *inter alia*: (i) paying ~~and colleting~~ excessive compensation and bonuses to certain of its executive officers; (ii) ~~losing billions of dollars in profits and valuation as a result of the 2023 Pride Campaign; (iii) causing target to repurchase over a billion dollars in Company stock at artificially inflated prices; and (iv)~~ awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs~~, including defending against~~ to defend the Individual Defendants' unlawful actions; and (iv) causing and/or permitting the ~~Securities Action~~Company to repurchase its own common stock at artificially inflated prices.

~~230.~~223.  As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

224.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

225.  By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

226.  The Individual Defendants either benefitted financially from the

improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

227. Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

### FIFTH CAUSE OF ACTION

**(Against the Individual Defendants for Aiding and Abetting)**

228. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

229. The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

230. Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the

scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

231. The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

232. As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

233. As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

234. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SIXTH CAUSE OF ACTION**

**(Against Defendants Cornell and Fiddelke Insider Trading)**

235. Plaintiff incorporates by reference and realleges each and every

117

allegation set forth above, as though fully set forth herein.

236. By reason of their fiduciary role as officers and directors of the Company, Defendants Cornell and Fiddelke (the "Insider Trading Defendants") specifically owed the Company the highest obligation of due care, good faith, and loyalty.

237. As directors and/or officers of the Company, the Insider Trading Defendants were given access to material information about the Company, as described above, which was not generally available to the public.

238. When the Insider Trading Defendants sold their Company stock, as detailed *supra*, they were in possession of material, non-public information described above and sold Company stock on the basis of such information for collective gross proceeds in excess of $14 million.

239. The information described above was proprietary, non-public information concerning the Company's business operations and financial condition. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold holdings in Company stock. The Insider Trading Defendants knew that this information was not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

240. As the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the

Company is entitled to disgorge any illegal profits obtained thereby.

## SEVENTH CAUSE OF ACTION

### (Against the Director Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9))

241.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

242.  Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

243.  Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

244.  The Director Defendants violated § 14(a) of the Exchange Act, 15

U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC. The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2022 and 2023 Proxy Statements filed with the SEC.

245. The Proxy Statements were used to solicit shareholder votes in connection with the re-election of the Director Defendants to the Board, among other things.

246. The 2022 Proxy Statement and 2023 Proxy Statement were materially false and misleading because the Board and its committees were not properly overseeing ESG risks, and "political and social risks" specifically, as evinced by the Company launching the 2023 Pride Campaign, which resulted in severe backlash and harm to Target.

247. Under the direction and watch of the Director Defendants, the 2024 Proxy failed to disclose, inter alia: (1) contrary to 2022 Proxy Statement and 2023 Proxy Statement's descriptions of the Board's risk oversight function and the Audit & Risk Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board breached their fiduciary duties; and (2) the Defendants on the Board at that time who breached their fiduciary duties were improperly interested in increasing their unjust compensation.

248. The 2022 Proxy Statement and 2023 Proxy Statement were materially

120

false and misleading because Target insiders were implementing the DEI and ESG initiatives, including the 2023 Pride Campaign, to benefit collateral stakeholder interests and themselves, and were not in the best interests of shareholders.

249. Per the 2022 Proxy Statement and 2023 Proxy Statement, executive compensation plans were indeed tied to DEI goals, which the Individual Defendants knew were not in the best interest of the Company

250. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 and 2023 Proxy Statements were materially false and misleading.

251. The materially false and misleading statements contained in the Proxy Statements misleadingly induced shareholders to vote in favor of the election of the Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

252. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

### EIGHTH CAUSE OF ACTION

**(Against the Individual Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder**

253. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

231. Plaintiff on behalf Target has no adequate remedy at law.

121

254.   ~~PRAYER~~During the Relevant Period, the Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

255.   As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Target, their control over, and/or receipt and/or modification of Target's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Target, participated in the fraudulent scheme alleged herein.

256.   The Individual Defendants knew and/or recklessly disregarded the

false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

257. The Individual Defendants were each members of Target's Board of Directors and senior management team during the aforesaid time period. Based on their roles at Target, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

258. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Target, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

259. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the

false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

260. As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

261. As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

Awarding ~~money damages~~, against all the Individual Defendants, ~~jointly and severally, for all losses~~ and ~~damages suffered~~ in favor of the Company, the damages sustained by the Company as a result of the ~~acts and transactions~~

124

~~complained of herein, together with pre-judgment interest, molded in a fashion to ensure the~~ Individual ~~Defendants do not participate therein or benefit thereby;~~

B. ~~B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and~~ Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment ~~they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon~~, aiding and abetting, and violations of § 10(b) of the Securities Exchange Act of 1934;

~~C. Awarding punitive damages;~~

C. ~~D. Awarding~~ Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violations of § 14(a) of the Securities Exchange Act of 1934;

D. Awarding, against all the Insider Trading Defendants, disgorgement of all illicitly gained proceeds as a result of their unlawful and disloyal insider trading;

E. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect

the Company and its investors from a recurrence of the damaging events described herein;

  F. Awarding to Plaintiff the costs and disbursements of ~~this~~the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

  G. ~~E.~~ Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff ~~hereby~~ demands a trial by jury on all ~~claims set forth herein.~~ issues so triable.

~~Dated: January 7, 2025~~

~~**COOK LAW, P.A.**~~

~~/s/_____~~
~~By:~~ ~~William J. Cook~~
 ~~Florida Bar No. 986194~~
 ~~610 East Zack Street, Suite 505~~
 ~~Tampa, FL 33602~~
 ~~Telephone: (813) 489-1001~~
 ~~wcook@cooklawfla.com~~

~~*Counsel for Plaintiff*~~

~~OF COUNSEL:~~

~~**RIGRODSKY LAW, P.A.**~~
~~Seth D. Rigrodsky~~

Timothy J. MacFall
Vincent A. Licata
825 East Gate Boulevard,
Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
sdr@rl-legal.com
tjm@rl-legal.com
vl@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite
3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Facsimile: (267) 507-6048
jgrabar@grabarlaw.com

Dated: January 17, 2025

Respectfully submitted,

By: /s/Joshua H. Eggnatz Joshua H. Eggnatz, Esq. Fla. Bar No.: 0067926
Michael J. Pascucci, Esq. Fla. Bar No.: 0083397
**EGGNATZ | PASCUCCI**
7450 Griffin Rd, Ste. 230
Davie, FL 33314
Telephone: (954) 889-3359
Facsimile: (954) 889-5913
Email: JEggnatz@JusticeEarned.com
Email: Mpascucci@JusticeEarned.com

*Local Counsel for Plaintiff*


Thomas J. McKenna*
Gregory M. Egleston*
**GAINEY McKENNA & EGLESTON**
260 Madison Ave., 22nd Floor
New York, NY 10016

Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com Email: gegleston@gme-law.com

(*Pro hac vice application forthcoming)

*Lead Counsel for Plaintiff*

128