**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

|  |  |
|---|---|
| *In re Target Corp. Securities Class Action Litigation* | Case No. 0:25-cv-04380-NEB-SGE <br><br> <u>CLASS ACTION</u> <br><br> CONSOLIDATED COMPLAINT |

Lead Plaintiffs State Teachers' Retirement System of Ohio ("STRS") and the State Board of Administration of Florida ("SBA," and together with STRS, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, among other things, their counsels' investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Target Corporation ("Target" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Target; and (c) review of other publicly available information concerning Target.

**<u>INTRODUCTION</u>**

1.  This is a class action brought on behalf of persons and entities that purchased or otherwise acquired Target common stock between March 9, 2022 and November 19, 2024, inclusive (the "Class Period"). The claims asserted herein are alleged against Target and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5 and 14a-9 promulgated thereunder.

2.  Target misled investors by making false and misleading statements about Target's Environmental, Social and Governance ("ESG") and Diversity, Equity, and Inclusion ("DEI")

mandates that led to widespread customer boycotts following Target's 2023 LGBT-Pride campaign (the "2023 LGBT-Pride Campaign" or "Campaign"). Defendants claimed that Target adopted these mandates to advance shareholder value. But, in reality, Target, through Defendants, pursued these mandates for the collateral interests of Defendants and other non-investor stakeholders. Defendants chose political activism over the interests of Target's shareholders. The negative effects of the Campaign on Target's business, including a subsequent campaign in 2024 (the "2024 Campaign"), led to a massive decline in Target's stock price.

3.    These campaigns were initiated at a time when backlash from "rainbow capitalism" campaigns was increasing dramatically. As early as 2016, Target faced consumer backlash to its own response to North Carolina legislation limiting multi-occupancy bathrooms and occupants of the same sex, as defined on the occupants' birth certificate. Then, in 2016 and 2017, the NFL saw a decline of 15 to 20% in television ratings attributed by many to a reaction against NFL players kneeling during the national anthem. The controversy continued with Gillette's "We Believe" advertising campaign, which sparked global backlash, Disney's announcement in February 2023 that it had lost two million subscribers following its taking a position on Florida's Parental Rights in Education Act, and Anheuser-Busch's April 2023 partnership with a transgender influencer, which sparked a nationwide boycott of Bud Light and a significant decline in the brand's sales.

4.    Every executive thus knew well before 2023 that adopting or publicly embracing politically charged branding in either direction, whether perceived as "woke" or conservative, posed significant business risks and could provoke a material consumer response. This case does not challenge the adoption of any particular initiative. Rather, it concerns Defendants' failure to disclose the nature and extent of Target's increasingly controversial ESG/DEI strategies, the known risks those strategies posed to the Company's business, and Defendants' willingness to prioritize those strategies over shareholder value.

5.      Against this backdrop, Target's 2023 LGBT-Pride Campaign was the most ambitious and extreme "Pride Month" campaign in Target's history.  It began multiple weeks before related campaigns by other companies and involved a larger display and more prominent placement at the front of stores.  It also featured extensive marketing and controversial merchandise for children (or otherwise in extra-small sizes), along with products by an openly "Satanist-inspired" designer.  This program was out of step with prior campaigns, embroiling Target in a culture war and provoking consumer backlash and boycotts that caused Target's sales to fall for the first time in six years.

6.      Throughout the Class Period, Target and Target's Chief Executive Officer ("CEO") Brian C. Cornell ("Cornell") misrepresented the significance of Target's ESG objectives relative to other business goals such as increasing sales and profitability.  Target and Cornell knowingly obscured the degree of importance they were placing on stakeholder interests, to the detriment of the interests of Target shareholders. Target and Cornell further misrepresented Target's willingness to sacrifice sales, profits and customer loyalty to advance their political agenda.  This deceit, perpetuated through misleading statements in the Company's public filings, including its periodic reports, press releases, and proxy statements, caused Target's investors to purchase Target stock at artificially inflated prices.

7.      Further, unbeknownst to investors, and contrary to Target's public statements, the members of Target's Board of Directors (the "Board") did not monitor or disclose the known risks of Target's 2023 LGBT-Pride Campaign and the 2024 Campaign as represented in proxy statements issued during the Class Period.  Without complete information regarding the Campaigns, their risks and Target's chosen business strategies, investors were deprived of the right to determine who to elect to lead the Company and to consider Target's true business strategies in determining how to vote their proxies on matters like executive compensation.  Relying on

assurances, for example, that Target's Board and its committees oversaw the "social and political issues and risks" of Target's ESG positions, Target's shareholders unknowingly supported Target's Board and management in their misuse of investor funds to serve their own political and social goals.

8.  As the truth of the negative effect of these campaigns came to light, Target suffered tens of billions of losses in its market capitalization.  Beginning in May 2023, shortly after the Campaign was launched, Target's stock price suffered precipitous declines.  On May 18, 2023, the American Family Association, one of the leading organizations supporting a Target boycott, published a blog post encouraging consumers to join the boycott.  Target's stock began its record decline that same day, dropping over $4 a share after the publication of the blog and losing over $10 billion in market share over the next ten days.  Ronny Reyes, *Target Loses $10B in 10 Days as Stocks Fall Following Boycott over LGBTQ-Friendly Kids Clothing*, N.Y. Post (May 28, 2023).

9.  Soon thereafter, on May 24, 2023, Defendants Cornell and Target acknowledged the controversy surrounding the 2023 LGBT-Pride Campaign, but their statements concealed the scope and intensity of the consumer backlash to the Campaign and impaired the market's ability to process information about the backlash.  Target's share price continued its decline in the 1-day, 5-day and over a longer period following the May 24, 2023 statements, despite the positive stock price performance of its competitors.

10.  Even after May 2023, however, Defendants misled investors by downplaying the scope and intensity of the consumer backlash to the 2023 LGBT-Pride Campaign.  By August 16, 2023, Defendant Cornell and other executives were forced to reveal additional information about the scope and effect of the consumer backlash to the Campaign on Target's Q2 2023 earnings report call.  On that call, Defendants and other Target executives revealed that the Campaign had harmed the Company's earnings and other financial metrics, and that Target's removal and

relocation of LGBT Pride-themed merchandise aimed to mitigate the strategic errors Target made with the Campaign. Target's stock price continued its decline.

11. The full scope of the damage to investors caused by Defendants' actions became apparent on November 20, 2024 when Target's stock price suffered a decline of 22% in one day, erasing $16 billion in market capitalization. To the surprise of investors, Target reported disappointing earnings and guidance, as it continued to grapple with the lingering effects of its ESG/DEI campaigns that drove customers away and exacerbated inventory and other issues within the Company. While Defendants tried to blame "unique challenges and cost pressures," *The Wall Street Journal* explicitly connected these weaknesses to customers who "say they are still upset about a Pride month collection in 2023 that they felt went too far." Sarah Nassauer, *Target Misfires with Shoppers*, Wall St. J. (Nov. 27, 2024).

12. Analysts were surprised by the material earnings miss and underperformance relative to peers like Walmart. For example, on November 20, 2024, Wells Fargo noted that an "[earnings per share] miss and guide down of this magnitude was certainly a big surprise," and that "there seems to be operating/inventory challenges." Wells Fargo noted further that Target was "Back in the Penalty Box," and the update "is likely to raise major questions . . . especially given the strong performance of peer [Walmart]." Both Bloomberg and *The Wall Street Journal* noted that Target's troubles were self-inflicted and identified the backlash over the 2023 LGBT-Pride Month collection as a factor underlying the sizeable earnings miss. *See* Andrea Felsted, *Target's Problem Isn't the Economy — It's Target*, Bloomberg (Nov. 21, 2024); Nassauer, *Target Misfires with Shoppers*, *supra*.

13. Defendants' misrepresentation of material facts in periodic filings with the SEC, in press releases, on earnings calls, and in annual proxy statements deprived investors of facts they were entitled to know (1) when investing in Target and (2) when voting their proxies. Target and

Cornell violated Section 10(b) and Rule 10b-5 by knowingly making or causing Target to issue misleading statements to investors regarding risk, oversight, value, compensation, consumer backlash and the value placed on promoting an ESG/DEI agenda at the expense of sales, demand and profitability, including that:

- Target's quarterly SEC filings and annual reports filed during the Class Period omitted that Target was subject to the specific risk of consumer boycotts because of its unique and intensified ESG/DEI initiatives like the 2023 LGBT-Pride Campaign, rendering statements made therein misleading;

- Target's 2022 and 2023 Annual Proxy Statements (the "2022 Proxy" and "2023 Proxy," respectively) falsely and misleadingly stated that Target's Board and its committees (i) oversaw social and political issues and risks arising from Target's pursuit of ESG/DEI mandates, (ii) adopted Target's ESG/DEI mandates in order to enhance shareholder value, and (iii) proposed executive compensation plans that were aligned with shareholder value;

- Cornell and Target obscured the more aggressive nature of the upcoming Pride campaign in the face of an already fraught economic and political landscape; and

- Target and Cornell misleadingly downplayed the scope of consumer boycotts after they began and continued to tout a narrative of caution and conservatism in the face of already existing economic challenges.

14. The statements in the 2022 and 2023 Proxies also give rise to separate and distinct claims under Section 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder. Target, Cornell, and current and former members of Target's Board disseminated the false and misleading 2022 and 2023 Proxies which contained material misstatements regarding oversight of social and political risk, focus on shareholder value, and the alignment of executive compensation with shareholder value, among other things.

## **PARTIES**

### A.    **Lead Plaintiffs**

15. Plaintiff Ohio STRS purchased Target common stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws, as further alleged herein. STRS's trades in Target common stock during the Class Period are listed in

Schedule A to the Certification of State Teachers Retirement System of Ohio, annexed hereto. STRS held 244,609 and 360,097 shares of Target common stock on the relevant proxy dates of April 11, 2022 and April 27, 2023. STRS is one of the two largest public pension systems in Ohio, and among the largest public pension systems in the United States. As of the end of 2025, STRS had about $102 billion in assets under management. STRS provides critical retirement, disability, and survivor programs to the State of Ohio's public-school teachers (including 157,000 retirees and over 549,000 members).

16.     Plaintiff Florida SBA purchased Target stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws, as further alleged herein. SBA's trades in Target common stock during the Class Period are listed in Attachment 2 to the Certification of State Board of Administration of Florida, annexed hereto. SBA is primarily responsible for investing the proceeds of the Florida Retirement Pension Plan, managing the Florida Hurricane Catastrophe Fund, and running Florida PRIME, as well as investing the proceeds of more than 25 other funds directed to the SBA by the Florida Legislature.

**B.     Defendants**

17.     Defendant Target is a Minnesota corporation with principal executive offices at 1000 Nicollet Mall, Minneapolis, MN, 55403-2542. Target's stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the trading symbol "TGT." Target issued the 2022 Annual Report (defined below), the 2022 Proxy, and the 2023 Proxy.

18.     Defendant Cornell has served as Target's Chairman and CEO at all relevant times. Defendant Cornell resides in Minnesota.

19.     Defendant Cornell, because of his position with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Defendant Cornell was provided with copies of the Company's reports and press

7

releases alleged herein to be materially false prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Indeed, Defendant Cornell personally signed the annual reports, annual proxy statements, and other filings that contained the misstatements alleged herein. Because of his position and access to material non-public information available to him, Defendant Cornell knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false. Defendant Cornell is liable for the false statements pleaded herein.

20.     Defendant David P. Abney is a Target director and was a Target director when Target issued the 2022 and 2023 Proxies. Defendant Abney resides in Georgia.

21.     Defendant Douglas M. Baker, Jr. is a former Target director and was a Target director when Target issued the 2022 and 2023 Proxies. Defendant Baker resides in Minnesota.

22.     Defendant George S. Barrett is a Target director and was a Target director when Target issued the 2022 and 2023 Proxies. Defendant Barrett resides in Ohio.

23.     Defendant Gail K. Boudreaux is a Target director and was a Target director when Target issued the 2022 and 2023 Proxies. Defendant Boudreaux resides in Indiana.

24.     Defendant Robert L. Edwards is a Target director and was a Target director when Target issued the 2022 and 2023 Proxies. Defendant Edwards resides in Idaho.

25.     Defendant Melanie L. Healey is a former Target director and was a Target director when Target issued the 2022 and 2023 Proxies. Defendant Healey resides in Ohio.

26.     Defendant Donald R. Knauss is a former Target director and was a Target director when Target issued the 2022 and 2023 Proxies. Defendant Knauss resides in Texas.

27.     Defendant Christine A. Leahy is a Target director and was a Target director when Target issued the 2022 and 2023 Proxies. Defendant Leahy resides in Illinois.

28.     Defendant Monica C. Lozano is a Target director and was a Target director when Target issued the 2022 and 2023 Proxies.  Defendant Lozano resides in California.

29.     Defendant Grace Puma is a former Target director and was a Target director when Target issued the 2023 Proxy. Defendant Puma resides in Florida.

30.     Defendant Derica W. Rice is a Target director and was a Target director when Target issued the 2022 and 2023 Proxies.  Defendant Rice resides in Rhode Island.

31.     Defendant Dmitri L. Stockton is a Target director and was a Target director when Target issued the 2022 and 2023 Proxies.  Defendant Stockton resides in North Carolina.

32.     The foregoing defendants referenced in paragraphs 18 through 31 are collectively referred to herein as the "Directors" or the "Individual Defendants."

## JURISDICTION AND VENUE

33.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) and Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

34.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

35.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)).  Defendant Target is incorporated and maintains its corporate headquarters in Minnesota.

36.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**CONTROL PERSON ALLEGATIONS**

37.    By reason of the Individual Defendants' positions on Target's Board, including Defendant Cornell and his position as Target's Chairman of the Board and as CEO, the Individual Defendants possessed the power and authority to control the contents of Target's proxy statements and annual reports. The Individual Defendants were provided with copies of Target's proxy statements and had the ability and opportunity to prevent their issuance or cause them to be corrected.

38.    Because of their positions with Target, and access to material, non-public information available to them, but not to the public, the Individual Defendants, including CEO Cornell, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

**FACTUAL ALLEGATIONS**

39.    Target has long cultivated a classic, all-American image, and sells itself as the favorite retailer of middle-class American families.  But for years, Target's Board and management wasted the Company's financial and reputational capital pursuing the Board's and management's personal ESG/DEI interests, while falsely and misleadingly portraying the risks of this strategy to Target's shareholders in order to artificially inflate Target's stock price and secure the Board's re-election.

40.    Target's CEO Brian Cornell and its Board did not disclose the unique risks of Target's 2023 LGBT-Pride Campaign, the 2024 Campaign, or the ESG/DEI initiatives which it advanced, but they told investors that they did.  In doing so, they deceived Target investors as to the true nature of the risks of their investments and caused them to unknowingly support Target's Board and management in their misuse of investor funds to serve their divisive political and social

10

goals—and ultimately cost investors billions. Cornell and Target also knowingly misled investors, in periodic filings and in other public statements, regarding their willingness to sacrifice sales and customers in order to advance the interests of other stakeholders and to advance a political agenda.

41.    Target faced immense customer backlash to its ambitious LGBT-"Pride Month" marketing and sales Campaign, one of its featured ESG/DEI initiatives. The Campaign was a dramatic departure from past years, representing the most ambitious and extreme "Pride Month" campaign in Target's history. It began multiple weeks before related campaigns by other companies and included an expanded footprint and more prominent placement at the front of stores. It also included extensive marketing and controversial merchandise, such as extra-small "swimsuits with clothing tags that describe the items as having . . . 'tuck-friendly construction[.]'" Abigail Anthony, *Target Reportedly Moving 'Pride' Items to Back of Store to Avoid the Bud Light Treatment*, Nat'l Rev. (May 23, 2023). Target also knowingly partnered for the collection with an openly "Satanist-Inspired" brand, Abprallen, which is known for other designs that "glorif[y] violence" against "transphobes," such as showing the phrases "'We Bash Back' with a heart-shaped mace in the trans-flag colors, 'Transphobe Collector' with a skull, and 'Homophobe Headrest' with skulls beside a pastel guillotine." Abigail Anthony, *Target Knew of Satanist-Inspired Merchandise When It Partnered with LGBT Brand, Designer Claims*, Nat'l Rev. (May 24, 2023).

42.    The 2023 LGBT-Pride Campaign prompted a strong adverse reaction from a large portion of Target's customer base, in particular because it featured marketing and products directed to children. Former Target Vice Chairman Gerald Storch also observed the "tuck swimsuit" was "where the big mistake was made[.]" Agustin Hays, *Former Target Exec Reveals the 'One Item' that Sparked Consumer Firestorm*, Fox News (June 3, 2023) (alteration marks omitted).

43.     These risks were no surprise to Target's management.  In 2016, Target became "the central battleground of a vitriolic national debate over transgender rights" after Target published an antagonistic response to North Carolina's transgender bathroom law.  Hayley Peterson, *The Target Boycott Is Spiraling Out of Control*, Bus. Ins. (Apr. 26, 2016).  Several customer boycotts ensued, and "[s]hopper traffic and same-store sales started sliding for the first time in years," causing Target to forgo millions of dollars in lost sales and revenue.  Hayley Peterson, *The Target Boycott Cost More Than Anyone Expected — and the CEO Was Blindsided*, Bus. Ins. (Apr. 6, 2017); *see also, e.g.*, Phil Wahba, *Nearly 1 Million Sign Pledge to Boycott Target Over Bathroom Policy*, Fortune (Apr. 28, 2016).  Target's same-store sales growth fell in each of the next three quarters.  Khadeeja Safdar, *How Target Botched Its Response to the North Carolina Bathroom Law*, Wall St. J. (Apr. 5, 2017).  "At Target's Minneapolis headquarters, executives scrambled to control the damage," which, "[a]fter an internal review, executives determined . . . was the tipping point for" closing stores in several markets.  *Id*.

44.     After the incident, Defendant Cornell reportedly admitted to Target staff that "Target didn't adequately assess the risk, and the ensuing backlash was self-inflicted," but "it was too late to reverse course."  *Id*.  Nonetheless, Defendant Cornell publicly defended the decision, stating: "We took a stance, and we're going to continue to embrace our belief of diversity and inclusion, just how important that is to our company." Travis M. Andrews, *Target CEO Responds to Nationwide Boycott of the Store Over Transgender Bathroom Policy*, Wash. Post (May 13, 2016).

45.     In ensuing years, other companies like The Walt Disney Company and Anheuser-Busch InBev Worldwide, Inc. experienced high-profile backlashes to similar marketing initiatives. *See, e.g.*, Andrew Stiles, *Disney Stock Down 33 Percent Since CEO Instigated Feud with DeSantis*, Wash. Free Beacon (May 24, 2023); Daniel Neman, *Bud Light Sales Continue to Plummet After*

*Transgender Marketing Controversy*, St. Louis Post-Dispatch (May 1, 2023). Nike and Gillette had also experienced similar customer backlash from marketing decisions. *See, e.g.*, Lauren Thomas, *Nike Shares Fall as Backlash Erupts Over New Ad Campaign Featuring Colin Kaepernick*, CNBC (Sept. 4, 2018); Katie Pavlich, *Woke to Broke: Gillette Loses Billions After Anti-Men, Transgender Shaving Ads*, Townhall (Aug. 1, 2019).

46.     Shareholders, consumer groups, and conservative commentators repeatedly warned Target that its ESG/DEI initiatives would cause it to lose customers. In response, Target assured investors that it was carefully monitoring for any social and political risks associated with its ESG/DEI initiatives.   In reality, the Board, both itself and through the applicable Board committees, only monitored risks it perceived from ***failing to achieve its self-imposed ESG/DEI mandates***.   These "risks" were ***not*** the "social or political" risks of ESG/DEI mandates—neither according to Target's definition nor by how a reasonable investor would understand those words. Instead, they were risks associated with a group of nonprofit-organization "stakeholders" that Target worked with to adopt its ESG/DEI mandates.   These "stakeholder"-driven "risks" were a pretext for Target to adopt ESG/DEI mandates, not good-faith oversight of the social and political risks of adopting ESG and DEI motivated corporate policies. *See, e.g.,* SEC Comm'r Hester M. Peirce, *My Beef with Stakeholders: Remarks at the 17th Annual SEC Conference*, Center for Corporate Reporting and Governance (Sept. 21, 2018) ("'Stakeholder' is so popular precisely because it is so elastic. . . .  It is used to refocus corporate decision-makers on constituencies other than their shareholders.").

47.     This was particularly evident when, amidst downplaying the fallout from the 2023 LGBT-Pride Campaign and promising to learn from the experience, Target promoted Erik Thompson to be its "Senior LGBTQIA+ Segmentation Strategist & Pride Lead." Thompson announced that he was "[h]onored to . . . lead Target's LGBTQIA+ multicultural merchandising

strategy and Pride businesses for the company and the LGBTQIA+ & Allied communities across the . . . nation" and that it was "[t]ime to whip out the . . . Glitter & Hellfire . . . flamethrowers and rip that old world to shreds darlings."  Luke Gentile, *Target's Newest Pride Strategist Bringing a Whole New LGBT Spirit to Christmas*, Wash. Exam. (Nov. 16, 2023).  When Thompson was asked if he would hurt Target's sales, he responded, "***Yes. Yes I will make sales tank.***" Amanda Harding, *Target Promotes 'GayCruella' To 'LGBTQIA+ Segmentation Strategist' Amid Abysmal Sales from Pride Backlash*, The Daily Wire (Nov. 15, 2023) (emphasis added).  Thompson has been employed by Target in several corporate roles and has worked for the company since June 2014. *Id*.

48.    Target then proceeded to roll out a Pride-themed Christmas collection.  *See* Sarah Wilder, *Target Doubles Down on LGBT Products, Hires New 'Pride Strategist'*, Daily Caller (Nov. 21, 2023).

49.    Despite the risks known internally to Target's sales from the ESG/DEI mandates and the 2023 LGBT-Pride Campaign in particular, Target failed to disclose that it was subject to intensified backlash from consumers because of the upcoming Campaign, and especially because the Campaign was materially different from past campaigns, rendering misleading statements in Target's 2022 and 2023 Proxies about Target's risks and risk oversight.

50.    Defendants also affirmatively and knowingly misrepresented the specific risks unique to the substantially modified 2023 Campaign, the degree of backlash thereto and the true and complete reasons for Target's declining performance in the period following the Campaign. Defendants Cornell and other Target executives further conveyed a false narrative of caution and conservatism throughout the relevant period, even after it became apparent that the Campaign was affecting sales, demand and customer loyalty.

51.     The 2022 and 2023 Proxies also misled investors by stating that Target's proposed executive compensation plans were aligned with shareholder value when, in reality, they included substantial incentive payments to executives for meeting ambiguous and subjective "DEI progress" mandates.

52.     In light of this misleading information, Target shareholders re-elected Target's Board at the 2023 election, turned down multiple proposals via shareholder vote to reform the Board's risk oversight functions, and approved executive compensation plans that incentivized Target's officers to implement programs like the 2023 LGBT-Pride Campaign.

53.     On May 31, 2024, Target released plans for its 2024 Campaign, which it implemented that summer.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS**

**A.      Defendants Cornell and Target Misrepresented the Risk of Consumer Boycotts Caused by Its ESG/DEI Initiatives**

1.      Target's 2021 Annual Report

54.     Historically, as companies have adopted ESG/DEI mandates to serve various stakeholders and undertaken business strategies to achieve them, they have experienced backlash from their customers.  To comply with the federal securities laws, public companies that are committed to ESG and DEI-related mandates must disclose their material risks including customer backlash.

55.     For example, ADT Inc.'s 2022 Form 10-K described risks related to its ESG initiatives even-handedly.  First, the company described the risks it faced from failing to "achieve" its ESG goals, i.e., risks it faced from stakeholders who support ESG mandates, and thus would react negatively to ADT "fail[ing]" to "achieve" ESG mandates:

> If we are unable to provide sufficient disclosure about our ESG practices, or if we fail to establish and achieve the objectives of our ESG program, which could include targets or commitments, consistent with investor, customer, employee, or other stakeholder expectations, we may not be viewed as an attractive investment,

service provider, workplace, or business, which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

ADT Inc., Annual Report (Form 10-K) at 47 (Feb. 28, 2023). But the company immediately followed this language with a description of risks from its pursuit of ESG mandates:

In addition, there exists certain "anti-ESG" sentiment among some individuals and government institutions. As we continue to establish our ESG related initiatives, we could face a negative reaction or legislation that impedes our activities or reflects poorly upon the Company, any of which could have a material adverse effect on our business, financial condition, results of operations, and cash flows.

*Id*.

56. Other companies that have adopted ESG and DEI goals have described the risk of backlash similarly. *See*, *e.g.*, State Street Corp., 2022 Annual Report (Form 10-K) at 42-43 ("[P]ublic criticism levelled at ESG investing practices could result in reduced investor demand for ESG-related products, which in turn could negatively effect [sic] our assets under management and resulting fee revenues."); Citigroup, Inc., 2022 Annual Report (Form 10-K) at 44 ("Citi also faces potentially conflicting anti-ESG initiatives"); Valero Energy Corp., 2022 Annual Report (Form 10-K) at 20 ("'anti-ESG' focused activism and investment funds[] may result in additional strains on company resources"); The Carlyle Grp., Inc., 2022 Annual Report (Form 10-K) at 68 ("Conversely, anti-ESG sentiment has also gained momentum").

57. In its annual and quarterly filings with the SEC, Target was required to provide investors with direct and honest disclosure of the actual risk—known to Target's Board and management—that customers would react negatively to its increasingly assertive ESG/DEI initiatives. Under Item 105 of Regulation S-K promulgated by the SEC, Target was required to disclose in a section titled "Risk Factors" those "material factors that make an investment . . . speculative or risky" and to "[c]oncisely explain how each risk affects the [company] or [its] securities." 17 C.F.R. § 229.105(a), (b). Here, Target and its stock were subject to a specific and material risk of consumer backlash to its ESG and DEI initiatives—including, in particular, to its

Pride Month campaigns. This risk was increasing in probability and severity because Target, under Cornell's leadership, was doubling down on those initiatives in the face of known and adverse customer sentiment toward them. Defendants' failure to disclose known risk rendered their affirmative statements false and misleading.

58. On March 9, 2022, the beginning of the Class Period, Target filed its Annual Report on Form 10-K for the fiscal year ended January 29, 2022 (the "2021 Annual Report"). In the 2021 Annual Report, Target misrepresented and failed to disclose that it was subject to increasing risks of consumer backlash to its ESG and DEI initiatives. Specifically, in the Risk Factors, Target said the following regarding the risks stemming from its ESG/DEI mandates:

> We believe that one of the reasons our shareholders, guests, team members, and vendors choose Target is the positive reputation we have built over many years for serving those constituencies and the communities in which we operate. ***To be successful in the future, we must continue to preserve Target's reputation.*** Our reputation is based in large part on perceptions, both about us and others with whom we do business, and broad access to social media makes it easy for anyone to provide public feedback that can influence perceptions of Target. It may be difficult to ***control negative publicity***, regardless of whether it is accurate. Target's responses to crises and ***our position or perceived lack of position*** on environmental, social and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation. While reputations may take decades to build, negative incidents involving us or others with whom we do business can quickly erode trust and confidence and can result in consumer boycotts, workforce unrest or walkouts, government investigations, or litigation. For example, we have a limited ability to end our relationship with CVS, which leases space to operate their clinics and pharmacies within our stores. If our guests have negative experiences with or unfavorably view CVS or other companies with whom we have relationships, it could cause them to reduce or stop their business with us. Negative reputational incidents could adversely affect our business and results of operations, including through lost sales, loss of new store and development opportunities, or team member retention and recruiting difficulties.

59.     Target's disclosure of the risks stemming from its ESG/DEI mandates in the 2021 Annual Report was materially false and misleading. Target concealed the known and specific risk of adverse customer and stockholder reactions to its extreme "Pride Month" campaigns, which rendered its generic statement about its "position or perceived lack of position" concerning those matters materially misleading. Target's disclosure was not specifically tailored to the known risk specific to the 2023 LGBT-Pride Campaign, focusing instead on its general reputation and generic negative publicity. The disclosure does not mention the Campaign at all.

60.     Target failed to disclose that the known risk of those reactions was not being monitored or addressed by the Board, that Target did not have systems in place to monitor such risks, and that Target was thus not attempting to "preserve Target's reputation" or "control negative publicity" with respect to adverse customer reactions to its ESG/DEI initiatives.

61.     Target failed to disclose, as required by Item 105, the known, specific risk of adverse customer reaction to its ESG/DEI mandates and to the Pride campaigns it intended to continue and to augment, rendering the statements above false and misleading.

2.     Target's Forms 10-Q for the Quarters Ending July 31 and October 31, 2022

62.     On August 26, 2022 and November 23, 2022, Target filed Forms 10-Q for the quarterly periods ended July 31, 2022 and October 31, 2022, respectively. Under the heading "Risk Factors," Target stated: "There have been no material changes to the risk factors described in Part I, Item 1A, Risk Factors of our Form 10-K for the fiscal year ended January 29, 2022."

63.     Target's Forms 10-Q for the fiscal periods ended July 31, 2022 and October 31, 2022 thus incorporated by reference the risk disclosure from the 2021 Annual Report detailed above in paragraph 58.

64.     This risk statement was false and misleading. Target omitted that there were known, specific risks associated with its ESG/DEI mandates generally, and LGBT issues specifically, including the risk of customer boycotts and harm to Target's financial results.

18

65.    Further, Target failed to disclose that the Board was not monitoring or addressing those known risks. Thus, its statements regarding "preserv[ing] Target's reputation" and "control[ling] negative publicity" were also misleading since Target was not, in fact, doing either with regard to its ESG and DEI initiatives.

66.    Item 105 required disclosure of the known risk of adverse customer reaction to Target's ESG/DEI initiatives and to the Campaign in particular, and Target failed to make these disclosures, rendering the statements above false and misleading.

67.    Further, in the November 16, 2022 press release reporting third quarter 2022 earnings, Cornell falsely touted a "business model which continues to serve our guests and drive loyalty" knowing full well that the planned 2023 LGBT-Pride Campaign would dramatically affect customer loyalty.  Cornell also claimed that Target was "planning the balance of the year more conservatively," "taking new actions to drive efficiencies" and taking other steps to position Target "well to navigate in any environment."  The press release made no mention of the upcoming Pride Campaign that was soon to be rolled out in the already precarious political and economic environment.

68.    During the accompanying November 16, 2022 earnings call, Defendants continued to assure investors that Target closely monitored and responded to consumer preferences and was prudently managing its business.  Specifically, Michael J. Fiddelke, the Company's then-Executive Vice President and Chief Financial Officer and current CEO, represented that Target was "closely . . . listening to our guests, ensuring we understand how they're feeling and how that is affecting their shopping behavior, and moving quickly to serve their rapidly changing needs."  Fiddelke further assured investors that Target can navigate upcoming challenges and "emerge even stronger in the long term, while continuing to deepen our relationship with guests and build long-term preference for Target."  Fiddelke further stated that Target was "plan[ning] the business prudently

and cautiously" in light of changing consumer trends and that the Company had "taken an increasingly cautious position in discretionary categories."

69.     The statements in paragraphs 67 through 68 were materially false and misleading because, while assuring investors that Target closely monitored consumer preferences, understood how customers' views affected their shopping behavior, and was "prudently and cautiously" managing its business in response to changing consumer trends, Defendants failed to disclose that the Company was planning the 2023 LGBT-Pride Campaign, which they knew or recklessly disregarded was reasonably likely to provoke significant consumer backlash and undermine the long-term customer loyalty and preference for Target that Defendants repeatedly touted.

70.     In reporting fourth quarter and full year 2022 earnings on February 28, 2023, Cornell stated that "we're planning our business cautiously in the near term to ensure we remain agile and responsive to the current operating environment" and that Target's healthy inventory position reflected its "conservative approach in discretionary categories." These statements were knowingly false and misleading in light of the known risks of the upcoming 2023 LGBT-Pride Campaign. Cornell knew of these risks by February 28, 2023 yet continued to convey a narrative of caution and conservatism in the face of already existing economic challenges.

71.     On the accompanying conference call, Cornell similarly stated: "We want to speak clearly of how Target's planning to stay on our growth path for the years ahead. . . . We see this as a time to combine steady leadership with our long-term strategy and a continued focus on agility and strong focus on retail fundamentals." Cornell further stated:

> We'll also reinforce how the trust and loyalty we've built with our guests shows in our traffic and share gains. Given value is absolutely top of mind right now, being able to deliver affordable joy, differentiates us in the marketplace. And that's a clear advantage in the near term and remains our focus over the long term. With those factors in mind, we also want to use this time to set clear and realistic expectations so shareholders and stakeholders can track what progress looks like in 2023.

20

72. On the same call, Cornell also represented that Target was "planning cautiously and we believe appropriately, given the economic challenges we anticipate this year." Christina Hennington, Target's then-Executive Vice President and Chief Growth Officer, similarly stated that the Company had "taken a cautious approach to this year's inventory commitments."

73. The statements in paragraphs 70 through 72 were materially false and misleading because, while assuring investors that Target was focused on its retail fundamentals, cautiously managing its business, and building long-term customer loyalty, Defendants failed to disclose that the Company was simultaneously planning the controversial 2023 LGBT-Pride Campaign. By February 28, 2023, Defendants knew of the risks of the upcoming Campaign, yet continued to stress Target's "retail fundamentals" and "cautious" approach to managing its business without disclosing the nature and scope of the upcoming Campaign or the material risks it presented to customer loyalty, demand, and the Company's future financial performance.

### 3. Target's 2022 Annual Report

74. On March 8, 2023, Target filed its Annual Report on Form 10-K for the fiscal year ended January 28, 2023 (the "2022 Annual Report"). Under the heading "Item 1A. Risk Factors," the 2022 Annual Report purported to disclose "the material risks we face." Target continued to emphasize the serious risk to the company's financial prospects if that core customer base were to have a negative perception of the corporation: "**Our continued success is dependent on positive perceptions of Target which, if eroded, could adversely affect our business and our relationships with our guests and team members**" (emphasis in original).

75. But unlike Target's 2021 Annual Report, the 2022 Annual Report made no mention of "ESG" or "DEI" in its discussion of reputational risks that could lead to "consumer boycotts." A comparison of the 2021 and 2022 Annual Reports is provided below, with the relevant removed language from the 2021 Report underlined:

**2021 Annual Report "Consumer Boycott" Language**

To be successful in the future, we must continue to preserve Target's reputation. Our reputation is based in large part on perceptions . . . It may be difficult to control negative publicity, regardless of whether it is accurate. Target's responses to crises and <u>our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation.</u> While reputations may take decades to build, negative incidents involving us or others with whom we do business can quickly erode trust and confidence and can result in consumer boycotts, workforce unrest or walkouts, government investigations, or litigation.

**2022 Annual Report "Consumer Boycott" Language**

To be successful in the future, we must continue to preserve Target's reputation. Our reputation is largely based on perceptions. It may be difficult to address negative publicity across media channels, regardless of whether it is accurate. Negative incidents involving us, our workforce, or others with whom we do business could quickly erode trust and confidence and result in consumer boycotts, workforce unrest or walkouts, government investigations, and litigation.

The 2022 Annual Report also provides no disclosure of ESG/DEI backlash as a "negative incident" that could result in consumer boycotts.

76.    Also, unlike the 2021 Annual Report, the 2022 Annual Report made no mention of risks associated with Target's ESG/DEI mandates.  Instead, the 2022 Annual Report stated the opposite: that the only risks stemming from Target's ESG/DEI mandates came from Target failing to adequately "achieve" such mandates. The 2022 Annual Report provided:

> [S]takeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform. We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. Any failure, or perceived failure, by us to achieve these goals and initiatives or to otherwise meet evolving and varied stakeholder expectations could adversely affect

our reputation and result in legal and regulatory proceedings against us.

77. These statements were incorporated by reference into Target's quarterly reports on Form 10-Q filed with the SEC on May 26, 2023, August 25, 2023, and November 22, 2023, with each report stating that "[t]here have been no material changes to the risk factors" described in the 2022 Annual Report.

78. These disclosures were false and misleading. Target's 2023 LGBT-Pride Campaign was just two months away, yet it failed even to mention the risk of adverse customer reactions and shareholder reactions. The 2023 LGBT-Pride Campaign was an ESG/DEI mandate that subjected Target to the risk of customer boycotts.

79. At the time Target issued the 2022 Annual Report, Target employees were planning and beginning to implement the 2023 LGBT-Pride Campaign. Target management knew of the planned Campaign.

80. These 2022 Annual Report statements were false and misleading because they omitted to disclose the known risks associated with its 2023 LGBT-Pride Campaign, which was launched in May 2023. These risks included, among other things, alienation of Target's core customer base, customer boycotts, negative press, and a negative effect on Target's reputation and operating results. If these risks materialized, which they did, Target would be subject to a decline in revenue and profits.

81. Target management was aware of these risks as they had in fact materialized following Target's response to the North Carolina transgender bathroom law, which led to significant customer boycotts. Target's management thus had first-hand experience with the negative outcomes associated with its stance on LGBT issues. Target had also witnessed the severe consumer backlash experienced by other companies such as Disney and Anheuser-Busch InBev Worldwide in response to similar marketing initiatives.

82.     Nonetheless, Target failed to disclose the risk that its ESG/DEI initiatives could harm its reputation and thereby negatively impact demand, sales and inventory, let alone disclose any information about the upcoming 2023 LGBT-Pride Campaign in its 2022 Annual Report. Nothing in the 2022 Annual Report is tailored to the specific known risk that Target's ESG and DEI goals could lead to consumer backlash and loss of sales.

4.     Target's Form 10-Q for the Period Ended April 29, 2023

83.     On May 26, 2023, Target filed its Form 10-Q for the period ended April 29, 2023. Under the heading "Risk Factors," Target incorporated by reference the risk factor cited above in paragraphs 74 and 76, *supra*, when it stated: "There have been no material changes to the risk factors described in Part I, Item 1A, Risk Factors of our Form 10-K for the fiscal year ended January 28, 2023" (i.e., the 2022 Annual Report).

84.     This statement was false and misleading because the risk disclosure in the 2022 Annual Report failed to disclose the known risks associated with its 2023 LGBT-Pride Campaign, which was launched in May 2023.  These risks included, among other things, alienation of Target's core customer base, customer boycotts, negative press, and a negative effect on Target's reputation and operating results.  When these risks materialized, Target suffered a material decline in revenue and profits.

85.     In announcing Target's first quarter earnings the prior week, Defendant Cornell noted: "We came into the year clear-eyed about the challenges consumers are facing, and we were determined to build on the trust we've established with our guests. It's required agility and the ability to flex across our multi-category portfolio as we lean into value and the product categories our guests need most right now."  In commenting on establishing trust with guests and leaning into product categories guests need most, Cornell failed to disclose the specific known risk of the increasingly extreme 2023 LGBT-Pride Campaign and Target's choice to pursue ESG goals at the expense of sales, demand and customer loyalty.

**B.    Defendants Cornell and Target Concealed the Consumer Backlash to the 2023 LGBT-Pride Campaign**

86.    Shortly after calls for consumer boycotts began, Target took certain remedial measures to reposition certain LGBT-themed merchandise in less prominent locations in retail locations.  On May 24, 2023, Target issued a statement entitled, "Target Statement on 2023 Pride Collection," in which it states:

> For more than a decade, Target has offered an assortment of products aimed at celebrating Pride Month.  Since introducing this year's collection, we've experienced threats impacting our team members' sense of safety and well-being while at work.  Given these volatile circumstances, we are making adjustments to our plans, including removing items that have been at the center of the most significant confrontational behavior.  Our focus now is on moving forward with our continuing commitment to the LGBTQIA+ community and standing with them as we celebrate Pride Month and throughout the year.

87.    A Target spokeswoman elaborated that "people have confronted workers in stores, knocked down Pride merchandise displays and put threatening posts on social media with video from inside stores." Sarah Nassauer, *Target to Pull Some LGBT-Themed Merchandise After Customer Backlash*, Wall St. J. (May 24, 2023).

88.    Defendant Cornell sent a publicly reported, companywide email with a similar "safety"-related explanation for the changes. In that email, he blamed the relocation of LGBT-themed merchandise to less prominent locations on "high volumes of angry, abusive and threatening calls" and "threats to our team's physical and psychological safety."  Dominick Reuter, *Target CEO Defends the Decision to Remove Pride Displays and Pledges to Support the LGBTQ Community. Read His Letter to Employees.*, Bus. Ins. (May 25, 2023).

89.    Cornell continued espousing a "safety" rationale for pulling back LGBT-themed merchandise by claiming that threats to Target employees were greater during the consumer backlash to the 2023 LGBT-Pride Campaign than during the George Floyd-inspired riots Target faced during the summer of 2020.  In an interview with CNBC's Becky Quick, Cornell stated:

25

I've seen natural disasters, we've seen the impact of Covid leading into the pandemic, some of the violence that took place after George Floyd's murder. But I would tell you, Becky, what I saw back in May is the first time since I've been in this job where I had store team members saying it's not safe to come to work.

*CNBC Transcript: Target CEO Brian Cornell Speaks with Becky Quick from the CNBC Evolve Global Summit*, CNBC (Nov. 2, 2023).

90. This explanation was improbable because Target faced such violent criminal conduct during the George Floyd riots that it was forced to "temporarily close 175 of its locations across the U.S." Lisette Voytko-Best, *Target Closes 175 Stores Nationwide in Wake of George Floyd Protests, Looting*, Forbes (May 31, 2020). Target did not close any of its locations in response to the backlash to the 2023 LGBT-Pride Campaign.

91. These statements attributing the remedial measures taken solely to safety issues were false and misleading because they failed to disclose that the reason Target removed LGBT-Pride-related merchandise was because it caused consumer backlash and boycotts that harmed Target's sales and related financial metrics. This was later revealed to be true by Defendant Cornell and other Target executives when they admitted that Target's 2023 LGBT-Pride Campaign was too prominent and resulted in lost revenue and profits, and thus pledged that future campaigns would be less prominent in Target's stores.

92. On the same day as Target's May 24, 2023 statement on worker safety, a Target insider told a national media outlet that Target's internal reporting systems lacked evidence of threats. An "LGBTQ employee" who spoke with Business Insider "said there was no mention of safety in the display-removal instructions they received via an internal messaging system." Dominick Reuter, *Target Workers Say the Abrupt Removal of Pride Month Displays Has Alienated Some LGBTQ Employees*, Bus. Ins. (May 24, 2023). Instead, the employee stated that "[t]he

communication provided to us explicitly said the decision to move these items was . . . to better meet our sales goals.  Not once was safety mentioned." *Id*.

93.    Another Target insider stated that Target had directed stores in politically conservative areas to "relocate[ ] Pride sections to avoid the kind of backlash Bud Light has received" as early as May 19—five days before Target's May 24 statement.  Brian Flood, *Target Holds 'Emergency' Meeting over LGBTQ Merchandise in Some Stores to Avoid 'Bud Light Situation,'* Fox News (May 23, 2023).

94.    Defendant Cornell subsequently admitted to the consumer backlash and blamed it on the timing and prominent location of the Pride merchandise in the store.  In the CNBC interview, he explained that Target exposed itself to consumer backlash because "we set the presentation much earlier than everyone else" by beginning in May, and because the display "was very prominent."  CNBC Transcript (Nov. 2, 2023), *supra*.

95.    Despite internally recognizing that the 2023 LGBT-Pride Campaign had generated significant consumer backlash, Defendants did not disclose that fact in Target's SEC filings during 2023.  Instead, Defendants continued to attribute the changes to the Pride campaign to employee safety concerns.  It was not until 2024 that Target acknowledged in its SEC filings that customer reactions to the 2023 LGBT-Pride Campaign had adversely affected the Company's business and informed changes to its approach to future Pride campaigns.

C.    **Target's 2022 and 2023 Proxies Falsely Touted Its Oversight of "Social and Political Issues and Risks" to Target's ESG/DEI Initiatives**

96.    In Target's 2022 and 2023 Proxies, Target assured investors that the Board monitored "social and political issues and risks" arising from the company's ESG mandates.  In reality, the Board—both itself and through the applicable Board committees—oversaw only the risks Target perceived from *failing to achieve Target's ESG and DEI mandates*, risks which are not social or political under Target's own definition and a common-sense interpretation of "social

27

and political issues and risks." Despite these representations, Target, its Board, and its Board committees did not monitor, or ignored, the social and political risks relating to the 2023 Pride Campaign.

  1.  Relevant Statements in Target's 2023 Proxy

97. Target filed its 2023 Proxy with the SEC on May 1, 2023 and its 2022 Proxy on April 25, 2022. Each described the Board's key role in risk oversight in similar language:

> **Risk oversight**
>
> Oversight of the various risks we face in implementing our strategy is an integral and continuous part of the Board's oversight of our business. The Board, each Committee, and management have specific roles and responsibilities with respect to those risks.
>
> **The Board and its Committees**
>
> The Board provides oversight of overall risks and seeks to ensure that our Leadership Team has processes in place to appropriately manage risk. Strategic risks are emphasized within that overall risk oversight responsibility because they are an integral and ongoing part of the Board's oversight of our business. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of our strategy, including the development and monitoring of specific initiatives and their overall alignment with our strategy. Similarly, at every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our Leadership Team the major events, activities, and challenges affecting Target.

2023 Proxy at 14. The 2022 Proxy was substantially similar. 2022 Proxy at 14.

98. The 2022 and 2023 Proxies also each emphasized the significance of "ESG matters" to the Board's risk oversight and described the Board's allocation of oversight of those matters throughout the Board and its committees:

> **Sustainability & ESG**
>
> We engage with a diverse group of stakeholders around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who

make our work possible. Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy. . . Given the breadth of ESG matters for a company of our size and scale, oversight of those issues is allocated throughout the Board and its Committees:

**Board**

- Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)
- Sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)
- Reputation management
- Crisis management and response

\*\*\*

**Audit & Risk Committee**

- Supply chain ESG matters, including vendor human capital and responsible sourcing practices

\*\*\*

**Governance & Sustainability Committee**

- Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)

\*\*\*

- Social and political issues and risks not allocated to other Committees
- Philanthropy and community engagement
- Policies and practices regarding public policy advocacy and political activities

2023 Proxy at 15–16.  The 2022 Proxy was substantially similar.  2022 Proxy at 15–16.

99.    While the 2022 and 2023 Proxies were both clear that each of Target's Board, the Audit & Risk Committee, and the Governance & Sustainability Committee was responsible for oversight of various "ESG matters," only the Governance & Sustainability Committee was described as overseeing "social" and "political" issues and risks.

29

100.    In discussing the Board Committees' roles in "fulfilling the oversight and other responsibilities delegated by the Board," the 2022 and 2023 Proxies also referenced Target's "Board Committee Charters" and directed shareholders to "current cop[ies]" of such charters "available on Target's website." 2022 Proxy at 12, 75; 2023 Proxy at 12, 78.

101.    The Board's Governance & Sustainability Committee Charter further described the Committee's ESG and political and social risk oversight responsibilities:

> **ESG & Corporate Responsibility Matters.** Oversee the Corporation's overall approach to environmental, social & governance and corporate responsibility matters, including:
>
> ***
>
> - identification of the ESG-related topics that are most relevant and important to the Corporation and any goals or aspirations related thereto;
>
> ***
>
> - *social and political issues and risks impacting the Corporation* (other than the human capital matters overseen by the Compensation & Human Capital Management Committee and the supply chain matters overseen by the Audit & Risk Committee);
> - the Corporation's philanthropy and community engagement activities;
> - external reporting on ESG and corporate responsibility matters
>
> **Public Advocacy and Political Activities.** Oversee the Corporation's policies and practices regarding public policy advocacy and political activities, including the process for selecting issues for engagement, lobbying activities, political contributions with corporate funds (including support of other organizations that may engage in political activity), and the activities of any political action committee organized by the Corporation.

Target Governance & Sustainability Committee Charter at 2–3 (emphasis added).

102.    The Governance & Sustainability Committee's oversight responsibility for "social and political issues and risks impacting the Corporation" is separate from its other responsibilities,

30

including the oversight of the "identification of ESG-related topics," "philanthropy and community engagement," and even "public advocacy and political activities."

2.      Target's 2022 and 2023 Proxies Each Represented that the Board Oversaw Social and Political Risks Arising from Backlash to Its ESG/DEI Initiatives

103.    The 2022 and 2023 Proxies' representation that the Governance & Sustainability Committee oversaw the "social and political issues and risks" of Target's ESG matters was false and misleading.  Rather than overseeing social and political issues and/or risks arising from Target's ESG matters, the Governance & Sustainability Committee oversaw Target's engagement with "stakeholders" to advance ESG/DEI-aligned goals.

104.    The Governance Committee preceded the Governance & Sustainability Committee. *See* 2022 Proxy at 63 (describing the position of Governance & Sustainability Committee Chair as "formerly Governance Committee Chair"); *id.* at 76 (erroneously referring to the Governance & Sustainability Committee as the "Governance Committee").

105.    The Governance Committee lacked express oversight responsibility for social and political issues and risks created by ESG matters.

106.    The Governance Committee "[a]ddresse[d] ESG topics on a consolidated basis by allocating responsibilities for ESG topics among the Board and its Committees . . . and [by] overseeing our overall approach to corporate responsibility." Target's 2021 Proxy Statement and Notice of Annual Meeting of Shareholders (the "2021 Proxy") at 18 (June 9, 2021).  It also oversaw management's responsibility to "instill ESG-related priorities into our business operations, including product design and development" and other business tasks.

107.    The Governance Committee's oversight responsibilities did not include any oversight of "risk."  Target, Governance Committee Charter. Likewise, Target's previous proxy statements did not mention "risk" in the Governance Committee's ESG-oversight responsibilities. *See, e.g.*, 2021 Proxy at 18.

108. The Governance & Sustainability Committee was established in September 2021 as part of the Board's overhaul of its committee structure. Target, 2022 ESG Report at 56.

109. The Governance & Sustainability Committee retained many of the previous Governance Committee's responsibilities, including to "[o]versee the Corporation's overall approach to environmental, social & governance and corporate responsibility matters." Governance & Sustainability Committee Charter at 2.

110. The Governance & Sustainability Committee was allocated the new responsibility to "oversee . . . *social and political issues and risks"* of Target's "ESG & Corporate Responsibility Matters." Governance & Sustainability Charter, *supra*, at 2–3 (emphasis added). The 2023 Proxy also highlighted the Governance & Sustainability Committee's new ESG oversight responsibility.

111. Target touted the new committee structure as a way for the Board to "enhance its approach to oversight of risk and ESG matters by reallocating to its committees oversight responsibility" for ESG and DEI matters. 2022 ESG Report at 56.

112. The background to the Governance & Sustainability Committee's ESG-risk oversight responsibilities and context of Target's intended alignment with corporate best practices support the meaning of overseeing "social and political issues and risks" that includes the social and political risks of both adopting ESG/DEI mandates and failing to adopt them.

### 3. Target's Board Did Not Oversee Social or Political Risks to ESG Matters

113. Contrary to a reasonable investor's understanding of "social and political issues and risks," and unlike the boards of the companies discussed *supra*, Target's Board instead oversaw only the issues and risks arising from the perceived failure to achieve its ESG and DEI mandates.

114. Rather than overseeing social and political issues and risks to protect shareholder interests by serving Target's customers, Target's Board and the Governance & Sustainability Committee instead focused on potential negative responses by "stakeholders" to Target's perceived failure to achieve ESG and DEI mandates.

115.    In the 2022 Annual Report (which Defendants caused Target to issue), Target elaborated on "stakeholder expectations"-driven ESG and DEI risk:

> *[S]takeholder expectations* regarding environmental, social, and governance matters continue to evolve and are not uniform. We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. *Any failure, or perceived failure, by us to achieve these goals and initiatives* or to otherwise meet evolving and varied stakeholder expectations could adversely affect our reputation and result in legal and regulatory proceedings against us.

(emphasis added).

116.    Target's main concern regarding ESG/DEI-related risk was the failure to meet "stakeholder expectations" concerning its ESG and DEI commitments which could adversely affect the Company.

117.    Risks arising from failure to meet "stakeholder expectations" are not "social or political issues and risks."  "Stakeholder expectation" risk is a separate category of risk arising from negative responses by the Company's "stakeholders."  Target's engagement with activists is not oversight of "social or political issues or risks" arising from the adoption of ESG and DEI commitments.  The purpose of Target's engagements with activist stakeholders is to adopt and implement ESG and DEI mandates regardless of the social or political issues or risks they create for Target.

118.    As evidenced by the Company's focus on "stakeholders" under its ESG/DEI risk framework, the Governance & Sustainability Committee did not oversee social and political issues and risks.

119.    The fact that Target engaged in the uniquely controversial 2023 LGBT-Pride Campaign is evidence of the Board's lack of oversight of social and political issues and risks.

4.     <u>Alternatively, Target's Board Only Oversaw Perceived Social or Political Risks to *Not* Adopting ESG Mandates</u>

120.     Even if the Board's focus on its "stakeholder expectations" and ESG/DEI risk included oversight of social and political issues or risks, the Board's selective focus on issues only associated with the political left rendered misleading the 2023 Proxy's representations that the Board oversaw "social and political issues and risks."

121.     A reasonable investor would conclude that the Governance & Sustainability Committee's oversight of "social and political issues and risks" related to ESG matters would include **any** material risk related to Target's ESG mandates, whether from the failure to achieve ESG mandates or from the pursuit of ESG mandates.

122.     Target instead oversaw only the issues and risks arising from Target's perceived **failure to achieve** its ESG and DEI mandates.

123.     Target further demonstrated its oversight of only select ESG/DEI risks by engaging in an ideologically motivated campaign to restrict books on LGBT issues from a conservative perspective from its stores and other sales platforms. Target engaged in this campaign for no rational purpose despite ongoing political backlash.

124.     Target's "stakeholders" skew heavily in a liberal ideological direction and do not appear to include any culturally or socially conservative groups representative of the average Target shopper.

125.     Even if the phrase "social and political issues and risks" meant only certain pro-ESG "issues and risks," the 2023 Proxy was still misleading because Target omitted to state the material fact that those were the only issues that the Board viewed as material social and political issues and risks arising from Target's ESG/DEI mandates.

**D.      Target's Proxies Contained False and Misleading Statements That Target's ESG and DEI Initiatives Were Designed to Increase Shareholder Value**

126.    Target's 2022 and 2023 Proxies each asserted that the Board acted to advance shareholder interests across all Company transactions, including with respect to ESG/DEI mandates.

127.    The 2022 and 2023 Proxies each communicated that the Board "prefers to maintain the flexibility to determine which leadership structure best serves the interests of Target and our shareholders," and would act to "prohibit any transaction it determines to be inconsistent with the interests of Target and its shareholders."

128.    The 2022 and 2023 Proxies each also stated that the Board's capital allocation strategy "[f]ully invest[s] in opportunities to profitably grow our business, create sustainable long-term value, and maintain our current operations and assets."

129.    These representations were material because a reasonable investor would have understood these statements to clarify that, despite Target's commitment of significant business resources to ESG/DEI mandates, the Board and management remained focused on shareholder value.

130.    Those representations were false because Target's ESG and DEI mandates were formulated and enforced to serve collateral "stakeholder" interests.

131.    Target's ESG/DEI mandates did not contribute to Target's growth.  Target's 2023 Proxy stated that "growth was driven primarily by traffic growth as guests increasingly chose Target as a convenient, reliable one-stop shop."  In the 2022 Annual Report, Defendant Cornell attributed Target's strength in store traffic to its merchandising program, which was focused on consumer purchasing patterns.  Nothing in these descriptions of Target's growth mentioned ESG/DEI.

132. Analysts credit Target's growth before the 2023 LGBT-Pride Campaign to its e-commerce strategy and investments. Forbes reported that Target's "digital comparable sales grew 29% after leaping 155% in Q3 of 2020" while "Amazon's Q3 net sales grew 15% and Walmart's Q3 U.S. e-commerce sales grew 8%." The report did not mention ESG/DEI.

133. Target's Board and management delegated the implementation of Target's ESG and DEI mandates to Target officials who suffered from disabling personal conflicts of interest, including with some of the very activists that Target partnered with in adopting and pursuing the ESG and DEI mandates.

134. For example, Target senior executive Carlos Saavedra served as treasurer at GLSEN (the Gay, Lesbian and Straight Education Network, now known as Glisten), and Target's Executive Vice President and Chief Food and Beverage Officer, Rick Gomez, served on the Board of GLSEN. These positions imposed conflicting duties on those officers and precluded them from implementing Target's ESG and DEI mandates in good faith to advance shareholder interests.

135. The 2023 Proxy's statement that the Board oversaw Target's ESG and DEI mandates to advance shareholder interests was misleading because, in reality, the Board delegated the execution of these mandates to executives who could not advance shareholder value in good faith.

### E. Target's Board Falsely Claimed Executive Compensation Plans Were Designed to Align with Shareholder Value

136. In seeking shareholders' approval of Target's executive compensation plans, the 2022 and 2023 Proxies represented that the plans aligned executives' incentives with maximizing shareholder value when, in fact, the plans were designed to substantially incentivize executives to pursue ESG/DEI mandates.

137. The 2023 Proxy outlined Target's "Executive compensation guiding principles," providing:

> We believe executive compensation should be ***directly linked to performance and long-term value creation for our shareholders***. With that in mind, three principles guide our compensation program:
>
> - Deliver on our pay for performance philosophy in support of our strategy.
> - Provide a framework that encourages ***outstanding financial results*** and shareholder returns over the long-term.
> - Attract, retain, and motivate a premier management team to sustain our distinctive brand and its competitive advantage in the marketplace.

(emphasis added). Target's 2023 Proxy also attested that the executive compensation programs "align with our pay for performance philosophy and are structured based on financial and operational performance and shareholder outcomes."

138.     A reasonable investor would understand these representations to mean that Target's executive compensation was substantially aligned with advancing Target shareholders' pecuniary interests in Target's stock performance, as measured by quantifiable financial performance metrics.

139.     In reality, Target awarded substantial amounts of executive compensation based on its executives' "performance" in satisfying ambiguous and subjective ESG/DEI goals to the detriment of investors.

140.     In fact, substantial sums of executives' compensation were based on Target's own internal and subjective assessment of executives' performance along DEI metrics.

141.     A footnote in the 2023 Proxy further explained that Target's executive compensation included a component ambiguously labeled "STIP" (an acronym the 2023 Proxy never defined, but which stands for "Short Term Incentive Plan"). The 2023 Proxy elaborated on the STIP component of executive compensation in a text box that followed immediately below this footnote, labeled with the subheading "How annual CEO pay is tied to performance":

37

The following pay elements are performance-based and represent a significant percentage of Annual TDC:

- STIP — Payouts range from 0% to 200% of goal depending on Sales, Incentive Operating Income, and the assessment of the team scorecard.

142. In a following section under the heading "Incentive measures and actual performance," the 2023 Proxy provided: "Our STIP is based on a combination of absolute *financial goals* and progress made toward key strategic priorities." (emphasis added).

143. These statements were misleading and deceptive based on a final section of the 2023 Proxy that was buried below the initial declaration that executive compensation was aligned with shareholder value.

144. Under a heading titled "Fiscal 2022 team scorecard assessment," the 2023 Proxy described that the "team scorecard component of the STIP . . . emphasized the business outcomes we expect from the execution of strategic priorities." Those priorities, or "specific team scorecard progress indicators," included that designated executives "advance[d] progress on our new three-year enterprise DE&I goals." Target's DEI goals were not mentioned in the guidelines for executive compensation.

145. This conflicting information in the 2023 Proxy rendered Target's representation that its executive compensation was aligned with shareholder value misleading. At the very least, Target's 2023 Proxy misleadingly minimized and obfuscated the outsized influence that ESG/DEI goals had on executive compensation, giving the false impression that such compensation was overwhelmingly tied to Target's financial performance.

**RULE 10B-5 SCIENTER AND RULE 14A-9 NEGLIGENCE ALLEGATIONS**

146. All Defendants were negligent in issuing the foregoing false and misleading statements in violation of Section 14(a) of the Exchange Act. Defendants were aware, or should have been aware, of red flags pertaining to potential and actual harm to Target caused by consumer

38

backlash to its ESG/DEI mandates.  Defendants were on notice that Target was subject to unique and specific risk due to its activism on LGBT political issues because Target had been the subject of a large customer boycott that was organized following Target's response to the North Carolina transgender bathroom law, another LGBT political issue.

147.    With respect to the separate claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, the facts below establish the relevant Defendants' required states of mind.

### A.    Defendant Cornell

148.    Defendant Cornell was motivated to mislead investors about the risks associated with Target's ESG/DEI mandates because his compensation was partly based on Target's advancement of ESG/DEI initiatives like the 2023 LGBT-Pride Campaign.

149.    Defendant Cornell's signing of the 2019 Business Roundtable Statement of Purpose, in his capacity as Target "Chairman & CEO," demonstrated his awareness that he and Target were committed to "stakeholder" benefits that excluded oversight of social and political risks of backlash to such stakeholder benefits.  Signatories pledged to make "a fundamental commitment to <u>all</u> of our stakeholders," that "[e]ach of our stakeholders is essential," and to "commit to deliver value to all of them."  *Statement on the Purpose of a Corporation*, Bus. Roundtable (Aug. 19, 2019) (emphasis added).  Defendant Cornell and Target thus pledged to value the interests of "stakeholders," even at the expense of shareholders.

150.    In response to a subsequent shareholder proposal for the Board to provide its "perspective regarding whether and how our Company's governance and management systems can or must be altered to fully implement the [Business Roundtable] Statement of Purpose," Target responded that its "governance and management systems" had "already fully implement[ed]" that Statement.

151. Knowing that both he and Target would manage Target to benefit "stakeholders," Defendant Cornell knew that he, Target, and the Board would fail to oversee risks from groups excluded from Target's definition of "stakeholders."

152. Defendant Cornell was also aware that he and Target's Board did not oversee risks of backlash to Target's ESG/DEI mandates because he viewed those mandates as part of his role and implemented them for their social value regardless of risk.

153. Defendant Cornell knew Target was subject to customer backlash from its activism on LGBT political issues because he served on the Board and as CEO during Target's 2016 response to the North Carolina transgender bathroom law, during which he admitted Target "didn't adequately assess risk," causing consumer backlash that caused Target significant losses. More than 1.5 million customers vowed to boycott Target as a result of Target's opposition to the bathroom law.

154. Defendant Cornell knew of the risk of customer backlash to Target's ESG and DEI activism. As CEO, Defendant Cornell was privy to Target's positions on ESG and DEI matters and their effect on the Company.

155. Defendant Cornell admitted his awareness of "backlash" to corporate "social justice" efforts. An interview with Defendant Cornell published May 17, 2023 provided the following:

> [Interviewer 1]: What's your take on some of the pushback now on you know, so called "woke" capitalism ... We saw so many CEOs like yourself stand up during this really challenging time in our society, when a lot kind of bubbled to the surface. ... We saw a lot of statements, a lot of partnerships sparked different programs and initiatives. ***And now we're seeing a lot of backlash, not just on the social justice side, but kind of woke capitalism in general***. What is your take on it? How do you approach it? How do you answer those criticisms?
>
> [Defendant Cornell]: You know, I start every day thinking about our company purpose and our company culture. So when we think about

40

purpose at Target, it's really about helping all the families, and that "all" word is really important. How to discover that little bit of joy in everyday life. Our brand is all about delighting and taking care of the families we serve, and all those families, most of America shops at Target. So we want to do the right thing to support families across the country. ***And when it's true to our purpose and true to our culture, we lean in. And I'm really proud of the work we've done in the DE&I space***. Now, the fact that we talked about almost 2,000 stores, well, half of those stores are run by female store directors. Over 40% of our store directors are diverse. That component is so important, but it also reflects the consumer we serve. And when your team, your leadership represents the consumer you serve, I think good things happen. So I can see the benefits for our shareholders. ***I know that focus on diversity and inclusion and equity has fueled much of our growth over the last nine years.*** But when you walk into a store and you feel at home, and it represents the community, it makes a huge difference. . . ***I think those are just good business decisions, and it's the right thing for society, and it's the great thing for our brand.***

[Interviewer 2]: Okay, but Brian, that was very compelling. You gave a very compelling answer to Michal's question without saying anything about politics or politicians. But what we're talking about is a political movement here that's trying to take what you just described, and turn it into a wedge issue. ***You exist in the political world. How do you deal with that?*** Do you just do what you just did there and stay out of it? How do you deal with what's happening in politics?

[Interviewer 1]: I should point out you're in Florida right now. Good thing you're not with Disney. But still?

 . . .

[Defendant Cornell]: I go back to, we start with what's right for the company purpose and that focus on families. We think about what's right for our team, and what's consistent with our culture. And Alan, when we do that, I think we make really good decisions. And we add value for our shareholders. And that's part of why we've seen explosive top-line growth. So, I think the facts are in, the results for us, and the things we've done from a DE&I standpoint, it's adding value, it's helping us drive sales, it's building greater engagement with both our teams and our guests. And those are just the right things for our business today.

Fortune Editors, *Target CEO: DEI Has 'Fueled Much of Our Growth Over the Last 9 Years,'*

Fortune (May 17, 2023) (emphasis added).

156. Defendant Cornell was aware of the "teams working on Pride" prior to the Campaign's launch. Given the 2023 LGBT-Pride Campaign's content, Defendant Cornell would have been aware of the risks of consumer backlash to the Campaign.

157. Defendant Cornell knew about the Board's lack of oversight of ESG/DEI risk because he managed a senior executive team that pushed the 2023 LGBT-Pride Campaign without regard for those risks.

158. Defendant Cornell also acknowledged his awareness of the heightened risk of consumer backlash to the 2023 LGBT-Pride Campaign because of the increasingly hostile consumer environment for LGBT marketing strategies. Defendant Cornell stated he was aware that Target made the 2023 LGBT-Pride Campaign "prominent in an environment where people had points of view" against LGBT marketing strategies like the Campaign. CNBC Transcript (Nov. 2, 2023), *supra.*

159. Defendant Cornell's scienter is further evidenced by his substantial sales of Target stock through a trust for which Defendant Cornell and his spouse serve as trustees. Before the November 20, 2024 corrective disclosure revealed the full extent of the adverse impact of the Pride campaigns on Target's business, Cornell, through his trust, sold 165,000 shares of Target stock in four transactions between August 22, 2023 and August 28, 2024, for proceeds exceeding $25.4 million. These discretionary sales were not made pursuant to a Rule 10b5-1 trading plan, occurred while the market remained unaware of the full extent of the harm caused by Defendants' ESG/DEI strategy and the 2023 LGBT-Pride Campaign, and further support a strong inference of scienter. Notably, neither Cornell nor his trust made any discretionary sales of Target stock during the twelve months preceding the Class Period.

### B. Defendant Target

160. Defendant Target knew by and through Defendant Cornell, who, along with other senior Target executives, was responsible for making the false and misleading statements detailed

herein, that Target was subject to the material risk of consumer boycotts in response to Target's ESG/DEI mandates and the 2023 LGBT-Pride Campaign; that Target's Board did not oversee those risks; that Target was not being managed to advance shareholder value; and that Target's executive compensation was not aligned with shareholder value.

### **RULE 10B-5 LOSS CAUSATION**

161. Lead Plaintiffs were damaged as a result of Defendants' misleading statements. From the start of the Class Period through November 20, 2024, the day after its conclusion, Target's stock price *was down 43%,* while its main rival and peer, Walmart, *was up 87%.* Likewise, the S&P 500 Index was up over 40% during this same time period. The bulk, if not entirety, of the underperformance began after the backlash from the DEI initiatives in May 2023.

162. The declines in Target's stock price beginning May 17, 2023, including, but not limited to, the declines summarized below, are directly attributable to the market absorbing information correcting Defendants' misrepresentations and omissions and/or the materialization of risks concealed by Defendants from Target's investors and shareholders.

163. Lead Plaintiffs suffered substantial economic losses as the price of Target's stock fell in response to the issuance of partial corrective disclosures and/or the materialization of risks concealed by the Defendants from Target's investors and shareholders. The following corrective disclosures caused Target's stock to drop, thereby damaging investors.

164. During the Class Period, as detailed herein, Lead Plaintiffs and the Class purchased Target common stock at artificially inflated prices and were damaged thereby. The price of the Company's common stock significantly declined when the misrepresentations reached the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses. As a result of their purchases of Target common

stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**A.    Losses Suffered During and in the Immediate Wake of the 2023 LGBT-Pride Campaign**

165.    The large, protracted consumer boycotts staged in response to Target's 2023-LGBT Pride Campaign served as corrective disclosures and/or risk materialization events that revealed (i) risks to Target from its ESG/DEI initiatives, (ii) risks to Target from the 2023 LGBT-Pride Campaign, (iii) the Board's lack of oversight of these risks, (iv) the true motives underlying the Board's adoption of its ESG/DEI initiatives, *i.e.*, not to enhance shareholder value, and (v) repeating material consumer backlash.  These disclosures also began to reveal the true effect of the Campaign on Target's financial results and the falsity of Cornell's claims of purported caution and conservatism in management of Target's operations.

166.    On May 18, 2023, the American Family Association, one of the leading organizations supporting the boycott, published a blog post encouraging consumers to "officially join with the 1.57 million others who have pledged to boycott Target." Monica Cole, *Target Indoctrinates Youth*, Am. Fam. Assoc'n (May 18, 2023). Target's stock began its record decline that same day, dropping $6.78, or 4.21%.  By May 26, 2023, Barron's reported that "[s]hares of Target were on pace to close the week at their lowest levels in nearly three years.  The seven-day selloff is partially about earnings, and partially about a decision to adjust its LGBTQ+ Pride Month Collection."  The article continued noting that Target's shares were "on track for their lowest close since August 2020."

167.    On May 24, 2023, Defendants Cornell and Target made statements that acknowledged the controversy surrounding the 2023 LGBT-Pride Campaign.  Specifically, Target announced that it had removed Pride merchandise associated with the most serious confrontations, allegedly because of threats affecting employees' safety and well-being, while reaffirming its

44

commitment to the LGBTQIA+ community. Target Statement on 2023 Pride Collection (May 24, 2023). However, as discussed above, Target employees were unaware of any threats and Target management explained the merchandise changes as being driven by sales goals, not employee safety. *See supra* ¶ 92. These statements concealed the scope and intensity of the consumer backlash to the Campaign and impaired the market's ability to process information about the backlash.

168. In the five days including and after the May 24 remarks, Target's share price declined by over 11%, dropping from $147.16 to $130.93.

169. Over a more extended period, the price of Target's stock declined from $160.96 at the market close on May 17, 2023 to $133.23 at the market close on June 14, 2023. In stark contrast, Target's peers saw their stock prices increase during the same period. For example, from May 17, 2023, to June 14, 2023, Walmart common stock (NYSE: WMT) increased from a price of $149.53 to $156.87 and Costco Wholesale Corporation (NASDAQ: COST) saw its common stock increase from $495 to $527.20.

170. The *New York Post* attributed this loss to the 2023 LGBT-Pride Campaign, noting that Target had lost $10 billion in market valuation over May 18–28, 2023 due to parents' backlash over the company's LGBT-themed clothing line for children, its "longest losing streak in 23 years." James Rogers, *Target's Stock, on Its Longest Losing Streak in 23 Years, Downgraded at JPMorgan*, Market Watch (June 1, 2023); *see also* Ronny Reyes, *Target Loses $10B in 10 Days as Stocks Fall Following Boycott over LGBTQ-Friendly Kids Clothing*, New York Post (May 28, 2023).

**B.      The Disclosure of Target's Q2 2023 Earnings Report Release and Investor Call**

171. Defendant Cornell and other executives revealed additional information about the scope and effect of the consumer backlash to the 2023 LGBT-Pride Campaign on Target's Q2 2023 earnings report call on August 16, 2023. On that call, Defendants and other Target executives

revealed that the 2023 LGBT-Pride Campaign had harmed the Company's earnings and other financial metrics. Defendants also revealed that Target's removal and relocation of LGBT Pride-themed merchandise actually aimed to mitigate the strategic errors Target made with the 2023 LGBT-Pride Campaign rather than just respond to isolated threats. Specifically, Target stated that future Pride and Heritage Month campaigns would emphasize broad relevance, more careful timing, placement and presentation, geographic segmentation, digital availability, and reconsideration of the mix of owned brands, national brands, and outside partners.

172.    In the August 16, 2023 press release announcing Target's second quarter earnings, Cornell acknowledged "softer-than-expected sales" without acknowledging or quantifying the effect of the ill-advised Pride Campaign on sales and demand. Cornell continued to tout Target's "cautious approach to planning our business" despite the material and continuing effect of the reckless 2023 LGBT-Pride Campaign.

C.    **The Full Truth Is Revealed**

173.    By May 2024, Target limited its Pride collection to Target.com and select stores based on historical sales performance, while continuing its Pride+ Business Council, employee resources and benefits, Pride-event participation, nonprofit support, and promotion of LGBTQ-owned brands. Target, *Target Shares Plans for Pride 2024* (May 31, 2024). However, the Company was experiencing operational and inventory issues, as well as slower sales, as a result of the lingering effects of the Pride campaigns.

174.    The full truth was revealed on November 20, 2024, when, before the market opened, Target slashed its earnings and guidance. Target announced weak financial results with fiscal Q3 earnings of $1.85 per share versus Street estimates of $2.30 per share, while its operating margin of 4.6% trailed a forecast of 5.6%. As far as guidance, Target's adjusted EPS guidance of between $1.85 and $2.45 per share was well below the consensus estimate of $2.65. This $1.85

compared with $2.10 in the same quarter of 2023, a decline of 11.9%. The Company also reported disappointing guidance, including "approximately flat comparable sales."

175.   This news caused the price of Target's stock to drop precipitously, from a close of $156 on November 19, 2024 to a close of $121.72 on November 20, 2024, a decline of 22%, wiping out $16 billion in market capitalization. These disappointing earnings and guidance were announced as Target continued to grapple with lingering effects of its ill-advised ESG/DEI campaigns.

176.   Analysts excoriated the Company. Wells Fargo noted that an "[earnings per share] miss and guide down of this magnitude was certainly a big surprise," and that "there seems to be operating/inventory challenges." Further, this analyst noted that Target was "Back in the Penalty Box," and that the update "is likely to raise major questions . . . especially given the strong performance of peer [Walmart]." JPMorgan noted the "sizable miss and guide down" and highlighted that Target "carrying higher levels of inventory weighed on results and the margin guide." Daiwa downgraded the stock to Neutral, noting "the stock price does not feel overvalued or cheap when considering the uncertainty of the results."

177.   On November 21, 2024, Bloomberg published an article titled "Target's Problem Isn't the Economy – It's Target," noting that "while competitors are flourishing, the big-box retailer just can't stop getting in its own way." The article noted:

> Perhaps the most concerning, and unexpected, element of the report was Target's failure to convince investors that it is finished creating self-inflicted wounds. The biggest of those were the inventory snafus of 2022. They were the result of the retailer's 2021 decision to stock up to keep shelves full amid pandemic-related supply-chain snarls. When those deliveries arrived — in the following spring — consumers had just started pulling back amid soaring inflation. Although Walmart (and others) made the same mistake, the world's biggest retailer has bounced back. ***Target has not, due in part to other missteps, such a bungling the response to last year's backlash over its Pride Month collection***. (emphasis added).

47

178.    On November 27, 2024, *The Wall Street Journal* published an article titled "Target Misfires with Shoppers," noting that "[s]hoppers are falling out of love with Target."  The article stated that Target sales were in a "funk" and "losing ground to both Walmart and Amazon.com," and that "[t]he Company's comparable sales growth – a tally of spending in established and from online orders – has lagged behind Walmart, its bigger rival, for 11 straight quarters."  The article also noted that some customers were shopping at the chain less because "[s]ome say they are still upset about a Pride month collection in 2023 that they felt went too far."

### RULE 14A-9 TRANSACTION AND LOSS CAUSATION

**A.    Transaction Causation: Shareholders' Re-election of Directors on the Basis of False Statements Regarding ESG-Risk Management Competencies**

179.    As a result of the false and misleading 2022 and 2023 Proxies, Target shareholders voted to re-elect the Directors to the Board.

180.    The re-election of Target's Directors in 2022 and 2023 was an essential link in causing the 2023 LGBT-Pride Campaign and the resulting economic losses to Lead Plaintiffs and other Target shareholders.

181.    Given the likely time it would have taken for Target management to plan and execute the 2023 LGBT-Pride Campaign, Board level oversight of the social and political risks of the Campaign occurred after the 2022 annual meeting held on June 8, 2022 (the "2022 Annual Meeting").

182.    The 2022 Annual Meeting was the first meeting after Target's Board overhauled its Board Committee structure and was therefore the first opportunity shareholders had to consider director candidates in light of the Governance & Sustainability Committee's purported oversight of social and political issues and risks.

183.    In the 2022 Proxy, unlike in previous proxy statements, Target included a line item in its director "skills and diversity matrix" that highlighted the director-candidates' "ESG

Understanding" or "[k]nowledge or experience that contributes to the Board's understanding of one or more ESG matters affected by our business." Nine of the eleven non-company employee directors on the Board were included in that category.

184. The 2022 Proxy's matrix also included a director skill, attributed to all eleven nominees, of "Reputation Management" defined as "[e]xperience in community relations, public service, government affairs, [and] corporate governance."

185. The 2023 annual meeting was held on June 14, 2023 (the "2023 Annual Meeting"), amid the 2023 LGBT-Pride Campaign customer backlash and during Target's lingering stock-price decline. The Target Board's purported oversight of social and political issues and risks was a central issue of the Directors' reelection.

186. The 2023 Proxy called for Directors' re-election by expanding on the 2022 Proxy's attribute of "ESG Understanding" with an attribute labeled "ESG," which denoted the directors' "[e]xperience in strategies supporting sustainable long-term value creation or any matters included in our ESG priorities; actively supervising someone performing similar functions; or on a board of directors overseeing any matters included in our ESG priorities."

187. The 2023 Proxy marked ten of the eleven independent directors with this new "ESG" attribute in calling for their re-election.

188. The 2023 Proxy's director skills and diversity matrix also notably updated its definition of "Reputation Management" to include "[e]xperience in . . . *crisis response*." (emphasis added).

189. The 2023 Proxy also added language to each of the Defendants' biographies not previously included in Target's proxy statements, noting Defendants' skills that "enhanc[e] . . . the Board's collective oversight capability."

190.     These representations put into issue and misrepresent the Board's competence to manage social and political issues and risks arising from Target's pursuit of social initiatives and contributed to shareholders re-electing directors on that basis.

191.     Instead of attempting to reverse the damage caused by the Campaign, immediately after the Directors were re-elected, Target continued the Campaign, causing further damage to Target's stock price and enabling continuing consumer backlash.

192.     While each of the director nominees was elected at the 2023 Annual Meeting, shareholder voting support for all director nominees in the aggregate declined compared to the 2022 Annual Meeting.

193.     The election of the Directors to the Board in 2022 and 2023 enabled the 2023 LGBT-Pride Campaign by electing a Board that failed to oversee the Campaign's risks or mitigate those risks.

194.     The Directors' conduct in allowing the preparation of the 2023 LGBT-Pride Campaign and failing to oversee social and political issues and risks preceded and continued after their election to the Board at the 2022 Annual Meeting.

195.     Lead Plaintiffs and other investors would have voted against the re-election of Directors to the Board if they had been told the truth of the Board's allowing of the 2023 LGBT-Pride Campaign and lack of oversight of social and political issues and risks.

**B.     Transaction Causation: Shareholders' Rejection of Good-Governance Shareholder Proposals**

196.     As a result of Target's misleading 2022 and 2023 Proxies, shareholders voted to reject good-governance proposals that would have increased Board accountability and enabled enhanced oversight of ESG/DEI initiatives like the 2023 LGBT-Pride Campaign.  Specifically, the proposals considered would have allowed shareholders to more easily nominate candidates for

election to the Board and separate the positions of CEO and Board Chairman currently combined and held by Defendant Cornell.

197. Had Target been forthcoming about its Board's and Defendant Cornell's failures of risk oversight and had these proposals been adopted, Target would not have failed to oversee ESG/DEI risks.

198. As a result of the issuance of the misleading 2022 Proxy, Target shareholders rejected a proposal to enable shareholders to more easily nominate candidates for election to the Board (the "Director Nomination Proposal").

199. Target's bylaws required that, in order for a shareholder or group of shareholders to be eligible to nominate a candidate for election to the Board, the shareholder or group must own at least 3 percent of Target's outstanding stock and, as a group, not exceed more than 20 shareholders. The Director Nomination Proposal sought to "enable as many shareholders as may be needed" to combine their shares in order to nominate director candidates.

200. The proposed change was intended to "serve[] as a guardrail to make sure that management elects the best directors" by improving shareholders' remedies if Target's "management does not engage in good faith."

201. The Board opposed the Director Nomination Proposal and recommended that Target shareholders vote against it. In opposing the proposal, the Board stated that it was "committed to being accountable to shareholders and has shown that commitment through both its policies and practices."

202. In reliance on the 2022 Proxy and the Board's statements regarding its ability to manage risk, shareholders defeated this proposal.

203.    Similarly, the false and misleading 2023 Proxy caused Target shareholders to reject a proposal to separate the positions of CEO and Board Chairman (the "Independent Chairman Proposal").

204.    The Independent Chairman Proposal noted that Target had not yet adopted this corporate governance "best practice" and that Target's current arrangement allowed the Chairman/CEO to "ignore the advice and feedback" from independent directors, suggesting Target "does not take the role of lead director seriously."

205.    In recommending that shareholders vote against the proposal, the 2023 Proxy stated:

> The Board believes that its current leadership structure and governance practices provide effective, independent oversight without mandating a predetermined Board leadership structure . . . The Lead Independent Director role provides effective, independent leadership through its clearly defined and robust set of roles and responsibilities.

In reliance on the 2023 Proxy and the Board's representation of its competence as to risk management, shareholders defeated this proposal.

206.    This was also an essential link to the 2023 LGBT-Pride Campaign because it permitted Defendant Cornell to maintain outsized influence over the Board, setting him up to promote his agenda and prevent the Board's proper oversight of social and political issues and risks arising from his management's engagement in the 2023 LGBT-Pride Campaign.

207.    The Independent Chairman Proposal would have removed Defendant Cornell from the Board and thereby removed a chief source of Target's pro-ESG/DEI initiatives, allowing for improved oversight.

**C.    Separate and Independent Transaction & Loss Causation: Shareholders' Approval of Unauthorized and Excess Executive Compensation**

208.    At both the 2022 and 2023 Annual Meetings, shareholders approved "Say on Pay" items for Target's executive compensation plan proposals in reliance on misleading statements and disclosures in the 2023 Proxy. At the meeting, shareholders approved the following resolution:

52

> Resolved, that the shareholders approve the compensation awarded to the [Named Executive Officers], as described in the [Proxy Statement], tabular disclosures, and other narrative executive compensation disclosures in the 2023 [and 2022] Proxy Statement.

209. Shareholders' approval of each executive compensation plan was an essential link in causing the 2023 LGBT-Pride Campaign and Lead Plaintiffs' losses resulting from it.

210. The executive compensation plan approved by shareholders materially incentivized Target executives to advance Target's ESG/DEI goals, which the 2023 LGBT-Pride Campaign also advanced.

211. For the executive compensation approved at the 2022 Annual Meeting, performance along the "three-year enterprise DE&I goals" on which Target's executive compensation was based included meeting spending targets with "diverse suppliers."

212. For the executive compensation approved at the 2023 Annual Meeting, performance along the "three-year enterprise DE&I goals" on which Target's executive compensation was based included Target's goal to "increase relevance with diverse guests" and "offer more products from diverse suppliers."

213. Target's management, including Defendant Cornell, also would have reasonably expected that engaging in the 2023 LGBT-Pride Campaign would improve their outcomes under the Team Scorecard for DEI progress, and thereby materially increase their compensation.

214. The shareholder approval of the executive compensation plans in both the 2022 and 2023 Proxies, also authorized the execution of corporate spending that caused an independent harm to Target and Target shareholders by paying Target Named Executive Officers ("NEOs") unauthorized compensation and excess compensation.

215. In reliance on the misleading executive compensation disclosures, Target paid executives (including Defendant Cornell) compensation that was not validly approved by shareholders. At the 2022 Annual Meeting, Target shareholders approved over $42.8 million in

compensation to Target NEOs.  At the 2023 Annual Meeting, Target shareholders approved over $36.9 million in compensation to Target NEOs.

216.    In the 2022 executive compensation plan, NEOs received over $2.5 million in STIP payouts for the "team scorecard component" that included progress on DEI goals.  In the 2023 executive compensation plan, executives received over $1.5 million in STIP payouts for the "team scorecard component" that included progress on DEI goals.

217.    Target secured shareholder approval of these sums via misleading proxy statements that tainted the shareholder approval process and renders these amounts unauthorized by shareholders.

218.    The payment by Target of such unauthorized and excess sums harmed Target shareholders, including Lead Plaintiffs, by interfering in Target's proper corporate governance, wasting corporate assets, and incentivizing value-destroying behavior by Target's executives.

**D.    Loss Causation**

219.    The election of the Directors to the Target Board, coupled with the unauthorized payment of executive compensation, damaged investors by causing further stock price declines.  Specifically, because the 2022 Proxy and 2023 Proxy each contained misleading statements, investors elected a Board that failed to exercise proper oversight of the 2023 LGBT-Pride Campaign and associated risks. The result of this was that the Company's reputation was damaged, and customers boycotted the Company, leading to a decline in sales and demand.  These events, in turn, resulted in a steady decline of the price of Target's stock from March 9, 2022 (when the stock price closed at $216) to November 20, 2024 (when the stock price closed at $121.72).  If a Board had been elected that was prepared to exercise proper oversight of the risks associated with the 2023 LGBT-Pride Campaign, Target's stock price would not have declined throughout this period.

220.    Customers never returned to Target following the 2023 and 2024 Pride Campaigns. Target continued to suffer from declining demand and weak revenues.  On November 20, 2024,

Target announced that its GAAP-adjusted earnings per share were $1.85, compared with $2.10 in the same quarter of 2023, a decline of 11.9%. The Company also reported disappointing guidance, including "approximately flat comparable sales."

221.    This news caused the price of Target's stock to drop precipitously, from a close of $156 on November 19, 2024 to a close of $121.72 on November 20, 2024, a decline of 22%.

## CLASS ACTION ALLEGATIONS

222.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Target common stock between March 9, 2022 and November 19, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

223.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Target's shares actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Target shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Target or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

224.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

225. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

226. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and prospects of Target;

(c) whether Defendants acted with the requisite state of mind for each count alleged; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

227. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

228. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading

may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Target who knew that the statement was false or misleading when made.

## PRESUMPTION OF RELIANCE

229. The market for Target's common stock was open, well-developed and efficient at all relevant times. As a result of the materially false or misleading statements, Target's common stock traded at artificially inflated prices during the Class Period. Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Target's common stock and market information relating to Target, and have been damaged thereby.

230. During the Class Period, the artificial inflation of Target's stock was caused by the material misrepresentations particularized in this Complaint causing the damages sustained by Lead Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made, or caused to be made, a series of materially false statements about Target's business, prospects, and operations. These material misstatements created an unrealistically positive assessment of Target and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and

misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

231.   At all relevant times, the market for Target's common stock was an efficient market for the following reasons, among others:

(a) Target shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Target filed periodic public reports with the SEC and/or the NYSE;

(c) Target regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Target was followed by common stock analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

232.   As a result of the foregoing, the market for Target's common stock promptly digested current information regarding Target from all publicly available sources and reflected such information in Target's share price. Under these circumstances, all purchasers of Target's common stock during the Class Period suffered similar injury through their purchase of Target's common stock at artificially inflated prices and a presumption of reliance applies.

## CAUSES OF ACTION

### COUNT I
**For Violations of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Against Defendants Target and Cornell**

233.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

234.    During the Class Period, Defendants Target and Cornell carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Target's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants Target and Cornell took the actions set forth herein.

235.    Defendants Target and Cornell (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Target's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

236.    Defendants Target and Cornell, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Target's business, operations, financial condition, and prospects, as specified herein.

237.    Defendants Target and Cornell employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Target's value and performance, which included the making of, or the participation in the making of, untrue statements of material facts about Target and its business operations, and risks thereto, and future

59

prospects, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

238.    Defendant Cornell's primary liability and controlling person liability arises from the following facts: (i) Defendant Cornell was the CEO of the Company during the Class Period and had complete control over the Company's public statements and filings; (ii) Defendant Cornell was privy to, and in fact personally directed, the creation and reporting of the Company's public filings; and (iii) Defendant Cornell was aware of the Company's dissemination of false information to the investing public which he knew and/or recklessly disregarded was materially false.

239.    Defendant Cornell had actual knowledge of the misrepresentations of material facts set forth herein, or acted with reckless disregard for the truth in that he failed to ascertain and to disclose such facts, even though such facts were available to him.  Defendant Cornell knowingly and/or recklessly made material misrepresentations for the purpose and effect of concealing risks to Target's business, operations, financial condition, and prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by the misstatements concerning the Company's business, operations, strategies, financial condition, and prospects throughout the Class Period, Defendant Cornell, and Defendant Target through its officers and agents, either had actual knowledge of the misrepresentations or were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false.

240.    Defendant Cornell signed and Defendant Target issued the misleading 2021 Annual Report, 2022 Annual Report, 2022 Proxy, and 2023 Proxy.  As a result of the dissemination of the materially false information, as set forth above, the market price of Target's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the

Company's common stock were artificially inflated, and relying directly or indirectly on the false statements made by the Defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants Target and Cornell, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired Target's common stock during the Class Period at artificially high prices and were damaged thereby.

241.   At the time of said misrepresentations, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Target was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Target common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

242.   By virtue of the foregoing, Defendants Target and Cornell violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

243.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against Defendant Cornell

244.   Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

245.   Defendant Cornell was a controlling person of Target within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his position as CEO of the Company,

61

and his ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, Defendant Cornell had the power to influence and control and did influence and control, directly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false. Defendant Cornell was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be false prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

246.    In particular, Defendant Cornell had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.

247.    As set forth above, Defendant Cornell violated Section 10(b) and Rule 10b-5 by his acts as alleged herein. By virtue of his position as a controlling person of Target, Defendant Cornell is secondarily liable pursuant to Section 20(a) of the Exchange Act for the acts of Target. As a direct and proximate result of Defendant Cornell's wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**<u>COUNT III</u>**
**For Violations of Section 14(a) of the Exchange Act**
**and SEC Rule 14a-9 Against All Defendants**

248.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

249.    Lead Plaintiffs bring this claim as a direct claim against Defendant Target and the Individual Defendants, including Defendant Cornell, for violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

62

250.    Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under § 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

251.    The Individual Defendants caused to be issued, and Defendant Target issued, the misleading 2022 and 2023 Proxies soliciting shareholder votes on their behalf.

252.    When Lead Plaintiffs purchased the stock and throughout the period of their ownership, the Individual Defendants and Target disseminated the false and misleading 2022 and 2023 Proxies, which made false and misleading statements of material fact and which failed to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9.

253.    As a result of Defendants' preparation, review, and dissemination of the 2022 and 2023 Proxies, Lead Plaintiffs have suffered substantial harm.

254.    Because of such misconduct, Defendants are liable pursuant to Section 14(a) of the Exchange Act and Rule 14a-9.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Declaring that Defendants Target and Cornell violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; that Defendant Cornell violated Section 20(a) of the Exchange Act; and that Defendant Target and the Individual

63

Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(c)     Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally to the extent permitted by law, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(d)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: August 6, 2026                             Respectfully Submitted,

*/s/ Erick G. Kaardal*                            */s/ Karin E. Fisch*
Erick G. Kaardal (MN 229647)                      Karin E. Fisch (*pro hac vice*)
**MOHRMAN, KAARDAL & ERICKSON,**                  Vincent J. Pontrello (*pro hac vice*)
**P.A.**                                          **GRANT & EISENHOFER P.A.**
150 South Fifth Street, Suite 3100                485 Lexington Avenue
Minneapolis, Minnesota 55402                      New York, NY 10017
(612) 465-0927                                    (646) 722-8500
kaardal@mklaw.com                                 kfisch@gelaw.com
                                                  vpontrello@gelaw.com
*Local Counsel*

                                                  */s/ Jared Kelson*
                                                  Jared Kelson (*pro hac vice*)
                                                  **BOYDEN GRAY PLLC**
                                                  800 Connecticut Avenue NW, Suite 900
                                                  Washington, DC 20006
                                                  (202) 955-0620
                                                  jkelson@boydengray.com

                                                  *Lead Counsel for Lead Plaintiffs*

                                                  JAMES UTHMEIER
                                                  Attorney General
                                                  State of Florida

R. Scott Palmer (*pro hac vice*)
Chief of Complex Enforcement
PL-01 The Capitol
Tallahassee, FL 32399-1050
(850) 414-3847
Scott.Palmer@myfloridalegal.com

Jason Gonzalez (*pro hac vice*)
**LAWSON HUCK GONZALEZ, PLLC**
101 E College Avenue, 5th Floor
Tallahassee, FL 32301
(850) 825-4334
jason@lawsonhuckgonzalez.com

Emily Percival (*pro hac vice*)
**AMERICA FIRST LEGAL
  FOUNDATION**
611 Pennsylvania Avenue SE, #231
Washington, D.C. 20003
(904) 540-5921
emily.percival@aflegal.org

*Additional Counsel for Lead Plaintiffs*

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

I, Stacey L. Wideman, on behalf of the State Teachers Retirement System of Ohio ("Ohio STRS"), hereby certify as follows:

1.      I am the Chief Legal Officer of Ohio STRS.  I am fully authorized to enter into and execute this certification on behalf of Ohio STRS.

2.      I have reviewed the consolidated complaint against Target Corporation ("Target") and others alleging violations of the federal securities laws and have authorized its filing.

3.      Ohio STRS did not purchase or acquire the securities of Target at the direction of counsel or in order to participate in any private action.

4.      Ohio STRS is willing to serve as a representative party on behalf of the proposed Class, including providing testimony at deposition and trial, if necessary.

5.      Attached as Schedule A to this certification is a list of Ohio STRS's transactions during the relevant period in the securities that are the subject of this matter.

6.      During the three-year period preceding the date of this certification, Ohio STRS has sought to serve as a representative party on behalf of a class asserting claims under the federal securities laws as follows:

    a. *Ohio Carpenters Pension Fund v. Globant S.A. et al.*, No. 26-cv-3405 (S.D.N.Y.) (lead plaintiff motion pending);

    b. *Boston Ret. Sys. v. DexCom, Inc.*, No. 25-cv-3284 (S.D. Cal.) (voluntarily dismissed before lead plaintiff appointment); *Prime v. DexCom, Inc. et al.*, No. 25-cv-8912 (S.D.N.Y.), consolidated with *Oakland Cty. Emps. Ret. Sys. et al. v. DexCom, Inc. et al.*, No. 25-cv-9370 (S.D.N.Y.) (not appointed lead plaintiff);

    c. *State Teachers Ret. Sys. of Ohio v. ZoomInfo Technologies*, No. 24-cv-5739 (W.D. Wash.) (appointed lead plaintiff); and

    d. *Coleman v. Charles River Laboratories Int'l, Inc.*, No. 23-cv-11132 (D. Mass.) (appointed lead plaintiff).

7.      Ohio STRS will not accept any payment for serving as a representative party on behalf of the proposed class beyond its *pro rata* share of any recovery, except as ordered or approved by the court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and accurate.


Executed this 4th day of August 2026.



_____
Stacey L. Wideman, Chief Legal Officer
*State Teachers Retirement System of Ohio*

## Target Corp. -- Schedule A
## State Teachers Retirement System of Ohio

**Cusip:** 87612E106
**Ticker:** TGT
**Class Period:** March 9, 2022 through November 19, 2024

**Beginning Holdings:** 268,544 shares

| Purchases | | | | Sales | | |
|---|---|---|---|---|---|---|
| **Trade Date** | **Quantity** | **Price** | | **Trade Date** | **Quantity** | **Price** |
| 06/17/22 | 60,000 | $140.29 | | 03/17/22 | 4,527 | $218.00 |
| 09/16/22 | 23 | $164.09 | | 03/18/22 | 2,833 | $226.05 |
| 09/16/22 | 206 | $164.09 | | 03/18/22 | 82 | $226.05 |
| 09/21/22 | 20,000 | $162.60 | | 03/18/22 | 2,188 | $226.05 |
| 10/24/22 | 10,000 | $160.24 | | 03/24/22 | 14,305 | $217.46 |
| 11/18/22 | 35,000 | $162.48 | | 05/24/22 | 3,289 | $149.95 |
| 11/22/22 | 30,000 | $156.25 | | 06/17/22 | 1,237 | $139.30 |
| 12/16/22 | 22 | $146.45 | | 06/21/22 | 3,665 | $141.66 |
| 12/16/22 | 681 | $146.45 | | 06/21/22 | 3,266 | $143.37 |
| 03/01/23 | 25,000 | $162.46 | | 06/24/22 | 1,841 | $150.42 |
| 03/17/23 | 16 | $159.36 | | 06/24/22 | 269 | $150.42 |
| 03/17/23 | 360 | $159.36 | | 06/27/22 | 1,638 | $150.68 |
| 09/15/23 | 17 | $123.05 | | 09/01/22 | 44,597 | $164.84 |
| 09/15/23 | 178 | $123.05 | | 10/28/22 | 3,534 | $167.52 |
| 12/15/23 | 25 | $138.37 | | 12/01/22 | 2,484 | $165.03 |
| 12/15/23 | 461 | $138.37 | | 05/31/23 | 1,189 | $130.93 |
| 03/15/24 | 2 | $164.22 | | 06/07/23 | 22,500 | $131.47 |
| 03/15/24 | 15 | $164.22 | | 06/07/23 | 7,500 | $131.49 |
| 03/15/24 | 285 | $164.22 | | 06/23/23 | 24 | $131.83 |
| 05/22/24 | 140,000 | $142.23 | | 06/23/23 | 4,753 | $131.83 |
| 06/27/24 | 14,000 | $146.22 | | 06/29/23 | 1,505 | $132.91 |
| 06/27/24 | 16,000 | $146.64 | | 06/30/23 | 1,200 | $131.90 |
| 09/19/24 | 9,202 | $156.53 | | 06/30/23 | 300 | $131.90 |
| 09/20/24 | 71 | $154.75 | | 07/27/23 | 1,445 | $134.50 |
| 09/20/24 | 15 | $154.75 | | 07/31/23 | 1,437 | $136.47 |
| 09/20/24 | 318 | $154.75 | | 11/29/23 | 2,148 | $131.32 |
| | | | | 12/28/23 | 3,445 | $142.54 |
| | | | | 01/30/24 | 2,457 | $140.52 |
| | | | | 02/26/24 | 1,285 | $150.15 |
| | | | | 02/27/24 | 1,289 | $151.99 |
| | | | | 02/28/24 | 1,289 | $151.44 |
| | | | | 03/21/24 | 880 | $170.17 |
| | | | | 03/27/24 | 632 | $174.67 |
| | | | | 06/28/24 | 2 | $148.04 |
| | | | | 06/28/24 | 14 | $148.04 |
| | | | | 06/28/24 | 2,917 | $148.04 |
| | | | | 08/28/24 | 1,151 | $156.86 |
| | | | | 09/26/24 | 1,134 | $155.98 |
| | | | | 10/30/24 | 2,263 | $148.52 |
| | | | | 11/18/24 | 420 | $156.56 |
| | | | | 11/18/24 | 1,104 | $156.56 |

# Certification of

# State Board of Administration of Florida

## DECLARATION OF CHRIS SPENCER

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1. My name is Chris Spencer, I am over 21 years old, and I have personal knowledge of the matters set forth herein. I am the Executive Director of the State Board of Administration of Florida (SBA).

2. Attached hereto as Attachment 1 is a true and correct copy of SBA's calculations of its number of shares purchased, net shares purchased, net funds invested, and estimated losses across different class periods from its investment in Target common stock.

3. Attached hereto as Attachment 2 is a true and correct copy of SBA's transaction history in Target common stock in each of those class periods.

I declare under penalty of perjury that the foregoing is true and correct. Executed this April 1, 2025.

Chris Spencer

1

# Attachment 1

| Class Period | Number of Target Corp. Common Stock Shares Purchased | Net Shares Purchased | Net Funds Invested | | Estimated Losses (LIFO Accounting Method) | |
|---|---|---|---|---|---|---|
| Aug. 26, 2022 - Nov. 19, 2024 (*Riviera Beach* complaint's class period) | 65,179 | 38,855 | $ | 9,051,728.47 | $ | 81,607.12 |
| Mar. 9, 2022 - Aug. 16, 2023 (*SBA's* compaint's class period) | 23,491 | 732 | $ | 3,650,495.18 | $ | 291,235.66 |
| Mar. 9, 2022 - Nov. 19, 2024 (combining both periods) | 87,603 | 39,330 | $ | 12,540,036.46 | $ | 348,359.83 |

# Attachment 2

**Class Period: 08/26/22- 11/19/2024**

| Date of Transaction | Purchase or Sale | Number of Shares | Base Price | NET Amount |
|---|---|---|---|---|
| 9/19/2022 | Purchase | 243.000 | 163.546 | 39,741.77 |
| 9/20/2022 | Purchase | 57.000 | 160.485 | 9,147.62 |
| 10/28/2022 | Purchase | 40.000 | 165.928 | 6,637.12 |
| 11/1/2022 | Purchase | 50.000 | 163.530 | 8,176.50 |
| 11/3/2022 | Purchase | 300.000 | 159.889 | 47,966.67 |
| 5/22/2023 | Purchase | 20.000 | 151.290 | 3,025.80 |
| 6/23/2023 | Purchase | 90.000 | 131.825 | 11,864.22 |
| 6/28/2023 | Purchase | 100.000 | 133.236 | 13,323.60 |
| 7/12/2023 | Purchase | 17.000 | 133.842 | 2,275.32 |
| 7/13/2023 | Purchase | 150.000 | 133.524 | 20,028.570 |
| 8/17/2023 | Purchase | 200.000 | 131.745 | 26,349.000 |
| 8/31/2023 | Purchase | 1,530.000 | 126.923 | 194,192.810 |
| 8/31/2023 | Purchase | 900.000 | 126.867 | 114,180.660 |
| 9/1/2023 | Purchase | 922.000 | 125.369 | 115,590.410 |
| 9/5/2023 | Purchase | 150.000 | 126.752 | 19,012.760 |
| 9/5/2023 | Purchase | 248.000 | 125.742 | 31,184.070 |
| 9/15/2023 | Purchase | 190.000 | 123.065 | 23,382.350 |
| 9/18/2023 | Purchase | 180.000 | 119.577 | 21,523.900 |
| 9/19/2023 | Purchase | 20.000 | 119.260 | 2,385.190 |
| 10/9/2023 | Purchase | 10.000 | 105.148 | 1,051.480 |
| 10/16/2023 | Purchase | 30.000 | 111.893 | 3,356.800 |
| 10/16/2023 | Purchase | 700.000 | 111.893 | 78,325.170 |
| 11/16/2023 | Purchase | 25,079.000 | 129.947 | 3,258,953.350 |
| 12/8/2023 | Purchase | 30.000 | 135.680 | 4,070.400 |
| 12/18/2023 | Purchase | 1,650.000 | 137.805 | 227,377.920 |
| 5/13/2024 | Purchase | 20.000 | 162.870 | 3,257.400 |
| 6/21/2024 | Purchase | 8,200.000 | 146.140 | 1,198,348.000 |
| 8/7/2024 | Purchase | 101.000 | 135.400 | 13,675.400 |
| 8/29/2024 | Purchase | 86.000 | 153.813 | 13,227.920 |
| 10/7/2024 | Purchase | 23,866.000 | 148.332 | 3,540,096.290 |
| | | | | |
| 11/16/2022 | Sale | 40.000 | 155.451 | 6,218.06 |
| 11/16/2022 | Sale | 50.000 | 155.451 | 7,772.57 |
| 12/16/2022 | Sale | 243.000 | 146.4446 | 35,586.05 |
| 12/16/2022 | Sale | 57.000 | 146.445 | 8,347.34 |
| 12/16/2022 | Sale | 300.000 | 146.445 | 43,933.39 |
| 6/14/2023 | Sale | 20.000 | 132.904 | 2,658.08 |
| 7/17/2023 | Sale | 100.000 | 129.946959 | 12,994.70 |
| 9/6/2023 | Sale | 1,530.000 | 124.06221 | 189,815.17 |
| 9/6/2023 | Sale | 900.000 | 124.06221 | 111,655.99 |
| 9/6/2023 | Sale | 922.000 | 124.06221 | 114,385.35 |
| 9/6/2023 | Sale | 248.000 | 124.06221 | 30,767.43 |
| 9/25/2023 | Sale | 17.000 | 112.24908 | 1,908.23 |
| 9/25/2023 | Sale | 180.000 | 112.24908 | 20,204.83 |
| 9/25/2023 | Sale | 20.000 | 112.24908 | 2,244.98 |
| 10/23/2023 | Sale | 300.000 | 107.41413 | 32,224.24 |
| 1/16/2024 | Sale | 1,020.000 | 141.06137 | 143,882.60 |
| 1/18/2024 | Sale | 90.000 | 137.38890 | 12,365.00 |
| 1/18/2024 | Sale | 150.000 | 137.38890 | 20,608.34 |
| 1/18/2024 | Sale | 200.000 | 137.38890 | 27,477.78 |

| | | | | |
|---|---|---|---|---|
| 1/18/2024 | Sale | 150.000 | 137.38890 | 20,608.34 |
| 1/18/2024 | Sale | 190.000 | 137.38890 | 26,103.89 |
| 6/10/2024 | Sale | 630.000 | 148.51087 | 93,561.85 |
| 6/28/2024 | Sale | 18,517.000 | 148.02588 | 2,740,995.30 |
| 6/28/2024 | Sale | 400.000 | 148.02588 | 59,210.35 |
| 6/28/2024 | Sale | 30.000 | 148.02588 | 4,440.78 |
| 11/19/2024 | Sale | 20.000 | 155.98050 | 3,119.61 |

Shares
retained at
end of class
period          469,388.00

**Class Period: 03/09/2022- 08/16/2023**

| Date of Transaction | Purchase or Sale | Number of Shares | Base Price | NET Amount |
|---|---|---|---|---|
| 4/28/2022 | Purchase | 349.000 | 235.036 | 82,027.42 |
| 5/19/2022 | Purchase | 18,700.000 | 154.019 | 2,880,151.56 |
| 6/21/2022 | Purchase | 100.000 | 144.440 | 14,444.00 |
| 7/20/2022 | Purchase | 2,327.000 | 155.758 | 362,449.33 |
| 7/21/2022 | Purchase | 948.000 | 157.422 | 149,235.68 |
| 9/19/2022 | Purchase | 243.000 | 163.546 | 39,741.77 |
| 9/20/2022 | Purchase | 57.000 | 160.485 | 9,147.62 |
| 10/28/2022 | Purchase | 40.000 | 165.928 | 6,637.12 |
| 11/1/2022 | Purchase | 50.000 | 163.530 | 8,176.50 |
| 11/3/2022 | Purchase | 300.000 | 159.889 | 47,966.67 |
| 5/22/2023 | Purchase | 20.000 | 151.290 | 3,025.80 |
| 6/23/2023 | Purchase | 90.000 | 131.825 | 11,864.22 |
| 6/28/2023 | Purchase | 100.000 | 133.236 | 13,323.60 |
| 7/12/2023 | Purchase | 17.000 | 133.842 | 2,275.32 |
| 7/13/2023 | Purchase | 150.000 | 133.524 | 20,028.570 |
| | | | | |
| 6/16/2022 | Sale | 349.000 | 143.009 | 49,910.22 |
| 7/14/2022 | Sale | 18,700.000 | 145.605 | 2,722,818.45 |
| 8/24/2022 | Sale | 100.000 | 163.111 | 16,311.13 |
| 11/16/2022 | Sale | 40.000 | 155.451 | 6,218.06 |
| 11/16/2022 | Sale | 50.000 | 155.451 | 7,772.57 |
| 12/16/2022 | Sale | 243.000 | 146.4446 | 35,586.05 |
| 12/16/2022 | Sale | 57.000 | 146.445 | 8,347.34 |
| 12/16/2022 | Sale | 300.000 | 146.445 | 43,933.39 |
| 6/14/2023 | Sale | 20.000 | 132.904 | 2,658.08 |
| 7/17/2023 | Sale | 1,450.000 | 129.946959 | 188,423.09 |
| 7/18/2023 | Sale | 102.000 | 130.524 | 13,313.44 |
| 7/19/2023 | Sale | 728.000 | 131.849 | 95,986.25 |
| 7/20/2023 | Sale | 261.000 | 134.770 | 35,174.99 |
| 7/21/2023 | Sale | 359.000 | 134.88351 | 48,423.18 |

Shares retained at end of class period    466,607.00

**Class Period: 03/09/2022- 11/19/2024**

| Date of Transaction | Purchase or Sale | Number of Shares | Base Price | NET Amount |
|---|---|---|---|---|
| 4/28/2022 | Purchase | 349.000 | 235.036 | 82,027.42 |
| 5/19/2022 | Purchase | 18,700.000 | 154.019 | 2,880,151.56 |
| 6/21/2022 | Purchase | 100.000 | 144.440 | 14,444.00 |
| 7/20/2022 | Purchase | 2,327.000 | 155.758 | 362,449.33 |
| 7/21/2022 | Purchase | 948.000 | 157.422 | 149,235.68 |
| 9/19/2022 | Purchase | 243.000 | 163.546 | 39,741.77 |
| 9/20/2022 | Purchase | 57.000 | 160.485 | 9,147.62 |
| 10/28/2022 | Purchase | 40.000 | 165.928 | 6,637.12 |
| 11/1/2022 | Purchase | 50.000 | 163.530 | 8,176.50 |
| 11/3/2022 | Purchase | 300.000 | 159.889 | 47,966.67 |
| 5/22/2023 | Purchase | 20.000 | 151.290 | 3,025.80 |
| 6/23/2023 | Purchase | 90.000 | 131.825 | 11,864.22 |
| 6/28/2023 | Purchase | 100.000 | 133.236 | 13,323.60 |
| 7/12/2023 | Purchase | 17.000 | 133.842 | 2,275.32 |
| 7/13/2023 | Purchase | 150.000 | 133.524 | 20,028.570 |
| 8/17/2023 | Purchase | 200.000 | 131.745 | 26,349.000 |
| 8/31/2023 | Purchase | 1,530.000 | 126.923 | 194,192.810 |
| 8/31/2023 | Purchase | 900.000 | 126.867 | 114,180.660 |
| 9/1/2023 | Purchase | 922.000 | 125.369 | 115,590.410 |
| 9/5/2023 | Purchase | 150.000 | 126.752 | 19,012.760 |
| 9/5/2023 | Purchase | 248.000 | 125.742 | 31,184.070 |
| 9/15/2023 | Purchase | 190.000 | 123.065 | 23,382.350 |
| 9/18/2023 | Purchase | 180.000 | 119.577 | 21,523.900 |
| 9/19/2023 | Purchase | 20.000 | 119.260 | 2,385.190 |
| 10/9/2023 | Purchase | 10.000 | 105.148 | 1,051.480 |
| 10/16/2023 | Purchase | 30.000 | 111.893 | 3,356.800 |
| 10/16/2023 | Purchase | 700.000 | 111.893 | 78,325.170 |
| 11/16/2023 | Purchase | 25,079.000 | 129.947 | 3,258,953.350 |
| 12/8/2023 | Purchase | 30.000 | 135.680 | 4,070.400 |
| 12/18/2023 | Purchase | 1,650.000 | 137.805 | 227,377.920 |
| 5/13/2024 | Purchase | 20.000 | 162.870 | 3,257.400 |
| 6/21/2024 | Purchase | 8,200.000 | 146.140 | 1,198,348.000 |
| 8/7/2024 | Purchase | 101.000 | 135.400 | 13,675.400 |
| 8/29/2024 | Purchase | 86.000 | 153.813 | 13,227.920 |
| 10/7/2024 | Purchase | 23,866.000 | 148.332 | 3,540,096.290 |
| | | | | |
| 6/16/2022 | Sale | 349.000 | 143.009 | 49,910.22 |
| 7/14/2022 | Sale | 18,700.000 | 145.605 | 2,722,818.45 |
| 8/24/2022 | Sale | 100.000 | 163.111 | 16,311.13 |
| 11/16/2022 | Sale | 40.000 | 155.451 | 6,218.06 |
| 11/16/2022 | Sale | 50.000 | 155.451 | 7,772.57 |
| 12/16/2022 | Sale | 243.000 | 146.4446 | 35,586.05 |
| 12/16/2022 | Sale | 57.000 | 146.445 | 8,347.34 |
| 12/16/2022 | Sale | 300.000 | 146.445 | 43,933.39 |
| 6/14/2023 | Sale | 20.000 | 132.904 | 2,658.08 |
| 7/17/2023 | Sale | 1,450.000 | 129.946959 | 188,423.09 |
| 7/18/2023 | Sale | 102.000 | 130.524 | 13,313.44 |
| 7/19/2023 | Sale | 728.000 | 131.849 | 95,986.25 |
| 7/20/2023 | Sale | 261.000 | 134.770 | 35,174.99 |
| 7/21/2023 | Sale | 359.000 | 134.88351 | 48,423.18 |
| 9/6/2023 | Sale | 1,530.000 | 124.06221 | 189,815.17 |

| 9/6/2023 | Sale | 900.000 | 124.06221 | 111,655.99 |
| 9/6/2023 | Sale | 922.000 | 124.06221 | 114,385.35 |
| 9/6/2023 | Sale | 248.000 | 124.06221 | 30,767.43 |
| 9/25/2023 | Sale | 17.000 | 112.24908 | 1,908.23 |
| 9/25/2023 | Sale | 180.000 | 112.24908 | 20,204.83 |
| 9/25/2023 | Sale | 20.000 | 112.24908 | 2,244.98 |
| 10/23/2023 | Sale | 300.000 | 107.41413 | 32,224.24 |
| 1/16/2024 | Sale | 1,020.000 | 141.06137 | 143,882.60 |
| 1/18/2024 | Sale | 90.000 | 137.38890 | 12,365.00 |
| 1/18/2024 | Sale | 150.000 | 137.38890 | 20,608.34 |
| 1/18/2024 | Sale | 200.000 | 137.38890 | 27,477.78 |
| 1/18/2024 | Sale | 150.000 | 137.38890 | 20,608.34 |
| 1/18/2024 | Sale | 190.000 | 137.38890 | 26,103.89 |
| 6/10/2024 | Sale | 630.000 | 148.51087 | 93,561.85 |
| 6/28/2024 | Sale | 18,517.000 | 148.02588 | 2,740,995.30 |
| 6/28/2024 | Sale | 400.000 | 148.02588 | 59,210.35 |
| 6/28/2024 | Sale | 30.000 | 148.02588 | 4,440.78 |
| 11/19/2024 | Sale | 20.000 | 155.98050 | 3,119.61 |

Shares retained    469,388.00